IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,                  )
                                           )
                        Plaintiff,         )
                                           )
v.                                         )                   No.14-3609-JB
                                           )
BENTLEY STREETT,                           )
                                           )
                        Defendant.         )

**Defendant Bentley Streett's Motion to Dismiss**
**Proposed Findings of Fact and Conclusions of Law**

Defendant Bentley Streett submits his proposed findings of fact and conclusions of law following the Court's September 10, 2018, evidentiary hearing with regard to Mr. Streett's Motion to Dismiss Counts 3-7 of Second Superseding Indictment. (Doc. 77). For the reasons stated below and pursuant to this third-party First Amendment challenge on behalf of teenagers who sext, this Court should find 18 U.S.C 2251(a) facially overbroad and dismiss the 5 of the 12 superseding indictment counts that charge violations of section 2251(a).

## I.      Proposed Findings of Fact

"When factual issues are involved in deciding a motion, the court must state its essential findings on the record." Fed. R. Crim. P. 12(d).

A. *The Experts*

1.  The Government's expert witness, Dr. Sueann Kenney-Noziska, is a licensed clinical social worker. (Motion to Dismiss hearing transcript ("MDT") 66).

2.  Dr. Kenney-Noziska works exclusively with abused and traumatized children and adolescents. (MDT 66).

3.  In 2016, Dr. Kenney-Noziska received two and one-half days of training from the National Center for Missing and Exploited Children ("NCMEC"), regarding exploited and missing children, so she could provide any necessary family services like post-reunification services. (MDT 70-71).

4.  Dr. Kenney-Noziska works with exploited children, as well as sexually or physically abused children. (MDT 71).

5.  Dr. Kenney-Noziska provides clinical treatment for children and teens in her areas of specialization. These include child abuse, neglect, maltreatment, sexual abuse, sexual trauma, sexual exploitation.  (MDT 72).

6.  Dr. Kenney-Noziska's practice involves teens who have already been sexually traumatized. (MDT 104).

7.  Dr. Kenney-Noziska's training has included adolescent and child development. (MDT 72-73).

8.  Dr. Kenney-Noziska has presented trainings that have included adolescent and child development. (MDT 73).

9.  Defense expert Dr. Victor C. Strasburger spent 28 years as a University of New Mexico School of Medicine pediatrics professor. (MDT 140).

10. Dr. Strasburger treated adolescents for 18 years at Sequoia Adolescent Treatment Center who were the more severe kids charged with a variety of offenses. (MDT 141).

11. Dr. Strasburger had been studying children and the media since 1982, when the American Academy of Pediatrics ("AAP") asked him to work with the Task Force on Children and Television. (MDT 141-142).

12. Dr. Strasburger has authored or co-authored most of the AAP policy statements on Children, Adolescents, and the Media. (MDT 142).

13. He has received the AAP's highest honor in adolescent medicine and in children and media advocacy. (MDT 142).

14. Dr. Strasburger has written 13 books on children, adolescents, and the media, including 4 textbooks. One of those textbooks is used in college communication courses across the country. (MDT 142-143).

15. Dr. Strasburger has lectured on children and adolescents and the media about 500 times in Europe, Asia, Australia, and in 47 of 50 states. (MDT 143).

16. In the past eight years, nearly every lecture Dr. Strasburger has given has included a sexting component. (MDT 143).

B. *Sexting defined*

1. "Sexting" is a media-coined term that has been given a number of definitions, some of which have included sexually explicit messages as well as images. The images and messages are transmitted to their peers. (MDT 75, Defendant's Exhibit ("Def") I, p. 5). [1]

2. "Sexting" is "most commonly used to describe the creation and transmission of sexual images by minors." (Government Exhibit ("USA") 2, p. 3).

---

[1] Where available, Bates numbers or numbering given an item in a CM/ECF filing are used for pinpoint cites to multi-page exhibits. Any exhibit like a scholarly article or study that does not contain Bates or CM/ECF-provided numbers will be identified by the page numbers used in the particular journal from which it comes. There are two exhibits that have not been properly numbered. Each will be referred to serially beginning with the first page of the exhibit. The first is Defendant's Exhibit D, "On-Line Media Reports of Sexting Prosecutions", which begins with a description of its contents that is labeled page one. The second is Defendant's Exhibit E, "Selection of Law Enforcement Policies Regarding Sexting", which begins with an unnumbered page that summarizes the contents of the exhibit that start with "A uniform draft agreement…" The defense apologizes for any inconvenience to the Court from failing to provide numbers for those two unnumbered exhibits.

3.  In "Sexting, A Typology", the authors limited their focus to what they called "youth-produced sexual images", which were defined as "images of minors, created by minors, that could qualify as child pornography under applicable criminal statutes." (USA 1, p.2).

4.  The authors of the study "Sexting, A Typology" divided sexting into two broad categories: experimental and aggravated. (USA 1, p. 2; MDT 83).

5.  Experimental sexting was defined as sending images to "established boy or girlfriends, to create romantic interest in other youth, or for reasons such as attention-seeking…." (USA 1, p. 2).

6.  Experimental sexting involves adolescents producing their own images to share with a peer in a romantic or sexual relationship or for flirting. (MDT 85, 130, 171-172).

7.  Experimental sexting is teen-produced and teen-shared. (MDT 108).

8.  Experimental sexting could include images of genitalia or breasts. (MDT 130).

9.  Aggravated sexting involves criminal or malicious intent that goes beyond the mere "creation, sending, or possession" of the images. (USA 1, P. 2; MDT 84).

10. Aggravated sexting requires additional acts beyond the production and peer sharing of a self-produced image. (MDT 109, 172).

11. Sexting becomes nonconsensual and is called cyberbullying or revenge porn when it is disseminated beyond the originally-intended recipient or recipients. (MDT 109, 172).

12. Aggravated sexting or nonconsensual sexting could also include sexting between teens and adults. (MDT 170).

C.  *The prevalence of teenage sexting*

1.  Determining the exact proportion of youth-produced images that could qualify as child pornography under federal or state law is difficult, due to differences in defining sexting,

failure to limit studies to minors or other issues with study representation, limiting studies to internet users, and how broadly the questions are phrased (USA 5, p. 333; USA 2, pp. 3-5; Def. J, pp. 4, 7; Def. H, p. 5; Def. K, p. 2, 7; Def. L, pp. 191, 196; Def. M, p. 6; USA 1, pp. 3, 12; USA 2, p. 6; USA 5, p. 1; MDT 86-87, 203, 206, 207, 208, 209-210).

2. Estimates of the percentage of teens sexting has ranged from 1.3 percent to 60 percent. (USA 5, p. 328).

3. One can still identify broad patterns without looking to specific percentages. (Def. J, p. 7).

4. The 2015 survey reports that 88 percent of teens 13-17 had access to a cell or smartphone and 90 percent of those use texting. A typical teen sends and receives 30 texts a day. (Def. J, pp. 5, 9).

5. Smartphones are only 10 years old and the most recent research shows that 95 percent of teenagers own or have access to a smartphone. (MDT 170).

6. Even those studies that concluded a low percentage of youth were sending sexually explicit messages nevertheless found it to be a "considerable number of youth." The issue of minors receiving and possessing potentially illegal images "is widespread enough that education about this and its consequences is strongly warranted." (Def. K, pp. 6-7).

7. According to a 2011 study, sexting occurs among a "notable minority of adolescents…." (USA 2, p. 6).

8. Sexting is "commonplace in youth behavior." (Def. L, p. 196).

9. The 2018 meta-analysis that looked to 39 different studies concluded that "[t]he prevalence of sexting has increased in recent years and increases as youth age." (USA 5, p. 327).

10. The meta-analysis noted "[r]ecent studies reveal that sexting is an increasingly common practice, with the prevalence increasing each year until youth reach the age of 18 years." It is "becoming increasingly clear that sexting is an increasingly common practice…." (USA 5, p. 328; MDT 172).

11. The 39 studies reviewed in meta-analysis featured 110,380 participants. It established that "a sizable minority of youth engage in sexting (1 in 7 sends sexts, while 1 in 4 receives sexts)…." (USA 5, pp. 328, 332, MDT 87, 172-173).

12. The now near ubiquitous smartphone ownership and existence of such mobile devices with privacy applications account for higher rates of sexting in more recent years and some of the lower prevalence found in earlier studies. (USA 5, p. 332).

13. The numbers will continue to grow given that most sexting is done with smartphones and the number of smartphones continues to grow. (MDT 175).

14. Dr. Kenney-Noziska says she has seen an increase in sexting through her practice and that sexting will likely continue to increase given the number of smartphones and children's access to them. (MDT 120-121).

15. The prevalence of sexting is not in doubt. The meta-analysis and five studies done since that time establish that sexting is increasing, especially as teenagers get older. (MDT 201).

16. The 2018 Pennsylvania study showed 29 percent of 9th to 12th graders had engaged in consensual sexting. (MDT 173, 239-240, Def. L).

17. The latest United States census figures show 22 million teens aged 13 to 17. The percentage of sexts from the meta-data analysis translates to three million minors in that

age range sending texts and six million minors in that age range receiving sexts. (MDT 174).

D. *There is no current evidence of any significant harm inherent in experimental, i.e., consensual teenage sexting*.

1. Experimental sexting could be developmentally appropriate, but aggravated sexting is not normative.  (MDT 91).

2. Experimental sexting is consensual. (MDT 113

3. Research is showing that consensual sexting with teen partners is potentially normative behavior. (MDT 121, 122).

4. A 2009 study stated that 9 of 10 teens reported no negative consequences from sexting. (Def. H, p. 6).

5. Most adolescent medicine practitioners agree that sexting among teens, especially in the context of romantic relationships or flirting, is a normative part of adolescent growth. (MDT 175-176).

6.  Sexting is "especially relevant during adolescence, a stage of development characterized by the establishment of new intimate relationships and sexual exploration…[and] can be a normal form of intimate expression and communication in sexual and romantic behaviors." (Def. M, p. 1).

7. "The sharing of sexual images, while risqué in one cultural dimension, may also be a form of sexual sharing that has some comparative safety to it in contrast to face-to-face sexual intimacy since it can be engaged in outside the presence of other persons. Thus the feelings of immediate embarrassment may be more manageable, a youth can control how she or he appears to another, and the pressure for additional sexual intimacy is not so intense and immediate, as it might be in a face-to-face sexual encounter." (USA 1, p. 9).

8.  "A higher rate among older youth is expected and generally corresponds to the age of sexual identity and exploration, which lends credence to the notion that youth sexting may be an emerging, and potentially normal, component of sexual behavior and development." (USA 5, p. 332).

9.  "A sizable minority of youth are sexting. It is possible that this behavior may be a normal part of sexual behavior and identity formation in the digital age. Consequently, efforts and resources to criminalize sexts should be redirected to educational programs on digital citizenship and healthy relationships." (USA 5, P. 333).

10. Dr. Kenney-Noziska has never had a patient present with a separate clinical issue for sending an experimental sext, although the teen may have a short-term preoccupation over sending a sext. Sexting may create transient anxiety over what might happen to the image. Generally, experimental or consensual sexting does not cause trauma. (MDT 96, 101, 115, 126, 132).

11. The 2018 Pennsylvania study, which looked at 2015 data, reported that youth who sext are more likely to be sexually active than nonsexting peers. But the relationship between sexting and risky sexual behavior "is less clear." (Def. L, p. 191).

12. Consensual sexting is "highly related to alcohol and tobacco use, being cyberbullied, and reporting both depressive symptoms and previous suicide attempts…" But the study was "not able to show a causal relationship among variables, and whether sexting is an antecedent or result of these behaviors…." (Def. L, p. 195).

13. Further study is necessary to determine whether sexting "can be considered a risk behavior along with traditional adolescent risk behaviors like sexual behavior and substance use." (Def. L., p. 197).

14.  More information is required about any association between sexting and other potential problems. (Def. M., p. 1).

15. Adolescence causes anxiety. It is the number one mental issue for teens. Teens experiencing transitional anxiety issues on a daily basis is not an unusual event. (MDT 138, 188).

16. Nearly 32 percent of youth ages 13-18 have been diagnosed with an anxiety disorder. (Def. L., p. 191).

17. As teens age, they may regret in the future sending an image to a romantic interest or through other innocent flirting. According to Dr. Strasburger, "teenagers do a lot of things that they later regret. Prosecuting them for images that are not child pornography would be 100 times worse." (MDT 194-195).

18. When the sexting becomes aggravated, beyond the production of the image and including further criminal or malicious behavior like cyber bullying or adult-involvement, it can potentially be harmful. (MDT 101, 182, 235-237).

19. Even with the rise in teen smartphone use and other technology available for sexting, with consequent increase in sexting, there is no indication that experimental, consensual sexting is leading to risky behaviors by teens such as drug use, teen pregnancy, increased teen sex, or alcohol use. (MDT 116, 117, 119).

20. The studies actually show that those risky teen behaviors are on the decline. (MDT 116, 167-168).

21. There is insufficient data currently to say that consensual sexting leads to other destructive teen behavior and it is premature to draw any conclusions. (MDT 183).

22. The harm to the teen may occur when the initial image, shared in a flirtatious, romantic relationship, is disseminated further and not from any initial, consensual sexting, i.e., aggravated and not consensual sexting. (MDT 90, 235-237).

E. *Significant harms can flow from law enforcement involvement or prosecution for teenager experimental sexting.*

1. Consequences of sexting prosecution range from diversion to felony convictions and sex offender registration. (Def. A-C).

2. Schools may be required to turn over any sexting investigation to law enforcement, a "tremendous issue" for teens. (MDT 186; Def. E., pp. 3, 7, 14).

3. The stigma of being forced to register as a sex offender, jail time, other penalties, and even the embarrassment suffered at school is a serious matter and potential source of life-altering trauma for teens. (MDT 124-125, 129).

4. Prosecution ruins a teen's life before they get a chance to develop and live, leading to potentially lengthy jail time and sex offender registration that causes them to be shunned and affects where they might be able to live. (MDT 176-177).

5. Leaving prosecution to law enforcement discretion potentially affects millions of American teenagers. Families are forced to employ lawyers, their name may be in the media, and it would be incredibly embarrassing. (MDT 182).

6.  A teenager can be particularly confused when he or she is considered both an offender and victim. (MDT 182-183).

7. Even those states with statutes calling for reduced penalties still causes serious consequences for teens who are placed in the criminal justice system with publicity that causes embarrassment, threats of jail time, and sex offender registration, for what amounts to innocent, flirtatious behavior. (MDT 184-185).

8.  When law enforcement intervenes in sexting, it becomes "a big deal" for the involved
    teenagers: "Your friends know you are being investigated. Schools may suspend you
    pending the investigation." (MDT 186).

9.  Law enforcement involvement in matters of experimental sexting by teenagers can result
    in depression, anxiety, and social isolation. (MDT 219).

10. These adverse effects can occur even when law enforcement intervention results in
    diversion or education programs with charges eventually being dismissed. (MDT 219).

11. Some jurisdictions require that the juvenile sexter be taken into custody pending the
    investigation and make no distinction between experimental and aggravated sexting.
    (MDT 187; Def. E, p. 22).

F.  *The threat of prosecution*

1.  Forty-eight of fifty states continue to criminalize teenagers who engage in sexting. Only
    New Mexico and Maine specifically provide for a sexting exception. (Def. A-C).

2.  Under current law, teens could be prosecuted for consensual sexting and be a victim of
    the crime at the same time. (MDT 123).

3.  Dr. Strasburger's research reveals more than a dozen sexting prosecutions in 2017-2018,
    including instances of a teen named as both offender and victim. (MDT 145-146).

4.  The National Council for Missing and Exploited Children ("NCMEC") operates the
    congressionally-mandated reporting mechanism for crimes against children on the
    internet. (Def. I, p. 4).

5.  NCMEC advocates for prosecutor and law enforcement discretion on a case-by-case
    basis. (Def. I, p. 2).

6. NCMEC forwards all tips it receives to law enforcement without determining whether an image is child pornography or if there has been a potential violation of law. (Def. I, p. 4).

7. News reports continue nationwide about prosecutions under state child pornography laws "in an attempt to control the growing progress of sexting. Some cases involve investigation or prosecution of girls who took or posted pictures of themselves." (Def. H, p. 7).

8. Law enforcement and prosecutors continue to use its discretion under those laws to investigate and prosecute teenagers who sext, resulting in those who self-produce images being labeled as both offender and victim. (Def. D, Def. E, p. 19, 21).

9.  While some prosecutors seem sympathetic, "some agencies in our sample did prosecute sextings, even the experimental cases involving romantic partners." (USA 1, p. 10).

10. One Government-submitted survey notes that "there were also a considerable portion of episodes coming to police attention that appeared to be rather minor in nature." Those were "more rightly viewed as adolescent sexual experimentation than as criminal violations [and] included teens who took pictures of themselves with cell phones without disseminating or intending to disseminate them; teens in relationships who only shared pictures with each other; [and] images that might not actually qualify as child pornography…." (USA 1, p. 8).

11. "It seems that law enforcement concerns about the conduct of and impact on the youth involved in these incidents went beyond simple distinctions of whether or not the images constituted child pornography…the problem may be best handled as part of education and mentoring that allows young people to think in a complex way about their romantic and sexual relationships." (USA 1, p. 9).

**II. Legal Standards and Conclusions of Law**

    A. *The legal standards for a third-party constitutional overbreadth attack based on a First Amendment infringement.*

1. Mr. Streett may challenge 18 U.S.C. 2251(a) for facial overbreadth under the First Amendment "because it also threatens others not before the court-- those who desire to engage in legally protected expression but who may refrain from doing so rather than risk prosecution or undertake to have the law declared partially invalid." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (1987) (Citation and internal quotation marks omitted).

2. Because the challenged statute infringes on the content of speech under the First Amendment, the statute is presumptively invalid, rather than being cloaked in the usual presumption of constitutionality. *United States v. Stevens*, 559 U.S. 460, 468 (2010).

3. The overbreadth must be real and "substantial as well, judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615-616 (1973).

4. Overbreadth is real when there is "a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds." *Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc.*, 482 U.S. 569, 574 (Citations and internal quotation marks omitted).

5. "'The concept of substantial overbreadth' is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge. On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from

inhibiting the speech of third parties who are not before the Court." *Members of the City Council v. Taxpayers for Vincent*, 466 U.S. 789, 800 (1984).

6. Mr. Streett first has the burden of "demonstrating, from the text of [the law] and from actual fact, that substantial overbreadth exists." *Virginia v. Hicks*, 539 U.S. 113, 122 (2003) (Brackets by Court, citation and internal quotation marks omitted).

7. Once substantial overbreadth is found, the burden of proof shifts to the Government to rebut that presumption and prove "the constitutionality of its actions." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) (Citation omitted).

    *B.  The statute at issue criminalizes teen sexting.*

1. This Court's overbreadth analysis begins with construing what the statute actually covers. *United States v. Williams*, 553 U.S. 285, 293 (2008).

2. Section (a) of the Sexual Exploitation of Children Act states:

> "**Any person** who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such **minor** engage in, any **sexually explicit conduct** for the purpose of **producing** any visual depiction of such conduct or for the purpose of **transmitting** a live visual depiction of such conduct, shall be punished as provided under subsection (e), if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed."  18 U.S.C. § 2251(a). (Emphasis added).

3. A "minor" is defined as "any person under the age of eighteen years." 8 U.S.C. § 2256(1).

4. "Sexually explicit conduct" is defined to include not only overtly sexual conduct like sexual intercourse or masturbation, but "lascivious exhibition of the genitals or pubic area of any person." 18 U.S.C. § 2256(2)(A)(v).

5. "Sexting" is "most commonly used to describe the creation and transmission of sexual images by minors." (USA 2, p. 3).

6. One study, "Sexting, A Typology", focused on what they called "youth-produced sexual images", which were defined as "images of minors, created by minors, that could qualify as child pornography under applicable criminal statutes." (Government Exhibit ("USA" 1, p.2).

7. The plain wording of the statute makes sexting unlawful. By definition, sexting involves minors producing sexual images that are transmitted to peers, images that may include genitalia. Whether the sexting image was child pornography would be a question of fact for a jury. *United States v. Wells*, 843 F.3d 1251, 1253 (10th Cir. 2016).

   *C. The statute is substantially overbroad given the number of teens potentially subject to prosecution and the wide discretion the Government has in prosecution.*

1. A statute is substantially overbroad when "a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473, 130 S. Ct. 1577, 1587 (2010).

2. The Court must also consider the level of discretion given to those charged with enforcing the statute. Not only must the law be narrowly tailored to address the intended ill, and therefore avoid criminalization of large amounts of protected speech, it cannot give the police "unconstitutional discretion in enforcement." *City of Houston v. Hill*, 482 U.S. 451, 466 (1987).

3. Criminal statutes are "scrutinized with particular care…." *City of Houston v. Hill*, 482 U.S. at 458 (Citations and internal quotation marks omitted). "[T]hose that make unlawful a

substantial amount of constitutionally protected conduct may be held facially invalid even if they also have legitimate application. *Id*. at 458-459 (Citation omitted).

      a.  **Notwithstanding the variation in studies about the percentage of teens who are sexting, the numbers show that millions of American teenagers engage in the practice**.

1. Studies have cited the percentage of teen sexting as anywhere from 1.3 percent to 60 percent. (USA 5, p. 328).

2. Even studies that have reported lower percentages of teen sexters have still found it to be a considerable number. (Def. K., pp. 6-7).

3. Quantifying the potential number of teen sexters subject to prosecution has suffered from varying definitions of sexting, variety of age groups and number of teens involved in the study or other issues with study representation, like limiting studies to internet users. The nature of the questions asked, and the medium used to ask them have all contributed to the varying range of percentage of sexters. (USA 5, p. 333; USA 2, pp. 3-5; Def. J, pp. 4, 7; Def. H, p. 5; Def. K, p. 2, 7; Def. L, pp. 191, 196; Def. M, p. 6; USA 1, pp. 3, 12; USA 2, p. 6; USA 5, p. 1; MDT 86-87, 203, 206, 207, 208, 209-210).

4. Nevertheless, broad patterns can still be discerned from various studies. (Def. J., p. 7).

5. Although smartphones have existed for only about 10 years, studies have shown that 95 percent of teenagers own or have access to one. (MDT 170).

6. The exponential growth of teen smartphone use and availability of privacy apps account for both the higher rates of sexting in recent years and the lower prevalence found in the earlier studies. (USA 5, p. 332).

7. There is a sizable minority of teenagers who are sexting. (USA 5, p. 333; USA 2, p. 6)

8. Sexting is now commonplace in youth behavior. (Def. L, p. 196).

9. Based on a 2018 meta-analysis of 39 studies involving 110,380 participants, it is now established that "a sizable minority of youth engage in sexting (1 in 7 sends sexts, while 1 in 4 receives sexts)…." (USA 5, pp. 328, 332, MDT 87, 172-173).

10. Sexting is an increasingly common practice, with prevalence increasing each year until age 18. (USA 5, p. 328; MDT 172).

11. Both the Government's expert and Mr. Streett's expert agree that the ubiquitous use of smartphones, with most sexting done via smartphones, means the number of sexters will continue to grow. (MDT 120-121, 175).

12. Although exact numbers are elusive, the number of teens sexting leaves no doubt as to its prevalence. (MDT 201).

13. Based on the figures from the 2018 meta-analysis, of the estimated 22 million teens aged 13-17 in the United States, three million teens aged 13-17 have sent a sext and six million teens have received them. (MDT 174).

**b.   A substantial number of teen sexters remain subject to prosecution**

1. Forty-eight of fifty states continue to criminalize teenagers who engage in sexting. Only New Mexico and Maine specifically provide for a sexting exception. (Def. A-C).

2. Teens can be prosecuted for consensual sexting and be considered a victim of the crime at the same time. (MDT 123).

3. Prosecutor and police policies continue to treat sexting as a criminal or delinquent act and many require schools to forego their own investigations and turn matters over to law enforcement. (Def. E).

4. Millions of American teens are sending or receiving sexual images that are potentially violating the law on a regular basis. (MDT 174).

5. While determining the exact percentage of teen sexters has been a matter of managing the many variables to get the most accurate answers, the one overriding obstacle to determining how many teens actually face prosecution for sexting has been the unavailability of juvenile case information. "A primary effect of the separate juvenile system is that all judicial proceedings are confidential and court files are sealed." *United States v. A.W.J.*, 639 F. Supp. 1558, 1559 (D. Minn. 1986).

6. Evidence from on-line sources indicates that sexting prosecutions are ongoing. (Def.  D; MDT 145-146).

7. Some officials have arrested and prosecuted teen 'sexters' under child pornography production, possession, and distribution laws. (USA 1, p. 3).

8.  Even when prosecutions do not result in convictions or delinquency findings, sexting teens experienced threats of prosecution that resulted in alternative dispositions that may not have warranted or allowed an appeal, thus making it impossible to determine the exact numbers of teens facing prosecution. See e.g., John A. Humbach, *'Sexting' and the First Amendment*, 37 Hastings Const. L.Q. 433, 434-435 (2010).

9. The specter of prosecution continues to loom in the federal courts as well. "Young adults--in many cases…have been prosecuted in state and federal courts for receiving or sending sexually provocative pictures of boyfriends or girlfriends only one or two years younger than they are." *S. N. B. v. Pearland Indep. Sch. Dist.*, 120 F.Supp.3d 620, 635-36 (S.D. Tex. 2014), citing *United States v. Nash*, 1 F.Supp.3d 1240, 1242; (N.D. Ala. Mar. 5, 2014) (Sentence of 60-months' probation following guilty plea for one count of § 2252A(a)(5)(b)) ("An odd day arises when a young man, who could legally have consensual

sex with his 16-year-old girlfriend, will forever be labeled a sex offender for receiving

provocative pictures of her that she sent him via text message.")

10.  Other federal courts have acted to prevent prosecution or school-imposed sanctions for

sexting. In one case, the parents of two high school students brought a lawsuit "to vindicate

their First Amendment rights" after their school punished them for taking provocative photos

with sexual themes and posting them on the internet while away from school. *T.V. v. Smith-*

*Green City. Sch. Corp.*, 807 F.Supp.2d 767 (N.D. Ind. 2011).

11. Another federal court granted a restraining order after parents filed suit to prevent a district

attorney from filing felony child pornography charges for their children's possession of

sexting images. *Miller v. Skumanick*, 605 F. Supp. 2d 634, 637-639 (M.D. Pa. 2009).

12. In *Ferber*, the Court found a lack of substantial overbreadth because the relevant statute's

"legitimate reach dwarfs its arguably impermissible applications…we seriously doubt, and it

has not been suggested, that these arguably impermissible applications of the statute amount

to more than a tiny fraction of the materials within the statute's reach." *Ferber*, 458 U.S. at

773. In contrast, millions of teens remain at risk for prosecution on both the federal and state

level.

13. Given the growing number of teenagers who can access smartphones and have available

applications that help them hide pictures, the number of teens sexting and the numbers of

sexts being sent is likely to increase. (MDT 174); https://offspring.lifehacker.com/is-your-

teen-hiding-sexting-photos-in-a-fake-calculator-1829529749.

14. Because Congress and state legislatures have failed to adequately adapt child pornography

statutes to adjust to new technologies that makes self-produced sexting images simple and

instantaneous, there will continue to be to more sexting prosecutions. The 40-year-old statute

in question, amended last in 2008, remains broad enough to encompass teen sexting. 18

U.S.C. 2251(a).

15. Despite evidence of its growth among adolescents as an acceptable form of expression, part

of their social milieu, and the medical community's belief that sexting is a normative part of

adolescent development, only New Mexico and Main have amended their child pornography

statutes to exempt teenager consensual sexting. (Def. A-C).

### c. The broad language in 18 U.S.C. § 2251(a) gives too much discretion to prosecutors and police.

1. The Supreme Court cautioned over a century ago that "'it would certainly be dangerous if the

legislature could set a net large enough to catch all possible offenders, and leave it to the

courts to step inside and say who could be rightfully detained, and who should be set at

large.'" *City of Houston v. Hill*, 482 U.S. 451, 466 (1987) (Citing *United States v. Reese,* 92

U.S 214, 221 (1876)).

2. "Suggestive pictures that focus on the genitals of minors wearing, for example, swim suits or

underpants can qualify [for prosecution], as can pictures of 16-year-old teenagers engaged in

legal sexual activity, at least under federal law." (USA 1, p. 3).

3. The National Council for Missing and Exploited Children ("NCMEC") operates the

congressionally-mandated reporting mechanism for crimes against children on the Internet.

(Def. I, p. 4).

4. NCMEC advocates for prosecutor and law enforcement discretion on a case-by-case basis.

(Def. I, p. 2).

5. NCMEC forwards all tips received without determining whether an image is child

pornography or if there has been a potential violation of law. (Def. I, p. 4).

6.  State prosecutions specifically seeking to control sexting continue to occur, including investigations of self-produced photos by teenage girls. (Def. H, p. 7).

7.  The Government believes that 18 U.S.C. § 2251 applies and criminalizes sexting between teens. (Doc. 136, p. 17 (June 25, 2018 hearing on Defendant's Motion to Dismiss, p. 17)).

8.  Prosecution under federal law could lead to a mandatory minimum prison sentence of 15 years. (Def. H, p. 11). 18 U.S.C. 2251(e).

9.  Federal law currently makes any sexting with sexually explicit images of minors under age 18 potentially subject to prosecution, even if the minor self-produces the image. 18 U.S.C. §§ 2251(a), 2256(2)(A).

10. Law enforcement and prosecutors continue to use its discretion under those laws to investigate and prosecute teenagers who sext, resulting in those who self-produce images being labeled as both offender and victim. (Def. D, Def. E, p. 19, 21).

11. Prosecutions have been brought for sexting between romantic partners. (USA 1, p. 10).

  *D. The Government has no compelling interest that will save the constitutionality of 18 U.S.C. § 2251 as currently written.*

1.  Mr. Streett has demonstrated that 18 U.S.C. § 2251(a) "reaches a substantial amount of constitutionally protected conduct." *Houston v. Hill*, 482 U.S. 451, 458-59, 107 S. Ct. 2502, 2508 (1987) (Citations and internal quotation marks omitted).

2.  The Government therefore has the burden to rebut that presumption and prove "the constitutionality of its actions." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) (Citation omitted).

3.  Because the statute at issue regulates the content of speech, the teen right to sexting, to survive constitutional scrutiny "it must be narrowly tailored to promote a compelling

Government interest." *United States v. Playboy Entm't Grp.*, 529 U.S. at  813 (2000) (Citing *Sable Communications of Cal., Inc. v. F.C.C.*, 492 U.S. 115, 126).

4. If a less restrictive alternative would serve the Government's purpose, the legislature must use that alternative. *Id*. (Citing *Reno v. ACLU*, 521 U.S. 844, 874 (1997)).

5.  "The Government may . . . regulate the content of constitutionally protected speech in order to promote a compelling interest if it chooses the least restrictive means to further the articulated interest." *Sable Communications, supra*, at 126.

6. "To do otherwise would be to restrict speech without an adequate justification, a course the First Amendment does not permit." *United States v. Playboy Entm't Grp.*, 529 U.S. AT 813 (2000)

7. "A statute may be so broadly drawn that, while effectively achieving its ends, it unduly restricts communications that are unrelated to its policy aims." *Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 600 (2001) (Citation omitted).

8. "[N]oble ends do not save a speech-restricting statute whose means are poorly tailored." *Lorillard Tobacco Co.*, 533 U.S. at 599.

9. The Government has failed to explain why a less restrictive provision would not be effective to address the sexual exploitation of minors that is at its core. Some alternatives already implemented under state law like decriminalization or even less severe penalties that do not include criminal penalties or sex offender registration have been suggested. (Def. A to C)

10. Scholars have recommended education, rather than prosecution. (Def. K, p. 6; USA 1, p. 9; USA 5, pp. 328, 333).

a. **Sexting is not child pornography and is therefore protected by the First Amendment**.

1. The title of the statute in question makes its purpose clear. It makes "Sexual Exploitation of Children" a crime with serious penalties. 18 U.S.C. § 2251.

2. The language of the statute is overly broad and unconstitutional because it covers a broad range of teen self-produced sexting. Such self-produced images do not create the abuse in its production that marks it as child pornography, speech not protected by the First Amendment. *New York v. Ferber*, 458 U.S. 747 (1982) ("*Ferber*").

3. The Court recognized those same interests in banning possession of child pornography, "anchoring its holding in the concern for the participants…." *Ashcroft v. Free Speech Coalition*, 535 U.S. 234, 250-251 (2002) (Citing *Osborne v. Ohio*, 495 U.S. 103, 110 (1990)).

4. *Ashcroft v. Free Speech Coalition* would place teen sexting outside the scope of the definitions of child pornography because it does not involve the sexual abuse of a child. As the High Court clarified, *Ferber* determined that the material there was child pornography "based on how it was made, not on what it communicated." *Ashcroft v. Free Speech Coalition* 535 U.S. 234, 250-251 (2002).

5. The Court in *Ashcroft v. Free Speech* echoed *Ferber's* finding that the speech was unprotected as child pornography because it was "intrinsically related to the sexual abuse of children." *Id*. at 250. (Citation and internal quotation marks omitted).

6. *Ferber* held that the speech there "was a proximate link" to the commercial distribution network the statute sought to close. *Id*. at 250.

7. In *Ashcroft v. Free Speech*, the Government contended that the virtual images, although not

the product of abuse, could lead to child abuse in a pedophile's use in further distribution or

to encourage children to engage in sexual activity. *Id*. at 241.

8. But *Ashcroft v. Free Speech* found, with respect to the virtual images there and like the teen

sexting here, "the causal link is contingent and indirect. The harm does not necessarily follow

from the speech, but depends upon some unquantified potential for subsequent criminal

acts." *Id*. at 250.

9.  Even more recently, the Supreme Court has reaffirmed the underlying rationale in *Ferber*

while finding that the State has "a compelling interest in protecting children from abuse…."

*United States v. Stevens* (2010) 559 U.S. 460, 471 (2010) ("*Stevens*").

10. *Stevens* reiterated that *Ferber* had carved out the child pornography exception to the First

Amendment because the commercial activity there was "an integral part of the conduct in

violation of the criminal statute." *Id*. at 471.

11. Under *Ferber* and its progeny, teen sexting is neither the product of sexual exploitation nor

an integral part of other criminal conduct and is therefore not child pornography.

      **b. Neither the Government' police power nor parens patriae interest are a sufficient compelling interest to uphold the broadly worded statute, where little or no harm can be show as a result of teens sexting.**

1. The Government nevertheless asserts an additional interest to save this presumptively

overbroad statute, in its parens patriae or police power authority to safeguard the welfare of

children. See eg., *United States v. Malloy*, 568 F.3d 166, 175 (4th Cir. 2009).

2. Because teenagers brains have not fully developed, they can engage in risky behavior. (MDT

107).

3. Teenagers are expected to make mistakes and they must make mistakes to "gain a sense of mature judgment." (MDT 195).

4. The United States Supreme Court has recognized the late maturation of juvenile brains in holding sentences of life without parole unconstitutional under the Eight Amendment's proscription against cruel and unusual punishment. *Miller v. Alabama*, 567 U.S. 460 (2012).

5. Therefore, criminal penalties should not be imposed on teenagers for the constitutionally-protected form of speech called sexting. "[T]ransient rashness, proclivity for risk, and inability to assess consequences--both lessened a child's moral culpability and enhanced the prospect that, as the years go by and neurological development occurs, his deficiencies will be reformed." *Miller v. Alabama,* 567 U.S. at 472 (Citations and internal quotation marks omitted).

6. Without the governmental interest in protecting children from exploitation in production, making the images child pornography, the High Court has never suggested that "other governmental interest would suffice" as a basis for a First Amendment restriction. *Ashcroft v. Free Speech Coalition*, 535 U.S. at 250 (Citation omitted.

7. Even if other interests could justify the broad language in the statute, there is little supporting evidence that consensual or experimental sexting is harmful. In fact, as the experts in this case testified, and the research reflects, consensual sexting is being considered more and more normative and developmentally appropriate for adolescents. (MDT 121, 122, 182).

8. Most adolescent medicine practitioners agree that sexting among teens, especially in the context of romantic relationships or flirting, is a normative part of adolescent growth. (MDT 175-176; Def. M., p. 1).

9. Sexting is relevant during adolescence as part of the stage of development when adolescents are establishing intimate relationships and engaging in sexual exploration. It is a form of "intimate expression and communication in sexual and romantic behaviors." (Def. M, p. 1; USA 5, p. 332).

10. Sexting offers minors the opportunity to explore their sexuality in a safe fashion. It can be engaged in outside the presence of others and thus be less embarrassing and subject to the minor's control. "[P]ressure for additional sexual intimacy is not so intense and immediate, as it might be in a face-to-face sexual encounter." (USA 1, p. 9).

11. A 2009 study stated that 9 of 10 teens reported no negative consequences from sexting. (Def. H, p. 6).

12. The Government has failed to meet its burden to overcome the statute's presumptive unconstitutionality because there is no demonstrable harm from sexting. While youth who sext are more likely to be sexually active than nonsexting peers, the relationship between sexting and risky sexual behavior "is less clear." (Def. L, p. 191).

13. While consensual sexting is "highly related to alcohol and tobacco use, being cyberbullied, and reporting both depressive symptoms and previous suicide attempts", studies have been unable "to show a causal relationship among variables, and whether sexting is an antecedent or result of these behaviors…." (Def. L, p. 195).

14.  Currently, there is no direct relationship between normative, consensual or experimental sexting and risky behaviors like drug use, teen pregnancy, increased teen sex, and alcohol use. (MDT 116, 117-119).

15.  Instead, the studies actually show that those risky teen behaviors are on the decline. (MDT 116, 167-168).

16. Further study is necessary to determine whether sexting "can be considered a risk behavior along with traditional adolescent risk behaviors like sexual behavior and substance use." (Def. L., p. 197; Def. M., p. 1).

17. There is insufficient data currently to say that consensual sexting leads to other destructive teen behavior and it is premature to draw any conclusions. (MDT 183).

18. At worst, sexting may create transient anxiety over what might happen to the image. Generally, experimental sexting does not cause trauma. (MDT 96, 101, 115, 126, 132).

19. As teens age, they may regret in the future sending an image to a romantic interest or through other innocent flirting. Teens do a lot of things they later regret. Prosecuting them for images that are not child pornography would be 100 times worse. (MDT 194-195).

20. But adolescence itself causes anxiety. It is the number one mental issue for teens. Teens experiencing transitional anxiety issues daily is not an unusual event. (MDT 138, 188).

21. Nearly 32 percent of youth ages 13-18 have been diagnosed with an anxiety disorder. (Def. L., p. 191).

22. It is only when the sexting becomes aggravated, beyond the production of the image and including further criminal or malicious behavior like cyber bullying or adult-involvement, that it can potentially be harmful. (MDT 101, 182).

23. Consequences of sexting prosecution range from diversion to felony convictions and sex offender registration. (Def. A-C).

24. It is the involvement of school or law enforcement that has proven more harmful to teenagers. The stigma of being forced to register as a sex offender, jail time, other penalties, and even the embarrassment suffered at school is a serious stigma for teens and harmful. (MDT 124-125, 129).

25. Even those states with statutes calling for reduced penalties still causes serious consequences for teens who are placed in the criminal system with publicity that causes embarrassment, threats of jail time, and sex offender registration, for what amounts to innocent, flirtatious behavior. (MDT 184-185).

26. Even where the sexting results in a diversion program, there are adverse consequences for teens like depression, anxiety, and social isolation. (MDT 219).

27. Prosecution ruins a teen's life before they get a chance to develop and live, leading to potentially lengthy jail time and sex offender registration that causes them to be shunned and affects where they might be able to live. (MDT 176-177).

28. Leaving prosecution to law enforcement discretion potentially affects millions of American teenagers. Families are forced to employ lawyers, their name may be in the media, and it would be incredibly embarrassing. (MDT 182).

29. The detrimental effect on teenagers is based on the matter coming to the attention of school or law enforcement. Peers become aware there is an investigation and the school might suspend the teen pending the investigation. (MDT 186).

30. Schools may be required to turn over any sexting investigation to law enforcement, a tremendous issue for teens.  (MDT 186; Def. E, pp. 3, 7, 14).

31. An accused juvenile sexter may be taken into custody pending the investigation, with no distinction made between consensual and aggravated sexting. (MDT 187; Def. E, p. 22).

32. A large amount of sexting that comes to the attention of law enforcement involves adolescent experimentation with self-produced and perhaps sexually explicit imagery that may or may not qualify for prosecution under the current statutory scheme. (USA 1, p. 8).

33. Because so many teens are sexting in the digital age, and it is considered normative adolescent sexual behavior, the issue of teen sexting should be an educational issue and not a criminal issue. (USA 1, p. 9; USA 5, p. 333).

34. 18 U.S.C. § 2251(a) is overbroad because it includes a substantial amount of what would otherwise be considered protected consensual teenage sexting, constitutionally protected speech under the First Amendment. *Ferber*, Mr. Streett has demonstrated the 18 U.S.C. § 2251(a) "reaches a substantial amount of constitutionally protected conduct." *Houston v. Hill*, 482 U.S. 451, 458-59, 107 S. Ct. 2502, 2508 (1987) (Citations and internal quotation marks omitted).

35. The Government therefore has the burden rebut that presumption and prove "the constitutionality of its actions." *United States v. Playboy Entm't Grp.*, 529 U.S. 803, 816-17 (2000) (Citation omitted).

36. Because of the breadth of the restriction on this content-based speech, there is "an especially heavy burden on the Government to explain why a less restrictive provision would not be as effective…." *Reno v. Aclu*, 521 U.S. 844, 879 (1997). The Government has not met its burden here.

37. Because there is no ambiguity in the statutory language here, the Court may not interpret it in a way that would avoid any constitutional infirmity. *United States v. Stevens*, 559 U.S. 460, 481, (2010). To do so under these circumstances, "would constitute a "serious invasion of the legislative domain…." *Ibid*. (Citations and internal quotation marks omitted).

38. Therefore, Mr. Streett's motion to dismiss counts three through seven of the indictment for constitutional overbreadth is granted.

Dated: November 1, 2018                              Respectfully submitted,

/s/ Harry Zimmerman
Harry Zimmerman
12231 Academy Rd NE, 301-315
Albuquerque, NM 87111
Tel: (505) 293-6859
Attorney for Bentley Streett
Email: hzattorney@gmail.com
Fax: 866-777-1126

**Certificate of Service**

I HEREBY CERTIFY that I electronically filed the foregoing with the Clerk of the Court

on November 1, 2018, using the CM/ECF system.

/s/ Harry Zimmerman
Harry Zimmerman