# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                                No. CR 14-3609 JB

BENTLEY A. STREETT,

      Defendant.

## <u>MEMORANDUM OPINION AND ORDER</u>

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Suppress Evidence, filed December 1, 2017 (Doc. 78)("Motion"); (ii) the Defendant's Supplemental Motion to Suppress All Evidence Seized and Any Fruits of the Poisonous Tree Obtained as a Result of the Unlawful Search, filed July 24, 2018 (Doc. 141)("Supp. Motion"); (iii) the Defendant Bentley Streett's Motion to Suppress Proposed Findings of Fact and Conclusions of Law, filed November 3, 2018 (Doc. 174)("Streett's Proposed Findings"); and (iv) the United States' Proposed Findings of Fact and Conclusions of Law (September 11, 2018 Evidentiary Hearing), filed November 2, 2018 (Doc. 168)("United States' Proposed Findings"). The Court held an evidentiary hearing on September 11, 2018. The primary issues are: (i) whether the Grand Jury Subpoena Duces Tecum at 1 (issued November 4, 3013), filed July 24, 2018 (Doc. 141-1)("Subpoena"), constitutes a search under the Fourth Amendment to the Constitution of the United States; (ii) whether the Subpoena violates New Mexico law and the Due Process Clause of the Fifth and Fourteenth Amendments to the Constitution of the United States; (iii) whether the Affidavit for Search Warrant (undated), filed July 24, 2018 (Doc. 141-2)("First Affidavit"), provides probable cause to believe that evidence of Streett's alleged criminal activity would be found in his cellular telephone records;

(iv) whether, even if the Search Warrant at 4 (issued February 12, 2014), filed July 24, 2018 (Doc. 141-2)("First Warrant"), issued based on the First Affidavit, lacks probable cause, Bernalillo County Sheriff's Office Detective Kyle Hartsock relied on the First Warrant in good faith when he obtained Streett's cellular telephone records; (v) whether the First Affidavit violates the Due Process Clause, because, as Streett argues, it lacks substantial evidence to support probable cause as required by New Mexico law; (vi) whether the Affidavit for Search Warrant (executed February 24, 2014), filed December 1, 2017 (Doc. 78-1)("Second Affidavit"), provides probable cause to believe that evidence of Streett's alleged criminal activity would be found at the residence at 4620 Plume Road NW, Albuquerque, New Mexico 87120 ("4620 Plume residence"); (vii) whether, even if the Search Warrant at 14 (issued February 24, 2014), filed August 15, 2018 (Doc. 144-5)("Second Warrant"), issued based on the Second Affidavit, lacks probable cause, Hartsock relied on the Second Warrant in good faith when he searched the 4620 Plume residence; (viii) whether, even if the Second Warrant lacks probable cause and Hartsock did not execute the Second Warrant in good faith, law enforcement inevitably would have obtained a warrant to search the 4620 Plume residence; and (ix) whether, even if the Second Warrant contains an incurable defect, even if Hartsock did not execute the Second Warrant in good faith, and even if law enforcement would not have inevitably obtained a search warrant for the 4620 Plume residence, Hartsock would have discovered the identities of the charged victims. The Court will deny the Motion and the Supp. Motion. The Court holds that the Subpoena is not a search under the Fourth Amendment, because of the third-party doctrine. The Court concludes that the Subpoena does not violate New Mexico law, because a grand jury issued it after presentment of evidence, and that the Subpoena does not violate the Due Process Clause, for the same reasons it does not violate the Fourth Amendment or

New Mexico law. The Court holds that the First Affidavit provides probable cause to search Streett's cellular telephone records and, even if it does not provide probable cause, that Hartsock relied on the First Warrant in good faith. Finally, the Court holds that the Second Affidavit does not provide probable cause to search the 4620 Plume Residence, but the Court will not suppress the resulting evidence because it concludes that: (i) Hartsock acted in good faith when he executed the Second Warrant; (ii) Hartsock would have inevitably discovered the evidence, because he would have obtained a valid warrant had the Second Warrant not issued; and (iii) Hartsock would have inevitably discovered the victims' identities through Streett's telephone records. Accordingly, the Court will deny the Motion and Supp. Motion, and will not exclude the telephone records or evidence seized from the 4620 Plume residence from the trial.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for rule 12(d) purposes. The Court makes these findings under the authority of rule 104(a) of the Federal Rules of Evidence, which requires a judge to decide preliminary questions relating to the admissibility of evidence, including the legality of a search or seizure and the voluntariness of an individual's confession or consent to a search. See United States v. Merritt, 695 F.2d 1263, 1269-70 (10th Cir. 1982). In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether

a witness is qualified, a privilege exists, or evidence is admissible.  In so doing, the court is not

bound by evidence rules, except those on privilege.").  Thus, the Court may consider hearsay in

ruling on a motion to suppress.  <u>See</u> <u>United States v. Ramirez</u>, 388 F. App'x 807, 810 (10th Cir.

2010)(unpublished)("It is beyond reasonable debate that Ramirez's counsel were not ineffective

in failing to make a Confrontation Clause challenge to the use of the confidential informant.  The

Supreme Court has not yet indicated whether the Confrontation Clause applies to hearsay

statements made in suppression hearings.");[1] <u>United States v. Garcia</u>, 324 F. App'x 705, 708 (10th

Cir. 2009)(unpublished)("We need not resolve whether <u>Crawford [v. Washington</u>, 541 U.S. 36

(2004)]'s[2] protection of an accused's Sixth Amendment confrontation right applies to suppression

hearings, because even if we were to assume this protection does apply, we would conclude that

the district court's error cannot be adjudged 'plain.'"); <u>United States v. Merritt</u>, 695 F.2d at 1269

("The purpose of the suppression hearing was, of course, to determine preliminarily the

admissibility of certain evidence allegedly obtained in violation of defendant's rights under the

---

[1]<u>United States v. Ramirez</u> is an unpublished opinion, but the Court can rely on an unpublished opinion for the United States Court of Appeals for the Tenth Circuit to the extent its reasoned analysis is persuasive in the case before it.  <u>See</u> 10th Cir. R. 32.1(A) ("Unpublished opinions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated: "In this circuit, unpublished orders are not binding precedent, . . . and . . . citation to unpublished opinions is not favored.  However, if an unpublished opinion . . . has persuasive value with respect to a material issue in a case and would assist the court in its disposition, we allow a citation to that decision."  <u>United States v. Austin</u>, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court concludes that <u>United States v. Ramirez, United States v. Garcia, United States v. Lopez-Carillo, United States v. Beck, United States v. Reed, United States v. Manning</u>, and <u>United States v. Welch</u> have persuasive value with respect to material issues, and will assist the Court in its disposition of this Memorandum Opinion and Order.

[2]<u>Crawford v. Washington</u> stands for the proposition that testimonial out-of-court statements against an accused are inadmissible at a criminal trial unless the declarant is unable to testify and the defendant had a previous opportunity to cross examine the declarant.  <u>See</u> 541 U.S. at 53-54.

Fourth and Fifth Amendments. In this type of hearing the judge had latitude to receive it, notwithstanding the hearsay rule."). <u>Cf</u>. <u>United States v. Hernandez</u>, 778 F. Supp. 2d 1211, 1226 (D.N.M. 2011)(Browning, J.)(concluding that "<u>Crawford v. Washington</u> does not apply to detention hearings").[3]

---

[3]Although Streett does not object under <u>Crawford v. Washington</u> to any evidence in this case, the Court concludes that <u>Crawford v. Washington</u> does not apply to pretrial suppression hearings. There is no precedent from the Supreme Court of the United States or the Tenth Circuit squarely deciding this issue, so the Court looks first to persuasive authority from other Courts of Appeals. The United States Court of Appeals for the Seventh Circuit has concluded that, where "the [district] court considered the [hearsay] statement at a suppression hearing, not at Ebert's trial[,] the Confrontation Clause was not implicated." <u>Ebert v. Gaetz</u>, 610 F.3d 404, 414 (7th Cir. 2010)(Tinder, J., joined by Posner and Rovner, JJ.)(citing <u>United States v. Harris</u>, 403 U.S. 573, 584 (1971)(noting that Confrontation Clause precedent "seems inapposite to ex parte search warrant proceedings under the Fourth Amendment")). The Tenth Circuit has concluded that "the restriction in the Confrontation Clause against admission of testimonial statements, like Agent Swihart's affidavit, is not implicated" in a suppression hearing and that, even if the statements "constituted hearsay, the same rule allowing hearsay evidence in suppression hearings applies." <u>United States v. Lopez-Carillo</u>, 536 F. App'x 762, 768-69 (10th Cir. 2013)(unpublished). The United States Court of Appeals for the Third Circuit has held it was not plain error for the district court to admit hearsay statements during a suppression hearing, because "[t]he Supreme Court has never suggested . . . that the Confrontation Clause applies during a pre-trial suppression hearing." <u>United States v. Robinson</u>, 663 F. App'x 215, 218 (3d Cir. 2016)(unpublished)(citing <u>Crawford v. Washington</u>, 541 U.S. at 53-54; <u>United States v. Raddatz</u>, 447 U.S. 667, 679 (1980)("This Court on other occasions has noted that the interests at stake in a suppression hearing are of a lesser magnitude than those in the criminal trial itself. At a suppression hearing, the court may rely on hearsay . . . even though that evidence may not be admissible at trial."); <u>Barber v. Page</u>, 390 U.S. 719, 725 (1968)("The right to confrontation is basically a trial right.")). The Supreme Court has "specifically rejected the claim that defendant's right to confrontation under the Sixth Amendment and Due Process Clause of the Fourteenth Amendment had in any way been violated" where, at the suppression hearing, "police proved probable cause for the [defendant's] arrest by testifying to the out-of-court statements of an unidentified informer" and "also made clear that there was no contrary rule governing proceedings in the federal courts." <u>United States v. Matlock</u>, 415 U.S. 164, 174-75 (1974)(discussing <u>McCray v. Illinois</u>, 386 U.S. 300 (1967)). This caselaw points the Court to concluding that <u>Crawford v. Washington</u> does not apply to pretrial suppression hearings. <u>Crawford v. Washington</u> makes testimonial out-of-court statements against an accused inadmissible at trial unless certain requirements are met, but the question whether these statements should be <u>suppressed</u> from trial is substantially and procedurally different. A suppression hearing is held for the limited purpose of determining whether evidence should be suppressed from trial because of law enforcements' constitutional violations. <u>See</u> <u>Gannett Co. v. DePasquale</u>, 443 U.S.

1.     **The Online Tip**.

1.     On October 31, 2013, the National Center for Missing and Exploited Children ("NCMEC")[4] received an online tip stating that Streett "requested a nude photograph by text message from my 15 year old daughter."  CyberTipline Report at 1, 3 (dated October 31, 2013), filed August 15, 2018 (Doc. 144-1)("NCMEC Tip").[5]

2.     The NCMEC Tip lists the "Incident Time" as October 21, 2013, 5:00 UTC.[6] NCMEC Tip at 3.

---

368, 378 (1979)("The whole purpose of such [suppression] hearings is to screen out unreliable or illegally obtained evidence and insure that this evidence does not become known to the jury."). Unlike trial, there is no risk of incarceration or adjudication of guilt at a suppression hearing, and a suppression hearing is not a prosecution.  The Court therefore concludes that Crawford v. Washington has no place in a suppression hearing.

[4]Congress established the private, non-profit organization NCMEC in 1984 with the Missing Children's Assistance Act.  See National Center for Missing and Exploited Children, Wikipedia, https://en.wikipedia.org/wiki/National_Center_for_Missing_and_Exploited_Children (last visited Nov. 16, 2018).  The Justice Department primarily funds NCMEC to provide information to the public and to "assist in locating missing children and to raise public awareness about ways to prevent child abduction, child sexual abuse and child pornography."  National Center for Missing and Exploited Children, supra.  NCMEC manages the CyberTipline, which allows the general public and service providers to report incidents of child exploitation and suicide risk, among other things.  See Transcript of Motion to Suppress Proceedings at 82:11-24 (Whitsitt)(taken September 11, 2018), filed September 28, 2018 (Doc. 159)("Tr.")

[5]NCMEC generated the NCMEC Tip upon receipt of the information from the submitter, and then NCMEC provided additional information, such as an email received from the submitter and data that NCMEC "gathered from searches on publicly-available, open-source websites." NCMEC Tip at 6.  See Tr. at 11:13-25 (Whitsitt).

[6]This contradicts Hartsock's testimony at the hearing that Streett's request "could have happened months" or "a year" or "several years before" the tipster reported it.  Tr. at 147:6-16 (Zimmerman, Hartsock).  Streett's Proposed Findings do, however, note that the NCMEC Tip provides the date of the incident.  See Streett's Proposed Findings ¶ 6, at 2 (citing Tr. at 16; NCMEC Tip; Office of the Attorney General of New Mexico Investigations Division Confidential Matter Report (undated)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Hearing Exhibit E)).

3.     NCMEC assigns its cyber tips priority levels from 1 to 4, with 1 being the highest-priority and 4 being the lowest, based on the threat or danger to the child victim.  See Transcript of Motion to Suppress Proceedings at 13:17-25 (Zimmerman, Whitsitt)(taken September 11, 2018), filed September 28, 2018 (Doc. 159)("Tr.").

4.     The NCMEC Tip states that it has a priority level of 3, the second-lowest priority level which NCMEC assigns its cyber tips and the lowest level assigned to submissions from an individual person, and that "[a]dditional information [is] required to determine possible risk." NCMEC Tip at 1.  See Tr. at 13:17-24 (Zimmerman, Whitsitt); id. at 17:9-18 (Zimmerman, Whitsitt).

5.     The NCMEC Tip was not provided confidentially; the submitter provides her name and provides her cellphone number while writing: "[My daughter] does not know that I saw the text and am reporting it.  I do not want the subject alerted."[7]  NCMEC Tip at 3 (redacting the "Submitter" portion from the copy filed with the Court).  See Tr. at 23:15-24 (Zimmerman, Whitsitt)(stating that there is no "indication that the mother wished to remain confidential"); id. at 96:8-10 (Mease, Hartsock)(stating that the submitter provided her name and it is redacted).

6.     The submitter states that "[i]t does not appear that my daugher [sic] sent this man any photos as he requested.  My concern is that he is on-line soliciting [sic] nude photos from other minor children and could possibly have received some."  NCMEC Tip at 4.

---

[7]The United States' Proposed Findings state that the submitter "requested that law enforcement not alert the suspect."  United States' Proposed Findings ¶ 2, at 2 (citing NCMEC Tip at 3).  The submitter, however, used the term "subject," which is ambiguous and could refer to Streett or the daughter, see infra ¶ 37, and therefore the Court cannot make a factual determination as to what the submitter meant by "subject" and will not adopt the United States' Proposed Finding on this point.

7.     The submitter also provides Streett's address as "Albuquerque, NM United States," his telephone number as "(505) 242-2677," and his age as approximately thirty-eight, but does not provide how she knows this information.[8]  NCMEC Tip at 3.

8.     The Tip's submitter later emailed "NCMEC's general email," saying "I just sent a report of child exploitation in on-line.  I realized after the fact that I entered the wrong phone number for the subject" and, after stating the original number provided is a contact number for the Albuquerque Police Department, provided Streett's correct telephone number as "505-974-9704". NCMEC Tip at 6.

9.     According to a NCMEC note on the Tip, the first "provided number for the reported user appears to result back to the police department" and, per the submitter's email, the correct "number is: 505-974-9704."  NCMEC Tip at 6-7.

10.    The note continues to provide an "ITACT"[9] for 505-974-9704, which provides the subscriber name as "STREETT BENTLEY," the "Phone In-Service Period: Active for 1 month or

---

[8]While Hartsock testified that "[t]here was nothing in that tip in which the CI identified the last name of Mr. Street," because that information "came from the further NCMEC law enforcement investigation," Tr. at 167:22-1 (Zimmerman, Hartsock), the NCMEC Tip states that "[t]he information appearing in Section A is information received in the original submission" and all the information "is voluntary and undertaken at the initiative of the Reporting Person," except the "Incident Type" and "Incident Time," NCMEC Tip at 3.  Thus, because Streett's name, address, telephone number, and approximate age were all provided in "Section A," this must be information provided by the submitter, and not later populated by NCMEC.  NCMEC Tip at 3. Accordingly, the Court does not adopt Streett's Proposed Finding ¶ 15, at 15.

[9]"ITACT" is an "Investigative Web-based application" that, with a ten-digit phone number, "provides access to phone subscriber information and the current carrier if a phone has not been competitively ported (when someone changes their service carrier but retains the phone number)," and "also provides additional phone data intelligence including whether a phone is prepaid and the in-service period."   Neustar iTACT, Neustar Comm., https://www.communications.neustar/resources/product-literature/itact-solutionsheet (last visited Oct. 26, 2018).

less," the carrier as T-Mobile USA, and the "Street Address: Albuquerque NM 87102-3472." NCMEC Tip at 7.

11.     The note also provides a "TLO"[10] for Streett, providing a date of birth of (redacted)/1975, other names and dates of birth associated with him, and associated telephone numbers besides the 974-9704 number: 505-550 (remainder redacted), a mobile; 505-349 (remainder redacted), but does not say with what type of telephone this number is associated; and 505-877(redacted), a landline.  NCMEC Tip at 8.

12.     The TLO also notes that Streett is a deceased individual's social security number, and provides the social security number as (redacted)-6364.  See NCMEC Tip at 8.

13.     There are two "Possible Criminal Records" for Streett in the note as well, NCMEC Tip at 8, but they do not indicate "a previous significant criminal history," Tr. at 23:8-10 (Zimmerman, Whitsitt).  See id. at 46:8-13 (Zimmerman, Whitsitt)(stating "there was no indication of any criminal history of" Streett being a sex offender).

14.     The note concludes with an address summary, providing a list of eight addresses, with the only non-redacted address being the 4620 Plume residence with associated dates of "4/12/2004 to 10/30/2013."  NCMEC Tip at 9.

---

[10]"TLO" stands for "TLOxp," a service which "filters through a massive repository of public and proprietary data" to provide "detailed reports filled with actionable data," including "[n]ames, addresses, aliases, emails, phones, places of employment," and criminal history.  About TLOxp, TransUnion & Alternative Data Solutions, Inc., https://www.tlo.com/about-tloxp# (last visited Oct. 26, 2018).  TLO is a subscriber-based service, so not everybody can access it.  See Tr. at 19: 14-17 (Whitsitt, Zimmerman); id. at 156:3-22 (Zimmerman, Hartsock)(discussing how, although TLO is "not an open source," the TLO provides only publicly available information, such as "mortgage information, public utility records, [and] vehicle registration," which "anyone in the public could get").

15.     Another NCMEC note on the Tip states: "The victim did not appear to engage with the reported user.  Based on the user, I will send to the NM ICAC."[11]  NCMEC Tip at 10.

16.     The NMCEC Tip concludes by saying it "was made available to the Law Enforcement Agencies listed below" and then lists the New Mexico Attorney General's Office -- naming special agent Anthony M. Maez as the assigned investigator -- and the Bernalillo County Sheriff's Office -- listing detective Kyle Hartsock as the assigned investigator.  NCMEC Tip at 11.

17.     Special Agent Jon Whitsitt began his career in law enforcement in June 2006, see Tr. at 9:14-15 (Whitsitt), and worked in the Attorney General's Office as a criminal analyst, "primarily focus[ing] on cyber tip management," from approximately September 2011, until approximately September 2014, Tr. at 10:9-21 (Zimmerman, Whitsitt).   See id. at 53:22 (Whitsitt)(clarifying that he did not leave the Attorney General's Office in 2013 as previously stated).

18.     The position of criminal analyst is not one of "sworn law enforcement capacity"; it is a civilian position.  Tr. at 34:5-7 (Whitsitt, Zimmerman).

19.     At some date which Whitsitt could not recall, he transitioned to the position of special agent -- which is a law enforcement officer position.  See Tr. at 54:3-11 (Whitsitt, Zimmerman).

---

[11]"ICAC" stands for "Internet Crimes Against Children," which is a national task force "engaged in proactive and reactive investigations and prosecutions of persons involved in child abuse and exploitation involving the Internet."  Home, ICAC: Internet Crimes Against Child. Task Force Program, https://www.icactaskforce.org/Pages/Home.aspx (last visited Oct. 25, 2018).  The New Mexico Attorney General operates the ICAC task force in New Mexico.  See Second Affidavit at 4.

20.     Whitsitt currently works at the Gallup Police Department.  <u>See</u> Tr. at 9:10 (Whitsitt).

21.     Whitsitt was a special agent when investigating the NCMEC Tip.  <u>See</u> NCMEC Tip at 11 (releasing the tip on November 1, 2013, to the Attorney General's Office); Letter to Custodian of Records at T-Mobile from Special Agent Jon R. Whitsitt at 1 (dated November 1, 2013)(submitted to the Court at the September 11, 2018 evidentiary hearing as Defendant's Hearing Exhibit B)("Preservation Letter")(showing Whitsitt's signature on November 1, 2013, as "Jon R. Whitsitt, Special Agent - ICAC").

22.     Whitsitt had special training as a criminal analyst to review NCMEC's cyber tips: he was "trained in [Internet Crimes Against Children] procedures and NCMEC, and reading those tip reports," and also "attended training at the [NCMEC office] in cyber tip management."  Tr. at 16:8-16 (Zimmerman, Whitsitt).

23.      "[C]yber tip management" refers to triaging the tips that the New Mexico Attorney General's Internet Crimes Against Children task force receives from NCMEC -- after NCMEC has screened them -- as New Mexico's "ICAC coordinator."  Second Affidavit at 4.  <u>See</u> Tr. at 10:20-11:5 (Zimmerman, Whitsitt); First Affidavit at 2.

24.     NCMEC asks the ICAC coordinators to "validate the information" in the cyber tips, because it forwards every tip received without "vouch[ing] for the accuracy of any of the information."  Tr. at 33:6-14 (Zimmerman, Whitsitt).

25.     Whitsitt's triage process is first "figuring out the most information [he] could without launching a full-fledged investigation, and then presenting the information to [his]

supervisor who would then assign the case to the appropriate law enforcement agency." Tr. at 11:4-9 (Whitsitt).

26.     Whitsitt "looked at the facts or the elements of the cyber tip," and, if he believed that a child "is in immediate threat or danger," that tip would take "an ultimate priority." Tr. at 13:6-12 (Whitsitt).

27.     Whitsitt would receive variable numbers of cyber tips on any given day -- some days no tips, other days up to fourteen tips -- but he could not recall how many cyber tips he received on the day that he got the NCMEC Tip. See Tr. at 12:23-13:3 (Whitsitt, Zimmerman).

28.     Whitsitt could not recall what priority NCMEC assigned the Tip in this case. See Tr. at 15:1-4 (Zimmerman, Whitsitt).[12]

29.     The NCMEC Tip was the only tip about Streett that Whitsitt received. See Tr. at 45:19-23 (Zimmerman, Whitsitt); id. at 46:1-7 (Zimmerman, Whitsitt)(discussing that more tips could make an investigation a higher priority).

---

[12]Streett's Proposed Findings state that "Whitsitt did not recall the cybertip report in this case," Streett's Proposed Findings ¶ 5, at 2 (citing Tr. at 15), but this is an inaccurate representation of Whitsitt's testimony, because he was asked if he recalled the NCMEC Tip's priority level, not if he recalled the Tip generally. This is the relevant exchange, during direct examination of Whitsitt by Mr. Zimmerman:

Q.     Do you recall this particular cyber tip involving Mr. Streett, what priority level was given by NCMEC?

A.     No, sir, I do not.

Tr. at 15:1-4 (Zimmerman, Whitsitt). The Court concludes that it is more accurate to read this exchange as showing that Whitsitt did not recall the NCMEC Tip's priority level, and therefore does not adopt Streett's Proposed Finding that Whitsitt did not recall the Tip. See Streett's Proposed Findings ¶ 5, at 2 (citing Tr. at 15).

30.     As to the NCMEC Tip, Whitsitt completed

an initial assessment on the information provided, which included accessing a system called TLO, which provides very basic information such as date of birth, Social Security numbers, previous addresses possible employment history, as well as running an NCIC criminal check; that checks for current wants/warrants, as well as Department of Motor Vehicle records.  [He] also check[ed] employment history to see if [the Attorney General's Office] ha[s] a current employer on file or previous employers.

Tr. at 18:25-19:11 (Whitsitt).  <u>See</u> Office of the Attorney General of New Mexico Investigations Division Confidential Matter Report at 2 (undated)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Hearing Exhibit E)("AG Report")(describing the investigative actions Whitsitt took).

31.     Nothing "raised a red flag" during Whitsitt's investigation of the NCMEC Tip.  Tr. at 14:16-18 (Zimmerman, Whitsitt).  <u>See id.</u> at 46:1-16 (Zimmerman, Whitsitt)(discussing that, if there had been multiple tips involving Streett or if he had a criminal history of being a sex offender, Whitsitt would have had to assign the NCMEC Tip a higher priority).

32.     Whitsitt stated that there was not probable cause to believe that sexual exploitation had occurred, <u>see</u> Tr. at 25:21-26:7 (Whitsitt, Zimmerman, Mease, Court), but believed that, if the information in the NCMEC Tip were true, a crime had been committed which justified further investigation, <u>see</u> Tr. at 57:11-24 (Mease, Whitsitt).[13]

---

[13]Streett's Proposed Findings provide that "Whitsitt had no indication that a crime had been committed," Streett's Proposed Findings ¶ 22, at 4 (citing Tr. at 22, 31), and that he "did not believe he had enough probable cause to justify any further investigation," Streett's Proposed Findings ¶ 23, at 4 (citing Tr. at 25-26, 38).  The Court concludes this is not a fair representation of the hearing and thus does not incorporate these Proposed Findings.  Mr. Zimmerman first points Whitsitt to the "additional information" on page four of the NCMEC Tip:

Q.     And what does that say?

A.      It reads, "It does not appear that my daughter sent this man any photos as he requested.  My concern is that he is online soliciting nude photos from other minor children and could possibly have received some."

Q.      So at that time you had no indication of a crime that had been committed?

. . . .

A.      No, I did not.

Tr. at 22:6 (Zimmerman); <u>id.</u> at 22:9-21 (Zimmerman, Whitsitt)(objection and ruling omitted).  It appears from this questioning that Whitsitt is only answering whether he had an indication that a crime had been committed from the portion of the NCMEC Tip he read, because of his later testimony regarding his preparing the Subpoena:

Q.      You did not on your own decide that a grand jury subpoena was needed?

A.      No, I would do that for most cases.

Q.      I'm sorry?  Do what?

A.      Obtain grand jury subpoenas, if it appeared that possible or alleged sexual exploitation had occurred.

Q.      Did you have any indication here -- you had --

A.      Possible, yes.

Q.      Maybe?

A.      Possible.

Q.      Not enough to satisfy you or any probable cause that would justify any further investigation?

. . . .

A.      Not at that point, no.

Tr. at 25:12-26:4 (Zimmerman, Whitsitt)(objection and ruling omitted).  This testimony, combined with Ms. Mease's cross-examination cited <u>supra</u> ¶ 31, shows that Whitsitt believed it possible that "sexual exploitation had occurred," but did not have probable cause showing that sexual

33.     The crime "[s]exual exploitation of children" is contained in N.M. Stat. Ann. § 30-6A-3, which provides, in the relevant parts, that

> [i]t is unlawful for a person to intentionally possess any obscene visual or print medium depicting any prohibited sexual act or simulation of such an act if that person knows or has reason to know that the obscene medium depicts any prohibited sexual act or simulation of such act and if that person knows or has reason to know that one or more of the participants in that act is a child under eighteen years of age. . . . It is unlawful for a person to intentionally cause or permit a child under eighteen years of age to engage in any prohibited sexual act or simulation of such an act if that person knows, has reason to know or intends that the act may be recorded in any visual or print medium or performed publicly.

N.M. Stat. Ann. § 30-6A-3(A), (D).

34.     "Prohibited sexual act" is defined in N.M. Stat. Ann. § 30-6A-2, and includes "masturbation" and "lewd and sexually explicit exhibition with a focus on the genitals or pubic area of any person for the purpose of sexual stimulation."  N.M. Stat. Ann. § 30-6A-2(A)(3), (5).

35.     Whitsitt did not speak with the submitter's daughter -- identified as M.Y. -- to determine her relationship with Streett or the nature of the text message communication with him, and did not speak with the submitter to check the credibility of the NCMEC Tip, see Tr. at 27:6-

---

exploitation had occurred.  Tr. at 25:16-17 (Whitsitt).  Whitsitt clarifies that, when he sought the Subpoena, he was still investigating whether a crime had been committed:

> Q.     You've indicated before there was insufficient evidence that the crime of criminal sexual communication or any crime had been committed at this point?
>
> A.     At that point the case was still under investigation, so we did not know whether or not that crime had been committed yet.  It was still under investigation.

Tr. at 31:2-9 (Zimmerman, Whitsitt).  Accordingly, the Court does not adopt Streett's Proposed Findings on this point, and concludes that its own ¶ 31 is more accurate.

12 (Zimmerman, Whitsitt), although he could have called them, <u>see</u> Tr. at 66:10-14 (Zimmerman, Whitsitt).

36.     It was not Whitsitt's job to "reach out to witnesses and conduct interviews" when conducting cyber tip maintenance, and nobody else at the Attorney General's Office does so when they are doing cyber tip maintenance.  Tr. at 59:14-24 (Mease, Whitsitt).

37.     Whitsitt acted under the assumption that the NCMEC Tip's submitter did not want Streett alerted, <u>see</u> Tr. at 21:21-25 (Whitsitt), because of the Tip's language "I do not want the subject alerted," NCMEC Tip at 3.  <u>See also</u> Tr. at 59:1-5 (Whitsitt)(acknowledging that the word "subject" is ambiguous and could refer to either the submitter's daughter or to Streett); <u>id.</u> at 65:8-12 (Zimmerman, Whitsitt)(reiterating it is unclear who "subject" referred to).

38.     Whitsitt then "prepared a subpoena duces tecum for the telephone number provided in the [NCMEC] tip," Tr. at 24:20-21 (Whitsitt), as he did "for most cases" where "it appeared that possible or alleged sexual exploitation had occurred," as part of his job "to obtain all possible information related to the cyber tip," Tr. at 25:2-18 (Whitsitt, Zimmerman).

39.     To seek the subpoena duces tecum, Whitsitt first gave his supervisor the information he had gathered on the NCMEC Tip -- "that the mother reported that her daughter had received a request from a man to send him a nude photograph" and that Whitsitt had conducted a criminal check -- and then recommended that they get "a grand jury subpoena duces tecum."  Tr. at 26:8-27:3 (Zimmerman, Whitsitt).

40.     A subpoena is the "quickest and least intrusive way to get . . . basic subscriber records back from a third party in a case like this," Tr. at 85:11-13 (Whitsitt), especially because

ICAC cases normally start with limited information, like "just an IP address or a user name maybe, or a phone number," Tr. at 85:20-22 (Whitsitt).

41.     Whitsitt recommends a subpoena duces tecum only if he believes that a cyber tip "needs further investigation" and if he believes "that information can be garnered from a subpoena duces tecum."  Tr. at 32:18-20 (Whitsitt).

42.     Not every cyber tip gives rise to the need for a subpoena duces tecum, because there has been no "possible violation of New Mexico State statute or federal law" which requires "further investigation."  Tr. at 32:23-33:5 (Zimmerman, Whitsitt).

43.     Subpoenas are actively sought both in the "inquiry" and "full-blown case" stages of investigation in the Attorney General's Office.  Tr. at 38:6-10 (Zimmerman, Whitsitt).

44.     After receiving authorization to proceed from his supervisor, Whitsitt then "had to consult with an attorney assigned to the New Mexico Attorney General's Office, Crimes Against Children Task Force."  Tr. at 27:23-28:1 (Whitsitt).

45.     This consultation involved Whitsitt providing that attorney "a brief on what [he] had; basically the same conversation [he] had with the supervisor; what the elements of the cyber tip were, the legwork, so to speak, of what [Whitsitt] had done thus far, and the reason [he] was asking for the grand jury subpoena duces tecum."  Tr. at 28:6-11 (Whitsitt).

   **2.     The Subpoena.**

46.     On November 1, 2014, Whitsitt sent T-Mobile USA a preservation letter requesting "pursuant to 18 U.S.C. Section 2703(f) that all known information relating to the T-Mobile telephone number (505) 974-9704, on the date of October 21, 2013 be preserved for a period of 90 days pending issuance of a formal court order," because that "user is suspected of criminal

sexual communication with a child."  Preservation Letter at 1.  See Tr. at 29:15-30:10

(Zimmerman, Whitsitt).

47.     "Criminal sexual communication with a child" is contained in N.M. Stat. Ann.

§ 30-37-3.3, providing that

> [c]riminal sexual communication with a child consists of a person knowingly and
> intentionally communicating directly with a specific child under sixteen years of
> age by sending the child obscene images of the person's intimate parts by means of
> an electronic communication device when the perpetrator is at least four years older
> than the child,

N.M. Stat. Ann. § 30-37-3.3(A), and that "'intimate parts' means the primary genital area, groin,

buttocks, anus or breast," N.M. Stat. Ann. § 30-37-3.3(C)(2).

48.     The Preservation Letter does not contain an Attorney General's Office case or

inquiry number, but provides the NCMEC Tip number.  See Preservation Letter (redacting the

NCMEC Tip number from the copy provided to the Court).

49.     At the time, there would not have been a case number as the investigation was still

in the "initial inquiry" stage and would have only had an inquiry number.  Tr. at 37:7-12 (Whitsitt).

50.     On November 4, 2013, the Second Judicial District Court, County of Bernalillo,

State of New Mexico, issued a Grand Jury subpoena duces tecum to T-Mobile commanding its

appearance at the Bernalillo County Courthouse on November 25, 2013.  See Subpoena at 1.

51.     The Subpoena requests the following records for disclosures:

> Subscriber information for the telephone number (505) 974-[remainder redacted]
> that had been utilized on or about October 21, 2013.  Including the name(s) and
> addresses of the person(s) who opened the account, the date the account was
> opened, detailed method of payment, alternate telephone number(s), email
> addresses, and any identifying information which would tend to identify the
> person(s) subscribing to this service.

Subpoena at 1.

52.     In the alternative, the Subpoena provides that the requested records "may be turned over to Special Agent Jon R. Whitsitt, a representative of the New Mexico Office of the Attorney General, acting as an aid to the GRAND JURY." Subpoena at 1.

53.     The Subpoena does not contain an Attorney General's Office case number or inquiry number. <u>See</u> Subpoena at 1.

54.     The Subpoena does not mention the Stored Communications Act, 18 U.S.C. § 2703. <u>See</u> Subpoena at 1.

55.     The Subpoena was issued on the basis of testimony regarding the NCMEC Tip.[14] <u>See</u> Tr. at 39:8-40:20 (Zimmerman, Whitsitt).

---

[14]It is unclear from the record who provided this testimony at the grand jury proceeding. Whitsitt believed he did, but was not certain:

Q.      And do you recall testifying on that day for this case?

A.      I believe so.  It's been a long time.  I'm not sure if that's the exact -- it should have been the exact day I testified, but --

Tr. at 39:23-40:2 (Zimmerman, Whitsitt).  The Grand Jury Log that Streett provided purporting to show the proceedings for the Subpoena, however, shows Owen Pena as testifying on behalf of the Attorney General's Office.  <u>See</u> Log of Grand Jury Room on 11/4/2013 at 1, filed November 3, 2018 (Doc. 174-1)("Grand Jury Log").  The Grand Jury Log shows the grand jury proceedings for a period of forty minutes.  <u>See</u> Grand Jury Log at 1-3.  The Grand Jury Log provides that the grand jury is considering subpoenas for "ROBLOX Corporation // Cyber Tip 21353331; T-Mobile," among a number of IP addresses.  Grand Jury Log at 1.  There does not seem to be any information in the Grand Jury Log connecting it to the Subpoena here, however, for the cyber tip number it provides does not match the NCMEC Tip's number, and there is no telephone number associated with T-Mobile.  <u>See</u> Grand Jury Log at 1; NCMEC Tip at 11 (providing the unredacted number as beginning with the numbers "216").  Regarding T-Mobile, the Grand Jury Log provides "how information known that offender in NM // investigation of T-Mobile // male requested photos // number tracked to T-Mobile // how obtaining number will aid in investigation//" and "phone will indicate who used phone on date of incident."  Grand Jury Log at 1.  This information does not convince the Court that Pena testified regarding the Subpoena in question despite Streett's statement that "Special Agent Owen Pena testified in support of the grand jury subpoenas issued on November 4, 2013, not Whitsitt," Streett's Proposed Findings at 18 n.2, and the United States'

56. On December 27, 2013, T-Mobile responded to the Subpoena, which it states was served on it on December 27, 2013,[15] by sending Whitsitt an email containing the subscriber information for 505-974-9704. See Email from Cathleen Rodriguez to SA Whitsitt (dated December 27, 2013), filed August 15, 2018 (Doc. 144-3)("T-Mobile Email").

57. It was "typical" that T-Mobile provide the information requested in a subpoena duces tecum "subsequent to the date they were asked to present it or return" it. Tr. at 41:9-12 (Zimmerman, Whitsitt).

58. Subpoenas were normally served "the same day or the day after" they are issued, Tr. at 55:4-8 (Zimmerman, Whitsitt), and it is "unusual for a service provider to turn something around on the exact same day that it's received," Tr. at 63:5-8 (Mease, Whitsitt).

59. The T-Mobile Email states that "Bentley A. Streett" is the "Billing Account Name" and the "Mobile Number Name," that the account was established on "06/04/2010," that "Telephone 1" and "Telephone 2" are 505-877-8596, that the address is the 4620 Plume residence, that Streett was born in 1975, and that Streett's social security number is (redacted)-6364. T-Mobile Email at 1.

---

statement that it "understands that Officer Jon Whitsitt did not provide testimony in front of the state grand jury on November 4, 2013," United States' Sealed Notice of Correction to Proposed Findings of Fact and Conclusions of Law (September 11, 2018 Evidentiary Hearing) at 1, filed November 6, 2018 (Doc. 175). The Court therefore does not make a finding as to who testified at the grand jury proceedings.

[15]That T-Mobile says the Subpoena was served on the same day T-Mobile provided the records seems to be a mistake, because of Whitsitt's testimony that he normally served subpoenas "the same day or the day after" they are issued, Tr. at 55:4-8 (Zimmerman, Whitsitt), and that it is "unusual for a service provider to turn something around on the exact same day that it's received," Tr. at 63:5-8 (Mease, Whitsitt). When the Subpoena was served, however, is immaterial to the Court's analysis.

60.     While a social security number "could be" part of the "basic identifying data" for which the Subpoena asks, 18 U.S.C. § 2703(f) does not delineate a social security number as "basic identifying data."  Tr. at 42:15-23 (Zimmerman, Whitsitt).

61.     The Stored Communications Act, 18 U.S.C. § 2703, allows the state or federal government to compel "a provider of electronic communication service" to disclose subscriber information with an administrative subpoena only if seeking the:

(A)     name;

(B)     address;

(C)     local and long distance telephone connection records, or records of session times and durations;

(D)     length of service (including start date) and types of service utilized;

(E)     telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address; and

(F)     means and source of payment for such service (including any credit card or bank account number),

of a subscriber to or customer of such service . . . .

18 U.S.C. § 2703(c).

62.     After receiving the T-Mobile Email, Whitsitt prepared a "supplemental report," to add to the initial report which contains "all the information from the case file," for presentation to Whitsitt's supervisor Anthony Maez.  Tr. at 48:23-49:5 (Zimmerman, Whitsitt).  See AG Report at 4.

63.     The AG Report is undated, but the initial report provides the investigatory actions Whitsitt took -- a TLO search, a New Mexico Motor Vehicle Division ("MVD") and criminal history return, an employment history search, a preservation letter to T-Mobile, and a subpoena

duces tecum to T-Mobile -- and the attached supplemental report states that T-Mobile responded

to the Subpoena on December 27, 2013, and identifies the subscriber of 505-974 (remainder

redacted) as "Bentley Streett of (portion redacted) Albuquerque, NM." AG Report at 2, 4.

64. On February 5, 2014, Whitsitt's supervisor at the Attorney General's Office

assigned the NCMEC Tip "to the particular law enforcement agency that would have been

responsible for further investigation," Tr. at 53:5-12 (Zimmerman, Whitsitt) -- specifically, the

Bernalillo County Sheriff's Office Crimes Against Children Unit, with Hartsock[16] as the case

---

[16]At the evidentiary hearing and in Streett's Proposed Findings, Streett attacks Hartsock's credibility. See Tr. at 206:20-208:5 (Zimmerman, Court); Streett's Proposed Findings at 17-18. At the hearing, Streett's counsel asked Hartsock if he had "been questioned by [his] own Internal Affairs Division about the inadequacy of [his] investigation or reporting," Tr. at 205:9-11 (Zimmerman), and Hartsock responded: "No, I can't recall an Internal Affairs investigation about the accuracy of my reporting," Tr. at 205:15-16 (Hartsock). Harry Zimmerman -- Streett's attorney -- also asked if, in the seven years that Hartsock served as a law enforcement officer in the field, he had "an internal affairs jacket indicating complaints against" him, Tr. at 205:21-25 (Zimmerman), and Hartsock responded "I presume," but that he had "not looked in [his] Internal Affairs file," Tr. at 206:1, 3-4 (Hartsock). Mr. Zimmerman then introduced a complaint of misconduct against Hartsock, because Hartsock "did not acknowledge that he had [complaints against him]." Tr. at 206:5-207:2 (Zimmerman). See generally Bernalillo County Sheriff's Department Internal Affairs Unit Investigators Supplemental Report (signed March 3, 2005)(filed with the Court at the September 11, 2018, evidentiary hearing as Defendant's Exhibit K)("IA Report"). Mr. Zimmerman said the IA Report relates to Hartsock's "failure to investigate and interview witnesses" in a previous investigation, which is "essential to [the Court's] understanding of the inadequacies of the search warrant here." Tr. at 207:5-8 (Zimmerman). Mr. Zimmerman also noted that, "about seven, eight years ago," the Court decided another motion to suppress involving failures in Hartsock's policing, and there, according to Streett, the Court "suppressed and did not find good faith." Tr. at 207:9-11 (Zimmerman)(citing United States v. Martinez, 696 F. Supp. 2d 1216 (D.N.M. 2010)(Browning, J.)).

The Court concludes that these two specific instances of alleged misconduct do not bear on Hartsock's credibility as a witness at the hearing. First, Hartsock does not deny the existence of the IA Report such that introducing it shows he was lying; when asked if Internal Affairs had questioned him about the inadequacy of his investigation or reporting he said "I can't recall," Tr. at 205:15 (Hartsock), and when asked more generally about the existence of complaints about him, he said he "presume[s]" that there are, Tr. at 206:1 (Hartsock). See Tr. at 205:9-206:1 (Zimmerman, Mease, Court, Hartsock). The Court notes that the IA Report is thirteen years old, from early in Hartsock's career in law enforcement, so that he could not remember the specific

agent, <u>see</u> Tr. at 80:13-23 (Mease, Hartsock); <u>id.</u> at 140:11-14 (Zimmerman, Hartsock). <u>See also</u> Bernalillo County Sheriff's Office Initial Detective Report at 3 (dated October 3, 2014)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Hearing Exhibit G)("Hartsock Report").

65.     The Bernalillo County Sheriff's Office Crimes Against Children Unit is affiliated with the ICAC task force, investigating a cyber tip if the Attorney General's Office believes that the Bernalillo County Sheriff's Office is best "geographically located to investigate" and "has the right resources to do an investigation." Tr. at 73:25-74:20 (Mease, Hartsock).

66.     Hartsock currently is a Special Agent in Charge at the Second Judicial District Attorney's Office. Tr. at 71:18-21 (Hartsock, Mease).

67.     Hartsock graduated from the Academy in 2004, <u>see</u> Tr. at 128:18-19 (Hartsock), then worked at the Bernalillo County Sheriff's Office for about fifteen years; where he worked in the driving-while-intoxicated unit for about three years after patrol, <u>see</u> 72:6-7 (Hartsock).

68.     The training at the Academy included two to three weeks of training on search warrants, and after graduation Hartsock received on-the-job training. <u>See</u> Tr. at 132:11-133:1 (Zimmerman, Hartsock).

---

subject of the Report is plausible. Second, the two prior instances of alleged misconduct do not point to Hartsock's character for truthfulness but, rather, his prior failings in properly investigating and therefore, the Court does not consider them. While the Federal Rules of Evidence's rules on character evidence do not bind the Court in a suppression hearing, the Court must decide this case's facts, and Hartsock's prior instances of alleged misconduct have little, if anything, to do with this case besides showing a propensity to not fully investigate things. This propensity has little, to no, bearing on Hartsock's credibility, and the Court finds Hartsock a credible witness here. As he testified before the Court, the Court looked at him carefully and listened to him clearly, and saw and heard nothing for the Court not to believe him. The Court therefore will not adopt Streett's Proposed Findings on pages 17-18.

69.     In 2009, Hartsock became a detective in the Crimes Against Children Unit, and in 2010 he started "a task force position with the [Federal Bureau of Investigation's ('FBI')] Regional Computer Forensic Laboratory," doing digital forensics for about three and a half years before returning to the Crimes Against Children Unit.  Tr. at 72:7-12 (Hartsock).  See 72:20-73:6 (Mease, Hartsock).

70.     While at the FBI's Regional Computer Forensic Laboratory, Hartsock became a certified forensic examiner after completing the FBI's training program for digital evidence, and has experience handling large data sets and drawing inferences from the data.  See Tr. at 75:1-5 (Mease, Hartsock); id. at 77:2-7 (Mease, Hartsock).

71.     When Hartsock returned to the Crimes Against Children Unit, it had "transitioned to what's called the Ghost Unit," which "specialized in juvenile sex trafficking, missing persons, and child exploitation cases."  Tr. at 72:16-19 (Hartsock).

72.     In Hartsock's ten years working in the field, he prepared approximately 100 affidavits for search warrants, see Tr. at 133:2-10 (Zimmerman, Hartsock), and worked on "several dozen" cases involving sexual abuse of children, Tr. at 132:5-7 (Hartsock).

73.     Hartsock is familiar with Bernalillo County Sheriff's Department Rules and Regulations (dated June 10, 2014)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Exhibit F)("BCSO Rules"), see Tr. at 134:11-19 (Zimmerman, Hartsock), but said he had never looked up New Mexico's rule on probable cause in warrants, see Tr. at 135:24-136:18 (Zimmerman, Hartsock), although he "knew the rule existed," Tr. at 189:1 (Hartsock).  Compare BCSO Rules at 1 (stating that "[p]robable cause must be based on what the Deputy believes to be reasonably trustworthy information"), with N.M. Ct. R. 5-211 (stating that

probable cause must "be based on substantial evidence," which could be hearsay if "there is a substantial basis for believing the source of the hearsay to be credible").

### 3.    The Cellular Telephone Records Search for 505-974-9704.

74.    The referral that Hartsock received from the Attorney General's Office contained the NCMEC Tip, the Subpoena, and the Subpoena's results.  See Tr. at 83:13-84:13 (Mease, Hartsock).

75.    This was the first ICAC referral Hartsock had ever received as the case agent.  See 80:13-23 (Mease, Hartsock).

76.    Hartsock believed that the nature of the NCMEC Tip -- that Streett allegedly requested a nude photograph from a fifteen-year-old girl -- warranted further investigation, because New Mexico law prohibits the asking or possessing of sexually explicit images of a child under the age of eighteen.  See Tr. at 87:19-88:15 (Hartsock, Mease).

77.    On February 12, 2014, Hartsock obtained a search warrant for the T-Mobile telephone records for 505-974-9704 on the basis of an undated affidavit that he submitted, which was incorporated into the warrant.  See First Affidavit at 3; First Warrant at 4; Tr. at 72:1-2 (Hartsock); id. at 72:8-9 (Hartsock).

78.    The Honorable Ross C, Sanchez, former New Mexico District Court Judge for the Second Judicial District Court, approved the First Warrant.  See First Warrant at 1.

79.    The First Warrant, like all warrants, must be supported by probable cause to be valid under the Fourth Amendment.  See Tr. at 145:23-25 (Zimmerman, Hartsock).

80.    The First Affidavit requests the: (i) "Account Subscriber Information identifying the name(s), address and other phone number associated with [the 505-974-9704] account";

(ii) "all phone calls made and received, listing the phone numbers called or calling from and the dates, times and durations from 7/31/2013-2/5/2014"; and (iii) "all text and mixed messages made and received, listing the phone number(s) texted or texted from and the dates and times from 7/31/2013-2/5/2014." First Affidavit at 1.

81.     Hartsock chose the "7/31/2013-2/5/2014" period, First Affidavit at 1, because he "decided to do 90 days prior to when the incident was reported to NCMEC" through the current date, but did not say why he decided on the "90 days prior," Tr. at 148:22-23 (Hartsock). See Tr. at 148:21-25 (Zimmerman, Hartsock).

82.     With the First Warrant, Hartsock sought to determine if Streett was texting M.Y. and if any "picture messages were being sent." Tr. at 91:8-12 (Hartsock).

83.     The First Affidavit describes how NCMEC "received an online tip about an adult male soliciting a nude photograph of a fifteen year old girl over text message conversation" on October 31, 2013. First Affidavit at 2. See NCMEC Tip at 1.

84.     The First Affidavit describes the tipster as a "confidential informant," First Affidavit at 2, because Hartsock wanted "to keep the identity of the mother private," Tr. at 94:17-18 (Hartsock).

85.     The NCMEC Tip does not say "keep my name out of [the investigation]"; rather, Hartsock interpreted the NCMEC Tip in that manner. Tr. at 12-17 (Mease, Hartsock).

86.     This was the first time Hartsock had relied on information coming from a person who he believed "didn't want to be named in a search warrant," Tr. at 94:11-13 (Hartsock), and relied on advice from "someone in narcotics" to refer to the tipster as a CI, Tr. at 94:14-17 (Hartsock).

87.     Hartsock recalls only one other time he kept an informant's name confidential in a warrant.  See Tr. at 133:20-134:3 (Hartsock).

88.     Hartsock should not have used the term "confidential informant" and should "have identified that her identity is known to me, or identified her as a relative to the child who could be at risk . . . .  Or . . . just put her name, because she's going to have to be disclosed in my case eventually, no matter what."    Tr. at 95:21-24.    See id. at 143:9-19 (Zimmerman, Hartsock)(discussing how Hartsock misused the term "confidential informant," clarifying that the tipster wished to remain anonymous but was not anonymous).

89.     Hartsock found the tipster "trustworthy" as the victim's mother, but did not put this fact in the First Affidavit.  Tr. at 144:5-19 (Hartsock, Zimmerman)(acknowledging that "the judge wouldn't have seen [the CI] as the mother" from the four corners of the First Affidavit).  See First Affidavit at 2 (not revealing the CI as M.Y.'s mother).

90.     The First Affidavit states that the tipster "physically observed the cell phone of the fifteen year old female," and that the tipster said that "the conversation was between MY and a male named Bentley Streett who lived in Albuquerque, NM."  First Affidavit at 2.

91.     The First Affidavit states that the tipster did not provide how she knew Streett was the male who requested the photograph nor how she knew that he resides in Albuquerque.  See First Affidavit at 2.

92.     The First Affidavit states that the tipster said that she "did not see a photograph or other media transmitted from MY to the requester, but was concerned that it could happen in the future."  First Affidavit at 2.  See NCMEC Tip at 4

93.     The First Affidavit does not discuss whether the tipster had provided accurate information to law enforcement in the past.  See First Affidavit at 2.

94.     Hartsock tried to contact the tipster "to gather more information[,] but ha[d] failed to do so at the time of writing" of his affidavit, First Affidavit at 2, but did not try harder to contact her, believing he had "a small likelihood of actually getting her to participate in the investigation" because "she didn't want her daughter to know," Tr. at 239:13-16 (Hartsock).  See Tr. at 140:23-141:11 (Hartsock, Zimmerman)(discussing how Hartsock tried to reach M.Y.'s mother, but failed, and did not contact local police for help); id. at 157:20-158:2 (Zimmerman, Hartsock)(elaborating that Hartsock only called the tipster once, and she did not answer).  See also Hartsock Report at 3.

95.     The First Affidavit states that "[t]he New Mexico Attorney Generals [sic] Internet Crimes Against Children task force received the tip and issued a subpoena to T-Mobile USA for the account information related to 505-974-9704, and discovered it was registered to Bentley Streett, who lives in Bernalillo County."  First Affidavit at 2.

96.     Hartsock believed that the Subpoena corroborated the NCMEC Tip, because T-Mobile's return verified that Streett owned the number and lived in Albuquerque.  See Tr. at 87:2-16 (Hartsock, Mease); id. at 152:21-153:9 (Hartsock, Zimmerman).[17]

---

[17]Streett's Proposed Findings aver that "[n]othing in the New Mexico Attorney General's T-Mobile Subpoena or return indicated the reliability of the CI or the information."  Streett's Proposed Findings ¶ 31, at 10 (citing Tr. at 151).  To the extent that Streett is saying that the Subpoena return does not corroborate the CI's information, this is a legal conclusion and not a fact and the Court does not adopt this Proposed Finding.  To the extent that Streett is simply stating that neither the Subpoena nor the return discuss the CI's reliability -- meaning whether she has previously provided accurate information, see United States v. Quezada-Enriquez, 567 F.3d at 1233 -- this is a fact, albeit irrelevant.

97. Hartsock requested the call, text, and mixed media message history for 505-974-9704 to confirm the online tip "and find out if any mixed media messages that contain nudity of MY or the requester" had been sent. First Affidavit at 2.

98. A person requesting nude photographs "has to make many requests before they attain a nude photograph." First Affidavit at 2.

99. Hartsock averred that he needs the telephone records, because, based on the NCMEC Tip, "the frequency or infrequency of mixed media messages" between M.Y. and Streett could evidence such requests, and "contain child pornography or the attempt to entice sex from a minor." First Affidavit at 3.

100. Hartsock had no information that sexually explicit images had been sought or that sexually explicit images existed. See Tr. at 172:21-173:16 (Zimmerman, Hartsock).

101. Hartsock thought he had probable cause to believe that a crime had been committed, because "[e]ven if the underage person doesn't send an image, simply soliciting . . . a nude or a sexually explicit image" is a crime, Tr. at 169:9-13 (Hartsock, Zimmerman), and in his "training and experience . . . usually when 40-year-old men text 15 year olds for nude pictures, they're not for medical reasons. They're going to be sexually explicit," Tr. at 169:23-170:1 (Hartsock).

102. Hartsock had run searches to determine if Streett had any outstanding warrants for his arrest or significant criminal history and did not find anything, but did not include this information in the First Affidavit. See 163:1-19 (Zimmerman, Hartsock); First Affidavit at 1-3.

103. As a matter of course, however, Hartsock does not include the criminal history of the suspect in his search warrants, because he is not sure if he can due to bias and prejudice. See Tr. at 166:17-22 (Hartsock).

104.     Hartsock executed the First Warrant on February 12, 2014, and T-Mobile thereafter emailed the requested records to him on February 18, 2014.  See Search Warrant Return of Inventory at 5 (dated March 11, 2014[18]), filed July 24, 2018 (Doc. 141-2)("First Warrant Return"); Hartsock Report at 3.

105.     The telephone records show about "136 communications back and forth between Bentley Streett's listed phone number on the cyber tip and the alleged victim's phone number, including right around the October 30th, 31st date of the cyber tip," and a mixed media message sent from Streett to the alleged victim.  Tr. at 97:12-18 (Hartsock).[19]  See Hartsock Report at 3.

106.     Hartsock described the returned telephone records as being of a "very large size" and that he counted communications with "135 different area codes," Tr. at 107:3-13 (Hartsock), with a total of approximately 56,000 calls and text messages, see Tr. at 97:7-9 (Hartsock); id at 259:6-9 (Hartsock)(describing a large majority of the records as text messages).

107.     Hartsock generated a map with multiple colored dots which "represent the approximate location of the different area codes that were found" in the telephone records, Tr.

---

[18]The First Warrant Return says that return was made on March 11, 2012.  See First Warrant Return at 5.  The First Warrant Return appears to be a boiler plate document with blanks for the affiant to add various pieces of information.  See First Warrant Return at 5.  The blanks for all the dates, however, end with "2012."  First Warrant Return at 5.  All of the 2012s are crossed out except for on the "Return made this" line -- by Hartsock, as the initials "KH" appear next to the crossed out 2012s -- so the Court concludes that the return was not made two years before the warrant was executed.  First Warrant Return at 5.

[19]Hartsock testified that "a picture message was sent from the alleged minor's phone to Bentley Streett's phone," Tr. at 97:16-18 (Hartsock), but this was a mistake.  The Hartsock Report states that the records show "a mixed media message (MMS) on October 30, 2013, from Bentley to the victim."  Hartsock Report at 3.  Further, the local law enforcement's interview of M.Y. state that only one photograph was exchanged -- a photograph from Streett of his face.  See Kittson County Sheriff's Department Report at 1 (dated February 23, 2014)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Hearing Exhibit L).

110:4-12 (Mease, Hartsock), spread across the United States and parts of Canada, and showing "that this person's phone is in communication with virtually every geographical region of the country," Tr. at 110:16-18. See Map (undated)(submitted to the Court at the September 11, 2018, evidentiary hearing as Government's Hearing Exhibit 1).

108.     The Map's dots indicate Streett was communicating with two people in Minnesota, where the NCMEC Tip submitter and her daughter, M.Y., reside. See Map at 1; Hartsock Report at 3-4; Kittson County Sheriff's Department Report at 1 (dated February 23, 2014)(submitted to the Court at the September 11, 2018, evidentiary hearing as Defendant's Hearing Exhibit L)("Vig Report").

109.     The number of area codes with which Streett was texting fits the mold of someone who meets people on the internet, which "has no geographical boundaries." Tr. at 111:3-16 (Hartsock). See Vig Report at 1 (stating that M.Y. told officers that she met Streett on Twitter); Second Affidavit at 4 (same).

110.     Hartsock also used Streett's telephone records to generate a pivot table[20] on Excel to "show[] in order . . . what numbers were on his phone records the most to least." Tr. at 111:13-16 (Hartsock). See Excel Table (undated)(submitted to the Court at the September 11, 2018, evidentiary hearing as Government's Exhibit 2).

---

[20]A pivot table summarizes a large amount of data so that a user may rearrange the data in a more meaningful way. Pivot Table, Wikipedia, https://en.wikipedia.org/wiki/Pivot_table (last visited Nov. 26, 2018).

111.     Hartsock thought that "every MMS message in the records is potentially of interest because it's showing pictures being communicated."[21] Tr. at 122:3-5 (Hartsock).

112.     The highest frequency number in the telephone records is for the number 40404, which "is a short message text code used by Twitter to indicate to a person's cellphone that they either have a notification or someone is responding to a post or direct massage on Twitter." Tr. at 113:17-21 (Mease, Hartsock). See Excel Table at 1.

113.     The second highest frequency number in the telephone records is for a telephone number with a 740 area code and a total of 4,218 text messages exchanged in the approximately six-month scope of the First Warrant, see Excel Table at 1; First Affidavit at 1; indicating that this individual "is probably one of the most important people in [Streett's] life," Tr. at 114:13-16 (Mease, Hartsock).

114.     Hartsock called this telephone number and spoke with a girl identified as M.S., who indicated that she is under eighteen, does not live in New Mexico, knew she was speaking to Streett, that she met Streett on Twitter, and that they had "sexual conversations." Tr. at 116:10-13 (Hartsock). See Tr. at 114:17-24 (Mease, Hartsock).

115.     M.S. indicated she knew a minor male who also communicated with Streett -- identified in the Second Superseding Indictment as "John Doe" -- and law enforcement later interviewed this male based on M.S.' information. See Tr. at 116:14-3 (Mease, Hartsock).

---

[21]MMS stands for "multimedia messaging service," which includes pictures, forty seconds or less of video, audio, and text messages greater than 160 alpha-numeric characters in length. Multimedia Messaging Service, Wikipedia, https://en.wikipedia.org/wiki/Multimedia_Messaging_Service (last visited Oct. 26, 2018).

116.    The third highest frequency number in the telephone records is for a telephone number with a 915 area code with a total of 3,211 text messages and fifty MMS messages exchanged in the approximately six-month scope of the First Warrant.  See Excel Table at 1, 5, 6; First Affidavit at 1.  See also Tr. at 120:21-121:8 (Mease, Hartsock)(describing how T-Mobile codes MMS messages differently and how to tell if the record is of MMS messages).

117.    The 915 telephone number belongs to the girl identified as Jane Doe 3 in the Second Superseding Indictment, who was later interviewed and who provided her electronics to law enforcement for investigation, which revealed "photographs that are the subject of the indictment." Tr. at 118:17-20 (Mease, Hartsock).  See Tr. at 117:7-11 (Mease, Hartsock); id. at 118:6-16 (Mease, Hartsock).

118.    The telephone records reveal the telephone numbers and number of messages exchanged in the approximately six-month scope of the First Warrant with Jane Doe 1 (telephone number beginning with 815), Jane Doe 2 (telephone number beginning with 416), Jane Doe 4 (telephone number beginning with 605), and John Doe (telephone number beginning with 707). See Tr. at 119:20-120:2 (Mease, Hartsock)(discussing Jane Doe 1 in the records); id. at 120:18-20 (Mease, Hartsock)(John Doe); id. at 122:10-12 (Mease, Hartsock)( Jane Doe 2); id. at 122:18-23 (Mease, Hartsock) (Jane Doe 4); Excel Table at 2, 6, 10; First Affidavit at 1.  See also Tr. at 178:15-19 (Zimmerman, Hartsock)(verifying that the telephone records "contained all of the alleged victims named in the indictment").

119.    Law enforcement interviewed Jane Doe 1, who also turned over her electronics, which revealed "photographs relating to the underlying indictment."  Tr. at 120:6-14 (Mease, Hartsock).

120.    The telephone records reveal 591 text messages and six MMS messages exchanged with Jane Doe 1.  Excel Table at 2, 10.

121.    None of the alleged victims named in the indictment independently contacted police to make a complaint.  See Tr. at 125:14-25 (Mease, Hartsock, Court, Zimmerman).

122.    Hartsock could not charge a crime based on the telephone records.  See Tr. at 181:16-17 (Hartsock).

### 4.    The February 24, 2014, Search of the 4620 Plume Residence.

123.    On February 24, 2014, Hartsock swore an affidavit supporting an application for a search warrant to search the 4620 Plume residence and obtained the search warrant the same day. See Second Affidavit at 13; Second Warrant at 14.

124.    The Honorable Christina T. Jaramillo, then-New Mexico Magistrate Judge for the Bernalillo County Metropolitan Court, approved the Second Warrant telephonically.  See Second Warrant at 14.

125.    The Second Warrant incorporates the Second Affidavit, stating it is "hereby made part of this warrant."  Second Warrant at 14.

126.    The Second Affidavit begins by providing a description of the appearance of the 4620 Plume residence, including that the only car not "backed in" the driveway was a brown Fiat with the New Mexico license plate "PL8SPCL."  Second Affidavit at 1.

127.    The Second Affidavit does not provide to whom the brown Fiat is registered.  See Second Affidavit at 1-13.

128.    Hartsock did not run the MVD records for the brown Fiat, nor did he look up assessor information for the 4620 Plume residence.  See Tr. at 193:5-194:1 (Zimmerman,

Hartsock)(discussing Hartsock's lack of recollection and not having this information anywhere); Hartsock Report at 3-4 (not providing this information); Second Affidavit at 1-13 (same).

129.     The MVD records reveal a brown Fiat with New Mexico license plate PL8SPCL has been titled to and registered by Pamela Lesiak since August 8, 2013, at the 4620 Plume residence.  See PL8SPCL - NM -Vehicles at 1 (dated September 13, 2018)(filed with the Court at the September 11, 2018, evidentiary hearing as Government's Exhibit 5).[22]  See also State of New Mexico Motor Vehicle Division Certificate of Vehicle Registration (undated)(filed with the Court at the September 11, 2018, evidentiary hearing as Defendant's Exhibit N)(showing a Fiat with license plate PL8SPCL registered to Lesiak from 2013-2014).

130.     The assessor records also show that Lesiak paid the 2013 tax bill for the 4620 Plume residence and that Streett granted her the property in 2005.  See 2013 Tax Bill at 2 (undated)(filed with the Court at the September 11, 2018, evidentiary hearing as Defendant's Exhibit J); Warranty Deed at 3 (dated October 7, 2005)(filed with the Court at the September 11, 2018, evidentiary hearing as Defendant's Exhibit J).

131.     In hindsight, knowing that the Fiat and home are tied to Lesiak in the MVD and assessor records, Hartsock "wouldn't have changed [his] mind to go forward with the warrant." Tr. at 201:10-11 (Hartsock); id. at 244:10-13 (Hartsock)(elaborating that this is because he "had no more recent information than what I felt those records to be, and to me, more reliable information," noting the telephone subscriber information).

---

[22]These records also reveal that the same license plate used to be on a Ford Crown Victoria which, from August 6, 2012, until October 17, 2013, was titled to and registered by Lesiak and Streett, at the 4620 Plume residence.  See PL8SPCL - NM- Vehicles at 3.

132.     This description of the 4620 Plume residence came from a "limited surveillance" that Hartsock conducted "during daytime hours, so [he] could get a description for [his] warrant and try to see if [he] could learn anything more about the house." Tr. at 101:6-9 (Hartsock).

133.     The Second Affidavit provides that the 4620 Plume residence contains many pieces of personal property that constitute a criminal offense and/or are material evidence of a criminal offense, including, but not limited to: (i) any electronic device "capable of sending text, photos and video using online based communication services," and any device enabling a computer to do so; (ii) any storage device "that can store images or other files that could contain child pornography"; (iii) "[a]ll documents which indicate proof of residence at 460 [sic] Plume Rd NW"; (iv) "[a]ll photographs . . . which depict a minor posed or candid in a sexual manner"; (v) "contracts, agreement records and accounts with Internet providers, computer bulletin boards or other computer on line service provider, and accounts with other persons, companies or corporations evidencing manufacturing, production, distribution, receiving, possessing, or sales" of any materials or documents "relating to sexual conduct of persons under the age of 18"; (vi) "personal property tending to establish the identity of person or persons having the dominion and control over the computer equipment"; (vii) lock boxes or safes, or evidence of such off-site containers, where "evidence of crimes against children may be stored for safekeeping against seizure"; and (viii) "[a]ll phones and all cell phone records to establish ownership." Second Affidavit at 1-3.

134.     The Second Affidavit again describes the NCMEC Tip and subsequent Subpoena issued to T-Mobile in same manner as in the First Affidavit. See Second Affidavit at 4.

135.     The Second Affidavit does not identify the CI as the alleged victim's mother nor provide whether she has provided accurate information in the past.  See Second Affidavit at 3-4.

136.     Again, the Second Affidavit does not include Streett's lack of outstanding warrants or criminal history.  See Second Affidavit at 4-13.

137.     The Second Affidavit provides some additional background information on the partnership between NCMEC and the New Mexico Attorney General's Office, stating that NCMEC screens the online tip first -- because anybody can submit one through its website -- then assign it to the appropriate state's "ICAC coordinator," who "conducts a basic investigation to find out what county or city has jurisdiction over the case."  Second Affidavit at 4.

138.     The Second Affidavit then discusses what Hartsock learned from Minnesota law enforcement's interviews with M.Y. and with her mother.  See Second Affidavit at 4.

139.     On February 21, 2014, Hartsock reached out through the ICAC network to law enforcement in Minnesota, where M.Y. resided, to attempt to make "in-person contact with mom and daughter, to get more information about what had occurred" -- especially because Hartsock believed the mixed media message "could have been child pornography."  Tr. at 98:1-16 (Hartsock).  See Hartsock Report at 3.

140.     At the time that Hartsock reached out to local law enforcement, he lacked "specific knowledge of" how to contact law enforcement in another state, Tr. at 182:9-10 (Hartsock), because he wanted "to make sure someone with ICAC background" would contact M.Y. and her mother, Tr. at 180:4-6 (Hartsock).

141.     Hartsock waited to contact local law enforcement until after he executed the First Warrant, because he wanted to establish if M.Y. was still talking to Streett, as it would "affect [his]

ability to interview someone over the phone or law enforcement's ability to interview [M.Y.] in person if [she is] still in contact with [Streett]." Tr. at 151:23-182:2 (Hartsock).

142. On February 23, 2014, Matthew Vig, with the Kittson County Sheriff's Office, made contact with M.Y. and her mother at the Kittson County Sheriff's Office in Minnesota. See Hartsock Report at 4; Vig Report at 1.

143. Vig took a statement from M.Y., who said she was fourteen-years-old at the time[23] and that Streett knew of her age, because her Twitter page showed her age of fourteen and because she told Streett that she was fourteen. See Vig Report at 1.

144. Vig reported that M.Y. said that Streett asked her "to send him nude photos to him, two or three times," but that she did not send him any photographs. Vig Report at 1.

145. The Vig Report states that M.Y. said Streett sent her a "face photo, no nudity," and that he "was older," but that she "did not know his true age." Vig Report at 1.

146. The Second Affidavit states that M.Y. "consensually gave her cellphone to Deputy Vig so he could download it and confirm the details of her relationship with Bentley." Second Affidavit at 5. See Vig Report at 1 (stating that, "with consent, I received M (remainder redacted)'s cell phone as evidence").[24]

---

[23]This does not meld with the NCMEC Tip's allegation that Streett "requested a nude photography by text message from [the submitter's] 15 year old daughter." NCMEC Tip at 3. The Court does not have sufficient information in the record to determine M.Y.'s age at the time of Streett's request, but notes that whether she was fourteen or fifteen at the time, she was a minor.

[24]Streett's Proposed Findings state "MY provided her cell phone to Minnesota law enforcement. No unlawful images were found." Streett's Proposed Findings ¶ 8, at 14 (citing Tr. at 189). This is a misstatement of the evidence. At the hearing, Mr. Zimmerman questioned Hartsock:

Q. There were no images that were unlawful on MY's phone, were there?

147.     Hartsock believed that the Vig Report "more strongly corroborated" the NCMEC Tip and that this corroboration, combined with "the phone records showing the high amount of communication, and that mixed media message being sent," led Hartsock to draft a search warrant for Streett's home.  Tr. at 100:13-18 (Hartsock).

148.     The Second Affidavit concedes there is no evidence that M.Y. sent Streett any nude photographs, but notes that Streett's asking constitutes a crime under N.M. Stat. Ann. § 30-37-3.2. See Second Affidavit at 5.

149.     New Mexico Stat. Ann. § 30-37-3.2 provides that the crime of

> [c]hild solicitation by electronic communication device consists of a person knowingly and intelligently soliciting a child under sixteen years of age, by means of an electronic communication device, to engage in sexual intercourse, sexual contact or in a sexual or obscene performance, or to engage in any other sexual conduct when the perpetrator is at least four years older than the child,

and that "electronic communication device" includes a computer and cellphone.  N.M. Stat. Ann. § 30-37-3.2(A) & (F).

150.     New Mexico Statute § 30-37-1 does not define "sexual or obscene performance," but defines "sexual conduct" as an "act of masturbation, homosexuality, sodomy, sexual

---

A.     I don't recall that they found any on that review.

Tr. at 189:19-22 (Zimmerman, Hartsock).  This indicates that Hartsock did not remember if images were found on M.Y.'s telephone.  Further, the Vig Report does not say what was found in the search of the cellular telephone, or if it even was searched.  See Vig Report at 1-2 (just saying the telephone was taken as "evidence").  The Hartsock Report also does not indicate if the telephone was searched.  See Hartsock Report at 4.  The Court thus cannot conclude that "[n]o unlawful images were found" on M.Y.'s cellular telephone," and does not incorporate this Proposed Finding.  Streett's Proposed Findings ¶ 8, at 14 (citing Tr. at 189).  The Court also does not incorporate Streett's Proposed Finding that "Hartsock omitted from his search warrant affidavit . . . the results of the search of MY's telephone showing no sexually explicit images," for the same reason.  Streett's Proposed Finding ¶ 10, at 15 (citing Vig Report; Tr. at 189-91).

intercourse or physical contact with a person's clothed or unclothed genitals, pubic area, buttocks or, if such person be female, breast." N.M. Stat. Ann. § 30-37-1(C).

151. Hartsock states that, in his "training and experience[,] a person does not try to gain child pornography only once and one way," and thus he "seeks to ensure no photographs were received from our victim that would violate further law of child exploitation and to ensure there were no other victims that our suspect has contacted asking for explicit images of minors." Second Affidavit at 5.

152. The remainder of the Second Affidavit provides how Hartsock's "training and experience" leads him to believe that evidence of child pornography may be found in the various pieces of personal property which he wants to search and seize. Second Affidavit at 5-13.

153. The Second Affidavit does not discuss the information gleaned from the telephone records that Hartsock obtained under the First Warrant. See Second Affidavit at 2-13.[25]

154. The Second Affidavit does not provide how Hartsock decided to search the 4620 Plume residence or why he believes Streett's personal property or evidence of Streett's alleged criminal activity will be found at the residence, see Second Affidavit at 1-13; Motion at 3, but Hartsock would have been able to add that information to the Second Warrant if the judge to whom he presented the Second Affidavit had asked where in Bernalillo County Streett lived, see Tr. at

---

[25]Streett's Proposed Findings state: "Hartsock could have used the information gleaned from the telephone warrant as a basis for the house warrant, even without the information Minnesota police provided after their interview of MY." Streett's Proposed Findings ¶ 61, at 13 (citing Tr. at 109-10). To the extent that this is stating that the telephone records alone could have established probable cause, this is a legal conclusion and the Court does not adopt this Proposed Finding. It is true, however, that the telephone records information could have been included in the Second Warrant to help establish probable cause.

103:4-9 (Mease, Hartsock). <u>See</u> <u>also</u> Tr. at 192:15-17 (Hartsock)(admitting it was a mistake to connect the address to Streett); <u>id.</u> at 204:15-17 (Hartsock)(same).

155.    The 4620 Plume address "came from the cyber tip; it came from the grand jury subpoena returns, and T-Mobile also provided it to [Hartsock] when they returned [Hartsock's] search warrant records," Tr. at 100:24-101:2 (Hartsock); the Hartsock Report provides that Streett's "New Mexico driver's license also showed this as his address," Hartsock Report at 4. <u>See</u> Tr. at 161:7-14 (Hartsock)(stating that Hartsock had no indication that Streett "was living anywhere else," because his driver's license and the subscriber billing information returned to 4620 Plume and that, "reasonably, to the best of my ability, without knocking on his door beforehand without a warrant, I was able to verify he lived there"); <u>id.</u> at 199:5-14 (Hartsock)(describing why he chose to search 4620 Plume).

156.    Hartsock executed the Second Warrant on February 25, 2014, leaving a copy of the Warrant with Lesiak, Streett's live-in girlfriend, and taking the following property: one Mac laptop, one Mac desktop, one "smart phone," and one "regular cell phone." Search Warrant Return and Inventory at 15 (dated March 4, 2014), filed August 15, 2018 (Doc. 144-5). <u>See</u> Tr. at 103:10-14 (Mease, Hartsock); Hartsock Report at 4.

157.    Streett was also present at the 4620 Plume residence upon execution of the Second Warrant. <u>See</u> Tr. at 103:13-14 (Mease, Hartsock); Hartsock Report at 4.

158.    Hartsock escorted Street, unhandcuffed, to his unmarked vehicle and, after Hartsock read Streett his <u>Miranda</u>[26] warnings, Streett agreed to speak. <u>See</u> Hartsock Report at 4.

---

[26]<u>Miranda v. Arizona</u>, 384 U.S. 436 (1966)("<u>Miranda</u>"). <u>Miranda</u> "requires that procedural safeguards be administered to a criminal suspect prior to 'custodial interrogation.'" <u>United States v. Perdue</u>, 8 F.3d 1455, 1463 (10th Cir. 1993)(quoting <u>Miranda</u>, 384 U.S. at 444). The Supreme

159.     Streett stated that only he and his girlfriend, Lesiak, lived in the 4620 Plume residence and that they were in a "'somewhat' open relationship."  Hartsock Report at 4.

160.     Streett confirmed that he uses his personal Twitter account -- @thebiguy69 -- "to meet and interact with woman [sic] and girls," and, while "he asks his followers to be at least 18 years of age," he "texts some of the girls he meets on [Twitter with] his cell phone," and "did recall a couple of users that he knew were under 19 years of age, one of them being the name 'M(remainder redacted).'"  Hartsock Report at 5.

161.     Streett also told Hartsock that "he may have asked some of the under 18 girls for nude photographs of themselves," but that he did not believe he had child pornography on his cellphone -- the Nokia Lumia smartphone retrieved from the residence.  Hartsock Report at 5.

162.     Streett discussed how he had previously traveled out of New Mexico to meet women whom he met online on two occasions: (i) around January 5, 2014, when he traveled to Phoenix, Arizona, to meet nineteen-year-old J., saying they had no sexual relationship; and (ii) on

---

Court provided the substance of the warning that must be given to a defendant to meet these procedural safeguard requirements:

> Prior to any questioning, the person must be warned that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed.  The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently.  If, however, he indicates in any manner and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning.  Likewise, if the individual is alone and indicates in any manner that he does not wish to be interrogated, the police may not question him.

Miranda, 384 U.S. at 444-45.

January 19, 2014, when he drove to Decatur, Illinois, to meet twenty-year-old F.S., with whom he engaged in "foreplay." Hartsock Report at 5.

**5.      The Subsequent Search Warrants Resulting from Evidence Seized from the 4620 Plume Residence.**

163.    On May 21, 2014, Hartsock swore to an affidavit supporting an application for a warrant to search Streett's primary cellular telephone taken during the search of the 4620 Plume residence: "A Nokia Lumia cell phone running a Microsoft Operating System." Affidavit for Search Warrant at 1 (executed May 21, 2014), filed December 1, 2017 (Doc. 78-2)("Third Warrant").

164.    The Third Warrant requests that the Second Judicial District Court allow Hartsock to send "[t]he text and mixed media messages stored on" Streett's Nokia cellular telephone "to the built in back-up service provided by Microsoft, which will transmit the phone[']s text and mixed media messages over the internet to Microsoft[']s servers. Once there, Microsoft can provide a disk or download of the messages in electronic format." Third Warrant at 1.

165.    The Third Warrant also "requests that Microsoft preserve these message[s] and not allow the user to initiate any request that could delete or alter the messages once uploaded." Third Warrant at 4.

166.    The Third Warrant provides the same description of the NCMEC Tip and Vig's follow-up with M.Y. that the Second Affidavit provides. See Third Warrant at 1-3.

167.    Hartsock again states that his "training and experience" counsels that "a person does not try to gain child pornography only once and one way," so he wants to ensure Streett received no photographs from M.Y. or any other underage victims. Third Warrant at 3.

168.     The Third Warrant describes Hartsock's execution of the Second Warrant and his conversation with Streett, in which Streett "admitted to meeting many women and girls on Twitter and other social media websites and ask[ing] them for nude photographs of themselves." Third Warrant at 3.

169.     According to the Third Warrant, Streett said in this conversation that "he remembered meeting MY and talking to her via text messages on his phone but couldn't remember if he asked her to send a naked photograph. He did know she was under 18 years old during their conversations." Third Warrant at 3. See Hartsock Report at 5 (stating that when asked about M.Y., Streett said he knows her).

170.     According to the Third Warrant, the Nokia telephone "contains thousands of messages between Bentley and other women, some who identify themselves as young as 14 years old and contain photographs of genitals being sent and received from Bentley." Third Warrant at 4.

171.     Microsoft told Hartsock that it could not prevent a remote user from erasing data from the phone, so he physically went through the conversations contained on the telephone. See Hartsock Report at 6.

172.     Hartsock extracted "[a]pproximately 13,000 different text messages" from the Nokia telephone, Tr. at 104:19-20 (Hartsock), and found that it appeared that Streett was texting minors, because Streett "would store the contacts as the name of the person, their location, their age and sometimes their usernames," Hartsock Report at 6. See Tr. at 104:19-105:3 (Hartsock, Mease).

173.     Hartsock found the conversation with M.Y., which showed that Streett "indirectly ask[ed] her for a nude photograph around the time the complaint was made."  Hartsock Report at 8.

174.     In a conversion with a person identified as "B," Streett discussed a sexual relationship he had "with a young follower" and sent B "a selfie of him and a white female who appears to be a teenager.  It appears they are in a hotel or motel room . . . ."  Hartsock Report at 10-11.

175.     After writing another warrant for "a longer expansion of records for Bentley from T-Mobile" to determine with whom Streett had the sexual relationship, he found "a large amount of texting between two phone numbers," one beginning with "414"[27] and the other with "815."  Hartsock Report at 11-12.

176.     On June 24, 2014, Hartsock swore to an affidavit to obtain a search warrant for the "call, SMS, MMS and any other recorded transaction records or meta data from 4/1/2013-2/28/2014,"[28] and the "cell tower locations for each call or SMS, MMS or other recorded transaction or meta data from 4/1/2013-2/28/2014" for Verizon Wireless Account 414-(remainder

---

[27]The Hartsock Report consistently provides the three digits as "404," but this is clearly a mistake, as he says, "I wrote warrants to Verizon Wireless, the carrier of both numbers," Hartsock Report at 12, and the resulting warrants are for telephone numbers beginning with "414" and "815."  See Affidavit for Search Warrant at 1 (executed June 24, 2014), filed December 1, 2017 (Doc. 78-3); Affidavit for Search Warrant at 1(executed August 26, 2014), filed December 1, 2017 (Doc. 78-4).

[28]The affidavit does not describe what is meant by "SMS" or "MMS."  "SMS" stands for "short message service," which is what is commonly known as a "text message"; although SMS messaging only "allow[s] users to send and receive messages of up to 160 alpha-numeric characters."  SMS, Wikipedia, https://en.wikipedia.org/wiki/SMS (last visited Oct. 26, 2018).  "MMS" is discussed supra note 21.

redacted).  Affidavit for Search Warrant at 1 (executed June 24, 2014), filed December 1, 2017 (Doc. 78-3)("Fourth Warrant").

177.    The Fourth Warrant provides the same information regarding the NCMEC Tip and Vig's contact with M.Y. as previous affidavits provide.  See Fourth Warrant at 1-3.

178.    According to the Fourth Warrant, Hartsock "interviewed Bentley Streett who admitted to meeting wom[e]n on Twitter and asking them for nude photographs, 1-2 of them he knew were under 18 when he asked for the nude photographs.  He stated that Twitter and text messaging were his primary ways of communicating with the underage girls."  Fourth Warrant at 3.

179.    The Fourth Warrant states that, after reviewing text messages on Streett's cellular telephone, Hartsock found "multiple conversations" in which Streett "sends a photo of himself with a young teenage looking female and tells a story that he went to Illinois and Indiana in July of 2013 and met a virgin 15 year old girl that he had sexual contact with for a few days."  Fourth Warrant at 3.

180.    According to the Fourth Warrant, Hartsock obtained Streett's telephone records, and identified the 414-(remainder redacted) number as one which Streett was "sending and receiving hundreds of text messages from in a short time span during early July, 2013."  Fourth Warrant at 3.

181.    Hartsock says that he wants to determine if this user is a "possible victim[] of sexual exploitation or sexual coercion to perform intimate acts.  By Bentley's statements he had physical sexual intercourse with her at his motel room, and with the phone location information affiant seeks to identify that hotel room."  Fourth Warrant at 3.

182.     On August 26, 2014, Hartsock swore to an affidavit for a search warrant to obtain "[a]ccount subscriber and a list of all other phone numbers associated with [Verizon Wireless] account [815-(remainder redacted),] including their names, address and other contact information between 6/1/2013-12/31/2013."  Affidavit for Search Warrant at 1 (executed August 26, 2014), filed December 1, 2017 (Doc. 78-4)("Fifth Warrant").

183.     After providing the same information regarding the NCMEC Tip and Hartsock's meeting with Streett as in the Fourth Warrant, the Fifth Warrant describes a photograph that Streett "appears to have taken . . . with the young female he had intercourse with," purportedly the fifteen-year-old virgin the Fourth and Fifth Affidavits describe Streett meeting in Illinois and Indiana. Fifth Warrant at 3.

184.     The Fifth Warrant describes this photograph as showing "what appears to be the inside of a motel room door."  Fifth Warrant at 3.

185.     According to the Fifth Warrant, the photograph "was found on the cell phone and by looking at the meta data on the photo, Bentley's phone that was seized was the phone that took the photograph.  The date is 7/13/13 for the photo and his call records indicate very high usage that day to this phone number."  Fifth Warrant at 3.

186.     Hartsock says he "believes the girl in the photo was using" the 815-(remainder redacted) number to communicate with Streett and that he "seeks to identify the owner of the cell phone account to find the girl and find her involvement with Bentley."  Fifth Warrant at 4.

187.     This 815 telephone number is the same 815 number discussed infra ¶¶ 118-120, belonging to Jane Doe 1.  See Tr. at 124:1-9 (Mease, Hartsock).

**PROCEDURAL BACKGROUND**

In December 2015, a grand jury returned a Second Superseding Indictment,[29] charging Streett with two counts of traveling in interstate commerce from New Mexico to Illinois "for the purpose of engaging in any illicit sexual conduct" with a person under eighteen years of age -- Jane Doe 1 -- that "would be in violation of Chapter 109A of Title 18, United States Code, had the sexual act occurred," in violation of 18 U.S.C. § 2423(b). Second Superseding Indictment at 1-2, filed December 17, 2015 (Doc. 33). The Second Superseding Indictment charges Streett with five counts of coercion and attempted coercion of a minor "to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," in violation of 18 U.S.C. §§ 2251(a), (e), and 2256. Second Superseding Indictment at 2-4.[30] The Second Superseding Indictment also charges Streett with one count of distributing visual depictions of minors engaged in sexually

---

[29]The Second Superseding Indictment is the controlling Indictment in this case. The first Indictment, issued by a grand jury on October 2014, charges Streett with two counts of coercing or enticing a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2422(b). See Indictment at 1 2, filed October 21, 2014 (Doc. 12). The Indictment also charges Streett with two counts of transferring obscene matter to someone younger than sixteen years old, in violation of 18 U.S.C. § 1470. See Indictment at 2 3.

In February 2015, a grand jury returned a Superseding Indictment, charging Streett with two counts of traveling in interstate commerce from New Mexico to Illinois "for the purpose of engaging in any illicit sexual conduct" with a person under eighteen years of age that "would be in violation of Chapter 109A of Title 18, United States Code, had the sexual act occurred," in violation of 18 U.S.C. § 2423(b). Superseding Indictment at 1-2, filed February 25, 2015 (Doc. 22). The Superseding Indictment charges Streett with three counts of attempted production of a visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2251(a), (e), and 2256. See Superseding Indictment at 2-4. The Superseding Indictment also charges Streett with two counts of transferring obscene materials to minors, in violation of 18 U.S.C. § 1470. See Superseding Indictment at 4-5.

[30]These counts -- Counts 3 through 7 -- each identify a different minor: John Doe, Jane Doe 4, Jane Doe 1, Jane Doe 2, and Jane Doe 3, respectively. See Second Superseding Indictment at 2-4.

explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2), (b)(1), and 2256, see Second Superseding Indictment at 5, two counts of transferring obscene materials to minors, in violation of 18 U.S.C. § 1470, see Second Superseding Indictment at 5-6, and two counts of possessing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256, see Second Superseding Indictment at 6. Streett files the Motion and Supp. Motion to challenge the evidence collected by law enforcement which will be used to support these charges at trial.

### 1.  **The Motion.**

Streett filed the Motion on December 1, 2017.  See Motion at 1.  The crux of Streett's argument in the Motion is that the Second Affidavit "is devoid of any indication that Mr. Streett resided at 4620 Plume, much less any indication that contraband related to Mr. Streett's alleged criminal activity would be found at this residence," and, thus that "evidence obtained as a result of th[is] unreasonable search . . . was wrongfully obtained in violation of Mr. Streett's Fourth Amendment rights, and should be excluded."  Motion at 1.  The Motion likens the Second Affidavit to the affidavit at issue in United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005), which identified the address "321 E. Church" but "never specified that 321 E. Church was the defendant's residence, and otherwise never explained the connection between 321 E. Church . . . or the suspected criminal activity."  Motion at 6 (citing United States v. Gonzales, 399 F.3d at 1228). According to Streett, the Tenth Circuit in United States v. Gonzales upheld the district court's holding to suppress the evidence, concluding the warrant lacked probable cause and the good-faith doctrine did not apply, because the "underlying documents are devoid of factual support."  Motion at 7 (quoting 399 F.3d at 1230).  Streett contrasts this holding with that in United States v. Beck, 139 F. App'x 950 (10th Cir. 2005)(unpublished)(Browning, J. sitting by designation), where the

Tenth Circuit upheld the application of the good-faith doctrine, because, "although the affidavit was weak, it established 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" Motion at 8 (quoting 139 F. App'x at 958). Streett concludes from this caselaw that, because the Second Affidavit lacks the "minimal nexus between 4620 Plume or any of the items listed on the Affidavit to Mr. Streett or his alleged criminal activity[,] . . . the evidence seized from the 4620 Plume Search must be suppressed." Motion at 9. Streett argues that, because the Second Affidavit states that it seeks to seize "'documents which indicate proof of residence,' [this] impl[ies] that the affiant had no actual knowledge of whether Mr. Streett was, in fact, a resident of 4620 Plume," underscoring the Second Affidavit's lack of a minimal nexus. Motion at 1. Streett thus argues that the Court must exclude "Streett's statements to police officers; computer; laptop; smartphone; and regular phone." Motion at 10.

The Motion concludes by arguing that "all evidence later discovered as a result of this illegal search of [4620 Plume] must also be excluded. This includes evidence discovered pursuant to the three search warrants which were later obtained in the months after the initial search of 4620 Plume." Motion at 10. This exclusion is necessary, Streett asserts, under "the fruit of the poisonous tree doctrine." Motion at 9 (citing Wong Sun v. United States, 371 U.S. 471, 485-88 (1963); United States v. Hatfield, 333 F.3d 1189, 1193-94 (10th Cir. 2003); United States v. Lin Lyn Trading, Ltd., 149 F.3d at 1116). Streett specifically argues that, once the Court suppresses the evidence obtained from the illegal search of the 4620 Plume residence, the Third, Fourth, and Fifth Affidavits fail to provide probable cause, and "the evidence obtained pursuant to the execution of these later warrants must also be suppressed." Motion at 10.

2. __The Supp. Motion.__

Streett filed the Supp. Motion on July 24, 2018, to set forth three additional arguments for suppression of evidence: (i) that Carpenter v. United States, 138 S. Ct. 2206 (2018), requires suppression of the evidence seized resulting from the Subpoena; (ii) that the First Warrant lacks probable cause, requiring suppression of evidence and fruits resulting from its execution; and (iii) that Hartsock failed to provide substantial evidence supporting a finding of probable cause in his First Affidavit in contravention of New Mexico Rules of Criminal Procedure, denying Streett due process of law. See Supp. Motion at 1, 19. Streett argues that Carpenter v. United States "makes the Government's initial privacy intrusion here, the subpoena, an unlawful search and seizure that violated Mr. Streett's Fourth Amendment rights." Supp. Motion at 2. Streett states that the Supreme Court of the United States held in Carpenter v. United States "that the prosecutor's request for cell site locator information ('CSLI') was a search and therefore required the Government to make a probable cause showing necessary to obtain a search warrant before obtaining cell phone information like the CSLI at issue in that case." Supp. Motion at 4 (citing Carpenter v. United States, 138 S. Ct. at 2221). The CSLI data, Streett argues, "gave the government, 'an intimate window into a person's life, revealing not only his particular movements, but through them his familial, political, professional, religious, and sexual associations.'" Supp. Motion at 4 (quoting Carpenter v. United States, 138 S. Ct. at 2217). Streett notes that "cell phones follow the user everywhere . . . and for the most part never leave the individual's side." Supp. Motion at 5. These technological changes, Streett states, led the Supreme Court to "modify[] the third party doctrine it had previously employed" in, for example, Smith v. Maryland, 442 U.S. 735 (1979). Supp. Motion at 5. The Supreme Court in Carpenter v. United States, Streett argues,

concluded that the CSLI data is collected involuntarily on everyone, "creat[ing] a reasonable expectation of privacy in the data," although "[m]ere telephone numbers dialed are still subject to the third party doctrine and do not require a probable cause determination." Supp. Motion at 6 (citing Carpenter v. United States, 138 S. Ct. at 2216, 2219). Streett states that the Supreme Court held "that the Fourth Amendment requires search warrants supported by probable cause, and not subpoenas, when the Government seeks cellular telephone records." Supp. Motion at 7 (citing Carpenter v. United States, 138 S. Ct. at 2269 (Gorsuch, J., dissenting)). He notes that the Supreme Court had previously held that the Fourth Amendment requires search warrants "to search the contents of a cell phone seized incident to arrest." Supp. Motion at 7 n.2 (citing Riley v. California, 134 S. Ct. 2473, 2495 (2014)). Streett cites the dissent of the Honorable Anthony Kennedy, former Associate Justice for the Supreme Court of the United States, because Justice Kennedy stated that the majority decision in Carpenter v. United States "calls into question the subpoena practices of federal and state grand juries." Supp. Motion at 8 (internal quotation marks omitted)(quoting Carpenter v. United States, 138 S. Ct. at 2234 (Kennedy, J., dissenting)).

Streett argues that the Subpoena is improper under the Fourth Amendment, because it gathers data that "included much more than merely numbers dialed," generating 2,305 documents.[31] Supp. Motion at 6. He then argues that "there is no way to know whether there was

---

[31]It is unclear from this portion of the Supp. Motion whether Streett is arguing that the Subpoena is improper, because the Subpoena did not generate 2,305 documents that "included not only the two telephone numbers dialed, which might be permissible under Carpenter, but who had initiated the call, the type of communication (text message), and the size of the data conveyed." Supp. Motion at 6 (citing Combined Detail LE at 1, filed July 24, 2018 (Doc. 141-3)). These documents were obtained via Hartsock's execution of the First Warrant, not under the Subpoena. See United States' Amended Response in Opposition to Defendant's Motions to Suppress Evidence (Docs. 78, 141) at 6, filed August 15, 2018 (Doc. 144).

a pending grand jury investigation necessary for the subpoena to issue or that it was issued at the behest of the District Attorney," and that "[s]ubpoenas issued without a pending grand jury matter are unlawful." Supp. Motion at 7 (citing State v. Martinez, 2018-NMSC-031, ¶ 7, 420 P.3d 568, 569). The Fourth Amendment, Streett avers, "requires the suppression of any evidence seized as a result of the initial subpoena for telephone records," because it sought "cell phone data beyond numbers dialed." Supp. Motion at 9.

Streett next argues that the First Warrant lacks probable cause. See Supp. Motion at 9. He says that he is challenging the First Warrant on its face, so the Court must look to "the four corners of the [First Affidavit] to determine whether the warrant is supported by probable cause." Supp. Motion at 9 (citing Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. 560, 565 n.8 (1971)). According to Streett, the First Affidavit "lacked sufficient information for a probable cause finding," so despite approval a magistrate judge's approval of the First Warrant, "all evidence seized pursuant to that search or subsequent searches must be suppressed." Supp. Motion at 10 (citing Wong Sun v. United States, 371 U.S. at 488). First, Streett argues that the First Affidavit "is immediately conspicuous and questionable because it is blank on the portion of the form calling for the date Hartsock signed as the affiant." Supp. Motion at 10 (citing First Affidavit at 3). Second, Streett argues that the First Affidavit proffers "no case specific facts justifying probable cause to issue a search warrant," and then quotes the portion of the First Affidavit discussing the NCMEC Tip, the Subpoena, T-Mobile's Email, and Hartsock's inability to contact the NCMEC tipster. Supp. Motion at 11 (quoting First Affidavit at 2). Streett then discusses electronic communication service providers' affirmative duty to report any apparent child pornography to NCMEC and the high fines associated with a failure to report. See Supp. Motion at 12 & n.3

(citing 18 U.S.C. § 2258A(a)). Streett characterizes the First Affidavit's language describing the NCMEC Tip as "an adult male soliciting a nude photograph of a fifteen year old girl," acknowledging that the Court must only examine the First Affidavit, but averring that "the language the affiant used made the actual NCMEC tip seem more nefarious, turning the word 'requested' into 'soliciting,'" and suggesting that "a struggling affiant [is] using all powers of creativity to create something out of nothing." Supp. Motion at 12 & n.4 (quoting First Affidavit at 2). Streett argues that, because nothing in the NCMEC Tip suggests the tipster's desire to remain a CI, Hartsock used the term in "an effort to beef up his lack of probable cause and draw attention from what easily could have been an intra-family dispute over a boyfriend the parent disapproved of." Supp. Motion at 13 & n.5 (citing NCMEC Tip at 3). Streett also argues that the First Affidavit's use of the term "conversation" suggests the tipster "had seen multiple communications," even though the NCMEC Tip refers to only one text message. Supp. Motion at 13 & n.6 (citing NCMEC Tip at 3).

Streett argues that, because the NCMEC Tip does not state how the tipster knew the requestor was an adult or how he would have known that M.Y. was a minor, and because the requestor asked only for a nude photograph, the First Affidavit fails to establish probable cause "to search for private subscriber information based on the notion that the search warrant 'could contain child pornography or the attempt to entice sex from a minor.'" Supp. Motion at 14 (quoting First Affidavit at 3). Streett further argues the First Affidavit is deficient in providing "no information that would indicate the reliability of the CI's information," and in not disclosing how the CI knew the identity or location of the requestor. Supp. Motion at 14 (citing First Affidavit at 2). The First Affidavit, in Streett's view, "relies solely on a confidential informant's hearsay tip

to NCMEC," and does not provide "the necessary reliability or . . . corroboration to justify the speculative nature of the affidavit." Supp. Motion at 15. Streett acknowledges that an affidavit may rely on hearsay, but he notes the Tenth Circuit, in United States v. Harris, 735 F.3d 1187 (10th Cir. 2013), said that "the basis of a confidential informant's knowledge, as well as his reliability, are important factors in deciding whether information in an affidavit supports a finding of probable cause for a search." Supp. Motion at 15 (internal quotation marks omitted)(quoting United States v. Harris, 735 F.3d at 1192). Streett avers that an affidavit relying on hearsay to establish probable cause is insufficient if it "neither provides a basis for the informant's veracity, nor includes sufficient independent corroboration of the informant's information." Supp. Motion at 15 (citing United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000)). With its lack of independent corroboration and no showing of the informant's veracity, the First Affidavit, Streett argues, lacks probable cause. See Supp. Motion at 15. Streett also argues that the First Affidavit does not "explain the origin of the telephone number 505-974-9704, allegedly associated with Mr. Streett" and that Hartsock was merely speculating, "unconvinced there was any criminal activity." Supp. Motion at 17. Streett points to the First Affidavit's language -- that Hartsock is requesting the telephone records to "see a wide picture of the frequency of communication between MY and the requestor, and the frequency or infrequency of mixed media messages that based on the CI's [sic] complaint, *could contain child pornography* or the attempt to entice sex from a minor" -- as showing the speculative nature of the search. Supp. Motion at 19 (emphasis in the Supp. Motion)(internal quotation marks omitted)(quoting the First Affidavit at 2-3).

Streett also argues that Hartsock omitted the information the Subpoena provides -- "like the numbers dialed, the nature of the communication, and the size of any messages conveyed"[32] -- and Streett's lack of criminal history. Supp. Motion at 18. Streett argues that "Hartsock had failed to come up with any further facts to support probable cause" and that "[t]he most basic of investigations went undone." Supp. Motion at 18. Streett argues that Hartsock's failure "to do even the minimal amount of investigation to verify the confidential informant's allegations" precludes the application of the good-faith doctrine. Supp. Motion at 16 (citing United States v. Bishop, 890 F.2d 212, 216-27 (10th Cir. 1989)). Streett states that Hartsock can blame only "himself for his lack of diligence in securing sufficient probable cause to justify a warrant." Supp. Motion at 16.

Streett then argues that the First Affidavit's lack of substantial evidence violates the Due Process Clause of the Fourth and Fourteenth Amendments, because the New Mexico Rules of Criminal Procedure require substantial evidence to support probable cause. See Supp. Motion at 19. Streett notes that the Supreme Court of the United States has held that "[a] petitioner may also be entitled to habeas relief if he shows that the alleged violations of state law resulted in a denial of due process," and has emphasized that federal courts should not reexamine a state court's determination of state law. Supp. Motion at 19 (citing Hicks v. Oklahoma, 447 U.S. 343, 346 (1980); Estelle v. McGuire, 502 U.S. 62, 68 (1991)). Streett notes that the "Court has the first opportunity to review the inadequacy of the" First Affidavit, because "no state court judge got to

---

[32]Again, Streett is confused what the Subpoena reveals. This telephone records information was not given to Hartsock until he executed the First Warrant. See First Warrant Return at 1. The Subpoena reveals only Streett's subscriber information. See T-Mobile Email at 1.

hear a motion to suppress." Supp. Motion at 20. Streett argues that "Hartsock failed to comply with Rule 5-211(E), a rule patterned on Federal Rules of Criminal Procedure 41," but which explicitly requires that probable cause be "based on substantial evidence." Supp. Motion at 20 (quoting N.M. Ct. R. 5-211). As, in Streett's view, the First Affidavit provides "few facts, much less probable cause," Streett argues the First Affidavit cannot contain substantial evidence. Supp. Motion at 20. Streett argues that this "violation of state procedural law" denied him due process. Supp. Motion at 21. Further, Streett notes that "the Supreme Court requires an affiant to draft 'a reasonably specific affidavit describing the content' of the image that is alleged to be illegal" when the probable cause analysis concerns child pornography. Supp. Motion at 21 (quoting New York v. P.J. Video, 475 U.S. 868, 874 n.5 (1986)). Streett argues that "the best practice in suspected child pornography cases is for search warrant affidavits to either attach the images at issue or at least describe the suspected unlawful images with sufficient detail." Supp. Motion at 22. That the First Affidavit says Streett solicited only a nude photograph, Streett argues, is not enough then to provide probable cause to search for child pornography. Nor does this solicitation provide substantial evidence, Streett argues, because "[m]ere nudity does not fit the federal statutory definition of child pornography. Supp. Motion at 22 (citing United States v. Horn, 187 F.3d 781, 789 (8th Cir. 1999)).

Streett concludes by asking for exclusion of the evidence here, because "Hartsock's lack of investigation before seeking this search warrant should be the kind of uninspired, if not lazy police work the Fourth Amendment was meant to deter." Supp. Motion at 23. Streett points to the lengthy sentence he faces if convicted as another reason why such law enforcement should not be tolerated. Streett argues that "[n]o crime had been committed under New Mexico law," but that

was not going to stop Hartsock's search. Supp. Motion at 23. Finally, Streett asks the Court to find the Subpoena, the search of Streett's telephone records, and the search of the 4620 Plume residence unlawful under the Fourth Amendment, and to exclude "all evidence seized including any evidence discovered as fruits of those searches." Supp. Motion at 24 (citing Wong Sun v. United States, 371 U.S. at 488).

### 3.    The Response.

The United States responds. See United States' Amended[33] Response in Opposition to Defendant's Motions to Suppress Evidence (Docs. 78, 141), filed August 15, 2018 (Doc. 144)("Response"). The United States argues that the Court should deny Streett's Motion and Supp. Motion, because Carpenter v. United States does not apply to the Subpoena here, and because probable cause supports the First and Second Warrants. See Response at 1. Even if probable cause is found lacking, the United States argues, "the executing officer acted with an objective good-faith belief that the warrants were properly issued." Response at 2. The United States begins by arguing that the Subpoena is valid under the Fourth Amendment and that Streett "misstates the scope of the data produced as a result of this subpoena," by contending "that 2,305 pages of phone records were provided by T-Mobile in response to the grand jury subpoena, when,

---

[33]Here, in the heading of the filing, the United States provides a footnote explaining why it filed an amended response: "The United States submits this amended response, which is identical to Doc. 143 with the exception of the addition of Section IV. This new section is added to alert the Court to additional arguments the United States will make with respect to the inevitable discovery and independent source doctrines." Response at 1 n.1. Document 143 is the United States' Nunc Pro Tunc Response in Opposition to Defendant's Motions to Suppress Evidence (Docs. 78, 141), filed August 13, 2018 (Doc. 143)("Nunc Pro Tunc Response"), which the United States filed nunc pro tunc because their response was due August 10, 2018, but "[t]he United States erroneously filed its previously-filed Response to Motion to Dismiss on August 10, 2018," and, thus, needed to correct this mistaken filing. Nunc Pro Tunc Response at 1 n.1.

in reality, those records were produced as a result of the later search warrant submitted to T-Mobile." Response at 6 (emphasis in original)(citing First Affidavit at 1).  The United States then notes that the Supreme Court's protection of cell-site locator information in Carpenter v. United States is limited to cell-site location information and cannot be extended to protect "basic cellular subscriber information."  Response at 6.  The United States District Court for the District of New Mexico has already rejected such an expansive reading of Carpenter v. United States, the United States contends, in United States v. Tolbert, 326 F. Supp. 3d 1211 (D.N.M. 2018)(Herrera, J.), where the court concluded that Tolbert "attempts to stretch *Carpenter* too far" by using it to argue that subpoenas to obtain identifying information for his IP address and email accounts were searches.  Response at 6 (internal quotation marks omitted)(quoting United States v. Tolbert, 326 F. Supp. 3d at 1224).  The United States avers that the Subpoena "contained a more limited request" than the subpoenas at issue in United States v. Tolbert, so a search warrant is not needed to obtain Streett's subscriber information.  Response at 7 (citing United States v. Tolbert, 326 F. Supp. 3d at 1225).  Further, the United States argues that law enforcement "acted in good faith in obtaining the subpoena years prior to the [Carpenter v. United States] decision," which "is neither substantive nor a 'watershed' procedural rule."  Response at 7 (quoting Tyler v. Cain, 533 U.S. 656, 665 (2001)).

The United States then argues that probable cause supports both the First and Second Warrants.  See Response at 8, 10-15.  First, it notes that no information was obtained via the Third Warrant, and that Streett does not have standing to challenge the Fourth and Fifth Warrants, because these are third-party accounts, so the United States will not address Streett's challenge in the Motion to these three warrants under the fruit-of-the-poisonous-tree doctrine.  See Response

at 8 n.3.  Then the United States notes that probable cause is determined by a "totality of the circumstances" and that the Court should review the magistrate judge's determination deferentially.  Response at 9 (citing Illinois v. Gates, 462 U.S. 213, 236, 238 (1983)).  The United States also underscores that "no one element has to be sufficient to show probable cause on its own," that the supporting affidavit need not contain "personal knowledge that the items sought are located at the place to be searched," and that the issuing magistrate judge may make reasonable inferences from the affidavit.  Response at 10 (citing United States v. Hargus, 128 F.3d 1358, 1362 (10th Cir. 1997); United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998)).

The United States argues that the First Affidavit contains "numerous reasons for issuing a search warrant to T-Mobile for Defendant's records," noting that it describes "an adult male soliciting a nude photograph from a 15-year-old female through text message."  Response at 10 (citing First Affidavit at 2).  The United States also tries to justify Hartsock's use of the term "confidential informant," saying it was used "to reflect the parent's concerns with alerting Defendant, and presumably her daughter, to the fact of the tip," and is not "indicative of some nefarious intent."  Response at 11-12.  The United States notes that the First Affidavit states "that the reporting party observed the minor's cellular phone, but noted that the minor had complied with the requests for nude photographs."  Response at 11 (citing First Affidavit at 2).  According to the United States, the First Affidavit verifies the reporting party's identification of the requestor, and his location and telephone number, because of the information obtained via the Subpoena.  See Response at 11.  Streett, the United States argues, ignores this verification.  See Response at 12. The United States also notes the First Affidavit's language "that the requested records could 'contain child pornography or the attempt to entice sex from a minor.'"  Response at 11 (quoting

First Affidavit at 3). As to Streett's contention that a nude photograph does not establish probable cause, the United States notes that "the state magistrate determined that the information regarding Defendant's attempted solicitation of nude photographs was sufficient to establish probable cause that the requested records would contain evidence of a criminal offense." Response at 12. The magistrate judge, the United States argues, "could reasonably infer that Detective Hartsock's description of Defendant 'soliciting' a 'nude photograph' from a minor was in violation of N.M.S.A. § 30-6A-3." Response at 12 (footnote omitted). The United States contends that Streett "would seem to require evidence of a completed offense in order to justify a request for a search warrant." Response at 13.

The United States then argues that, because Hartsock obtained additional information from the interview that Vig conducted with M.Y. and with her mother, Hartsock was better able "to verify and corroborate the initial information to NCMEC" in the Second Affidavit. Response at 13. According to the United States, this interview confirmed M.Y.'s mother was the CI and that the NCMEC Tip "did not stem from a 'family dispute over a boyfriend,' as suggested by Defendant." Response at 13 (quoting Supp. Motion at 13). The United States argues that M.Y.'s mother "is the 'unquestionably honest citizen' contemplated by the Supreme Court in *Gates*," because she made the Tip out of concern for her daughter, so "'rigorous scrutiny' [of her basis of knowledge] is unnecessary." Response at 14 (quoting Illinois v. Gates, 462 U.S. at 233-24). The United States construes the Second Affidavit as making it "clear that the focus of this investigation was Defendant's cellular phone," and that "the ubiquitous use of mobile devices" renders a link between the cellular telephone and the residence unnecessary. Response at 14. The United States notes that the Second Affidavit identifies the residence to be searched, that it requests permission

to search electronic devices capable of sending texts and photographs, and that the information received via the Subpoena confirmed Streett owns the telephone number and lives in Bernalillo County. See Response at 14. The United States argues that, under the totality-of-the-circumstances test, the Second Affidavit sufficiently corroborates the NCMEC Tip, and that the issuing magistrate judge could draw reasonable inferences providing "abundant reason to 'believe that a search would uncover contraband or evidence of criminal activity.'" Response at 15 (quoting United States v. Danhauer, 229 F.3d at 1006).

The United States also argues that, if the First and Second Affidavits lack probable cause, then the good-faith exception applies and will allow admission of the evidence collected from the execution of the First and Second Warrants. See Response at 15. As to the Second Affidavit, the United States writes that "a natural reading of the affidavit provides sufficient indicators of probable cause that a crime occurred through the use of Defendant's cellular phone, which was registered to his home address in Bernalillo County." Motion at 19 (citing Illinois v. Gates, 462 U.S. at 236). These indicators, the United States argues, mean that the Second Affidavit "establishes 'a minimally sufficient nexus between the illegal activity and the place to be searched.'" Motion at 19 (quoting United States v. Gonzales, 399 F.3d at 1230). The United States notes that "Hartsock was truthful in laying out all of the reasons he had for seeking a warrant" and that, because he "had no reason to believe that the warrant should not have been issued," suppression "would not further the purposes of the exclusionary rule." Motion at 19. The United States argues that the Second Affidavit "was not so lacking in probable cause as to render the officer's belief in its validity objectively unreasonable," because "Hartsock's explanation of the ICAC's procedure for processing CyberTipline reports, coupled with the later explanation that

a subpoena issued to T-Mobile confirmed Defendant's address, would lead any reasonable law enforcement officer to conclude that the target residence was, in fact, Defendant's residence." Motion at 20.

The United States also argues that the evidence "would have been inevitably discovered by lawful means," making an important distinction with United States v. Gonzales, because no inevitable discovery argument was addressed in that case. Motion at 20 & n.6. Hartsock, the United States notes, "was aware of facts that sufficiently established probable case." Motion at 21 (heading capitalization omitted). The United States argues that the evidence "clearly demonstrates that Detective Hartsock knew that 4620 Plume Rd. NW, was, in fact, Defendant's residence." Motion at 22 (citing NCMEC Tip at 9; T-Mobile Email at 1). Hartsock's knowledge, the United States argues, shows "the inevitability of him rectifying any deficiency identified by the judge." Motion at 22 n.7. Thus, the United States asserts, Hartsock would have been able to obtain a valid warrant and "the evidence obtained during the search of Defendant's residence need not be suppressed because it would have been inevitably discovered." Motion at 22.

Finally, the United States argues that "the Court need not suppress the evidence found at Defendant's residence, because Detective Hartsock would have inevitably discovered the victims' identities due to law enforcement efforts already underway" -- namely, the First Warrant, issued to obtain Streett's telephone records from T-Mobile. Motion at 23. These telephone records contain the telephone numbers for Streett's other victims, so "Hartsock would have inevitably identified, located, and interviewed each of these victims." Motion at 23. The United States also notes how "Hartsock sought a separate search warrant for [M.Y.]'s phone records, which showed numerous contacts with Defendant's phone." Motion at 23. Further, the United States contends

that, "even if the Court concludes that the very nature of the victims' identities is tainted, the independent source doctrine would remove any taint from the search," because "the same evidence would have been discovered through an independent source -- Defendant's phone records from T-Mobile, and the separate search warrant for [M.Y.]'s phone records." Motion at 23-24. The United States argues: "[T]he victims provided their electronic devices for forensic examination, which resulted in the location of evidence to independently support the charged offenses." Motion at 24.

### 4. **The Reply**.

Streett replies to reiterate his request for the "suppression of all evidence seized subsequent to and as a result of the" Subpoena, First Warrant, and Second Warrant. Reply to Government's Amended, Nunc Pro Tunc Response in Opposition to Defendant's Motion to Suppress All Evidence Seized and Any Fruits of the Poisonous Tree Obtained as a Result of the Unlawful Searches at 1-2, filed September 12, 2018 (Doc. 154)("Reply"). Streett contends that he has standing to challenge the Fourth and Fifth Warrants, as poisonous fruits of the search under the Second Warrant. See Reply at 2 & n.1. As to the Subpoena, Streett states that "it is impossible to determine whether Hartsock or the New Mexico Attorney General Special Agent Jon R. Whitsitt ('Whitsitt') presented evidence to a sitting grand jury with a prosecutor and an actual case to consider." Reply at 3. If the Subpoena issued outside this process, Streett argues, it "was obtained in violation of New Mexico law and due process." Reply at 3 (citing In re Chavez, 2017-NMSC-012, 390 P.3d 965; State v. Martinez, 2018-NMSC-031, 420 P.3d 568; State v. Eder, 1985-NMCA-076, 704 P.2d 465). Streett then notes that the "error regarding the source of the more than two thousand pages of phone records was a large basis of the argument under *Carpenter*," but argues that the Subpoena is still unlawful, because "more than basic identifying information was provided

by T-Mobile in response to that initial subpoena," including his social security number. Reply at 4 n.2 (citing T-Mobile Email at 1). Streett maintains that social security numbers have been recognized as confidential, and that the Court cannot rely on United States v. Tolbert, because the information obtained in that case did not include social security numbers and motions to suppress are fact specific. See Reply at 4 n.2 (citing Meyerson v. Prime Realty Servs., LLC, 796 N.Y.S.2d 848, 852 (2005); United States v. Marshall, 157 F.3d 477, 481 (7th Cir. 1998)). Further, Streett argues, Carpenter v. United States does apply retroactively, so the Court must still determine Whitsitt's good faith regarding the Subpoena. See Reply at 5 (citing Griffith v. Kentucky, 479 U.S. 314, 328 (1987)). He notes that the statute under which Whitsitt obtained the Subpoena -- the Stored Communications Act, 18 U.S.C. § 2703 -- does not authorize the disclosure of the subscriber's social security number. See Reply at 5.

Further, Streett argues that, for the good-faith exception to apply to a subpoena issued "unilaterally and not after a presentation of evidence," there must be "more than evidence that police acted consistently with a department's practice, even if that practice is approved by a supervisor." Reply at 5 (citing Tuskan v. Jackson Cty., No. 1:13cv356, 2016 U.S. Dist. LEXIS 182700 (S.D. Miss. June 24, 2016)(Ozerden, J.)). Streett avers that the Supreme Court of New Mexico requires suppression of evidence obtained via an illegal subpoena and that the Supreme Court of the United States "has recognized a constitutional right of personal privacy," establishing a due process violation. Reply at 6 (citing Roe v. Wade, 410 U.S. 113, 152 (1973); Whalen v. Roe, 429 U.S. 589, 599 (1977)). Streett then goes through the Matthews v. Eldridge, 424 U.S. 319 (1976), factors: (i) "[t]he first factor, the privacy interest here, is the disclosure of personal information"; (ii) the second factor, the risk of erroneous deprivation through the procedures

issued, "is great[,] . . . because the statutes require a third party determine the need for the information"; and (iii) the third factor, the burden on the government that additional procedure would entail, would be null, because "following the federal statute and New Mexico procedure for grand jury subpoenas would add no particular burden." Reply at 6-7. Streett argues that, because the Supreme Court recognizes privacy interests "as a necessary adjunct to emerging technology" and the Subpoena was not issued pursuant to New Mexico law -- also making it invalid under the Stored Communications Act -- his due process rights were violated and that "[a]ny subsequent fruits must therefore be suppressed." Reply at 7.

Streett then argues that the First Affidavit does not establish probable cause, because Hartsock did not corroborate the information in the NCMEC Tip, or "determine the credibility of either the confidential informant or the minor before seeking the phone warrant," despite the Tip "warn[ing] that '[a]dditional information required to determine possible risk.'" Reply at 7 (quoting NCMEC Tip at 1). Streett notes that Hartsock "provided no further case-specific probable cause basis" and "failed to date the affidavit." Reply at 7. According to Streett, the First Affidavit provides no "evidence of suspected criminal activity from a reliable or verified source," but relies only on information "nearly four-months-old" and "Hartsock's hunch that he might find something based on a tip he never checked out." Reply at 8. Streett also notes that the date on which the informant submitted the NCMEC Tip -- Halloween, "a well-know [sic] day for pranks and hoaxes" -- "should have given Hartsock pause and reason to follow up on the validity of the tip." Reply at 9. Streett argues that, for a magistrate judge to draw reasonable inferences from the First Affidavit, "there must be enough facts to establish the informant's veracity or sufficient independent corroboration to support the facts." Reply at 9 (citing United States v. Danhauer, 229 F.3d at

1006).  The First Affidavit, Streett argues, does not provide the informant's reliability, the timeliness of the informant's information, or a nexus between the place to be searched and the item to be seized -- which are pertinent to the magistrate judge's probable cause determination.  See Reply at 9-10.

Further, Streett argues that the First Affidavit lacks probable cause even if the NCMEC Tip is considered.  See Reply at 10.  He first notes that the First Affidavit does not mention a specific crime and "that the Government cannot decide what crime had been committed," because Hartsock alleges a violation of N.M. Stat. Ann. § 30-37-3.2 in the Second Affidavit, but the United States "seemingly lacks confidence in probable cause to support that charge" and instead avers that the First Affidavit supports § 30-6A-3(E).  Reply at 10-11.  Streett argues that the First Affidavit "fail[s] to establish probable cause for either beyond a request for a nude photograph," because there are no facts showing "a pattern of behavior that escalated to more graphic requests" or "a tendency to commit such crimes."  Reply at 11.  Streett states that the First Affidavit does not "support the multiple hearsay, non-verified informant with uncorroborated information."  Reply at 11.  Streett argues that "the abhorrent nature of the offenses alleged here . . . should call for exercise of caution" and that "[c]hild pornography is a particular repulsive crime, but not all images of nude children are pornographic."  Reply at 12 (citing United States v. Hill, 459 F.3d 966, 970-71 (9th Cir. 2006)).  Streett argues that Hartsock should have known that nude images would not support probable cause to search for child pornography: "*Insofar as possessing nude pictures of children is not per se illegal, reasonable officers should at least obtain a description of the photographs before relying on them to* justify entry into a residence."  Reply at 12 (emphasis in Reply)(internal quotation marks omitted)(quoting United States v. Doyle, 650 F.3d 460, 473-74

(4th Cir. 2011)). Further, Streett argues that the NCMEC Tip "did not indicate any kind of sexual exploitation" and that the "[t]ext conversation had no context." Reply at 13. Streett also notes that the informant's concern was only that a crime could be committed in the future and not that one had been committed. See Reply at 13. Streett argues that Hartsock does not seem to know the elements of the crime which he was investigating, because he "did not state that multiple requests had been made and that there had been any request for sexually explicit photographs here." Reply at 13. "Hartsock set forth the speculative nature of his requested search in the affidavit," according to Streett, and speculation does not establish probable cause. Reply at 14.

Streett then argues that the "additional information Hartsock added for the house warrant . . . highlights the glaring inadequacy and dearth of facts contained in the phone warrant." Reply at 14. According to Streett, the Second Affidavit "uses the same speculative language in support of a fishing expediting [sic]," and does not "allege a sufficient nexus between an alleged crime and the location of the evidence sought." Reply at 15. Streett argues that the United States does not demonstrate such a nexus in the Response, and "offers no reason for failing to establish any connection in the affidavit between any criminal activity and the 4620 address used for the house warrant," so the Second Warrant lacks probable cause. Reply at 15. Streett, thus, argues that, if the Court concludes that the First Warrant is valid, the Court should suppress the evidence and fruits obtained from the search of the 4620 Plume residence. See Reply at 15.

As to the good-faith doctrine, Streett agrees with the United States' statement of the law, but argues that the good-faith doctrine is inapplicable to either warrant. See Reply at 15-16. Streett notes that the United States "makes no effort to establish a good faith exception for the phone warrant, apparently recognizing that exclusion cannot be remedied by good faith there." Reply at

16. Streett then distinguishes the cases on which the United States relies to establish good faith as to the Second Warrant by noting that the magistrate judge telephonically approved the Second Warrant and that Hartsock did not conduct much of an investigation. See Reply at 16-17. Streett alleges that the Second Affidavit "lacked two basic elements that were needed to establish probable cause," namely: (i) "facts constituting a crime"; and (ii) "a minimal nexus between a crime and the address." Reply at 17-18. Streett acknowledges that the Tenth Circuit applied the good-faith doctrine where a "natural reading of the affidavit indicates that the vehicle identified in the probable cause section is the vehicle involved in the criminal offense." Reply at 18 (internal quotation marks omitted)(quoting United States v. Beck, 139 F. App'x at 957). According to Streett, however, the United States, "cannot point to any facts here that allow a similar, natural reading of the affidavit and demonstrate a nexus between the address and any criminal activity." Reply at 18. Streett argues that "nothing indicates that the telephone number discussed in the affidavit was registered to Mr. Streett's 'home address' or that the T-Mobile subpoena 'confirmed Defendant's address.'" Reply at 18 (citation omitted)(quoting Response at 19-20). Further, Streett notes that, although the Second Affidavit describes five vehicles at the 4620 Plume residence, the Second Affidavit "provides no identification information that might link the vehicles or Mr. Streett to the residence." Reply at 19. Streett argues that, because the Second Affidavit does not link "any possible criminal activity involving the telephone number with the address," Hartsock could not have "exercise[d] the kind of professional judgment Gonzales requires." Reply at 19 (citing United States v. Gonzales, 399 F.3d at 1230). Streett also argues that Hartsock's "subjective knowledge is not sufficient to satisfy a finding of objective good faith." Reply at 20 (internal quotation marks omitted)(quoting United States v. Hodson, 543 F.3d 286, 293 (6th Cir. 2008)).

Streett also argues that the inevitable-discovery doctrine is inapplicable, because the United States has not "prove[d] by a preponderance of the evidence that the same information 'inevitably would have been discovered by lawful means.'" Reply at 21 (quoting Nix v. Williams, 467 U.S. 431, 444 (1984)). Streett argues that the United States provides "little to meet its burden" by justifying inevitable discovery on "Hartsock's subjective feeling" that he had probable cause to search the 4620 Plume residence. Reply at 21. Further, as to the United States' argument that it would discover "the victims' identities due to law enforcement efforts already underway," Streett notes that the United States does not explain what those efforts were. Reply at 21 (internal quotation marks omitted)(quoting Response at 23). The United States also relies on the "search warrant for Jane Doe 1's phone records," but Streett notes that this warrant "was based on the information received from the unlawful phone warrant for Mr. Streett's phone and could not otherwise have been independently and lawfully obtained." Reply at 21. According to Streett, the United States only argues inevitable discovery as to the Second Warrant and does not discuss "the factors this Court should look at in determining whether to apply inevitable discovery." Reply at 21 (citing United States v. Souza, 223 F.3d 1197 (10th Cir. 2000)). As to the factors the Court should consider, Streett notes that the Tenth Circuit decision in United States v. Souza sets forth four factors to determine the likelihood that the evidence would have inevitably been discovered through lawful means: (i) "the extent to which the warrant process has been completed" at the time of the search; (ii) "the strength of the showing of probable cause at the time the search occurred"; (iii) "whether a warrant ultimately was obtained, albeit after the illegal entry"; and (iv) "evidence that law enforcement agents jumped the gun because they lacked confidence in their showing of probable cause." Reply at 22 (internal quotation marks omitted)(quoting United States v. Souza,

223 F.3d at 1204). Streett avers that "[f]actors one and three seem to slightly favor the Government with regard to the house warrant," but that "[f]actors two and four . . . strongly favor Mr. Streett." Reply at 22. Streett argues that, without probable cause to believe that a crime had been committed, and no nexus between a crime and the home, "Hartsock's probable cause for the house warrant was weak and insufficient," and that "this case would seem a textbook example of factor four." Reply at 22-23. Streett states that Hartsock had no probable cause for any crime regarding M.Y., "[d]espite access to the alleged victim and her phone," and "jumped the gun" while "[s]till awaiting the results of the unlawful phone subpoena." Reply at 23. According to Streett, the Second Affidavit thus does not have facts allowing the Court to "have a high level of confidence that a lawful warrant would have issued and the evidence seized from the house warrant inevitably discovered." Reply at 23. Streett distinguishes the cases that the United States cite in the Response, "because investigations were well underway and the evidence in question was aware to police prior to any unconstitutional activity." Reply at 23. As to the United States' argument for the application of the independent-source doctrine, Streett argues that it cannot apply, because "[t]he Government has failed to demonstrate that the illegally-obtained evidence did not taint any of the subsequently obtained evidence." Reply at 23-24. Finally, Streett points to the value in deterring "Hartsock's unlawful conduct," because he "is now the State of New Mexico Second Judicial District Attorney's Chief Investigator" and, thus, "now can influence every law enforcement agency that interacts with the that [sic] office, as well as young prosecutors with limited experience," so suppression would have a "system-wide impact." Reply at 25.

## RELEVANT FOURTH AMENDMENT LAW

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. Fourth Amendment rights are enforceable against state actors through the Due Process Clause of the Fourteenth Amendment. See Mapp v. Ohio, 367 U.S. 643, 655 (1961)("Since the Fourth Amendment's right of privacy has been declared enforceable against the States through the Due Process Clause of the Fourteenth, it is enforceable against them by the same sanction of exclusion as used against the Federal Government."); United States v. Rodriguez-Rodriguez, 550 F.3d 1223, 1225 n.1 (10th Cir. 2008)("[T]he Fourth Amendment applies against state law enforcement officials as incorporated through the Due Process Clause of the Fourteenth Amendment."). "Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'" (internal quotation marks omitted)(quoting Brigham City v. Stuart, 547 U.S. 398, 403 (1978))). Cf. United States v. Sharpe, 470 U.S. 675, 691 (1985)(Marshall, J., concurring)(underlining that investigatory stops "do[] not constitute the sort of arrest that the Constitution requires be made upon probable cause" because of their lower degree of intrusiveness); United States v. Brignoni-Ponce, 422 U.S. 873, 881-82 (1975)(discussing the importance of allowing officers with reasonable suspicion of criminal activity to conduct a brief investigative stop); Terry v. Ohio, 392 U.S. 1 (1968)(allowing officers who have "reason to believe" a person is armed and dangerous to stop the person and conduct a brief protective search for weapons). The Supreme Court has stated that "searches conducted outside the judicial process,

without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnote omitted).

### 1.      The Fourth Amendment "Standing" Analysis.

"The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of 'standing.'" Ysasi v. Brown, 3 F. Supp. 3d 1088, 1125 (D.N.M. 2014)(Browning, J.)(citing United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [place searched] that society is prepared to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search."); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched.")). Accordingly, the Court, following the Tenth Circuit's lead, has also referred to this reasonable-expectation-of-privacy test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'" (internal quotation marks omitted)(quoting United States v. Poe, 556 F.3d at 1121)). The Supreme Court's decisions suggest, however, that the "standing" test has now expressly been incorporated into the substantive Fourth Amendment search analysis. See United States v. Sweeney, No. 14-CR-0020, 2014 WL 2514926, at *2 (E.D. Wis. June 4, 2014)(Adelman,

J.)("Once referred to as 'standing,' this requirement is actually part of substantive Fourth Amendment law.").

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain *Jones*'[34] use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," *Simmons v. United States*, 390 U.S. [377, 389 (1968)], the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in *Jones* and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in *Jones* also may have been aware that there was a certain artificiality in analyzing this question in terms of standing

---

[34]Jones v. United States, 362 U.S. 257 (1960), overruled by United States v. Salvucci, 448 U.S. 83 (1980).

because in at least three separate places in its opinion the Court placed that term within quotation marks.

Rakas v. Illinois, 439 U.S. at 138-39 (footnote omitted)(second alteration in original). The Supreme Court emphasized:

> [N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40 (citations omitted). In Minnesota v. Carter, 525 U.S. 83 (1998), the Supreme Court recognized that Rakas v. Illinois put an end to the practice of conducting a Fourth Amendment standing analysis separate from the substantive Fourth Amendment search analysis:

> The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in *Rakas* . . . . Central to our analysis [in Rakas v. Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." [Rakas v. Illinois, 439 U.S. at 140.]

Minnesota v. Carter, 525 U.S. at 87-88 (citations omitted). The Supreme Court has, thus, noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same. Rakas v. Illinois, 439 U.S. at 139.

### 2. Whether a Fourth Amendment Search Occurred.

A court cannot suppress evidence unless the search was a Fourth Amendment search. See Mapp v. Ohio, 367 U.S. at 654-55 (holding that "evidence obtained by searches and seizures in violation of the Constitution is" inadmissible). A Fourth Amendment search occurs either where

the government, to obtain information, trespasses on a person's property or where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information. See United States v. Jones, 565 U.S. 400, 404-08 (2012). "[T]he *Katz* reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." United States v. Jones, 565 U.S. at 409 (emphasis in original).

### a. The Trespass-Based Analysis.

In Florida v. Jardines, 569 U.S. 1 (2013), the Supreme Court explained that the Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a "search" within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 569 U.S. at 5 (quoting United States v. Jones, 565 U.S. at 406 n.3). "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 565 U.S. at 408 n.5 (emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)). In determining whether a search has occurred, "[t]respass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 565 U.S. at 408 n.5. The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000). Moreover, the Supreme Court, in Florida v. Jardines, suggested that the trespass-based analysis applies only where the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects. The

Fourth Amendment does not, therefore, prevent all investigations conducted on private property; for example, an officer may (subject to *Katz*) gather information in what we have called "open fields" -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text.

But when it comes to the Fourth Amendment, the home is first among equals.

Florida v. Jardines, 569 U.S. at 6 (citations omitted).[35]

_____

[35]The Honorable Elena Kagan, Associate Justice for the Supreme Court of the United States, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full." 569 U.S. at 16 (Kagan, J., concurring)(first alteration in original). "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests." 569 U.S. at 13 (Kagan, J., concurring). Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "[i]n just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one." 569 U.S. at 12 (Kagan, J., concurring). This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of privacy; she argued that, like her analogy, the facts in Florida v. Jardines likewise involved a trespass and a violation of privacy expectations:

That case is this case in every way that matters. Here, police officers came to Joelis Jardines' door with a super-sensitive instrument, which they deployed to detect things inside that they could not perceive unassisted. The equipment they used was animal, not mineral. But contra the dissent, see [569 U.S. at 16-17] (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is of no significance in determining whether a search occurred.

569 U.S. at 12 (Kagan, J., concurring). According to Justice Kagan, had she written the majority opinion based on the Katz v. United States reasonable-expectations-of-privacy search test,

[a] decision along those lines would have looked . . . well, much like this one. It would have talked about "'the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion.'" [569 U.S. at 6] (quoting *Silverman v. United States*, 365 U.S. 505, 511 . . . (1961)). It would have insisted on maintaining the "practical value" of that right by preventing police officers from standing in an adjacent space and "trawl[ing] for evidence with impunity." [133 S. Ct.] at 1414. It would have explained that "'privacy expectations are most

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), aff'd, 597 F. App'x 991 (10th Cir. 2015), the Court analyzed whether the Secret Service's digital scan of electronic information in the defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a trespass-based analysis, concluding that it was not, because the Secret Service properly possessed the credit and debit cards, and the additional act of scanning the cards to read the virtual data contained on the strips did not involve a physical intrusion or physical penetration of space. See 943 F. Supp. 2d at 1264-65. The Court noted that, "[e]ven if the Supreme Court were to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card separately, is not a constitutionally protected area. 943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card, however, given that the financial institution which issues the card places the same information on the magnetic strip as embossed on the card's exterior, the only instances in which the information inside the credit or debit card is not information already seen by and known to the officer is when the information has been reencoded for unlawful purposes. In these instances, not only does the person asserting his or her Fourth Amendment right not own or otherwise lawfully possess the information contained inside the card on the magnetic strip, but the person has stolen the information with the intent to use that information to steal further from the person whose information is on the magnetic strip. Protecting this area from law enforcement search and seizure would thus not further the Fourth Amendment's express purpose of protecting "[t]he right of the people to be secure in *their* persons, houses, papers, and effects . . . ." U.S. Const. amend IV.

---

heightened'" in the home and the surrounding area. [569 U.S. at 7] (quoting *California v. Ciraolo*, 476 U.S. [at] 213 . . . ). And it would have determined that police officers invade those shared expectations when they use trained canine assistants to reveal within the confines of a home what they could not otherwise have found there. See [569 U.S. at 8-9], and n.2-3.

569 U.S. at 13 (Kagan, J., concurring).

943 F. Supp. 2d at 1273 (alteration in original).

**b.     <u>Katz v. United States</u>' Reasonable-Expectation-of-Privacy Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which the Honorable Antonin Scalia, former Associate Justice for the Supreme Court of the United States, wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the *Katz v. United States* reasonable-expectation-of-privacy test is still good law." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242. Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the *Katz* test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in *Katz*) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has *occurred* (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the *Constitution* would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis and alteration in original)(citations omitted). In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice Scalia never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions

asserted that the Katz v. United States reasonable-expectation-of-privacy analysis added to the trespass-based analysis. See Florida v. Jardines, 569 U.S. at 11 ("The *Katz* reasonable-expectations test 'has been *added to*, not *substituted for*,' the traditional property-based understanding of the Fourth Amendment . . . ." (emphasis in original)(quoting United States v. Jones, 565 U.S. at 409). The Court concluded in United States v. Alabi that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the *Katz v. United States* reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach." 943 F. Supp. 2d at 1243.

In June 2013, Justice Scalia dissented from the Supreme Court's decision in Maryland v. King, 569 U.S. 435 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 569 U.S. at 465. Justice Scalia criticized the majority opinion for analogizing DNA testing to taking an arrestee's photograph by citing to Katz v. United States and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'" Maryland v. King, 569 U.S. at 477 (Scalia, J., dissenting). Justice Scalia also pointed out that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the *body* is at stake? (The Fourth Amendment lists "persons" *first* among the entities protected against unreasonable searches and seizures.).

Maryland v. King, 569 U.S. at 469 (Scalia, J., dissenting)(emphasis in original). Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school. Perhaps the construction of such a genetic panopticon is wise. But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

Maryland v. King, 569 U.S. at 482 (Scalia J., dissenting).

The Supreme Court's recent decision in Carpenter v. United States, 138 S. Ct. 2206 (2018), underscores that the "reasonable-expectation-of-privacy test has been *added to*, not *substituted for*, the common-law trespassory test." United States v. Jones, 565 U.S. at 409. In Carpenter v. United States, the Honorable John Roberts, Chief Justice for the Supreme Court of the United States, writing for the majority, relied on the Katz v. United States test to determine that the United States violated the defendant's Fourth Amendment rights by obtaining his cell-site records without a warrant. See 138 S. Ct. at 2217-19. Chief Justice Roberts wrote that "what [one] seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected," 138 S. Ct. at 2217 (internal quotation marks omitted)(quoting Katz v. United States, 389 U.S. at 351-52), and that "[a] majority of this Court has already recognized that individuals have a reasonable expectation of privacy in the whole of their physical movements," 138 S. Ct. at 2217 (citing United States v. Jones, 565 U.S. at 430 (Alito, J., concurring in judgment); id. at 415 (Sotomayor, J., concurring)). Chief Justice Roberts concluded that "historical cell-site records present even greater privacy concerns than the GPS monitoring of a vehicle we considered in *Jones*" and allowing the government warrantless access to this information contravenes individuals' reasonable expectation of privacy in the whole of their physical movements. 138 S. Ct. at 2217-18. The Court, therefore, concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy

expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until after he runs the facts through the trespass prong.

### c. Katz v. United States' Reasonable-Expectations-of-Privacy Analysis.

"Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted." Rakas v. Illinois, 439 U.S. at 133-34 (internal quotation marks omitted)(quoting Alderman v. United States, 394 U.S. 165, 174 (1969)). "A district court cannot suppress evidence unless the movant proves that a search implicates *personal* Fourth Amendment interests." United States v. Jones, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original). "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'" United States v. Miller, 425 U.S. 435, 440 (1976)(quoting Hoffa v. United States, 385 U.S. 293, 301-02 (1966)). The Tenth Circuit has, thus, noted that "[a]n illegal search or seizure only harms those with legitimate expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990), abrogated on other grounds by Byrd v. United Sates, 138 S. Ct. 1518 (2018)). Thus, "[t]he proper inquiry" to determine whether a search implicates a defendant's Fourth Amendment interests still depends, after conducting a trespass-based analysis, on "whether the defendant had an expectation of privacy in the place searched and whether that expectation was objectively reasonable." Kerns v. Bd. of Comm'rs of Bernalillo Cty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.) abrogated on other grounds as recognized in Ysasi v. Brown, 3 F. Supp. 3d at 1130 n.24.

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. 405, 409 (2005)(quoting United States v. Jacobsen, 466 U.S. 109, 123 (1984)).  The Supreme Court has, thus, recognized that, rather than determining whether law enforcement's conduct was a search, it sometimes proves easier to "assess[] when a search is not a search."  Kyllo v. United States, 533 U.S. 27, 32 (2001).

> In assessing when a search is not a search, we have applied somewhat in reverse the principle first enunciated in *Katz v. United States*.  *Katz* involved eavesdropping by means of an electronic listening device placed on the outside of a telephone booth -- a location not within the catalog ("persons, houses, papers, and effects") that the Fourth Amendment protects against unreasonable searches.  We held that the Fourth Amendment nonetheless protected Katz from the warrantless eavesdropping because he "justifiably relied" upon the privacy of the telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33 (citation omitted).  The Supreme Court, thus, articulated the Katz v. United States rule -- which Wayne R. LaFave, professor at the University of Illinois College of Law, has noted is "somewhat inaccurately stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004) -- which posits: "[A] Fourth Amendment search does *not* occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'"  Kyllo v. United States, 533 U.S. at 33 (emphasis and second alteration in original)(quoting California v. Ciraolo, 476 U.S. 207, 211 (1986)).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'"  United States v. Jones, 565

U.S. at 408 (quoting <u>Minnesota v. Carter</u>, 525 U.S. at 88).  <u>See</u> <u>United States v. Harmon</u>, 785 F.

Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy existed, the court

consider concepts of real or personal property law . . . .").  In analyzing whether an expectation of

privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions

developed in property and tort law between guests, licensees, invitees, and the like, ought not to

control."  <u>Rakas v. Illinois</u>, 439 U.S. at 143 & n.12.  Although ownership or lawful possession is

not determinative under the <u>Katz v. United States</u> reasonable-expectation-of-privacy test, it is often

a dispositive factor; because the Fourth Amendment provides a personal right, a defendant bears

the burden of demonstrating "that he *gained* possession [of the area searched] from the owner or

someone with the authority to grant possession."  <u>United States v. Arango</u>, 912 F.2d 441, 445 (10th

Cir. 1990).

### i.      Subjective Expectation of Privacy.

A defendant maintains a subjective expectation of privacy when he or she "has shown that

'he sought to preserve something as private.'"  <u>Ysasi v. Brown</u>, 3 F. Supp. 3d at 1132 (internal

alterations omitted)(quoting <u>Bond v. United States</u>, 529 U.S. at 338).  Thus, there is no reasonable

expectation of privacy in otherwise private information disclosed to a third party.  <u>See</u> <u>United

States v. Miller</u>, 425 U.S. at 443.  "[T]he Fourth Amendment protects people, not places.  What a

person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."

<u>Katz v. United States</u>, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the
> obtaining of information revealed to a third party and conveyed by him to
> Government authorities, even if the information is revealed on the assumption that
> it will be used only for a limited purpose and the confidence placed in the third
> party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.

In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which *Katz*' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection. For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects. Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was. In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

Smith v. Maryland, 442 U.S. at 740 n.5. In United States v. Jones, the Honorable Sonia Sotomayor, Associate Justice for the Supreme Court of the United States, commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties. This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks. People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers. Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not. I for one

doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy. I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

565 U.S. at 417 (Sotomayor, J., concurring)(citations omitted). Most recently, in Carpenter v. United States, the Supreme Court recognized the third-party doctrine's application to "telephone numbers and bank records," but declined to extend it to cover cell-site location records. 138 S. Ct. at 2216-17. Chief Justice Roberts, writing for the majority, wrote:

Given the unique nature of cell phone location records, the fact that the information is held by a third party does not by itself overcome the user's claim to Fourth Amendment protection. Whether the Government employs its own surveillance technology as in [United States v.] Jones or leverages the technology of a wireless carrier, we hold that an individual maintains a legitimate expectation of privacy in the record of his physical movements as captured through CSLI.

Carpenter v. United States, 138 S. Ct. at 2217. The Court notes, however, that, regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think that what they post on the internet is or remains private. See United States v. Meregildo, 883 F. Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley III, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

### ii. Privacy Expectation That Society Is Prepared to Recognize as Reasonable.

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d 833, 838 (10th

Cir. 2012)(internal quotation marks omitted)(quoting <u>United States v. Allen</u>, 235 F.3d 482, 489 (10th Cir. 2000)).  The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities."  <u>United States v. Jacobsen</u>, 466 U.S. 109, 122 (1984).  "Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values that the Fourth Amendment protects."  <u>California v. Ciraolo</u>, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment" (alteration in original)(internal quotation marks omitted)(quoting <u>Oliver v. United States</u>, 466 U.S. 170, 182-83 (1984))).  This second factor of the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'"  LaFave, <u>supra</u>, at § 2.1(d), at 439 (quoting <u>Katz v. United States,</u> 389 U.S. at 353).  Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather on whether the expectation of privacy is justified or legitimate.  <u>See</u> <u>Smith v. Maryland</u>, 442 U.S. at 739.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant. In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123). In United States v. Place, 462 U.S. 696 (1983), the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment." 462 U.S. at 707. The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it. See 462 U.S. at 699. The drug-sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine. See 462 U.S. at 699. While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could identify only criminal activity:

We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item.

Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

In these respects, the canine sniff is *sui generis.* We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

United States v. Place, 462 U.S. at 707 (citation omitted).

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. The Federal Express employees then called the Drug Enforcement Agency ("DEA") and repacked the contents in the original packaging before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tube and the agent's visual inspection were not Fourth Amendment searches:

The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search. It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 120 (footnote omitted). The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been

conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment." 466 U.S. at 122. The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine. It could tell him nothing more, not even whether the substance was sugar or talcum powder. We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?

> . . . .

> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy. This conclusion is not dependent on the result of any particular test. It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised. But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest. Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.

> . . . .

> Here, as in *Place*, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Place, 466 U.S. at 122-24 (footnote omitted).

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States

v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[36] The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the series of cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at], governmental conduct that *only* reveals the possession of contraband 'compromises no legitimate privacy interest.'" 543 U.S. at 408 (emphasis in original)(quoting United States v. Jacobsen, 466 U.S. at 123). The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'" Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122). The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted an unlawful search. *Kyllo v. United States*, 533 U.S. 27 . . . (2001). Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath." *Id.*, at 38 . . . . The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car. A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

---

[36]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes. Out of the current Supreme Court Justices, Justices Thomas and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented. See 543 U.S. at 405.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants." 943 F. Supp. 2d at 1275. The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- *i.e.*, intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280. The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully." 943 F. Supp. 2d at 1281. Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." 943 F. Supp. 2d at 1287.

   3.    **Search Warrants Require Probable Cause.**

"The Supreme Court requires that a magistrate judge be provided information sufficient to determine the existence of probable cause before he or she issues a warrant." United States v. Romero, 743 F. Supp. 2d 1281, 1302 (D.N.M. 2010)(Browning, J.)(citing Illinois v. Gates, 462 U.S. at 239), aff'd, 749 F.3d 900 (10th Cir. 2014). Probable cause requires "more than mere

suspicion but less evidence than is necessary to convict." United States v. Burns, 624 F.2d 95, 99

(10th Cir. 1980). To establish probable cause to justify a search of a home, an affidavit in support

of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search

would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d

at 1006. "Probable cause undoubtedly requires a nexus between suspected criminal activity and

the place to be searched." United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990). The

task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the
> circumstances set forth in the affidavit before him, including the veracity and basis
> of knowledge of persons supplying hearsay information, there is a fair probability
> that contraband or evidence of a crime will be found in a particular place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(internal quotation

marks omitted)(quoting Illinois v. Gates, 462 U.S. at 238). See United States v. Glover, 104 F.3d

1570, 1578 (10th Cir. 1997)(concluding that, in determining whether an affidavit supports a

finding of probable cause, the court must review the affidavit as a whole and look to the totality of

the information contained therein), abrogated on other grounds by Corley v. United States, 556

U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable

inferences from the material provided in the warrant application." United States v. Rowland, 145

F.3d at 1205.

"A reviewing court should accord great deference to a magistrate's determination of

probable cause . . . ." United States v. Reed, 195 F. App'x at 822. The court's duty is "simply to

ensure that the magistrate had a 'substantial basis for . . . conclud[ing]' that probable cause

existed." Illinois v. Gates, 462 U.S. at 238-39 (alteration in original)(quoting Jones v. United

States, 362 U.S. at 271). This deference is appropriate to further the Fourth Amendment's strong

preference for warrants. See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); Aguilar v. Texas, 378 U.S. 108, 110-11 (1964)("An evaluation of the constitutionality of a search warrant should begin with the rule 'that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of officers . . . .'" (quoting United States v. Lefkowitz, 285 U.S. 452, 464 (1932)), abrogated on other grounds by Illinois v. Gates, 462 U.S. 213. Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.

"The deference accorded a magistrate judge's probable cause determination, however, is not boundless." United States v. Alabi, 943 F. Supp. 2d at 1253-54 (citing United States v. Leon, 468 U.S. 897, 914 (1984)). "The court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause." United States v. Sedillo, 297 F. Supp. 3d 1155, 1180 (D.N.M. 2017)(Browning, J.)(citing United States v. Danhauer, 229 F.3d at 1006). Specifically, the court should not defer to a magistrate judge's "probable cause determination if it is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. at 239).

## RELEVANT LAW ON THE EXCLUSIONARY RULE

When evidence is obtained in violation of a person's rights under the Fourth or Fifth Amendments, the government will generally be prohibited from using that evidence in a criminal

prosecution against that person.  See Sanchez–Llamas v. Oregon, 548 U.S. 331, 348 (2006)("We have applied the exclusionary rule primarily to deter constitutional violations.  In particular, we have ruled that the Constitution requires the exclusion of evidence obtained by certain violations of the Fourth Amendment violations, and confessions exacted by police in violation of the right against compelled self-incrimination or due process."  (citations omitted)); United States v. Calandra, 414 U.S. 338, 347 (1974)("Under this rule, evidence obtained in violation of the Fourth Amendment cannot be used in a criminal proceeding against the victim of the illegal search and seizure.").  "For the exclusionary rule to apply, the defendant must show, by a preponderance of the evidence: a constitutional violation, and a causal nexus between the violation and the evidence sought to be excluded."  United States v. Villaba, No. CR 13-0664, 2013 WL 4782206, at *27 (D.N.M. Aug. 21, 2013)(Browning, J.)(citing United States v. Torres-Castro, 470 F.3d 992, 999 (10th Cir. 2006)).  Once the defendant makes this showing, if the prosecutor still desires to proffer the challenged evidence, the burden shifts to the prosecution to establish that an exception to the exclusionary rule applies.  See United States v. Torres-Castro, 470 F.3d at 999.

### 1. The Good-Faith Exception.

Recognizing that the "sole purpose" of the exclusionary rule "is to deter future Fourth Amendment violations," the Supreme Court has held that evidence will not be excluded where the officer who obtained the evidence -- through an unlawful search or seizure -- acted in good faith. United States v. Davis, 564 U.S. 229, 236-37 (2011).  To determine whether the good-faith exception applies, courts must balance the deterrent effect of excluding the evidence against "the 'substantial social costs' generated by the rule."  United States v. Davis, 564 U.S. at 237 (quoting United States v. Leon, 468 U.S. at 907).  The Supreme Court has explained that "[t]he basic insight

of the *Leon* line of cases is that the deterrence benefits of exclusion 'var[y] with the culpability of the law enforcement conduct' at issue." United States v. Davis, 564 U.S. at 238 (second alteration in original)(quoting Herring v. United States, 555 U.S. 135, 143 (2009)). Consequently, "[w]hen the police exhibit 'deliberate,' 'reckless,' or 'grossly negligent' disregard for Fourth Amendment rights, the deterrent value of exclusion is strong and tends to outweigh the resulting costs." United States v. Davis, 564 U.S. at 238 (quoting Herring v. United States, 555 U.S. at 144). By contrast, "when the police act with an objectively reasonable good-faith belief that their conduct is lawful, or when their conduct involves only simple, isolated negligence, the deterrence rationale loses much of its force, and exclusion cannot pay its way." United States v. Davis, 564 U.S. at 238 (citations and internal quotation marks omitted).

### a.      Warrants Based on Illegally Obtained Information.

"When a search is conducted pursuant to a warrant that is based on illegally obtained information, a court is not to blindly apply the good-faith exception." United States v. Alabi, 943 F. Supp. 2d at 1260. "Instead, the court is to consider the warrant with the illegally obtained information excluded and determine, based on the remaining information, whether probable cause nevertheless existed." United States v. Alabi, 943 F. Supp. 2d at 1260. If the remaining content of the warrant affidavit establishes probable cause, the search pursuant to that warrant was appropriate, and the evidence need not be excluded:

> When a warrant is tainted by some unconstitutionally obtained information, we nonetheless uphold the warrant if there was probable cause absent that information. "An affidavit containing erroneous or unconstitutionally obtained information invalidates a warrant if that information was critical to establishing probable cause. If, however, the affidavit contained sufficient accurate or untainted evidence, the warrant is nevertheless valid." *United States v. Snow*, 919 F.2d 1458, 1460 (10th Cir. 1990).

United States v. Sims, 428 F.3d 945, 954 (10th Cir. 2005)(citation omitted). See United States v. Cusumano, 83 F.3d 1247, 1250 (10th Cir. 1996)("In our review, we may disregard allegedly tainted material in the affidavit and ask whether sufficient facts remain to establish probable cause."). "The apparent rationale for this rule is that one officer cannot execute a warrant 'in good faith' if it contains information that he or a fellow officer obtained illegally." United States v. Alabi, 943 F. Supp. 2d at 1260 (quoting United States v. Herrera, 444 F.3d 1238, 1249 (10th Cir. 2006)).

### b. United States v. Leon.

In United States v. Leon, the Supreme Court faced the question whether to apply the good-faith exception when a police officer mistakenly thought probable cause supported a warrant from which he obtained evidence. See 468 U.S. at 905. The Supreme Court noted that excluding this evidence would not deter police misconduct. See 468 U.S. at 918-19. The officer had taken all of the necessary steps to comply with the Fourth Amendment and reasonably thought his warrant, and, thus, his search, was valid. See 468 U.S. at 918-19. The Supreme Court explained that, when a warrant is issued on less than probable cause, the person whose conduct the law wishes to deter is the issuing judge and that excluding the evidence would not have a significantly deterrent effect on judicial conduct. See 468 U.S. at 916-17. The Supreme Court, thus, concluded that a court need not suppress evidence seized pursuant to a facially valid warrant which later turns out to lack probable cause, as long as police were acting in good-faith reliance on that warrant. See 468 U.S. at 922-23.

"The Tenth Circuit therefore now applies the rule that, in cases where the police obtained a warrant but the affidavit supporting the warrant does not establish probable cause, suppression

of the evidence found is generally not warranted, so long as the officers relied in good faith on the

warrant." United States v. Martinez, 696 F. Supp. 2d 1216, 1244 (D.N.M. 2010)(Browning,

J.)(citing United States v. Tuter, 240 F.3d 1292, 1300 (10th Cir. 2001); United States v. Danhauer,

229 F.3d at 1007), aff'd, 643 F.3d 1292 (10th Cir. 2011).

> "[T]he suppression of evidence obtained pursuant to a warrant should be ordered . . . only in those unusual cases in which exclusion will further the purposes of the exclusionary rule," [United States v. Leon, 468 U.S.] at 918 . . . "Where an officer acting with objective good faith obtains a search warrant from a detached and neutral magistrate and the executing officers act within its scope, there is nothing to deter." *United States v. Nolan*, 199 F.3d 1180, 1184 (10th Cir. 1999).

United States v. Tuter, 240 F.3d at 1298-99. Furthermore, the Tenth Circuit has explained that,

"[u]nder *Leon*, we presume good-faith when an officer acts pursuant to a warrant unless one of

'four contexts' appl[ies]." United States v. Barajas, 710 F.3d 1102, 1110 (10th Cir. 2013).

> First, evidence should be suppressed if the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his "reckless disregard for the truth." Second, the exception does not apply when the "issuing magistrate wholly abandon[s her] judicial role." Third, the good-faith exception does not apply when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." Fourth, the exception does not apply when a warrant is so facially deficient that the executing officer could not reasonably believe it was valid.

United States v. Danhauer, 229 F.3d at 1007 (citations omitted)(quoting United States v. Leon,

468 U.S. at 922-23). See United States v. Perrine, 518 F.3d 1196, 1206-07 (10th Cir. 2008). "If

any of these situations is present, the good-faith exception should not be applied, and the evidence

should be excluded." United States v. Romero, 743 F. Supp. 2d at 1316.

### c.     Herring v. United States.

In Herring v. United States, officers arrested Herring pursuant to an arrest warrant listed in

the Dale County, Alabama, warrant database. See 555 U.S. at 137. In the search incident to that

arrest, officers found drugs and a gun on Herring's person. <u>See</u> 555 U.S. at 137. Herring was then indicted on federal gun- and drug-possession charges. <u>See</u> 555 U.S. at 138. It turned out, however, that the warrant under which the officers arrested Herring had been recalled, but the database had not been updated to reflect that recall. <u>See</u> 555 U.S. at 138. Asserting that the evidence found during the search was fruit of an unlawful arrest, Herring sought to suppress it. <u>See</u> 555 U.S. at 138. The district court denied Herring's motion to suppress, and the United States Court of Appeals for the Eleventh Circuit affirmed. <u>See</u> 555 U.S. at 138.

 The Supreme Court affirmed the Eleventh Circuit's affirmation of the district court's denial of Herring's motion to suppress, based primarily on the good-faith exception to the exclusionary rule. <u>See</u> 555 U.S. at 140-46. The Supreme Court agreed with the Eleventh Circuit that, although the police's failure to update the warrant database to reflect that Herring's warrant was withdrawn was negligent, it was not reckless or deliberate. <u>See</u> 555 U.S. at 140. The Supreme Court reiterated its holding in <u>United States v. Leon</u>: "When police act under a warrant that is invalid for lack of probable cause, the exclusionary rule does not apply if the police acted 'in objectively reasonable reliance' on the subsequently invalidated search warrant." <u>Herring v. United States</u>, 555 U.S. at 142 (citing <u>United States v. Leon</u>, 468 U.S. at 922). Tracing the history of cases applying and declining to apply the exclusionary rule, the Supreme Court distilled a general principle: "To trigger the exclusionary rule, police conduct must be sufficiently deliberate that exclusion can meaningfully deter it, and sufficiently culpable that such deterrence is worth the price paid by the justice system." <u>Herring v. United States</u>, 555 U.S. at 144. The Supreme Court further explained that "evidence should be suppressed only if it can be said that the law enforcement officer had knowledge, or may properly be charged with knowledge, that the search was unconstitutional."

Herring v. United States, 555 U.S. at 143 (internal quotation marks omitted)(quoting Illinois v. Krull, 480 U.S. 340, 348-49 (1987)). As long as the "police have [not] been shown to be reckless in maintaining [the] warrant system, or to have knowingly made false entries to lay the groundwork for future false arrests," exclusion of evidence is not warranted when the arrest was made on objectively reasonable reliance on a warrant that had been subsequently recalled. Herring v. United States, 555 U.S. at 146.

### d.    Davis v. United States.

In Davis v. United States, the Supreme Court confronted the question whether to apply the exclusionary rule when police conduct a search in objectively reasonable reliance on binding judicial precedent. See 564 U.S. at 239. At the time of the officer's search, the Supreme Court had not yet decided Arizona v. Gant, 556 U.S. 332 (2009) -- which held that the Fourth Amendment requires officers to demonstrate a continuing threat to their safety posed by the arrestee or a need to preserve evidence related to the crime of the arrest to justify a warrantless vehicular search incident to arrest. See Arizona v. Gant, 556 U.S. at 341-48. The Eleventh Circuit had interpreted the Supreme Court's decision in New York v. Belton, 453 U.S. 454 (1981), as establishing a bright-line rule authorizing the search of a vehicle's passenger compartment incident to a recent occupant's arrest. See United States v. Gonzalez, 71 F.3d 819, 825 (11th Cir. 1996). Although the officers' search incident to the defendant's arrest "was in strict compliance with then-binding Circuit law and was not culpable in any way," it was unconstitutional under Arizona v. Gant. United States v. Davis, 564 U.S. at 239-40.

The Supreme Court determined that the "acknowledged absence of police culpability dooms [the defendant's] claim." United States v. Davis, 564 U.S. at 240. The Supreme Court

explained that "[p]olice practices trigger the harsh sanction of exclusion only when they are deliberate enough to yield meaningful deterrence, and culpable enough to be worth the price paid by the justice system." United States v. Davis, 564 U.S. at 240 (citation and internal quotation marks omitted). The Supreme Court stated: "The conduct of the officers here was neither of these things. The officers who conducted the search did not violate [the defendant's] Fourth Amendment rights deliberately, recklessly, or with gross negligence. Nor does this case involve any recurring or systemic negligence on the part of law enforcement." United States v. Davis, 564 U.S. at 240 (citation and internal quotation marks omitted). The Supreme Court concluded that, "[u]nless the exclusionary rule is to become a strict-liability regime, it can have no application in this case." United States v. Davis, 564 U.S. at 240.

2.      **The Inevitable-Discovery Exception.**

Under the inevitable-discovery exception, "illegally obtained evidence may be admitted if it 'ultimately or inevitably would have been discovered by lawful means.'" United States v. Christy, 739 F.3d 534, 540 (10th Cir. 2014)(quoting Nix v. Williams, 467 U.S. at 444). "The government possesses the burden of proving by a preponderance of the evidence that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d 1199, 1203 (10th Cir. 2005). In United States v. Owens, 782 F.2d 146 (10th Cir. 1986), the Tenth Circuit noted that, for the inevitable-discovery exception to apply, there must be a "lawful police investigation [that] inevitably would have discovered" the evidence in question. 782 F.2d at 152. Relying on this statement from United States v. Owens, the Court stated in United States v. Christy, 810 F. Supp. 2d 1219 (D.N.M. 2011)(Browning, J.), aff'd, 739 F.3d 534 (10th Cir. 2014), that the inevitable-discovery exception "permits evidence to be admitted

if an independent, lawful police investigation inevitably would have discovered it." 810 F. Supp. 2d at 1274 (citations and internal quotation marks omitted). On appeal, however, the Tenth Circuit clarified that the inevitable-discovery exception does not require an independent investigation that would have discovered the evidence in question. See United States v. Christy, 739 F.3d at 540. The Tenth Circuit explained:

> In Cunningham and Souza we applied inevitable discovery to situations like the one here -- where there was "one line of investigation that would have led inevitably to the obtaining of a search warrant by independent lawful means but was halted prematurely by a search subsequently contended to be illegal." Cunningham, 413 F.3d at 1204 n.1. In Cunningham, police searched the defendant's home after getting his consent. Id. at 1202. The defendant later contested the search, claiming his consent was coerced. Id. We held that even if the search was illegal, the evidence was admissible because the officers "would have obtained a search warrant" if the search had not occurred. Id. at 1205. In Souza, police illegally opened a UPS package that contained drugs. 223 F.3d at 1200, 1202. We held the evidence admissible under inevitable discovery because the officers "would have obtained a warrant" had the illegal search not occurred. Id. at 1206. Thus, our case law does not require a second investigation when the first (and only) investigation would inevitably have discovered the contested evidence by lawful means.
>
> . . . .
>
> Thus, lest there be any doubt, we reaffirm the notion that inevitable discovery requires only that the lawful means of discovery be "independent of the constitutional violation," [United States v.] Larsen, 127 F.3d [984,] 987 [(10th Cir. 1997)], and conclude that a second investigation is not required.

United States v. Christy, 739 F.3d at 540-41.

In United States v. Souza, the Tenth Circuit "set forth the standard for considering whether the inevitable discovery doctrine applies to a warrantless search," United States v. Cunningham, 413 F.3d at 1203, when "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," United States v. Souza, 223 F.3d at 1203. The Tenth Circuit stated that, "a court may apply the inevitable discovery exception only when it has a high

level of confidence that the warrant in fact would have been issued and that the specific evidence

in question would have been obtained by lawful means." United States v. Souza, 223 F.3d at 1205.

The Tenth Circuit adopted four factors to determine "how likely it is that a warrant would have

been issued and that the evidence would have been found pursuant to a warrant":

> 1) "the extent to which the warrant process has been completed at the time those
> seeking the warrant learn of the search"; 2) the strength of the showing of probable
> cause at the time the search occurred; 3) whether a warrant ultimately was obtained,
> albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped
> the gun' because they lacked confidence in their showing of probable cause and
> wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1204 (citations omitted)(quoting United States v. Cabassa, 62

F.3d 470, 473-74, 473 n.2 (2d Cir. 1995)). Applying the first factor, the Tenth Circuit stated:

> [T]he prerequisite to a consideration of the inevitable discovery exception in these
> cases, steps taken to obtain a warrant prior to the unlawful search, is present in this
> case. Special Agent Rowden took steps to alert his office that he would be coming
> back to prepare a warrant for the package and made sure that the affidavit form
> would be ready when he got back to his office. Also, the package was specifically
> placed on the floor behind Detective Sloan for the purpose of obtaining a warrant.

United States v. Souza, 223 F.3d at 1205. Regarding the second factor, the Tenth Circuit stated:

> [A]t the time the illegal search occurred, probable cause to believe the package
> contained contraband was extremely strong. The package itself contained several
> suspicious characteristics, including all of the openings on the box being heavily
> taped, the box having been sent through third party shipping, the sender having only
> used a first name, and the box being solid so that no side of it could be compressed.
> Moreover, the box was alerted to by a certified narcotics dog, which is itself
> sufficient to create probable cause.

United States v. Souza, 223 F.3d at 1205-06. The Tenth Circuit noted that a sergeant eventually

obtained a search warrant. See United States v. Souza, 223 F.3d at 1206. Regarding the third

factor, the Tenth Circuit stated that, unlike "*Cabassa*, there is no question . . . concerning the

inevitability of discovery of the evidence if the police had obtained a search warrant because the

package was secured by the officers and there was no chance that it would not still be there when the warrant actually was issued." United States v. Souza, 223 F.3d at 1206. The Tenth Circuit did not reach the fourth factor, but concluded that, although it was

> very reluctant to apply the inevitable discovery exception in situations where the government fails to obtain a search warrant and no exception to the warrant requirement exists, in this case the inevitability of discovery of the evidence convince[d] [it] that [the case before it was] one of those occasions when the doctrine should apply.

United States v. Souza, 223 F.3d at 1206.

In United States v. Owens, the Tenth Circuit emphasized the "danger of admitting unlawfully obtained evidence on the strength of some judge's speculation that it would have been discovered legally anyway." 782 F.2d at 152-53 (internal quotation marks omitted)(quoting United States v. Romero, 692 F.2d 699, 704 (10th Cir. 1982)). The Tenth Circuit considered whether contraband seized without a warrant could still be admitted under the inevitable-discovery doctrine. See United States v. Owens, 782 F.2d at 152-53. Rejecting the United States' position that the motel maids' routine cleaning of the defendant's room for the next occupant would have revealed the contraband and that, therefore, discovery of the evidence was inevitable, the Tenth Circuit concluded:

> Several factors suggest that motel employees performing routine cleaning may not have inevitably discovered the cocaine. First, if the [motel]'s staff had cleared [the defendant's] room, they would not necessarily have opened and searched all his luggage and closed containers. In fact, such an intrusion would have been a significant invasion of his privacy. Second, even if the room had been cleared and the white powder inside the closed bag had been discovered by the motel staff, the lack of any police involvement in routine room cleanings suggests that police discovery of the evidence would not have been inevitable. The evidence certainly does not demonstrate that the [motel]'s staff would necessarily have recognized the powder as cocaine or have called the police if they had so recognized it. Finally, absent the unlawful search, [the defendant] might have posted bail on the charge of receiving stolen property and could have returned to his motel room before either

the cleaning staff or the police discovered the contraband. Alternatively, a friend
could have returned to claim the closed bag.

782 F.2d at 153. "*United States v. Owens* suggests that courts should be realistic, if not skeptical,

when assessing the probability that law-enforcement officers would inevitably have uncovered the

challenged evidence through an independent investigation." United States v. Martinez, 696

F. Supp. 2d at 1244.

In United States v. Cunningham, the Tenth Circuit "appl[ied] the inevitable discovery

doctrine . . . because [it was] convinced that without Mr. Cunningham's disputed consent, the

warrant to search his house would have been issued and the incriminating evidence would have

been discovered." 413 F.3d at 1205. The Tenth Circuit, in addressing the first factor -- the extent

to which the warrant process had been completed at the time those seeking the warrant learn of the

search -- stated:

> Here, the officers took substantial steps to obtain a warrant before the contested
> search occurred. The record demonstrates that they had focused their investigation
> on 1175 and 1179 East 76th Terrace, and had drafted an affidavit to support a search
> warrant for one of these homes. As a result of their conversation with the AUSA,
> the officers decided that further surveillance on the two homes was necessary
> before they specifically selected one to search, and they proceeded to conduct that
> surveillance immediately. The officers' actions clearly indicate they took steps to
> obtain a search warrant and that they intended to obtain the warrant for either 1175
> or 1179 East 76th Terrace as soon as possible.

United States v. Cunningham, 413 F.3d at 1204. Regarding the second factor -- the strength of the

showing of probable cause at the time the search occurred -- the Tenth Circuit stated:

> The officers also possessed strong probable cause for their search of 1179
> East 76th Terrace by the time Mr. Cunningham arrived at the home. Prior to that
> time, they had acquired background information about the alleged check-writing
> ring, narrowed their investigation to one residential block, and focused on the two
> homes sharing a common driveway. The officers' surveillance had uncovered the
> following additional information: a red car containing two individuals identified
> earlier in the investigation arrived, parked briefly, and then pulled out from behind

1179 East 76th Terrace; a black pickup truck previously observed in the investigation was stopped containing Mr. Cunningham, who said that he lived at 1179 East 76th Terrace; the residents of 1175 East 76th Terrace told officers that the home next door had been receiving all of the traffic that evening, and the officers ruled out 1175 East 76th Terrace as the location visited by the alleged check supplier; and a gray Blazer previously observed in the investigation was seen parked by 1179 East 76th Terrace. The government thus had sufficient probable cause for a search of 1179 East 76th Terrace at the time of Mr. Cunningham's disputed consent to search his home.

United States v. Cunningham, 413 F.3d at 1204-05. Regarding the third factor -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Tenth Circuit stated: "Moreover, the officers ultimately did obtain a warrant, albeit based in part on information retrieved from inside Mr. Cunningham's home." 413 F.3d at 1205. Regarding the fourth factor -- evidence that the officers "jumped the gun," because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit stated:

There is also no evidence the officers "jumped the gun" due to a lack of confidence about probable cause and out of a desire to force the issue. Instead, the record indicates that the search occurred at the time it did because of the coincidental arrival of Mrs. Cunningham. Her presence on the scene led to a series of events that culminated in her son's release from jail, his return home, and his consent to search. As a result, we are satisfied the government has demonstrated that, as in Souza, but for Mrs. Cunningham's arrival at 1179 East 76th Terrace on the evening of the search, the officers would have obtained a search warrant and the evidence in question would have been found.

United States v. Cunningham, 413 F.3d at 1205 (citations omitted). The Tenth Circuit, therefore, applied the inevitable-discovery doctrine. See 413 F.3d at 1205.

In United States v. Christy, the Court applied the four United States v. Souza factors and determined that the inevitable-discovery exception applied. See 810 F. Supp. 2d at 1275-79. Regarding the first factor -- the extent to which the warrant process had been completed at the time those seeking the warrant learn of the search -- the Court stated: "The deputies did not take any

steps to obtain a warrant before entering Christy's residence. The United States concedes that they did not attempt to obtain a warrant before entering Christy's residence. . . . This factor thus weighs against applying the inevitable discovery exception." 810 F. Supp. 2d at 1275 (citations omitted). As to the second factor -- the strength of the showing of probable cause at the time the search occurred -- the Court concluded:

> The Court finds that Carvo had strong probable cause that Christy committed crimes. At the time of the search, Carvo believed he had probable cause for the California crime of unlawful sexual intercourse, because Christy and K.Y. exchanged naked pictures through electronic mail transmissions over the internet and then arranged a meeting in the middle of the night for K.Y. to run away with Christy.

> . . . .

> . . . Because Carvo knew that K.Y. and Christy were exchanging naked pictures, "the belief that there was a sexual relationship or sexual interest between the two was reasonable." These circumstances are sufficient to form "a reasonable ground for belief of [Christy's] guilt," for the California crime of unlawful sexual intercourse.

> Carvo also had strong probable cause for the federal crime of coercion or enticement. Carvo believed that he had probable cause for the federal crime of enticement or coercion, because of Christy's and K.Y.'s communications through the internet and electronic mail transmissions, because Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., which showed her breasts, and because cellular telephone evidence shows that Christy traveled across state lines to bring K.Y. to New Mexico.

> . . . .

> . . . Because Carvo knew that Christy and K.Y. communicated through electronic mail transmissions, that Christy sent K.Y. naked pictures of himself and solicited pictures of K.Y., because evidence showed that Christy traveled across state lines with K.Y., and because Carvo had strong probable cause that Christy committed the California crime of unlawful sexual intercourse, Carvo had "a reasonable ground for belief of [Christy's] guilt," for the federal crime of coercion or enticement. Because Carvo had strong probable cause for the California crime of unlawful sexual intercourse and for the federal crime of enticement or coercion, this factor weighs in favor of application of the inevitable discovery doctrine.

810 F. Supp. 2d at 1276-78 (brackets in original)(citations omitted). Regarding the third factor, -- whether a warrant ultimately was obtained, albeit after the illegal entry -- the Court held:

> The deputies "ultimately did obtain a warrant, albeit based in part on information retrieved" from Littlefield's actions of peering through a crack in the blinds in Christy's window, and from the deputies' entry into Christy's residence and subsequent interview of Christy. *United States v. Cunningham*, 413 F.3d at 1205. Although portions of the affidavits supporting the warrants were based on information the Court has found illegally obtained, the affidavits also included information from the California investigation. Although the Tenth Circuit appears to rely on illegally obtained information in its inevitable discovery analysis, the Court does not believe that it can do so. Carvo had strong probable cause that Christy committed California and federal crimes, and Carvo's probable cause was based on his investigation, and not on any information he learned from the [the Bernalillo County Sheriff's Office ("BCSO")] or from the Albuquerque FBI. Because Carvo had strong probable cause for a California crime and a federal crime, based on information that he learned in his investigation, and not based on information he learned from the BCSO or from the Albuquerque FBI, Carvo would have obtained search warrants that were not based on illegally obtained information. Based upon Carvo's belief that he had probable cause for both violations of California state law and violations of federal law, he would "have asked [BCSO] and/or -- either one -- the FBI to obtain a search warrant for [Christy's] Albuquerque residence, vehicle, computers, cell phones, things of that nature." If the BCSO or Albuquerque FBI were not able to obtain a search warrant for these locations, Carvo would have written a federal search warrant himself and come to the District of New Mexico to seek the warrant with himself as the affiant. Carvo is cross designated to acquire both state and federal search warrants. This factor thus weighs in favor of application of the inevitable-discovery doctrine.

810 F. Supp. at 1278-79 (second and third alterations in original)(citations omitted). As to the fourth factor -- the existence of evidence that the officers jumped the gun, because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Court determined:

> There is "no evidence that the officers 'jumped the gun' due to a lack of confidence about probable cause and out of a desire to force the issue." *United States v. Cunningham*, 413 F.3d at 1205. The record indicates that the search occurred when it did because the deputies believed that they had exigent

circumstances to enter Christy's residence.  This factor thus weighs in favor of application of the inevitable discovery doctrine.

810 F. Supp. 2d at 1279.  Consequently, the Court applied the inevitable-discovery doctrine.  See 810 F. Supp. 2d at 1279.

On appeal, the Tenth Circuit affirmed the Court's decision.  See 739 F.3d at 539-544.  Addressing the United States v. Souza factors, the Tenth Circuit noted that the defendant challenged the Court's ruling only on factors two and four -- the strength of the probable cause showing when the unlawful search occurred and whether the officers "'jumped the gun' to sidestep the warrant requirement."  United States v. Christy, 739 F.3d at 541 (quoting Opening Brief of Appellant at 24, United States v. Christy, 739 F.3d 534 (10th Cir. 2014)(No. 12-2127)).  Regarding the second factor -- the strength of the showing of probable cause at the time the unlawful search occurred -- the Tenth Circuit stated:

> The district court found that Officer Carvo knew that K.Y. was a minor, there was a large age difference between her and Mr. Christy, the two exchanged sexually explicit pictures, and that Mr. Christy traveled across state lines with K.Y.  Given those factual findings, it is a reasonable inference that a sexual relationship existed between Mr. Christy and K.Y.  Officer Carvo also knew that K.Y. was potentially suicidal, had left her depression medication behind, and ran away from home with Mr. Christy.  Based on that knowledge, Officer Carvo's belief that K.Y. was at risk for sexual victimization and assault was reasonable.  Thus, Officer Carvo had reasonable grounds to believe that Mr. Christy engaged in sexual activity in violation of California law and coerced or enticed K.Y. to travel across state lines to engage in criminal sexual activity in violation of federal law.  The district court was correct in weighing this factor in favor of applying inevitable discovery.

United States v. Christy, 739 F.3d at 542 (citations omitted).  Analyzing the fourth factor -- evidence that the officers jumped the gun because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli -- the Tenth Circuit explained:

Mr. Christy argues that the deputies "jumped the gun" by forcing entry into his home due to their lack of confidence about probable cause. Yet as the district court found, no evidence supports the theory that the deputies forced entry for that reason. Instead, the deputies forced entry because they believed K.Y. was in danger. Mr. Christy argues that the search was not in fact justified by exigent circumstances and points to the district court's conclusion that it was not. But that is beside the point. The record fully supports the reasonableness of the deputies' assessment of danger. The district court was correct in weighing this factor in favor of the government.

United States v. Christy, 739 F.3d at 543 (citations omitted). The Tenth Circuit concluded, therefore, that the Court properly applied the United States v. Souza factors. See 739 F.3d at 542.

### 3. The Independent-Source Exception.

If the information found during an "unconstitutional search[] . . . [is] used to obtain [a] search warrant," then "evidence seized during the later search conducted pursuant to [the] warrant would be inadmissible as fruit of the poisonous tree." United States v. Hatfield, 333 F.3d at 1194 (citing Murray v. United States, 487 U.S. 533, 542-44 (1988)). When determining whether evidence is fruit of the poisonous tree, a court is to consider whether the evidence was "come at by exploitation of [the initial] illegality or instead by means sufficiently distinguishable to be purged of the primary taint." Segura v. United States, 468 U.S. 796, 804-05 (1984)(internal quotation marks omitted)(alteration in original)(quoting Wong Sun v. United States, 371 U.S. at 488). Under the independent-source doctrine, evidence that is obtained based upon information unrelated to an unlawful search is not fruit of the poisonous tree. See Segura v. United States, 468 U.S. at 799 (citing Silverthorne Lumber Co. v. United States, 251 U.S. 385 (1920)). Evidence therefore need not be excluded under the fruit-of-the-poisonous-tree doctrine if there is an independent source for discovery of the challenged evidence. See Segura v. United States, 468 U.S.at 805. "The government bears the burden of showing, by a preponderance of the evidence, that there is truly an independent source for the challenged evidence." United States v. Forbes,

528 F.3d 1273, 1279 (10th Cir. 2008)(citing <u>United States v. Lin Lyn Trading, Ltd.</u>, 149 F.3d 1112, 1116 (10th Cir. 1998)).  Two Supreme Court cases have considered the operation of the independent-source doctrine in situations where a search warrant is obtained subsequent to an unlawful search.

In <u>Segura v. United States</u>, police unlawfully entered an apartment and spotted drug-trafficking paraphernalia in plain view.  <u>See</u> 468 U.S. at 801.  A warrant was later obtained, based upon information that the police had known before the entry and executed at the apartment.  <u>See</u> 468 U.S. at 801.  In the meantime, police stayed in the apartment to preserve the scene.  <u>See</u> 468 U.S. at 801.  Pursuant to the warrant, they later seized the paraphernalia, as well as cocaine, cash, ammunition, and records of drug transactions, none of which had been observed during the unlawful search.  <u>See</u> 468 U.S. at 801.  Before the Supreme Court was the question whether the evidence that was not in plain view during the unlawful entry should be suppressed.  <u>See</u> 468 U.S. at 802 & n.4.

The Supreme Court held that, because the warrant was based on information obtained before the search, the evidence seized was from an independent source and was not fruit of the poisonous tree.  <u>See</u> 468 U.S. at 813-14.  Thus, whether the entry and occupation of the apartment was unlawful was "irrelevant to the admissibility of the challenged evidence," because of the independent source for the warrant.  468 U.S. at 813.  Finding any connection between the unlawful entry and the seizure under the warrant to be sufficiently attenuated, the Supreme Court rejected the argument that the police occupation led to the seizure, because the evidence might otherwise have been destroyed.  <u>See</u> 468 U.S. at 815-16.

Segura v. United States was limited to situations where the challenged evidence was not in plain view during an unlawful search. Murray v. United States addressed this question that Segura v. United States left open: whether the independent-source doctrine was available for evidence observed in plain view during an unlawful search. See 487 U.S. at 535. The Supreme Court held that the doctrine also applied to evidence in plain view. See 487 U.S. at 540-41.

Murray v. United States dealt with a situation in which federal law enforcement obtained a warrant for a warehouse after illegally forcing entry to that warehouse. Based upon tips from informants, federal agents began surveillance of several defendants. See 487 U.S. at 535. Agents observed two of the defendants entering and then leaving a warehouse, one driving a camper and the other driving a truck. See 487 U.S. at 535. When the defendants left the warehouse, the agents saw two individuals and a tractor-trailer rig with a long container inside. See 487 U.S. at 535. Several other drivers drove the camper and the truck, and ultimately the vehicles were lawfully stopped and found to contain marijuana. See 487 U.S. at 535. After hearing of the marijuana in the vehicles, agents entered the warehouse and saw numerous burlap-wrapped bales in plain view. See 487 U.S. at 535. The agents left and did not reenter the warehouse until later. See 487 U.S. at 535. They obtained a warrant, without mentioning the entry or relying upon any observations from that entry, and seized the bales, which contained marijuana. See 487 U.S. at 535.

The Supreme Court stated that "reseizure of tangible evidence already seized" could be allowed in the right circumstances. 487 U.S. at 542. "So long as a later, lawful seizure is genuinely independent of an earlier, tainted one . . . there is no reason why the independent source doctrine should not apply." 487 U.S. at 542. A source for a warrant would not be genuinely independent "if the agents' decision to seek the warrant was prompted by what they had seen during the initial

entry, or if information obtained during that entry was presented to the Magistrate and affected his decision to issue the warrant." 487 U.S. at 542 (footnote omitted). Although the district court had made factual findings that the unlawful entry was not revealed to the magistrate judge and that the agents did not rely on any observations from the entry in applying for a warrant, the record contained no findings whether the agents would have sought a warrant absent the entry and so the Supreme Court ultimately remanded for a determination in the district court regarding the independent-source doctrine's applicability. See 487 U.S. at 543-44.

"A source is genuinely independent if the government can show that the evidence was obtained by 'means sufficiently distinguishable to be purged of the primary taint.'" United States v. Forbes, 528 F.3d at 1278 (quoting Wong Sun v. United States, 371 U.S. at 488). "By contrast, a source is not independent if, 'granting establishment of the primary illegality, [the evidence has] been come at by the exploitation of the illegality.'" United States v. Forbes, 528 F.3d at 1278 (alteration in original)(quoting Wong Sun v. United States, 371 U.S. at 488). To be an independent source, the source does not need to be temporally distinct from an unlawful search: "It was of no moment that [an illegal search and a lawful independent source] all occurred as part of one brief, uninterrupted sequence of events. Rather, it was enough that a genuinely independent source of the evidence" justify a search. United States v. Forbes, 528 F.3d at 1279.

In support of this principle, the Tenth Circuit has approvingly discussed United States v. Moore, 329 F.3d 399 (5th Cir. 2003). In that case, police allegedly unlawfully arrested a motorist and then conducted a canine search of the vehicle's exterior, leading to the discovery of drugs in the trunk. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Despite the closeness of the events, the United States Court of Appeals for the

Fifth Circuit held that the canine search, which was legal in the circumstances regardless of the arrest's legality, was an independent source and thus the drugs found in the trunk were not subject to suppression. See United States v. Forbes, 528 F.3d at 1279 (discussing United States v. Moore, 329 F.3d at 404-05). Following United States v. Moore, the Tenth Circuit has held that, although officers may have unlawfully searched the trailer of a tractor-trailer rig, a near-simultaneous lawful canine search that revealed drugs in the cab of the rig was an independent source. See United States v. Forbes, 528 F.3d at 1280.

## LAW REGARDING PROCEDURAL DUE PROCESS CLAIMS

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1.

> The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.

Reid v. Pautler, 36 F. Supp. 3d 1067, 1136 (D.N.M. 2014)(Browning, J.)(citing Cty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998)). "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property." Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.). The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due process rights were violated: (i) "[d]id the individual possess a protected property [or liberty] interest to which due process protection was applicable?"; and (ii) "[w]as the individual afforded an appropriate level of process?" Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"[T]o determine whether due process requirements apply in the first place, we must look not to the 'weight' but to the nature of the interest at stake." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 570-71 (1972). "'Liberty' and 'property' are broad and majestic terms. They are among the '(g)reat (constitutional) concepts . . . purposely left to gather meaning from experience." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571 (quoting Nat'l Mut. Ins. v. Tidewater Transfer Co., 337 U.S. 582, 646 (1949)(Frankfurter, J., dissenting)). The Supreme Court has "made clear that the property interests protected by procedural due process extend well beyond actual ownership of real estate, chattels, or money. By the same token, the Court has required due process protection for deprivations of liberty beyond the sort of formal constraints imposed by the criminal process." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 571-72 (footnote omitted). "Yet, while the Court has eschewed rigid or formalistic limitations on the protection of procedural due process, it has at the same time observed certain boundaries," because "the words 'liberty' and 'property' in the Due Process Clause of the Fourteenth Amendment must be given some meaning." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572. Concerning the Fourteenth Amendment's meaning of "liberty" guaranteed, the Supreme Court has stated the following:

> "Without doubt, it denotes not merely freedom from bodily restraint but also the right of the individual to contract, to engage in any of the common occupations of life, to acquire useful knowledge, to marry, to establish a home and bring up children, to worship God according to the dictates of his own conscience, and generally to enjoy those privileges long recognized . . . as essential to the orderly pursuit of happiness of free men." In a Constitution for a free people, there can be no doubt that the meaning of 'liberty' must be broad indeed.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572 (citation omitted)(quoting Meyer v. Nebraska, 262 U.S. 390, 399 (1923)).

"The Fourteenth Amendment's procedural protection of property is a safeguard of the security of interests that a person has already acquired in specific benefits."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576.  These property interests, as already explained, clearly can include "real estate, chattels, or money," but they "may take many forms."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 572, 576.

> Thus, the Court has held that a person receiving welfare benefits under statutory and administrative standards defining eligibility for them has an interest in continued receipt of those benefits that is safeguarded by procedural due process.  Similarly, in the area of employment, the Court has held that a public college professor dismissed from an office held under tenure provisions, and college professors and staff members dismissed during the terms of their contracts, have interests in continued employment that are safeguarded by due process.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 576–77 (citations omitted).

Based upon these decisions, "[t]o have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'"  Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007)(quoting Carnes v. Parker, 922 F.2d 1506, 1509 (10th Cir. 1991)).  See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

> Property interests, of course, are not created by the Constitution.  Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  See Farthing v. City of Shawnee, 39 F.3d 1131, 1135 (10th Cir. 1994)("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(quoting Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).  "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"  Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (quoting Mullane v. Cent. Hanover Bank & Tr. Co., 339 U.S. 306, 313 (1950)).  "(D)ue process is flexible and calls for such procedural protections as the particular situation demands."  Mathews v. Eldridge, 424 U.S. at 334 (internal quotation marks omitted)(alteration in original)(quoting Morrisey v. Brewer, 408 U.S. at 481).  The Supreme Court has explained that

> "the root requirement" of the Due Process Clause [is] "that an individual be given an opportunity for a hearing *before* he is deprived of any significant property interest."  *Boddie v. Connecticut*, 401 U.S. 371, 379 . . . (1971)(emphasis in original) . . . . This principle requires "some kind of a hearing" prior to the discharge of an employee who has a constitutionally protected property interest in his employment. *Board of Regents v. Roth*, 408 U.S. at 569-570 . . . .
>
> . . . .
>
> . . . [T]he pretermination "hearing," though necessary, need not be elaborate.  We have pointed out that "[t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings."  *Boddie v. Connecticut*, 401 U.S. at 378 . . . .  In general, "something less" than a full evidentiary hearing is sufficient prior to adverse administrative action. *Matthews v. Eldridge*, 424 U.S. at 343 . . . .

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545(footnote and citations omitted).

The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "the private interest that will be affected by the official action" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process." *Hamdi v. Rumsfeld*, 542 U.S. 507, [529] . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335 . . .). A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'" *Id.* (quoting Mathews v. Eldridge, 424 U.S. at 335 . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004). The hearing required depends on:

(i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose. See Mathews v. Eldridge, 424 U.S. at 335. For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate." Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999). See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(concluding that removal of a child from parents' custody requires a predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event" (internal quotation marks omitted)(quoting Smith v. Org. of Foster Families for Equal. and Reform, 431 U.S. 816, 848 (1977))).

The Court has previously considered procedural due process violations several times. For example, in A.M. through Youngers v. New Mexico Department of Health, No. CIV 13-0692, 2015 WL 13668431 (D.N.M. Dec. 7, 2015)(Browning, J.), the Court concluded that the New Mexico Department of Health violated due process when it afforded a woman with developmental

disabilities no process before depriving her of medical care, conditions of reasonable care, safety, and nonrestrictive confinement. See 2015 WL 13668431, at *37-43. The Court has also concluded that a tenured city employee was not denied due process when the city fired him, because the city afforded him a hearing. See Salazar v. City of Albuquerque, 776 F. Supp. 2d 1217, 1239 (D.N.M. 2011)(Browning, J.)("A citizen is entitled to process and is not necessarily guaranteed a win."). See also Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1215 (D.N.M. 2009)(Browning, J.)(denying due process claims where a state employee "got her opportunity to be heard at a complex grievance hearing, with an attorney and with an opportunity to question witnesses, and make opening and closing arguments to a panel of decision-makers"); Camuglia v. City of Albuquerque, 375 F. Supp. 2d 1299, 1308-09 (D.N.M. 2005)(Browning, J.), aff'd, 448 F.3d at 1221 (concluding that "it cannot be denied that the City, acting through its inspectors, may close a restaurant to protect the health of patrons and workers without first providing a hearing to the restaurant owner").

## LAW REGARDING SUBSTANTIVE DUE PROCESS CLAIMS

The Due Process Clause of the Fourteenth Amendment provides that "no State shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1. In general, state actors may be held liable under § 1983 only for their own affirmative acts that violate a plaintiff's due process rights and not for third parties' acts. See Robbins v. Oklahoma, 519 F.3d 1242, 1251 (10th Cir. 2008)(citing DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. 189, 197 (1989)). "[N]othing in the language of the Due Process Clause itself requires the State to protect the life, liberty and property of its citizens against invasion by private actors." DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

The Due Process Clause is not a guarantee of a minimal level of safety and security. See DeShaney v. Winnebago Cty. Dep't of Soc. Servs., 489 U.S. at 195.

### 1. **Exceptions to the General Rule.**

There are, however, two exceptions to the general rule. The first -- the special-relationship exception -- arises when the state has a custodial relationship with the victim, which triggers an affirmative duty to provide protection to that individual. See Christiansen v. City of Tulsa, 332 F.3d 1270, 1280 (10th Cir. 2003); Graham v. Indep. Sch. Dist. No. 1-89, 22 F.3d 991, 994-95 (10th Cir. 1994). The second -- the danger-creation exception -- provides that a state may also be liable for an individual's safety "only when 'a state actor affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence.'" Robbins v. Oklahoma, 519 F.3d at 1251 (quoting Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001)). "If either the special-relationship or danger-creation exception applies, the conduct of the state actor must go beyond negligence to the point of 'shocking the conscience.'" Glover v. Gartman, 899 F. Supp. 2d 1115, 1135 (D.N.M. 2012)(Browning, J.)(citing Johnson ex rel. Estate of Cano v. Holmes, 455 F.3d 1133, 1142 (10th Cir. 2006)). The Court's decision in Glover v. Gartman was also consistent with a previous Tenth Circuit decision -- Radecki v. Barela, 146 F.3d 1227 (10th Cir. 1998) -- in which the Tenth Circuit stated:

> It is true, of course, that "state actors are generally only liable under the Due Process Clause for their own acts and not private violence." There are, however, two exceptions to that rule. First, the state may be subject to constitutional liability if it does not perform a duty to provide protection to an individual with whom the state has a special relationship because it has assumed control over that individual, such as in a prison. Second, the state may be constitutionally liable if it creates a danger that results in harm to an individual, even if that harm is ultimately inflicted by a private party. The "shocks the conscience" standard applies to both types of suits.

Radecki v. Barela, 146 F.3d at 1230 (citations omitted)(quoting Uhlrig v. Harder, 64 F.3d 567, 572-73 (10th Cir. 1995)).

### 2. The Special-Relationship Exception.

The first exception to the general principle that a state's negligent failure to protect an individual cannot trigger liability under the Due Process Clause is the special-relationship doctrine. A plaintiff must show that they were involuntarily committed to state custody to establish a duty to protect under the special-relationship doctrine. See Liebson v. N.M. Corr. Dep't, 73 F.3d 274, 276 (10th Cir. 1996). "A special relationship exists when the state assumes control over an individual sufficient to trigger an affirmative duty to provide protection to that individual (e.g., when the individual is a prisoner or involuntarily committed mental patient)." Uhlrig v. Harder, 64 F.3d at 572.

### 3. The Danger-Creation Exception.

The Due Process Clause protects against "deliberately wrongful government decisions rather than merely negligent government conduct." Uhlrig v. Harder, 64 F.3d at 573. The danger-creation exception to this rule applies only when a state actor "affirmatively acts to create, or increases a plaintiff's vulnerability to, or danger from private violence." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). See Estate of B.I.C. v. Gillen, 710 F.3d 1168, 1173 (10th Cir. 2013)("[S]tate officials can be liable for the acts of private parties where those officials created the very danger that caused the harm."). Under a danger-creation theory, there is no § 1983 liability absent "an intent to harm" or "an intent to place a person unreasonably at risk of harm." Uhlrig v. Harder, 64 F.3d at 573. A plaintiff must show "sufficient[] 'affirmative conduct on the part of the state in placing the plaintiff in danger.'" Estate of B.I.C. v. Gillen, 710 F.3d at 1173 (quoting Gray

v. Univ. Colo. Hosp. Auth., 672 F.3d 909, 916 (10th Cir. 2012)).  To state a prima-facie case for

a danger-creation claim for due-process violations, the plaintiff must show that his or her claim

meets a six-part test:

> (i) the state and individual actors must have created the danger or increased
> plaintiff's vulnerability to the danger in some way; (ii) the plaintiff must be a
> member of a limited and specifically definable group; (iii) the defendant's conduct
> must put the plaintiff at substantial risk of serious, immediate, and proximate harm;
> (iv) the risk must be obvious and known; (v) and the defendant must have acted
> recklessly in conscious disregard of that risk.

Peña v. Greffet, 922 F. Supp. 2d 1187, 1227 (D.N.M. 2013)(Browning, J.)(citing Rost ex rel. K.C.

v. Steamboat Springs RE–2 Sch. Dist., 511 F.3d 1114, 1126 (10th Cir. 2008)).

In determining whether the danger-creation exception applies, the Tenth Circuit has

focused on the deliberateness of the conduct in relation to the caused harm.  See Christiansen v.

City of Tulsa, 332 F.3d at 1281.  The defendant must recognize the unreasonableness of the risk

of the conduct and act with an "intent to cause a particularized harm."  Medina v. City & Cty. of

Denver, 960 F.2d 1493, 1496 (10th Cir. 1992), overruled on other grounds by Cty. of Sacramento

v. Lewis, 523 U.S. 833 (1998).  The intent to place a person unreasonably at risk is present where

the defendant is "aware of a known or obvious risk" creating a high probability that serious harm

will follow, and the defendant nonetheless proceeds with a "conscious and unreasonable disregard

of the consequences."  Medina v. City & Cty. of Denver, 960 F.2d at 1496.

**4.     What Shocks the Conscience.**

A government actor's official conduct intended to injure in a way that cannot reasonably

be justified by any government interest most likely shocks the conscience.  See Cty. of Sacramento

v. Lewis, 523 U.S. at 849 ("[C]onduct intended to injure in some way unjustifiable by any

government interest is the sort of official action most likely to rise to the conscience-shocking

level."). "[A] plaintiff must do more than show that the government actor intentionally or recklessly caused injury to the plaintiff by abusing or misusing government power." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (internal quotation marks omitted)(quoting Moore v. Guthrie, 438 F.3d 1036, 1040 (10th Cir. 2006)). "[T]he plaintiff must demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscience shocking." Camuglia v. City of Albuquerque, 448 F.3d at 1222 (alteration in original)(internal quotation marks omitted)(quoting Uhlrig v. Harder, 64 F.3d at 574).

> Establishing these limits advances "three basic principles highlighted by the Supreme Court in evaluating substantive due process claims: (1) the need for restraint in defining their scope; (2) the concern that § 1983 not replace state tort law; and (3) the need for deference to local policymaking bodies in making decisions impacting upon public safety."

Camuglia v. City of Albuquerque, 448 F.3d at 1223 (quoting Uhlrig v. Harder, 64 F.3d at 573). "Whether the conduct shocks the conscience is an objective test, based on the circumstances, rather than a subjective test based on the government actor's knowledge." Peña v. Greffet, 922 F. Supp. 2d at 1227 (citing James v. Chavez, 830 F. Supp. 2d 1208, 1275 (D.N.M. 2011)(Browning, J.)(finding that the use of deadly force did not shock the conscience even if the suspect did not have an intent to harm the officer, because the officer "had sufficient facts before him to conclude that there was a threat of serious physical harm" and the "courts must evaluate a [government actor's] conduct objectively"), aff'd, 511 F. App'x 742 (10th Cir. 2013)(unpublished)).

In Martinez v. Uphoff, 265 F.3d 1130 (10th Cir. 2001), the widow of a corrections officer sued the director, deputy director, warden, and deputy wardens of the department of corrections, alleging that the defendants deliberately failed to ensure proper training and supervision of

penitentiary personnel, failed to provide safe and adequate staffing, and failed to take corrective action to protect her husband, all of which resulted in him being killed during the escape of three inmates.  See 265 F.3d at 1132.  The district court concluded that the plaintiff failed to state a § 1983 claim for violation of the Due Process Clause under a danger-creation theory, because the defendants' actions were "not of such a magnitude that the Court is able to conclude they shock the conscience."  Martinez v. Uphoff, 265 F.3d at 1134 (internal quotation marks omitted)(quoting the district court's opinion).  The Tenth Circuit agreed with the district court's conclusion, stating: "[U]nder the circumstances of this case, 'inaction in the face of known dangers or risks [was] not enough to satisfy the danger-creation theory's conscience shocking standard.'" 265 F.3d at 1135 (alteration in original)(quoting the district court's opinion).

In Schaefer v. Las Cruces Public School District, 716 F. Supp. 2d 1052 (D.N.M. 2010)(Browning, J.), the plaintiff alleged that the defendants -- the school district and its superintendent, and a middle school's principal and vice principal -- violated the plaintiff's substantive due-process rights when they did not take sufficient action to prevent a student at the school from "racking"[37] the plaintiff's son.  716 F. Supp. 2d at 1072-73. The Court concluded that the defendants' conduct did not shock the conscience.  See 716 F. Supp. 2d at 1074-75. The Court explained:

> Assuming the absolute worst from the Schaefers' alleged facts, the Defendants were aware of three instances of an unknown eighth-grade student racking various sixth-grade students within the span of a month, and failed to implement policies to improve hallway monitoring and stop this conduct from occurring in time to prevent AS from falling victim to the same fate. Further, the Defendants indicated to the sixth graders that it had policies in place to punish individuals that assaulted other students but did not, in fact, have such policies.

---

[37] The parties in Schaefer v. Las Cruces Public School District defined "racked" as being "kicked and/or punched in the testicles."  716 F. Supp. 2d at 1059 n.2.

While such behavior may be worthy of remedy under tort law, and perhaps worthy of punishment in the form of punitive damages, the Court's conscience is not shocked.

. . . Any number of actions by the Defendants might have remedied the problem, but the Court's conscience is not shocked by the Defendants' failure to consider or implement such a policy. Even if the Defendants knew that students frequently -- more than three times per month -- attacked other students in the halls and declined to implement safety measures to minimize that conduct, the Court is not convinced that it would rise to the level of shocking the conscience.

716 F. Supp. 2d at 1074-75.

## LAW REGARDING DIVERSITY JURISDICTION AND ERIE

Under Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1983)("Erie"), a federal district court sitting in diversity applies "state law with the objective of obtaining the result that would be reached in state court." Butt v. Bank of Am., N.A., 477 F.3d 1171, 1179 (10th Cir. 2007). Accord Mem. Hosp. v. Healthcare Realty Tr. Inc., 509 F.3d 1225, 1229 (10th Cir. 2007). The Court has held that if a district court exercising diversity jurisdiction cannot find a Supreme Court of New Mexico "opinion that [governs] a particular area of substantive law . . . [the district court] must . . . predict how the Supreme Court of New Mexico would [rule]." Guidance Endodontics, LLC v. Dentsply Int'l., Inc., 708 F. Supp. 2d 1209, 1224-25 (D.N.M. 2010)(Browning, J.). "Just as a court engaging in statutory interpretation must always begin with the statute's text, a court formulating an Erie prediction should look first to the words of the state supreme court." Peña v. Greffet, 110 F. Supp. 3d 1103, 1132 (D.N.M. 2015)(Browning, J.).[38] If the Court finds only an

---

[38] In performing its Erie-mandated duty to predict what a state supreme court would do if faced with a case, see Comm'r v. Estate of Bosch, 387 U.S. 456 (1987), a federal court may sometimes contradict the state supreme court's own precedent if the federal court concludes that the state supreme court would, given the opportunity, overrule its earlier holding, see Anderson Living Trust v. WPX Energy Prod., LLC, 27 F. Supp. 3d 1188, 1247 n.30 (D.N.M.

opinion from the Court of Appeals of New Mexico, while "certainly [the Court] may and will consider the Court of Appeal[s'] decision in making its determination, the Court is not bound by the Court of Appeal[s'] decision in the same way that it would be bound by a Supreme Court decision." Mosley v. Titus, 762 F. Supp. 2d 1298, 1332 (D.N.M. 2010)(Browning, J.)(noting that where the only opinion on point is "from the Court of Appeals, . . . the Court's task, as a federal district court sitting in this district, is to predict what the Supreme Court of New Mexico would do if the case were presented to it" (citing Wade v. EMCASCO Ins., 483 F.3d 657, 666 (10th Cir. 2007)(explaining that, "[w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do," and that, "[i]n doing so, it may seek guidance from decisions rendered by lower courts in the relevant state")))[39] The Court may also rely on

_____

2014)(Browning, J.). Courts should, obviously, be reticent to formulate an Erie prediction that conflicts with state-court precedent; even if the prediction turns out to be correct, such predictions produce disparate results between cases filed in state and federal courts, as the old state supreme court precedent usually binds state trial courts. The factors to which a federal court should look before making an Erie prediction that a state supreme court will overrule its prior precedent vary depending upon the case, but some consistent ones include: (i) the age of the state supreme court decision from which the federal court is considering departing -- the younger the state case is, the less likely it is that departure is warranted; (ii) the amount of doctrinal reliance that the state courts -- especially the state supreme court -- have placed on the state decision from which the federal court is considering departing; (iii) apparent shifts away from the doctrine that the state decision articulates, especially if the state supreme court has explicitly called an older case's holding into question; (iv) changes in the composition of the state supreme court, especially if mostly dissenting justices from the earlier state decision remain on the court; and (v) the decision's patent illogic or its inapplicability to modern times. See Peña v. Greffet, 110 F. Supp. 3d at 1132 n.17. In short, a state supreme court case that a federal court Erie predicts will be overruled is likely to be very old, neglected by subsequent state-court cases -- perhaps because it is in a dusty corner of the common law which does not get much attention or have much application -- and clearly wrong.

[39]The Supreme Court has addressed what the federal courts may use when there is not a decision on point from the state's highest court:

The highest state court is the final authority on state law, but it is still the duty of the federal courts, where the state law supplies the rule of decision, to ascertain and

Tenth Circuit decisions interpreting New Mexico law.  See Anderson Living Tr. v. WPX Energy

Prod., LLC, 27 F. Supp. 3d at 1243 & n.30.[40]  Ultimately, "the Court's task is to predict what the

---

apply that law even though it has not been expounded by the highest court of the State.  An intermediate state court in declaring and applying the state law is acting as an organ of the State and its determination, in the absence of more convincing evidence of what the state law is, should be followed by a federal court in deciding a state question.  We have declared that principle in *West v. American Telephone and Telegraph Co.*, 311 U.S. 223 (1940), decided this day.  It is true that in that case an intermediate appellate court of the State had determined the immediate question as between the same parties in a prior suit, and the highest state court had refused to review the lower court's decision, but we set forth the broader principle as applicable to the decision of an intermediate court, in the absence of a decision by the highest court, whether the question is one of statute or common law.

. . . We have held that the decision of the Supreme Court upon the construction of a state statute should be followed in the absence of an expression of a countervailing view by the State's highest court, and we think that the decisions of the Court of Chancery [the New Jersey trial court] are entitled to like respect as announcing the law of the State.

. . . .

The question has practical aspects of great importance in the proper administration of justice in the federal courts.  It is inadmissible that there should be one rule of state law for litigants in the state courts and another rule for litigants who bring the same question before the federal courts owing to the circumstance of diversity of citizenship.  In the absence of any contrary showing, the rule [set forth by two New Jersey trial courts, but no appellate courts] appears to be the one which would be applied in litigation in the state court, and whether believed to be sound or unsound, it should have been followed by the Circuit Court of Appeals.

Fid. Union Tr. Co. v. Field, 311 U.S. 169, 177-80 (1940)(footnotes and citations omitted).  The Supreme Court has softened this position over the years; federal courts are no longer bound by state trial or intermediate court opinions, but "should attribute [them] some weight . . . where the highest court of the State has not spoken on the point."  Comm'r v. Estate of Bosch, 387 U.S. at 465 (citing King v. Order of United Commercial Travelers, 333 U.S. 153, 159 (1948)).  See 17A James Wm. Moore et al., Moore's Federal Practice § 124.20 (3d ed. 1999)("Decisions of intermediate state appellate courts usually must be followed . . . [and] federal courts should give some weight to state trial courts decisions."  (emphasis and title case omitted)).

[40]In determining the proper weight to accord Tenth Circuit precedent interpreting New

Mexico law, the Court must balance the need for uniformity between federal court and state court interpretations of state law with the need for uniformity among federal judges. If the Court adheres too rigidly to Tenth Circuit caselaw, ignoring changes undergone by a state's law in the ensuing years, then parties litigating state-law claims will be subject to a different body of substantive law, depending on whether they litigate in state court or federal court. This result frustrates the purpose of Erie, which held that federal courts must apply state court interpretations of state law, rather than their own, in part so that parties achieve a consistent result regardless of the forum. This consideration pulls the Court toward according Tenth Circuit precedent less weight and according state court decisions issued in the ensuing years more weight. On the other hand, when the state law is unclear, it is desirable for there to at least be uniformity among federal judges as to its proper interpretation. Otherwise, different federal judges within the same circuit -- or even the same district, as district courts' decisions are not binding, even upon themselves -- would be free to adopt differing interpretations of a state's law. This consideration pulls the Court towards a stronger respect for vertical stare decisis, because a Tenth Circuit decision on point -- regardless whether it accurately reflects state law --at least provides consistency at the federal level, so long federal district judges are required to follow it.

The Court must decide how to weigh Tenth Circuit caselaw against more-recent state court decisions, choosing a point on the spectrum between the two extremes: rigidly adhering to Tenth Circuit precedent unless there is intervening caselaw directly on point from the state's highest court, on one end; and independently interpreting the state law, regarding the Tenth Circuit precedent as no more than persuasive authority, on the other. In striking this balance, the Court notes that it is generally more concerned about systemic inconsistency between the federal courts and the state courts than it is about inconsistency among federal judges. Judges, even those within a jurisdiction with ostensibly identical governing law, sometimes interpret and apply the law differently from one another; this inconsistency is part and parcel of a common-law judicial system. More importantly, litigants seeking to use forum selection to gain a substantive legal advantage cannot easily manipulate such inconsistency: cases are assigned randomly to district judges in this and many federal districts; and, regardless, litigants cannot know for certain how a given judge will interpret the state law, even if they could determine the identity of the judge pre-filing or pre-removal. All litigants know in advance is that whomever federal district judge they are assigned will look to the entirety of the state's common law in making his or her determination -- the same as a state judge would. Systemic inconsistency between the federal courts and state courts, on the other hand, not only threatens the principles of federalism, but litigants may more easily manipulate the inconsistency. When the Tenth Circuit issues an opinion interpreting state law, and the state courts subsequently shift away from that interpretation, litigants -- if the district courts strictly adhere to the Tenth Circuit opinion -- have a definite substantive advantage in choosing the federal forum over the state forum, or vice versa.

The Court further notes that district courts may be in a better position than the Tenth Circuit to be responsive to changes in state law. Tenth Circuit decisions interpreting a particular state's law on a specific issue are further apart in time than the collective district courts' are. More importantly, the Tenth Circuit does not typically address such issues with the frequency that the state's courts themselves do. As such, Tenth Circuit precedent can lag behind developments in state law -- developments that the district courts may be nimble enough to perceive and adopt.

Additionally, much of the benefit of having a consistent Tenth Circuit-wide interpretation of a particular state's law is wasted. Other than Oklahoma, every state encompassed by the Tenth Circuit contains only one federal judicial district, and there is relatively little need for federal judges in Wyoming and Kansas to have a uniform body of New Mexico law to which to look. Last, the Court notes, respectfully, that district courts may be in a better position than the Tenth Circuit to develop expertise on the state law of the state in which they sit. Every federal judicial district in the nation, except the District of Wyoming, covers at most one state. It is perhaps a more workable design for each district court to keep track of legal developments in the state law of its own state(s) than it is for the Tenth Circuit to monitor separate legal developments in eight states.

Having outlined the relevant considerations, the Court thinks the proper stance on vertical stare decisis in the context of federal court interpretations of state law is as follows: the Tenth Circuit's cases are binding as to their precise holding -- what the state law was on the day the opinion was published -- but lack the positive precedential force that its cases interpreting a federal statute or the federal Constitution possess. A district court considering a state law issue after the publication of a Tenth Circuit opinion on point may not come to a contrary conclusion based only on state court cases that were available to the Tenth Circuit and that the Tenth Circuit considered, but it may come to such a conclusion based on intervening state court cases.

When interpreting state law, the Tenth Circuit does not and cannot issue a case holding that *x* is the law in New Mexico; it holds that the proper interpretation of New Mexico law, at the time the opinion is released, is *x*. Its holdings are descriptive, not prescriptive -- interpretive, not normative. Because federal judicial opinions lack independent substantive force on state law issues, but possess such force regarding federal law issues, the Court thinks the following is not an unfair summary of the judicial interpretive process: (i) when interpreting federal law, the federal appellate courts consider the existing body of law, and then issue a holding that both reflects and influences the body of law; that holding subsequently becomes a part of the body of law; but (ii) when interpreting state law, the federal appellate courts consider the existing body of law, and then issue a holding that only reflects the body of law; that holding does not subsequently become a part of the body of law. The federal district courts are bound to conclude that the Tenth Circuit's reflection of the then-existing body of law was accurate. The question is whether they should build a doctrine atop the case and use the existence of the Tenth Circuit's case to avoid any responsibility to independently consider the whole body of state law that exists when the time comes that diversity litigants raise the issue in their courtrooms. Giving such effect to the Tenth Circuit's interpretations of state law is at tension with Erie, giving independent substantive effect to federal judicial decisions -- i.e., applying federal law -- in a case brought in diversity.

The purpose of Erie is well-known and simple, and the Court should not complicate it beyond recognition: it is that the same substantive law governs litigants' cases regardless whether they are brought in a federal or state forum. For simplicity's sake, most courts have settled on the formulation that "the federal court must attempt to predict how the states' highest court would rule if confronted with the issue." Moore's Federal Practice § 124.22[3] (citing Comm'r v. Estate of Bosch, 387 U.S. at 465 ("[A]n intermediate appellate state court [decision] is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." (citation and

internal quotation marks omitted))).  This formulation may not be the most precise one if the goal is to ensure identical outcomes in state and federal court -- the Honorable Milton I. Shadur, United States District Judge for the Northern District of Illinois, looks to state procedural rules to determine in which state appellate circuit the suit would have been filed were it not in federal court, and then applies the state law as that circuit court interprets it, see Abbott Labs. v. Granite State Ins., 573 F. Supp. 193, 196-200 (N.D. Ill. 1983)(Shadur, J.)(noting that the approach of predicting the state supreme court's holdings will often lead to litigants obtaining a different result in federal court than they would in state court, where only the law of the circuit in which they filed -- and certainly not nonexistent, speculative state supreme court law -- governs) -- but it is a workable solution that has achieved consensus.  See Allstate Ins. v. Menards, Inc., 285 F.3d 630, 637 (7th Cir. 2002)("[W]e adhere today to the general rule, articulated and applied throughout the United States, that, in determining the content of state law, the federal courts must assume the perspective of the highest court in that state and attempt to ascertain the governing substantive law on the point in question.").  This formulation, built out of ease-of-use, does not relieve courts of their Supreme Court-mandated obligation to consider state appellate and trial court decisions.  To the contrary, even non-judicial writings by influential authors, statements by state supreme court justices, the closeness of the vote on a prior case addressing the issue, and personnel changes on the court -- considerations that would never inform a federal court's analysis of federal law -- may validly come into play.  The question is whether the district courts must abdicate, across-the-board, the "would decide" aspect of the Erie analysis to their parent appellate courts when the Court of Appeals has declared an interpretation of state law.

The Erie doctrine results in federal cases that interpret state law withering with time.  While cases interpreting federal law become more powerful over time -- forming the groundwork for doctrines, growing upward from one application (Congress may create a national bank) to many (Congress may set quotas on wheat-growing for personal consumption), expanding outward from the general (states must grant criminal jury trials) to the specific (the jury need not be twelve people, nor must it be unanimous) -- federal cases interpreting state law often become stale.  New state court cases -- even when not directly rebuking the federal court's statement of law -- alter the common-law legal landscape with their dicta, their insinuations, and their tone.  The Supreme Court, which picks its cases sparingly and for maximum effect, almost never grants certiorari to resolve issues of state law.

The Court's views on Erie, of course, mean little if the Tenth Circuit does not agree.  In Wankier v. Crown Equipment Corp., 353 F.3d 862 (10th Cir. 2003)(McConnell, J.) the Tenth Circuit said that,

> [w]here no controlling state decision exists, the federal court must attempt to predict what the state's highest court would do.  In performing this ventriloquial function, however, the federal court is bound by ordinary principles of *stare decisis*.  Thus, when a panel of this Court has rendered a decision interpreting state law, that interpretation is binding on district courts in this circuit, and on subsequent panels of this Court, unless an intervening decision of the state's highest court has resolved the issue.

Wankier v. Crown Equip. Corp., 353 F.3d at 866.  From this passage, it seems clear that the Tenth Circuit permits a district court to deviate from its view of state law only on the basis of a subsequent case "of the state's highest court."  The American Heritage Dictionary of the English Language 1402 (William Morris ed., New College ed. 1976)(defining "unless" as "[e]xcept on the condition that; except under the circumstances that").  A more aggressive reading of the passage -- namely the requirement that the intervening case "resolv[e] the issue," Wankier v. Crown Equip. Corp., 353 F.3d at 866 -- might additionally compel the determination that any intervening caselaw must definitively and directly contradict the Tenth Circuit interpretation to be considered "intervening."

It is difficult to know whether the Honorable Michael W. McConnell's, former United States Circuit Judge for the Tenth Circuit, limitation of "intervening decision" to cases from the highest state court was an oversight or intentional.  Most of the Tenth Circuit's previous formulations of this rule have defined intervening decisions inclusively as all subsequent decisions of "that state's courts," a term which seems to include trial and intermediate appellate courts.  Even Koch v. Koch Industries, Inc., 203 F.3d 1202, 1231 (10th Cir. 2000), the primary authority upon which Wankier v. Crown Equipment Corp. relies, uses the more inclusive definition.  In fact, Wankier v. Crown Equipment Corp. quotes its relevant passage:

> In the absence of intervening Utah authority indicating that a plaintiff is not required to prove a safer, feasible alternative design, we are bound to follow the rule of *Allen* [v. Minnstar, Inc., 8 F.3d 1470 (10th Cir. 1993), a Tenth Circuit case interpreting an issue of Utah law], as was the district court. "Following the doctrine of stare decisis, one panel of this court must follow a prior panel's interpretation of state law, absent a supervening declaration to the contrary by that state's courts or an intervening change in the state's law." Koch v. Koch Indus., Inc., 203 F.3d at 1231.

Wankier v. Crown Equip. Corp., 353 F.3d at 867.

Whether the decision to limit the intervening authority a district court can consider was intentional or not, the Tenth Circuit has picked it up and run with it.  In Kokins v. Teleflex, Inc., the Tenth Circuit, quoting Wankier v. Crown Equipment Corp., refused to consider an opinion from the Court of Appeals of Colorado holding directly the opposite of an earlier Tenth Circuit interpretation of Colorado law.  See Kokins v. Teleflex, Inc., 621 F.3d 1290, 1297 (10th Cir. 2010)(Holmes, J.)("[T]he Colorado Court of Appeals decided *Biosera*[, Inc. v. Forma Scientific, Inc., 941 P.2d 284 (Colo. Ct. App. 1998)], so it is not an 'intervening decision of the state's *highest court*.'"  (emphasis in original)(quoting Wankier v. Crown Equip. Corp., 353 F.3d at 866)).

The Tenth Circuit has set forth a stringent restriction on its district courts' ability to independently administer the Erie doctrine.  More importantly, the Tenth Circuit's view may be at tension with the above-quoted Supreme Court precedent, as well as its own prior caselaw.  Moore's Federal Practice lists the Tenth Circuit as having been, at one time, a "court[ that] hold[s] that a prior federal appellate decision [interpreting state law] is persuasive." Moore's Federal Practice § 124.22[4] (citing State Farm Mut. Auto. Ins. v. Travelers Indem. Co., 433 F.2d 311, 312 (10th Cir. 1970)).  Still, the Court is bound to abide by the Tenth Circuit's interpretation of Erie.

state supreme court would do." Wade v. EMCASCO Ins. Co., 483 F.3d at 666. Accord Mosley v. Titus, 762 F. Supp. 2d at 1332 (citation omitted); Rimbert v. Eli Lilly & Co., 577 F. Supp. 2d 1174, 1188-89 (D.N.M. 2008)(Browning, J.).

**ANALYSIS**

The Court concludes that neither the Subpoena nor the First Warrant are searches under the Fourth Amendment, because of the application of the third-party doctrine. The Court also concludes that the Subpoena is valid under New Mexico law and does not violate Streett's due process rights, and the Court will not suppress the subscriber information evidence. Further, even if the First Warrant is a search under the Fourth Amendment mandating a valid warrant, the Court concludes that probable cause supports the First Warrant -- and, if probable cause is lacking, that the good-faith doctrine applies -- so the Court will not suppress the telephone records evidence. Finally, the Court concludes that probable cause does not support the Second Warrant to search Streett's home, but the good-faith and inevitable-discovery doctrines apply, so the Court will not suppress the resulting evidence and there are no fruit-of-the-poisonous-tree problems with the Third or Fourth Warrants. Accordingly, the Court will deny the Motion and the Supp. Motion.

**I. THE SUBPOENA IS VALID UNDER THE FOURTH AMENDMENT AND UNDER NEW MEXICO LAW, AND DOES NOT VIOLATE STREETT'S DUE PROCESS RIGHTS.**

In the Supp. Motion, Streett proffers two reasons why the Subpoena is invalid: (i) it is a search under the Fourth Amendment, requiring a warrant that probable cause supports; and (ii) it is invalid under New Mexico law. See Supp. Motion at 7, 9. In his Reply, Streett contends that, if issued in violation of New Mexico law, the Subpoena was obtained in violation of due process. See Reply at 3. The Reply admits that the mistake of Streett's counsel "regarding the source of

the more than two thousand pages of phone records was a large basis of the argument under *Carpenter* for suppression of the subpoena and its fruits," but Streett maintains the Subpoena's unlawfulness, because "more than basic identifying information was provided by T-Mobile in response to that initial subpoena." Reply at 4 n.2 (citing T-Mobile Email at 1). The Court thus examines the Subpoena under the Fourth Amendment and New Mexico law, and concludes that the Subpoena is valid under both. The Court therefore will not suppress evidence gathered as a result of the Subpoena.

## A. THE SUBPOENA DOES NOT CONSTITUTE A SEARCH UNDER THE FOURTH AMENDMENT.

The case on which Streett relies to argue against the Subpoena's validity is distinguishable, because it deals with "whether the Government conducts a search under the Fourth Amendment when it accesses historical cell phone records that provide a comprehensive chronical of the user's past movements." Carpenter v. United States, 138 S. Ct. at 2211. The information obtained from the Subpoena -- Streett's subscriber information -- provides no such insight into Streett's movements and, thus, the privacy analysis from Carpenter v. United States is inapplicable.

The Supreme Court has recognized that the Fourth Amendment seeks to safeguard people from unreasonable searches, and has provided two basic guideposts in determining what constitutes an unreasonable search: (i) that the Fourth "Amendment seeks to secure 'the privacies of life' against 'arbitrary power,'" Carpenter v. United States, 138 S. Ct. at 2213-14 (quoting Boyd v. United States, 116 U.S. 616, 630 (1886)); and (ii) that "a central aim of the Framers was 'to place obstacles in the way of a too permeating police surveillance,'" Carpenter v. United States, 138 S. Ct. at 2214 (quoting United States v. Di Re, 332 U.S. 581, 595 (1948)). With changing technology allowing more government encroachment into private areas, the Supreme Court seeks

to maintain "preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." Carpenter v. United States, 138 S. Ct. at 2214 (internal quotation marks omitted)(quoting Kyllo v. United States, 533 U.S. at 34). Thus, if a person has no reasonable expectation of privacy in the information seized, there has been no search -- and no warrant supported by probable cause is needed. See Carpenter v. United States, 138 S. Ct. at 2213 (citing Smith v. Maryland, 442 U.S. at 740). The Supreme Court has held that a person may have no such reasonable "expectation of privacy in information he voluntarily turns over to third parties," which is commonly known as the third-party doctrine. Smith v. Maryland, 442 U.S. at 743-44. This doctrine applies "even if the information is revealed on the assumption that it will be used only for a limited purpose." United States v. Miller, 425 U.S. at 443.

Subscriber information, unlike the cell-site records at issue in Carpenter v. United States, fits neatly under existing Supreme Court and Tenth Circuit precedent under the third-party doctrine. The Tenth Circuit has noted, regarding the expectation of privacy in information associated with an IP address, that "[e]very federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation." United States v. Perrine, 518 F.3d at 1204 (listing cases). One such court that the Tenth Circuit cited is the United States Court of Appeals for the Sixth Circuit, which held that people hold no "Fourth Amendment privacy interest in their subscriber information because they communicated it to the systems operators" -- thus relying on the third-party doctrine. Guest v. Leis, 255 F.3d 325, 336 (6th Cir. 2001)(cited in United States v. Perrine, 518 F.3d at 1204). The Tenth Circuit also cited to the United States Court of Appeals for the Fourth Circuit, which held that an invalid subpoena "does not trigger the application of the Fourth

Amendment, as [the defendant] had no privacy interest in the non-content information obtained as a result of the subpoena," which was "the account information given to the [internet service provider] in order to establish the e-mail account." United States v. Hambrick, 225 F.3d 656, 2000 WL 1062039, at *4 (4th Cir. 2000)(unpublished table decision)(cited in United States v. Perrine, 518 F.3d at 1204). The account information provided pursuant to the subpoena in United States v. Hambrick included "the defendant's name, address, social security number, [and] credit card number." 55 F. Supp. 2d 504, 507 (W.D. Va. 1999)(Michael, J.), aff'd, 2000 WL 1062039, at *4. Subscriber information voluntarily transmitted to a telephone company therefore also falls under the third-party doctrine, because this information was communicated to the company to obtain telephone service, so Streett does not have a reasonable expectation of privacy in this information. The Subpoena, therefore, is not a search under the Fourth Amendment.

Streett argues that the disclosure under the Subpoena was unlawful, because T-Mobile provided "more than basic identifying information," including "[h]is social security number." Reply at 4 n.2. He avers that his social security number is "private and confidential information," which should be considered in deciding whether the Subpoena is unlawful. Reply at 4 n.2 (internal quotation marks omitted)(quoting Meyerson v. Prime Realty Servs., LLC, 796 N.Y.S.2d at 852). The Subpoena did not, however, specifically request Streett's social security number, it requested "[s]ubscriber information[,] . . . [i]ncluding the name(s) and addresses of the person(s) who opened the account, the date the account was opened, detailed method of payment, alternate telephone number(s), email addresses, and any identifying information which would tend to identify the person(s) subscribing to this service." Subpoena at 1. The statute authorizing disclosure of this information via an administrative subpoena, see 18 U.S.C. § 2703(c)(2), provides

that T-Mobile shall release the subscriber's name and address, the "length of service (including start date)," the "means and source of payment for such service (including any credit card or bank account number," and the "telephone or instrument number or other subscriber number or identity, including any temporarily assigned network address" when issued a grand jury subpoena. 18 U.S.C. § 2703(c)(2). It does not appear from 18 U.S.C. § 2703's face that the Subpoena's requests are outside the statute's scope as Streett contends. See Streett's Proposed Findings at 18 n.2.

Further, that the Subpoena led to the disclosure of what Streett contends is confidential information -- his social security number -- does not mean the Subpoena violated the Fourth Amendment. First, law enforcement already had access to Streett's social security number. See NCMEC Tip at 8 (providing Streett's social security number); Tr. at 18:25-19:4 (Whitsitt)(discussing how he accessed the TLO system to investigate Streett after receiving the NCMEC Tip, which provides social security numbers). Second, in the context of administrative subpoenas, the Tenth Circuit found a subpoena duces tecum enforceable, even though it sought "personal, private, and confidential" matters, and no probable cause was shown, because "administrative 'fishing expeditions' are often permitted; and . . . administrative subpoenas may be enforced for investigative purposes unless they are plainly incompetent or irrelevant to any lawful purpose." Equal Emp't Opportunity Comm'n v. Univ. of N.M., 504 F.2d 1296, 1303 (10th Cir. 1974). Although not an administrative subpoena, the Subpoena here is not plainly incompetent, for it seeks the subscriber information that law enforcement may obtain via a subpoena under statute without probable cause -- as discussed above -- and is relevant to verifying the identity of the person who asked a minor for a nude photograph and to the resulting law enforcement investigation. Further, a Fourth Circuit case -- on which the Tenth Circuit relied in

United States v. Perrine, 518 F.3d at 1204, to hold that there is no Fourth Amendment privacy right in subscriber information -- concluded that no privacy interest was implicated by disclosure of the defendant's social security number under an invalid subpoena.  See United States v. Hambrick, 2000 WL 1062039, at *4, aff'g 55 F. Supp. 2d 504.  The Subpoena therefore is not a search as contemplated by the Fourth Amendment and suppression of the resulting evidence is unwarranted.

### B.    THE SUBPOENA IS VALID UNDER NEW MEXICO LAW AND DOES NOT VIOLATE STREETT'S RIGHT TO DUE PROCESS.

Streett argues that, if the Subpoena was issued without the "pending grand jury investigation necessary" or if it was not "issued at the behest of the District Attorney," it is unlawful under New Mexico law.  Supp. Motion at 7 (citing State v. Martinez, 2018-NMSC-031, ¶ 13, 420 P.3d at 570).  The Supreme Court of New Mexico has "recognize[d] that . . . judicial subpoenas issued unilaterally by the deputy district attorney in the absence of any pending court or grand jury proceeding [are] unlawful."  State v. Martinez, 2018- NMSC-031, ¶ 12, 420 P.3d at 570.  See State v. Eder, 1985-NMCA-076, ¶¶ 2, 5, 704 P.2d at 467 (finding it to be prosecutorial misconduct to unilaterally issue subpoenas to further an investigation without authorization by the grand jury, and that the proper remedy is to suppress the resulting evidence from trial).[41]  The Supreme Court of New Mexico has also held that "it is unlawful for a court or an officer of the court to issue any subpoena in the absence of a pending judicial action."  In re Chavez, 2017-

---

[41]The Court is confident that the Supreme Court of New Mexico would agree with the New Mexico Court of Appeals' holding in State v. Eder that the information obtained from unilaterally issued subpoenas should be suppressed from trial, because the Supreme Court of New Mexico favorably cited this decision in two of its own decisions: (i) State v. Martinez, 2018-NMSC-031, ¶ 29, 420 P.3d at 573; and (ii) In re Chavez, 2017-NMSC-012, ¶ 11, 390 P.3d at 967-68.

NMSC-012, ¶ 2, 390 P.3d at 966. "[A] pending court case or grand jury investigation" satisfies the "pending judicial action" requirement. State v. Martinez, 2018-NMSC-031, ¶ 13, 420 P.3d at 570 (citing In re Chavez, 2017-NMSC-012, ¶¶ 2, 16, 19, 390 P.3d at 966, 968-69). New Mexico law requires subpoenas to: (i) "state the name of the court from which it is issued"; (ii) "state the title of the action and its criminal action number"; (iii) "command each person to whom it is directed to attend and give testimony or to produce and permit inspection and copying of designated . . . documents or tangible things in the possession, custody or control of that person"; and (iv) "be substantially in the form approved by the Supreme Court." N.M. Ct. R. 5-511(A)(1). The Supreme Court of New Mexico reads this language as "plainly requir[ing] that subpoenas be issued only in connection with existing judicial actions." In re Chavez, 2017-NMSC-012, ¶ 11, 390 P.3d at 967. This requirement does not mandate that a criminal case be filed, however, as the Supreme Court of New Mexico also wrote that "pre-indictment subpoenas are not per se unlawful," for they are "routinely issued . . . in connection with grand jury proceedings under NMSA 1978, Section 31-6-12(A)."[42] In re Chavez, 2017-NMSC-012, ¶ 18, 390 P.3d at 969.

Here, the Subpoena provides that: (i) the Second Judicial District Court issued the Subpoena; (ii) the Subpoena was issued in the investigation of "Telephone number (505) 974-

_____

[42]N.M. Stat. Ann. § 31-6-12(A) provides, in relevant part, that

[t]he grand jury has power to order the attendance of witnesses before it, to cause the production of all public and private records or other evidence relevant to its inquiry and enforce such power by subpoena issued on its own authority through the district court convening the grand jury and executed by any public officer charged with the execution of legal process of the district court.

N.M. Stat. Ann. § 31-6-12(A).

[remainder redacted]," with the number "No. GJ-2013-04"[43]; (iii) and the Subpoena commands T-Mobile's "Custodian of Records" to appear and bring the requested records. Subpoena at 1. Unlike the subpoenas at issue in State v. Martinez, which were issued unilaterally and not pursuant to a "pending prosecution, court action, or grand jury proceeding," State v. Martinez, 2018-NMSC-031, ¶ 4, 420 P.3d at 569, a grand jury issued the Subpoena here after the presentment of evidence, see Tr. at 39:23-40:15 (Zimmerman, Whitsitt); Log of Grand Jury Room at 1. Accordingly, the Subpoena was not issued unilaterally and is valid under New Mexico law.

Moreover, even if the Subpoena were not valid under New Mexico law, it would not violate the Fifth Amendment. A violation of state law does not automatically mean that the federal Constitution has been violated. See United States v. Mikulski, 317 F.3d 1228, 1232 (10th Cir. 2003)("The officers' violation of state law is not, without more, necessarily a federal constitutional violation."); Peterson v. Peterson, No. CIV 03-0660 JB/LAM, 2004 WL 3426406, at *6 (D.N.M. Aug. 1, 2004)(Browning, J.)("Thus, the procedures that the New Mexico Child Support Enforcement Act[, N.M. Stat. Ann. § 40-4A-1 to -20,] requires are not determinative of the question whether the Defendants deprived Peterson of his due process rights under the federal constitution. The Court must evaluate Peterson's claim in light of the federal standards governing procedural due process."). Although procedural due process protects an underlying substantive interest rooted in an "independent source such as state law," it is federal law that determines if the Due Process Clause protects that interest. Town of Castle Rock v. Gonzales, 545 U.S. 748, 757

---

[43]Whitsitt testified that this reference number refers to the grand jury term and not to a case number. See Tr. at 37:14-22 (Zimmerman, Whitsitt). At the time the grand jury issued the Subpoena, because Whitsitt was still investigating the NCMEC Tip to determine if a more substantive investigation into the allegations was needed, there was no case number yet. See 60:14-25 (Mease, Whitsitt).

(2005)(internal quotation marks omitted)(quoting Memphis Light, Gas & Water Div. v. Craft, 466 U.S. 1, 9 (1978)). The Supreme Court of the United States has provided a balancing test for determining whether a procedural due process violation has occurred:

> First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

Matthews v. Eldridge, 424 U.S. at 335.

The privacy interest here, Streett contends, is the disclosure of his private information in contravention of his constitutional right to privacy. See Reply at 6. Streett cites to no case establishing a right to privacy in one's subscriber information. See Reply at 6. The first case he cites as establishing a "constitutional right of personal privacy" is Roe v. Wade, 410 U.S. 113 (1973), Reply at 6, which notes that "only personal rights that can be deemed 'fundamental' or 'implicit in the concept of ordered liberty'" are protected, which "has some extension to activities relating to marriage, procreation, contraception, family relationships, and child rearing and education," Roe v. Wade, 410 U.S. at 152 (citations omitted)(quoting Palko v. Connecticut, 302 U.S. 319, 325 (1937)). The second, and only other case, that Streett cites to establish his privacy right is Whalen v. Roe, 429 U.S. 589 (1977), which describes the "individual interest in avoiding disclosure of personal matters" as "the right to be let alone." Whalen v. Roe, 429 U.S. at 599 & n.25 (internal quotation marks omitted)(quoting Olmstead v. United States, 277 U.S. 438, 478 (1928)(Brandeis, J., dissenting)). Neither of these cases supports Streett's assertion that he has an all-encompassing privacy interest in the "identification data," as Streett characterizes the subscriber information released, that he provided to a third party on his own accord. Reply at 6.

Unless the Supreme Court is prepared to abandon the third-party doctrine -- which it has not and which the Court does not recommend it do -- it is not sound for Streett to argue that certain information is "private" where he willingly shared this same information with T-Mobile to obtain telephone service from it -- which, unlike obtaining services from a doctor or lawyer, implies no confidentiality protections. For Streett to have a protected interest in keeping such subscriber information private, he must "have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577. As previously discussed, Streett has no reasonable expectation of privacy in this information, however, because of the Fourth Amendment's third-party doctrine. That the Stored Communications Act, 18 U.S.C. § 2703, compels disclosure of this information to law enforcement only under certain circumstances -- such as with the use of an administrative or grand jury subpoena issued pursuant to state or federal law -- does not create an entitlement to the privacy of this information. See 18 U.S.C. § 2703(c)(2) ("A provider of electronic communication service or remote computing service shall disclose to a governmental entity the [subscriber information] of a subscriber to or customer of such service when the governmental entity uses an administrative subpoena authorized by a Federal or State statute or a Federal or State grand jury or trial subpoena . . . ."). Rather, the Stored Communications Act provides a procedure through which law enforcement may obtain this subscriber information. Streett therefore has no interest that the Due Process Clause protects.

Whether Streett has an interest to which due process applies does not end the inquiry, however. The next factor assesses the value of additional procedures in obtaining a subpoena. Even if the Subpoena here were issued in violation of New Mexico law -- which it was not --

Streett desires that "a third party determine the need for the information," Reply at 6, which was done here because a grand jury listened to testimony and decided to issue the Subpoena, see Tr. at 39:23-40:15 (Zimmerman, Whitsitt); Log of Grand Jury Room at 1. Even if this were approval were insufficient under New Mexico law, additional safeguards would not decrease the risk of law enforcement unilaterally obtaining a subpoena here, because a third party determined the need for a subpoena as the Stored Communications Act requires. See Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. 305, 320-21 (1985)("In defining the process necessary to ensure 'fundamental fairness' we have recognized that the Clause does not require that 'the procedures used to guard against an erroneous deprivation . . . be so comprehensive as to preclude any possibility of error, and in addition we have emphasized that the marginal gains from affording an additional procedural safeguard often may be outweighed by the societal cost of providing such a safeguard." (quoting Mackey v. Montrym, 443 U.S. 1, 13 (1979))). It is unclear what additional safeguards Streett would desire here, but anything beyond what was done here -- presentment of evidence to the grand jury for approval of a subpoena, pursuant to 18 U.S.C. § 2703(c)(2) -- would be "outweighed by the societal cost of providing" it. Walters v. Nat'l Ass'n of Radiation Survivors, 473 U.S. at 321. Further, the Stored Communications Act provides for special opportunities for notice and hearing in certain circumstances. See 18 U.S.C. § 2703-04. The process used to obtain the Subpoena therefore does not violate Streett's due process rights under the Fifth and Fourteenth Amendments. The Due Process Clause affords Streett no more protection than the Fourth Amendment. See Pino v. Higgs, 75 F.3d 1461, 1469 (10th Cir. 1996)(stating that, because the Fourth Amendment's probable cause requirement was specifically tailored for the criminal justice

system, procedural due process cannot afford more protection). Suppression of the evidence obtained from the Subpoena is unwarranted.

## II. THE FIRST AFFIDAVIT ESTABLISHES PROBABLE CAUSE TO SEARCH STREETT'S TELEPHONE RECORDS.

Streett argues that the First Affidavit "is immediately conspicuous and questionable because it is blank on the portion of the form calling for the date Hartsock signed as the affiant," and lacks probable cause because it "offered no case-specific facts." Supp. Motion at 10-11 (citing First Affidavit at 3, 11). Because the First Affidavit relies mainly on the NCMEC Tip -- which Hartsock characterizes as a CI's Tip -- in an attempt to establish probable cause, Streett alleges that Hartsock's failure to corroborate the CI's Tip or to indicate the CI's reliability means the First Affidavit lacks probable cause. See Supp. Motion at 14. Streett avers that the "Court may proceed directly to the good faith issue," Reply at 15, but the Court does not, because "resolution of [this] Fourth Amendment issue is necessary to guide future action by law enforcement officers and magistrates," United States v. Danhauer, 229 F.3d at 1005.

First, the Court concludes that Streett has no reasonable expectation of privacy in the telephone numbers with which he texts, or in whether those texts are SMS or MMS messages.[44] The Supreme Court has recognized "that the application of the Fourth Amendment depends on whether the person invoking its protection can claim a 'justifiable,' a 'reasonable," or a 'legitimate

---

[44]It is clear there was no search under the trespass-based analysis here, because there was no physical intrusion into a constitutionally protected area, so the Court skips to whether Streett has a subjective expectation of privacy that society recognizes as reasonable in the telephone records collected. See United States v. Alabi, 943 F. Supp. 2d at 1264 ("A Fourth Amendment search occurs where the government, to obtain information, trespasses on a person's property to obtain information. A Fourth Amendment search may also occur where the government violates a person's subjective expectation of privacy that society recognizes as reasonable to collect information." (citing Florida v. Jardines, 569 U.S. at 11)).

expectation of privacy that has been invaded by government action." Smith v. Maryland, 442 U.S. at 739 (quoting Rakas v. Illinois, 439 U.S. at 143 & n.12; Rakas v. Illinois, 439 U.S. at 434-35 (Powell, J., concurring); Rakas v. Illinois, 439 U.S. at 441 (White, J., dissenting); United States v. Chadwick, 433 U.S. 1, 7 (1977); United States v. Miller, 425 U.S. at 442; United States v. Dionisio, 410 U.S. 1, 14 (1973); Couch v. United States, 409 U.S. 322, 335-36 (1971); United States v. White, 401 U.S. 745, 752 (1971)(plurality opinion); Mancusi v. DeForte, 392 U.S. 364, 368 (1968); Terry v. Ohio, 392 U.S. at 9). There is no such legitimate expectation of privacy in "telephone numbers and bank records." See Carpenter v. United States, 138 S. Ct. at 2216-17.

Carpenter v. United States held that a person's "legitimate expectation of privacy in the record of his physical movements" overcomes "the fact that the information is held by a third party." Carpenter v. United States, 138 S. Ct. at 2217. The information acquired here, by contrast -- telephone numbers texted, and whether those texts are SMS or MMS messages -- implicates no deeper privacy expectation as the cell-site location information did in Carpenter v. United States, and the Supreme Court stated that there is no legitimate expectation of privacy in telephone numbers dialed. See Carpenter v. United States, 138 S. Ct. at 2216 ("[T]he third-party doctrine applies to telephone numbers and bank records."); Smith v. Maryland, 442 U.S. at 745 ("[P]etitioner in all probability entertained no actual expectation of privacy in the phone numbers he dialed, and . . . even if he did, his expectation was not 'legitimate.'"). The revelation of whether Streett "dialed" those numbers by texting a SMS or MMS message does not reveal any "private" information, for the designation of "SMS" versus "MMS" does not reveal content of the messages but, rather, how those messages were sent. Supra note 28. Cf. United States v. Finley, 477 F.3d 250, 259 (5th Cir. 2007)(concluding that the defendant "had a reasonable expectation of privacy

in the call records and text messages on" his cellular telephone), overruled on other grounds by

Riley v. California, 134 S. Ct. 2473 (2014). Accordingly, Streett has no reasonable expectation of

privacy in the telephone numbers he texted, or in whether those texts are SMS or MMS messages

and, thus, cannot raise a Fourth Amendment challenge to the receipt of this information with the

First Warrant. See United States v. Poe, 556 F.3d at 1122 ("[A] defendant raising a Fourth

Amendment challenge must first demonstrate that he . . . had a subjective expectation of privacy

in the premises searched and that society is prepared to recognize that expectation as reasonable.'"

(quoting United States v. Rhiger, 315 F.3d 1283, 1285 (10th Cir. 2003))). Even if Streett has,

however, a subjective expectation of privacy that society is ready to constitutionally protect and,

thus, may challenge the First Warrant under the Fourth Amendment, the Court will not suppress

the resulting evidence, because probable cause supports the warrant.

Probable cause must support search warrants to comply with the Fourth Amendment's

requirements. See United States v. Brinklow, 560 F.2d 1003, 1005 (10th Cir. 1977). Requiring

more than "mere suspicion" of criminal activity, but "less evidence than is necessary to convict,"

United States v. Burns, 624 F.2d at 99, probable cause is found where the facts in an affidavit

would "lead a prudent person to believe that a search would uncover contraband or evidence of

criminal activity," United States v. Danhauer, 229 F.3d at 1006.[45]    The probable cause

---

[45]Streett cites to United States v. Nguyen, 673 F.3d 1259 (9th Cir. 2013), for the proposition
that "[p]robable cause for a search warrant requires 'a fair probability *both that a crime has been
committed and* that evidence of its commission will be found in the location to be searched.'"
Streett's Proposed Findings ¶ 8, at 20 (emphasis in Streett's Proposed Findings)(quoting United
States v. Nguyen, 673 F.3d at 1263). This assertion is not binding on the Court, because it comes
from an outside circuit. Accordingly, the Court conducts its probable cause analysis as provided
by the Tenth Circuit: "An affidavit in support of a search warrant must contain facts sufficient to
lead a reasonable person to believe that a search would uncover contraband or evidence of criminal

determination requires the judge issuing the warrant to "examine the totality of the circumstances set forth in the affidavit, including an informant's veracity and basis of knowledge." United States v. Danhauer, 229 F.3d at 1006. The judge must only "make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. at 238. Even if the informant's motives are doubted, "his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." Illinois v. Gates, 462 U.S. at 234. A reviewing court "should afford a magistrate's probable cause decision great deference," unless there is "no 'substantial basis for concluding that probable cause existed.'" United States v. Danhauer, 229 F.3d at 1006 (quoting United States v. Rowland, 145 F.3d at 1204).

Here, the First Warrant issued to search the subscriber information, telephone calls made and received, and SMS and MMS made and received between July 31, 2013, and February 5, 2014, for the telephone number 505-974-9704. See First Warrant at 4; First Affidavit at 1. To support a finding of probable cause, the First Affidavit provides one short paragraph describing the NCMEC Tip, in which Hartsock calls M.Y.'s mother a "confidential informant." First Affidavit at 2. Hartsock writes that the CI states that she "physically observed [M.Y.'s] cell phone," that Streett was the requester asking M.Y. for a nude picture, and that Streett lives in Albuquerque, but that she "did not state in the complaint how [she] knew the name or location of the requester."

activity." United States v. Danhauer, 229 F.3d at 1006. This determination therefore necessarily requires a reasonable person to believe that there is criminal activity to be discovered.

First Affidavit at 2.  Hartsock states that he has failed to make contact with M.Y.'s mother.  <u>See</u> First Affidavit at 2.  He provides, however, that the New Mexico Attorney General's Office obtained a Subpoena for the subscriber information for the 505-974-9704 telephone number, and T-Mobile verified that the number belongs to Streett, who lives in Bernalillo County.  <u>See</u> First Affidavit at 2.  Although the First Affidavit does not explicitly state that the 505-974-9704 telephone number is the number that requested the nude photograph, this is logically inferred from the natural reading of the First Affidavit, because the NCMEC Tip provides that Streett requested the photograph and because the New Mexico Attorney General's Office subpoenaed the account information for this telephone number, discovering it belongs to Streett.  <u>See</u> <u>United States v. Beck</u>, 139 F. App'x at 958 (providing that "a commonsense reading of the affidavit" allowed the conclusion that the truck identified to be searched is the same truck used in the commission of the crime, even though this was not explicitly stated in the affidavit).  Hartsock "seeks the call and text/mixed media message history from" Streett's cellular telephone number to corroborate the NCMEC Tip and determine if Streett or M.Y. sent any MMS messages, which "could contain nudity."  First Affidavit at 2.

Streett first argues that the allegation that he requested a nude photograph from a minor does not provide any evidence of a crime.  <u>See</u> Supp. Motion at 14.[46]  He notes that the NCMEC

---

[46]Streett cites to <u>New York v. Ferber</u>, 458 U.S. 747 (1982), saying "[t]he United States Supreme Court has determined that 'nudity, without more is protected expression.'"  Streett's Proposed Findings ¶ 13, at 21 (quoting <u>New York v. Ferber</u>, 458 U.S. at 765 n.18).  The footnote Streett cites to is discussing a drive-in theater showing nude scenes.  <u>New York v. Ferber</u>, 458 U.S. at 765 n.18 (citing <u>Erznoznik v. City of Jacksonville</u>, 422 U.S. 205 (1975)).  It does not discuss whether an adult asking a minor for a nude photograph is protected expression, or whether an adult asking a minor for a nude photograph could support a determination of probable cause.  The Court therefore does not find <u>New York v. Ferber</u> helpful in determining whether the First or Second Warrants contain probable cause.

Tip states that there had only been one text and, to the informant's knowledge, M.Y. did not send Streett a nude photograph. See Supp. Motion at 18. Streett further argues that Hartsock is merely speculating as to criminality in the First Affidavit, because he writes that he "needs the records to see a wide picture of the frequency of communication between MY and the requestor, and the frequency or infrequency of mixed media messages that based on the CI's [sic] complaint, *could contain child pornography* or the attempt to entice sex from a minor." Supp. Motion at 19 (emphasis in the Supp. Motion)(quoting First Affidavit at 2-3). Streett avers that, similar to the allegation that the "defendant had shown the victim pictures of nude children" being insufficient to provide probable cause to believe the defendant possessed child pornography, the allegation that Streett asked for a nude photograph of a minor is insufficient to provide probable cause that Streett possessed child pornography. Supp. Motion at 14 (quoting United States v. Doyle, 650 F.3d at 472).

In United States v. Doyle, the affidavit sought a warrant to search for evidence of child pornography, and the Fourth Circuit found "remarkably scant evidence in the affidavit . . . to support a belief that Doyle in fact possessed child pornography. The bulk of the information supplied in the affidavit concerned allegations of sexual assault." United States v. Doyle, 650 F.3d at 472. The Fourth Circuit concluded that these allegations of sexual assault did not support probable cause to support a search for child pornography and that the only allegation of child pornography -- a statement that an alleged sexual assault victim was shown photographs of nude children -- was double hearsay, provided by the uncle of the alleged victim, whose reliability and veracity was not addressed in the affidavit. United States v. Doyle, 650 F.3d at 472. Further, the Fourth Circuit held that, even if the informant and the alleged victim were telling the truth, nudity,

alone, "does not constitute child pornography as that term is defined by Virginia law." United States v. Doyle, 650 F.3d at 473. The Tenth Circuit, however, has held affidavits describing only nudity sufficient to support a finding of probable cause, because, while a depiction of nudity is not sufficient to constitute child pornography, this fact "sp[eaks] to the Government's burden of proof at trial rather than the standard for probable cause, which requires 'only the probability, and not a prima facie showing, of criminal activity.'" United States v. Edwards, 813 F.3d 953, 962 (10th Cir. 2015)(quoting United States v. Soderstrand, 412 F.3d 1146, 1153 (10th Cir. 2005)). Hartsock could not describe the image itself, because as the NCMEC Tip states, there was no image sent.[47] NCMEC Tip at 3-4. The First Affidavit does not focus just on child pornography, however, but says that there could have been an "attempt to entice sex from a minor," so it therefore meets the requirement of a showing of a probability of criminal activity. First Affidavit at 3. Cf. United States v. Simpson, 152 F.3d 1241, 1252 (10th Cir. 1998)(Kelly, J., concurring)(stating he would

---

[47]The facts here are thus distinguishable from New York v. P.J. Video, which Streett relies on to assert that "the Supreme Court requires an affiant to draft 'a reasonably specific affidavit describing the content' of the image that is alleged to be [child pornography]." Streett's Proposed Findings ¶ 6, at 41 (quoting New York v. P.J. Video, 475 U.S. at 874 n.5). Further, here there is no risk that the issuing judge relied "on the affiant's inference that an image is child pornography," because the First Affidavit stated that there was no known image at the time. Streett's Proposed Findings ¶ 9, at 42. Thus, Streett's reliance on Ashcroft v. Free Speech Coalition, 535 U.S. 234 (2002), as establishing that the First Affidavit should have "attach[ed] the images at issue or at least describe[d] the suspected unlawful images with sufficient detail" is misplaced. Streett's Proposed Findings ¶ 9, at 42 (citing Ashcroft v. Free Speech Coalition, 535 U.S. at 256). Streett relies on the nonprecedential case United States v. Brunette, 256 F.3d 14 (1st Cir. 2001), for substantially the same proposition -- that a "[j]udge cannot determine if allegedly pornographic images are pornographic without looking at the images or the affidavit providing a detailed, factual description of them" -- but again the Court concludes that this case is irrelevant, because there were no images for Hartsock to describe. Streett's Proposed Findings ¶ 10, at 43 (citing United States v. Brunette, 256 F.3d at 18).

find warrant lacking probable cause, because it "repeatedly utilized the term 'child pornography'" without any further description, and no other indication of criminal activity).

Whether a tip from a confidential informant may provide probable cause is determined by the veracity, reliability, timeliness, and basis of knowledge of the informant. See United States v. Knox, 883 F.3d 1262, 1275 (10th Cir. 2018)(also emphasizing that there should be a "nexus between the item to be seized and the place to be searched"); United States v. Quezada-Enriquez, 567 F.3d 1228, 1233 (10th Cir. 2009). Veracity concerns the informant's truthfulness, reliability "entail[s] inquiry into whether the informant has provided accurate information in the past," and, for basis of knowledge, "firsthand observation is entitled to greater weight than secondhand information." United States v. Quezada-Enriquez, 567 F.3d at 1233. These three factors, however, "are not absolute, independent requirements that must be satisfied in order for probable cause to exist"; rather, whether probable cause exists is determined by a totality of the circumstances. United States v. Quezada-Enriquez, 567 F.3d at 1233. Here, Hartsock could offer no evidence on the informant's reliability, because the informant has not provided any information in the past. See United Sates v. Quezada-Enriquez, 567 F.3d at 1233. Hartsock also provides little evidence to establish the informant's veracity, although the fact that he knew the tipster's identity is "one indicator of veracity." United States v. Pulliam, 748 F.3d 976, 971 n.2 (10th Cir. 2014). Another indicator of veracity is whether the informant could face criminal charges for making the tip. See United States v. Quezada-Enriquez, 567 F.3d at 1233 ("Veracity concerns whether there is reason to believe that the informant is telling the truth, including whether he faces criminal charges or whether his statement is against his own penal interest."). Both Minnesota and New Mexico make it a criminal offense, under some circumstances, to provide false information to law enforcement.

> Whoever informs a law enforcement officer that a crime has been committed or otherwise provides information to an on-duty peace officer, knowing that person is a peace officer, regarding the conduct of others, knowing that it is false and intending that the officer shall act in reliance upon it, is guilty of a misdemeanor.

Minn. Stat. Ann. § 609.505. <u>See</u> 10A Minnesota Practice Series: Jury Instruction Guides -- Criminal 24.34 (6th ed.)(laying out the elements of the crime of falsely reporting a crime). <u>See also</u> N.M. Stat. Ann. § 30-39-1 ("It is unlawful for any person to intentionally make a report to a law enforcement agency or official, which report he knows to be false at the time of making it, alleging a violation by another person of the provisions of the Criminal Code."). Although NCMEC is not a law enforcement agency, its website states that it forwards all tips to law enforcement. <u>See</u> Cybertipline, Nat'l Ctr. for Missing & Exploited Child., http://www.missingkids.com/gethelpnow/cybertipline (last visited Nov. 7, 2018). Further, the Tenth Circuit has held that NCMEC is a governmental entity with "statutory law enforcement powers and duties," and capable of violating the Fourth Amendment. <u>United States v. Ackerman</u>, 831 F.3d 1292, 1299 (10th Cir. 2016). <u>See</u> <u>United States v. Keith</u>, 980 F. Supp. 2d 33, 41 (D. Mass. 2013)(O'Toole, J.)(stating that "the CyberTipline serves no private purpose for NCMEC separate from assisting law enforcement," and, thus, serves a purely public law enforcement purpose). The Supp. Motion is one of state law, and neither state -- nor any state with a similar statute -- has interpreted the statute in such a way that would make lying to NCMEC a crime.[48] Applying a plain language analysis, however, the informant probably could not face criminal charges if the information provided in the NCMEC Tip proved to be false. Nevertheless, that the informant

---

[48]The Court was unable to find a case that interpreted a lying-to-law-enforcement statute as applying to NCMEC.

could reasonably believe that she faced criminal penalties if she lied in the NCMEC Tip points to her veracity.

A low showing of veracity and reliability alone, however, is not fatal to the probable cause determination, because "[w]hen there is sufficient corroboration of an informant's information there is no need to establish the veracity of the informant." United States v. Danhauer, 229 F.3d at 1006. The First Affidavit provides that the Subpoena return -- showing that Streett indeed owns the telephone number texting M.Y. and that he lives in Bernalillo County, which includes Albuquerque -- independently corroborates most of the NCMEC Tip's information. See Tr. at 238:9-23 (Mease, Hartsock)(discussing how Hartsock verified Streett's name, location, and phone number, corroborating the NCMEC Tip). While the Subpoena return corroborates only "non-innocuous" or "innocent" information,[49] this corroboration "obviate[s] the need to establish veracity." United States v. Manning, 635 F. App'x 404, 407 (10th Cir. 2015)(unpublished). Further, the First Affidavit states that the informant "physically observed [M.Y.'s] cell phone,"

_____

[49]Streett cites to United States v. Turner, 713 F. Supp. 714 (D. Vt. 1989)(Coffrin, J.), for the proposition that, "[w]ithout further corroboration of any of the facts behind the cybertip, this information [from the Subpoena] was insufficient to support probable cause to issue the telephone warrant based only on a single confidential informant's tip." Streett's Proposed Findings ¶ 7, at 26 (citing United States v. Turner, 713 F. Supp. at 718). The Honorable Albert Wheeler Coffrin, former United States District Court Judge for the District of Vermont, concluded that the affidavit in United States v. Turner did not establish probable cause. See 713 F. Supp. at 718. In United States v. Turner, the affidavit corroborated "two of the informant's facts . . . : the unlisted telephone number and the fact that defendant had a large telephone bill consistent with the long-distance use described by the informant." 713 F. Supp. at 718. Judge Coffrin concluded that "neither fact is sufficiently detailed such that it raises the credibility of the informant's tip," and that "the information gathered by the police was not suggestive of illegal activity." 713 F. Supp. at 718. The Court does not find this decision persuasive, in light of Tenth Circuit precedent establishing that "[c]orroboration of non-innocuous information can obviate the need to establish veracity." United States v. Manning, 635 F. App'x 404, 407 (10th Cir. 2015). This is especially true in light of the other factors here pointing to the CI's veracity, namely that Hartsock knew her identity and that the CI could believe she faced criminal charges for lying. See supra at 150-52.

which is how she knew that Streett asked M.Y. for a nude photograph. First Affidavit at 2. Although there was no corroboration of this statement, for Hartsock failed in his attempt to make contact with the informant, the informant said that she observed M.Y.'s cellular telephone, giving rise to the logical inference that she saw the text from Streett in which he asked for a nude photograph. See United States v. Biglow, 562 F.3d 1272, 1281 (10th Cir. 2009)(stating that judges may draw reasonable inferences from the facts in the affidavit). Such "firsthand observation is entitled to greater weight than secondhand information." United States v. Quezada-Enriquez, 567 F.3d at 1233. See United States v. Knox, 883 F.3d at 1276 ("And while hearsay evidence can support probable cause, the most powerful basis of knowledge for an informer is personal knowledge of the alleged wrongdoing." (citing United States v. Pulliam, 748 F.3d at 971)). The informant does not provide any "highly specific or personal details" regarding the text message, but details are less important where the affidavit describes the informant's basis of knowledge. United States v. Manning, 635 F. App'x at 408 (internal quotation marks omitted)(quoting United States v. Tuter, 240 F.3d at 1298). While the First Warrant issued a little over three months after the incident date in the NCMEC Tip, there is no indication that the information in it is stale, because evidence of whether Streett was texting M.Y. would remain in the telephone records for as long as those records are kept. Compare NCMEC Tip at 3 (incident date of October 21, 2013); with First Warrant at 4 (issued February 12, 2014). There is also a nexus between the alleged criminal activity -- the solicitation of a nude photograph -- and the place to be searched -- the telephone records -- because whether Streett was, in fact, texting M.Y. would be found in the telephone records. From the totality of the circumstances, therefore, a judge could reasonably find probable cause based on the informant's firsthand knowledge, combined with the small showing

of veracity -- because Hartsock knew her name, she could have thought that she faced criminal

charges if the information provided was false, and through independent corroboration of innocuous

information -- and the nexus between the telephone records and the alleged criminal activity.

Streett's lack of criminal history does not change the probable cause determination, because even

if that information were provided, probable cause would still be found.  The probable cause

determination was not based on a misunderstanding of Streett's criminal history, but rather the

totality of the circumstances in the First Affidavit that led "a prudent person to believe that a search

would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d

at 1006.  That there is a substantial basis to conclude probable cause exists means that the Court

should defer to the state judge's finding of probable cause.  See United States v. Pulliam, 748 F.3d

at 971.[50]  The request here "is grounded in a real probability" of finding evidence in the telephone

_____

[50]The Court agrees with the United States' contention that the submitter is better classified
as an "unquestionably honest citizen."  See Response at 12 (internal quotation marks
omitted)(quoting Illinois v. Gates, 462 U.S. at 233).  This is because M.Y.'s mother is an ordinary
citizen who provided her identity making the Tip.  See J.B. v. Washington Cty., 127 F.3d 919, 929
(10th Cir. 1997).  She provided the information regarding Streett's request of her daughter to
NCMEC as a matter of civic duty, because she witnessed what she believed to be concerning
conduct.  Further, she had "no apparent ulterior motive for providing false information."  United
States v. Gagnon, 635 F.3d 766, 768 (10th Cir. 1980).  Therefore, her veracity should be presumed,
because there are no circumstances here suggesting she should not be trusted, and law enforcement
corroborated the nonincriminatory information she provided, so her Tip sufficiently establishes
probable cause.  See United States v. Saulsberry, 878 F.3d 946, 950-51 (10th Cir. 2017)(noting
that "[t]he veracity of identified private citizen informants . . . is generally presumed in the absence
of special circumstances suggesting that they should not be trusted," and that "[t]he Supreme Court
has held that probable cause . . . can be based on an anonymous tip corroborated only by
nonincriminatory information" (internal quotation marks omitted)(quoting United States v.
Brown, 496 F.3d 1070, 1075 (10th Cir. 2007))(citing Illinois v. Gates, 462 U.S. at 243-45)).
However, the Court may only determine probable cause from the four corners of the affidavit,
United States v. Knox, 883 F.3d at 1272, and the affidavit provides no indication that the tipster is
M.Y.'s mother, or anything other than a CI.  See First Affidavit at 2.

records of Streett's contact with M.Y., so the First Warrant has probable cause.  United States v.

Sedillo, 297 F. Supp. 3d at 1186.

Finally, it does not matter that the First Affidavit does not identify the date it was sworn.[51]

The lack of a date does not remove the probable cause that the First Affidavit provides.  The First

Affidavit was provided under oath, and the judge approved the First Warrant despite the lack of a

date on the First Affidavit.  The First Affidavit contains the date that NCMEC received the Tip --

October 31, 2013 -- and was executed to support the First Warrant, which is dated February 12,

2014.  Further, Hartsock testified that the judge was supposed to fill in the date that Hartsock swore

the affidavit -- noting the language "subscribed and sworn to before me," First Affidavit at 3

(capital letters omitted) -- although he "started filling out that part . . . for the judge on future ones,"

Tr. at 159:15-25 (Hartsock, Zimmerman).  Hartsock recalls writing the First Affidavit on February

---

[51]The Court also concludes that Streett's argument that Hartsock intentionally used language to "ma[k]e the actual MCMEC Tip seem more nefarious" has no bearing on the issues here.  Supp. Motion at 12 n.4.  First, there is no evidence in the record indicating that Hartsock used this language to mislead the magistrate judge.  See, e.g., Tr. at 163:20-24 (Zimmerman, Hartsock)(Hartsock denying the accusation that he "tr[ies] to kind of pump up the language a little bit so the judge sees something that might encourage the judge to issue that warrant"); id. at 165:17-19 (Hartsock)(saying he does not "ha[ve] that level of clarity when I write my warrants to [beef up my language] on purpose"); id. at 242:6-9(Hartsock)(denying that he was consciously "trying to affect the judge's understanding of what the case was"); supra note 16 (finding Hartsock credible).  Second, law enforcement officers are often not English majors.  They may use big words instead of plain language as a matter of course.  The differences here between "requested" and "soliciting," Supp. Motion at 12 n,4, "from" and "of," Tr. at 165:6-7 (Zimmerman), and "send" and "take and send," Tr. at 230:21-22 (Zimmerman), are minor, and do not indicate nefariousness or an intent to beef up a showing of probable cause,.  Requesting a nude photograph from somebody could indicate that the requestor is not asking, necessarily, for a photograph of that specific person.  That the requester is, however, asking for a photograph of that specific person is a natural and logical reading of such language.  It would be odd for a person to specifically ask someone for a nude photograph, expecting to get a nude photograph of somebody else without specifically asking for a photograph of that third party.  Cf. Tr. at 243:1-3 (Hartsock)(discussing how he has had cases where "a perpetrator is asking one kid to try to get photos of someone else, and they specify").

5, 2014, and this is supported by his Report, so because the warrant was issued a week later on February 12, 2014, it is clear that the affidavit was not sitting around for long.  See Tr. at 160:1-5 (Zimmerman, Hartsock); First Warrant at 4; Hartsock Report at 3.  The Court accordingly defers to the judge's finding of probable cause and will not suppress the telephone records seized pursuant to the First Warrant.

### III.    EVEN IF THE FIRST AFFIDAVIT LACKS PROBABLE CAUSE TO SEARCH STREETT'S TELEPHONE RECORDS, THE EXCLUSIONARY RULE DOES NOT REQUIRE SUPPRESSION OF THE RESULTING EVIDENCE, BECAUSE THE GOOD-FAITH EXCEPTION APPLIES.

There is a presumption that an officer acts in good faith when relying upon a search warrant.  See United States v. McKneely, 6 F.3d 1447, 1454 (10th Cir. 1993)(quoting United States v. Cardall, 773 F.2d 1128, 1133 (10th Cir. 1985)).  The good-faith exception does not apply, however, where: (i) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his 'reckless disregard of the truth'"; (ii) the issuing judge abandoned his or her "judicial role"; (iii) the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (iv) the "warrant is so facially deficient that the executing officer could not reasonably believe it was valid."  United States v. Danhauer, 229 F.3d at 1007 (internal quotation marks omitted)(quoting United States v. Leon, 468 U.S. at 923).  Likewise, good faith is absent if a reasonable officer "would have known that the search was illegal despite the magistrate's authorization."  United States v. Cook, 854 F.2d 371, 372 (10th Cir. 1988)(quoting United States v. Leon, 468 U.S. at 922 n.23).  The Court's inquiry is "confined to reviewing the four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath."  United States v. Knox, 883 F.3d at 1272.  If the warrant's text and the affidavit's

language lack any factual support -- as opposed to whether the facts alleged are sufficient to show probable cause -- then the executing officer's "reliance was wholly unwarranted." United States v. McKneely, 6 F.3d at 1454 (internal quotation marks and emphasis omitted)(quoting United States v. Cardall, 773 F.2d at 1133). "An affidavit is not devoid of factual support 'if it establishe[s] a minimally sufficient nexus between the illegal activity and the place to be searched.'" United States v. Campbell, 603 F.3d 1218, 1231 (10th Cir. 2010)(emphasis in original)(internal quotation marks omitted)(quoting United States v. Henderson, 595 F.3d 1198, 1202 (10th Cir. 2010)).

Streett avers that Hartsock's search pursuant to the First Warrant was completely speculative and devoid of probable cause. See Supp. Motion at 19. Streett argues that the good-faith exception is not available to Hartsock, because he "failed to do even the minimal amount of investigation to verify the confidential informant's investigations." Supp. Motion at 16. The Court construes this argument as one that the First Affidavit lacks any indicia of probable cause or that it is facially deficient, rendering official belief in it unreasonable.[52] The Tenth Circuit rejected such an argument in circumstances with less indicia of the informant's veracity or independent corroboration than here. In United States v. Danhauer, the Tenth Circuit concluded that the affidavit lacked probable cause, because "the affiant neither established the veracity of the informant, nor obtained sufficient independent corroboration of the informant's observation," providing no nexus between the alleged criminal activity -- the manufacturing of

---

[52]Streett avers that two circumstances rendering the good-faith exception are applicable here: "[T]he affidavit in support of the warrant is so lacking in indicia of probable cause to render official belief in its existence entirely unreasonable[,] . . . [and] a warrant is so facially deficient that the executing officer could not reasonably believe it was valid." Streett's Proposed Findings ¶ 2, at 35 (internal quotation marks omitted)(quoting United States v. Danhauer, 229 F.3d at 1007).

methamphetamine -- and the place to be searched. 229 F.3d at 1006. The Tenth Circuit nonetheless determined that the good-faith exception applied, because "the absence of information establishing the informant's reliability or basis of knowledge does not preclude an officer from manifesting a reasonable belief that the warrant was properly issued, particularly when the officer takes stops to investigate the informant's allegation." 229 F.3d at 1007. The officer in United States v. Danhauer had "verified the informant's physical description of the Danhauer property and confirmed by a records check that" the defendant lived there, observed the defendant's wife at the property, and looked into the defendant's criminal background. 229 F.3d at 1004.

Here, Hartsock's reliance on the judge's issuance of the First Warrant is also not "wholly unwarranted," because the First Affidavit contains indicia of probable cause. United States v. Danhauer, 229 F.3d at 1007. The First Affidavit contains some showing of the informant's veracity, as discussed in Part II, and also states that she has firsthand knowledge of the allegation that Streett asked her daughter for a nude photograph, because she observed her daughter's cellular telephone. See First Affidavit at 2. The Subpoena return verifies that Streett owns the telephone number that texted the informant's daughter and that he lives in the area that the informant alleges. See First Affidavit at 2. Although Hartsock did not to make contact with the informant when he requested the warrant, United Sates v. Danhauer establishes that this failure to "verify the informant's most serious allegation" does not prevent Hartsock from relying in good faith on the judge's probable cause determination. United States v. Danhauer, 229 F.3d at 1006. See also United States v. Bishop, 890 F.3d at 217 ("That reliance on an informant of unproven reliability is demonstrated by the fact of Leon itself."). Further, the First Affidavit necessarily establishes a nexus between the suspected criminal activity and the place to be searched, because the allegation

that Streett solicited a nude photograph from a minor via a text message is inherently connected to his cellular telephone. Accordingly, the Court concludes that Hartsock acted in objectively reasonable, good-faith reliance on the First Warrant and, thus, will not suppress Streett's cellular telephone records obtained pursuant to the First Warrant.

## IV.    THE FIRST AFFIDAVIT DOES NOT DENY STREETT DUE PROCESS UNDER THE FIFTH AND FOURTEENTH AMENDMENTS.

Streett argues that the First Affidavit lacks "substantial evidence to support a probable cause finding to issue a search warrant" as the New Mexico Rules of Criminal Procedure requires, and thus denied him due process under the Fifth and Fourteenth Amendments. Supp. Motion at 19. Rule 5-211 requires probable cause be "based on substantial evidence, which may be hearsay in whole or in part, provided there is a substantial basis for believing the source of the hearsay to be credible and for believing that there is a factual basis for the information furnished." N.M. Ct. R. 5-211(E).[53] Streett does not contend that he was deprived "of life, liberty, or property without

---

[53]Streett argues that "Hartsock failed to comply with Rule 5-211(E), a rule patterned on Federal Rules of Criminal Procedure 41" and cites "*State v. Perea* (Ct. App. 1973)" for this proposition. Supp. Motion at 20; Streett's Proposed Findings ¶ 4, at 41. The Court is unsure which case Streett is citing because he does not provide the full citation, but believes that he is citing State v. Perea, 1973-NMCA-123, 513 P.2d 1287, because this is the only such titled case the Court found that the Court of Appeals of New Mexico decided in 1973 discussing the probable cause requirement contained in New Mexico Rules of Criminal Procedure. See 1973-NMCA-123, ¶¶ 3-4, 513 P.2d at 1289. State v. Perea does not state that the New Mexico rule requiring that probable cause be "based on substantial evidence" was patterned on rule 41 of the Federal Rules of Criminal Procedure. It does say, however, that "[t]he rules, which the drafters of [the old version of N.M. Ct. R. 5-211(E)] obviously had in mind, for evaluating supporting affidavits for probable cause are well established," then cites to a number of Supreme Court cases as support. 1973-NMCA-123, ¶ 4, 513 P.2d at 1289 (citing United States v. Harris, 403 U.S. 573 (1971); United States v. Ventresca, 380 U.S. 102 (1965); Aguilar v. Texas, 378 U.S. 108 (1964); Rugendorf v. United States, 376 U.S. 528 (1964); Jones v. United States, 362 U.S. 257 (1960)). The Court thus does not conclude that State v. Perea establishes that "Rule 5-211(E)[ is] a rule patterned on Federal Rules of Criminal Procedure 41." Supp. Motion at 20; Streett's Proposed Findings ¶ 4, at 41.

due process of law," U.S. Const. amend. XIV, § 1, but only that he "was denied due process here because of Hartsock's violation of state procedural law," Supp. Motion at 21. A violation of state law, however, does not automatically mean that the federal Constitution has been violated. See United States v. Mikulski, 317 F.3d at 1232; Peterson v. Peterson, 2004 WL 3426406, at *6. As discussed in Part II, the Court concludes that the First Affidavit contains substantial evidence to support a finding of probable cause. Further, Streett is legally foreclosed from challenging the First Warrant's sufficiency under the Due Process Clause, because, "[w]here a particular Amendment 'provides an explicit textual source of constitutional protection' against a particular sort of government behavior, 'that Amendment, not the more generalized notion of "substantive due process," must be the guide for analyzing these claims.'" Albright v. Oliver, 510 U.S. 266, 273 (1994)(quoting Graham v. Connor, 490 U.S. 386, 395 (1989)). The Fourth Amendment provides that "no Warrants shall issue, but upon probable cause," so the Fourth Amendment is Streett's only redress for his allegation that the First Warrant lacks substantial evidence supporting a finding of probable cause. U.S. Const. amend. IV. See Conn v. Gabbert, 526 U.S. 286, 293 (1999)("Challenges to the reasonableness of a search by government agents clearly fall under the Fourth Amendment, not the Fourteenth."). Streett alleges no deprivation of life, liberty, or property -- he is only arguing that the First Affidavit lacks probable cause -- so he does not allege a procedural or substantive due process violation. See Tonkovich v. Kan. Bd. of Regents, 159 F.3d 504, 527 (10th Cir. 1998). Also, none of the conduct here "would 'shock the conscience of federal judges,'" because Hartsock does not "demonstrate a degree of outrageousness and a magnitude of potential or actual harm that is truly conscious shocking." Uhlrig v. Harder, 64 F.3d at 573 (quoting Collins v. City of Harker Heights, 503 U.S. 115, 126 (1992)). Hartsock satisfies

the Fourth Amendment here -- because a neutral judge issued the First Warrant upon finding probable cause in the First Affidavit -- so Streett has received due process.[54] See Pino v. Higgs, 75 F.3d at 1469 (holding that appellant's failure to establish a Fourth Amendment violation necessarily means that she has not established a violation of her Fourteenth Amendment due process rights). Streett is engaged in a hypothetical attack on Hartsock's work, and attacks only the sufficiency of the First Warrant, not the execution. Hartsock was not engaged in an outrageous, warrantless search; he was trying to get a warrant and got one. An officer getting warrants -- even if they are faulty, which is not the case with the First Warrant -- hardly shocks the conscience, and Streett never uses these words. See United States v. Vilar, No. S305CR621KMK, 2007 WL 1075041, at * 54 (S.D.N.Y. April 4, 2007)(Karas, J.)(seeking permission to get a search warrant "is conduct that soothes, rather than shocks, the conscience").

---

[54]Streett argues that "Hartsock convinced a judge to issue the warrant through an unverified CI and nothing more than a hunch," which "did not satisfy the legal standard . . . set forth by New Mexico." Streett's Proposed Findings ¶ 8, at 42 (citing State v. Turkal, 1979-NMSC-071, 599 P.2d 1045). As previously discussed, Hartsock did establish the credibility of the CI. See supra Part II. Further, Streett's reliance on State v. Turkal is misplaced to establish a violation of his due process rights, because State v. Turkal was decided solely on Fourth Amendment grounds. 1979-NMSC-071 ¶ 19, 599 P.2d at 1048. The Supreme Court of New Mexico concluded the warrant at issue in State v. Turkal properly relied on information provided by a juvenile informant, "[b]ecause of the knowledge personal to the juvenile informant, and by a reading of the affidavit as a whole" showing a "reliability of the information she provided." 1979-NMSC-071, ¶ 11, 599 P.2d at 1047. The juvenile had stated that the "defendant was furnishing illegal drugs" and "taking nude photographs of young girls and had, in fact, asked her to pose for him." 1979-NMSC-071, ¶ 10, 599 P.2d at 1047. She did not provide any innocuous information, but the narcotics allegation was corroborated by a "reliable confidential informant." 1979-NMSC-071, ¶¶ 10-11, 599 P.2d at 1047. The facts of State v. Turkal are thus distinguishable, and do not help Streett to establish a due process violation.

## V. THE SECOND AFFIDAVIT DOES NOT ESTABLISH PROBABLE CAUSE TO SEARCH THE 4620 PLUME RESIDENCE.

To comply with the Fourth Amendment, a search warrant may only "issue only upon probable cause." United States v. Brinklow, 560 F.2d at 1005. "Probable cause" requires more than "mere suspicion" of criminal activity, but may rely on "less evidence than is necessary to convict." United States v. Burns, 624 F.2d at 99. The facts in a search warrant affidavit establish probable cause when they "lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity." United States v. Danhauer, 229 F.3d at 1006. Stated differently, probable cause exists where the affidavit stablishes "a nexus between suspected criminal activity and the place to be searched." United States v. Corral-Corral, 899 F.2d at 937. "Probable cause to search a person's residence does not arise based solely upon probable cause that the person is guilty of a crime. Instead, there must be additional evidence linking the person's home to the suspected criminal activity." United States v. Rowland, 145 F.3d at 1204. In determining whether probable cause exists, the magistrate judge issuing the warrant "must examine the totality of the circumstances set forth in the affidavit, including an informant's veracity and basis of knowledge." United States v. Danhauer, 229 F.3d at 1006. See Illinois v. Gates, 462 U.S. at 238. A reviewing court "should afford a magistrate's probable cause decision great deference, unless there is "no 'substantial basis for concluding that probable cause existed.'" United States v. Danhauer, 229 F.3d at 1006 (quoting United States v. Rowland, 145 F.3d at 1204).

The Second Affidavit does not allege sufficient facts to establish probable cause to search the 4620 Plume residence.[55] The Second Affidavit relies primarily on the NCMEC Tip as

---

[55]The Court concludes that law enforcement's collection of evidence from the 4620 Plume residence is a search under the Fourth Amendment, because it involves a physical intrusion into a

providing probable cause to search the 4620 Plume residence for evidence of solicitation and child pornography. Although the Second Affidavit erroneously identifies the tipster as a "confidential informant," whether the tipster -- the alleged victim's mother -- is or is not a confidential informant does not change the analysis. Law enforcement verified the telephone number which she provided as belonging to Streett and that Streett resides in Albuquerque as reported. See Second Affidavit at 4. Further, law enforcement contacted the alleged victim, who turned over her cellular telephone for evidence collection and confirmed that Streett asked her for a nude photograph, while knowing that she was only fourteen-years-old. See Second Affidavit at 4-5. The Second Affidavit thus set forth "sufficient independent corroboration of an informant's information, [so] there is no need to establish the veracity of the informant." United States v. Danhauer, 229 F.3d at 1006.

The Second Affidavit does not, however, indicate Streett's connection with the 4620 Plume residence. The Tenth Circuit, in United States v. Gonzales, concluded that probable cause did not exist to search a residence when the supporting affidavit merely identified "'321 E. Church' as the place to be searched," but "never specified that 321 E. Church was Mr. Gonzales's residence or that there was any connection between that location and Mr. Gonzales, the vehicle, or the suspected criminal activity." 399 F.3d at 1227-28. The Tenth Circuit did not provide much analysis on this point, because the United States conceded that the warrant lacked probable cause, stating only that

---

constitutionally protected area -- Streett's home. See U.S. Const. amend. IV; Florida v. Jardines, 569 U.S. at 11 ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred."). Therefore, there is no need to determine if the search of the 4620 Plume residence violated Streett's expectation of privacy under Katz v. United States. The Court nevertheless concludes, however, that Streett has a subjective expectation of privacy in the 4620 Plume residence, as his home, and that society is prepared to recognize this expectation as reasonable, because privacy expectations are most heightened in the home. See California v. Ciarolo, 476 U.S. at 213. The search of the 4620 Plume residence, therefore, constitutes a search under either test.

"[i]t is well-settled that for probable cause to exist there must be a 'nexus between [the contraband to be seized or] suspected criminal activity and the place to be searched.'" 399 F.3d at 1228 (alteration in original)(quoting United States v. Rowland, 145 F.3d at 1203-04). Here, this required nexus is not in the Second Affidavit. All the Second Affidavit provides regarding Streett's residence is the discussion of T-Mobile's Email responding to the Subpoena for the account information for the 505-974-9704 telephone number, which states "it was registered to Bentley Streett, who lives in Bernalillo County." Second Affidavit at 4. The T-Mobile Email even provides Streett's address as the 4620 Plume residence, yet Hartsock did not include this connection in the Second Affidavit. Unfortunately, this oversight means the Second Affidavit provides no nexus between the 4620 Plume residence and Streett's personal property that Hartsock had probable cause to believe contained evidence of child exploitation.

A magistrate judge could logically infer that Streett's personal property -- such as his cellular telephone or personal computer -- would be found at his residence. See United States v. Biglow, 562 F.3d at 1280 ("[M]agistrate judges may draw their own reasonable conclusions, based on the Government's affidavit and the 'practical considerations of everyday life,' as to the likelihood that certain evidence will be found at a particular place." (quoting Anthony v. United States, 667 F.2d 870, 874 (10th Cir. 1981)); United States v. Reyes, 798 F.2d 380, 382 (10th Cir. 1986)("It is reasonable to assume that certain types of evidence would be kept at a defendant's residence and an affidavit need not contain personal observations that a defendant did keep such evidence at his residence." (citing Anthony v. United States, 667 F.2d at 874-75)). A magistrate judge could not, however, logically infer that, because Streett resides in Bernalillo County, he lives at the 4620 Plume residence -- there is no evidence provided from which to draw this inference.

Cf. United States v. Biglow, 562 F.3d at 1281 ("We recognize that magistrate judges are vested with substantial discretion to draw all 'reasonable inferences' from the Government's evidence." (quoting Illinois v. Gates, 462 U.S. at 240)).  Further, that Hartsock would have been able to provide the required nexus if asked for clarification does not save the warrant, for there is no indication that Hartsock provided this clarification, and, thus, there is no "substantial basis" for the magistrate judge to find probable cause to search the 4620 Plume residence.  United States v. Rowland, 145 F.3d at 1204.  Insofar as the record reveals, the issuing judge telephonically approved a search warrant that did not connect Streett to the 4620 Plume residence, and Hartsock's testimony that he had information that would arguably establish the necessary nexus does not rehabilitate the insufficient Second affidavit.  See Whiteley v. Warden, Wyo. State Penitentiary, 401 U.S. at 565 n.8)("Under the cases of this Court, an otherwise insufficient affidavit cannot be rehabilitated by testimony concerning information possessed by the affiant when he sought the warrant but not disclosed to the issuing magistrate.  A contrary rule would, of course, render the warrant requirements of the Fourth Amendment meaningless."  (citation omitted)).  The Court concludes, therefore, that the Second Affidavit does not provide probable cause to search the 4620 Plume residence.

## VI.  THE EXCLUSIONARY RULE DOES NOT REQUIRE SUPPRESSION OF THE EVIDENCE OBTAINED VIA THE ILLEGAL SEARCH OF THE 4620 PLUME RESIDENCE, BECAUSE BOTH THE GOOD-FAITH AND INEVITABLE-DISCOVERY EXCEPTION APPLY.

The Court concludes that suppression of the evidence seized during the search of the 4620 Plume residence does not promote the purpose of the exclusionary rule.  The evidence will come in, because Hartsock and his fellow deputies executed the search warrant for the 4620 Plume residence in good faith.  Further, even if the good-faith exception does not apply here, the evidence

would have been inevitably discovered.  Accordingly, the Court will not suppress the evidence found at the 4620 Plume residence or the fruits of that evidence.

### A.    HARTSOCK AND HIS FELLOW OFFICERS RELIED ON THE SECOND WARRANT IN GOOD FAITH WHEN THEY SEARCHED THE 4620 PLUME RESIDENCE.

There is a presumption that, "when an officer relies upon a warrant, the officer is acting in good faith," United States v. McKneely, 6 F.3d at 1454 (quoting United States v. Cardall, 773 F.2d at 1133), unless one of four situations apply: (i) "the issuing magistrate was misled by an affidavit containing false information or information that the affiant would have known was false if not for his 'reckless disregard of the truth'"; (ii) the issuing magistrate abandoned his or her "judicial role"; (iii) the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (iv) the "warrant is so facially deficient that the executing officer could not reasonably believe it was valid," United States v. Danhauer, 229 F.3d at 1007 (internal quotation marks omitted)(quoting United States v. Leon, 468 U.S. at 923).  A court must determine "whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." United States v. Cook, 854 F.2d at 372 (quoting United States v. Leon, 468 U.S. at 922 n.23).  The Court's inquiry is "confined to reviewing the four corners of the sworn affidavit and any other pertinent information actually shared with the issuing judge under oath." United States v. Knox, 883 F.3d at 1272.  Good faith is absent only if the warrant's text and the affidavit's language lack any factual support -- as opposed to whether the facts alleged are sufficient -- and, thus, the executing officer's "reliance was wholly unwarranted." United States v. McKneely, 6 F.3d at 1454 (internal quotation marks and emphasis omitted)(quoting United States v. Cardall, 773 F.2d at 1133).  "An affidavit is not devoid of factual

support 'if it establishe[s] a minimally sufficient nexus between the illegal activity and the place to be searched.'"  United States v. Campbell, 603 F.3d at 1231 (emphasis in original)(internal quotation marks omitted)(quoting United States v. Henderson, 595 F.3d at 1202).

A showing of "minimal nexus" requires significantly less than a showing of probable cause.  See United States v. Welch, 291 F. App'x 193, 202 (10th Cir. 2008)(unpublished)("While the expectation of finding evidence of a crime at Welch's residence does not reach the level of probable cause, our test for good faith requires significantly less, merely a minimal nexus.").  The minimal nexus requirement is satisfied when an affidavit "'describes circumstances which would warrant a person of reasonable caution' in the belief that 'the articles sought' are at a particular place."  United States v. Biglow, 562 F.3d at 1279 (quoting United States v. One Hundred Forty-None Thousand Four Hundred Forty-Two and 43/100 Dollars ($149,442.43) in U.S. Currency, 965 F.2d 868, 874 (10th Cir. 1992)).  The Tenth Circuit has identified four non-exhaustive factors it considers when evaluating the minimal nexus requirement: "(1) the type of crime at issue, (2) the extent of a suspect's opportunity for concealment, (3) the nature of the evidence sought, and (4) all reasonable inferences as to where a criminal would likely keep such evidence."  United States v. Biglow, 562 F.3d at 1279.

Streett does not allege that Hartsock knowingly included false information in the Second Affidavit that misled the issuing judge or that the issuing judge wholly abandoned her judicial role. See generally Motion at 6-9.  Streett argues that the good-faith exception cannot apply here, because "the Affidavit in support of the warrant was so lacking in any indicia of probability and so facially deficient."  Motion at 6.  See Streett's Proposed Findings ¶ 2, at 35 (citing United States v. Danhauer, 229 F.3d at 1007).  That the Second Affidavit fails to establish probable cause is not

sufficient, on its own, to prevent the application of the good-faith exception. See United States v. Danhauer, 229 F.3d at 1007. The Court thus analyzes whether (i) the supporting affidavit is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; or (ii) the "warrant is so facially deficient that the executing officer could not reasonably believe it was valid," as to prevent Harstock's good-faith reliance on the search warrant for the 4620 Plume residence. United States v. Danhauer, 229 F.3d at 1007 (internal quotation marks omitted)(quoting United States v. Leon, 468 U.S. at 923).

Streett relies on United States v. Gonzales for his argument against the good-faith exception. In that case, the officer sought a warrant to search the home of the defendant -- a convicted felon -- for a firearm, because officers found ammunition, but no matching firearm, in the vehicle he was driving. See 399 F.3d at 1227. The Tenth Circuit found that the supporting affidavit lacked probable cause, because it contained

> no facts explaining how the address was linked to Mr. Gonzales, the vehicle, or the suspected criminal activity, or why the officer thought the items to be seized would be located at the residence. Rather, besides the physical description of the address, the only facts before the magistrate were that Mr. Gonzales was a convicted felon and a Glock 10 mm magazine was found in a vehicle in which he was the only occupant. The only attempt at a connection was the detective's assertion that in his experience, "firearm [sic] are often kept at the residence."

399 F.3d at 1230 (alteration in original)(quoting the affidavit in question). The Tenth Circuit held that the good-faith exception would not keep the evidence in, because, "[f]or good faith to exist, there must be *some* factual basis connecting the place to be searched to the defendant or suspected criminal activity." 399 F.3d at 1231 (emphasis in original). While the deficiency in the affidavit at issue in United States v. Gonzales is similar to the deficiency in the Second Affidavit in this case, the Court does not conclude that United States v. Gonzales requires the Court to find the

good-faith exception cannot apply here. The Court concludes that to read United States v. Gonzales as creating a bright-line rule precluding the application of the good-faith doctrine where, as here, the affidavit supporting a warrant fails to provide a link between a specific house -- known to be the defendant's but not stated as such in the affidavit -- and a defendant, but contains enough facts that there is an indicia of probable cause to search the defendant's house, disserves the purpose of the good-faith doctrine. Applying the exclusionary rule here would not meaningfully deter "sufficiently deliberate" police conduct. Herring v. United States, 555 U.S. at 144. Instead, exclusion would punish law enforcement for the issuing magistrate judge's mistake in not catching the probable cause problem in the Second Affidavit.

In United States v. Gonzales, the Tenth Circuit noted that "the only facts before the magistrate were that Mr. Gonzales was a convicted felon and a Glock 10mm magazine was found in a vehicle in which he was the only occupant." 399 F.3d at 1230. The Honorable Robert C. Brack, now-senior United States District Court Judge for the District of New Mexico, who decided the suppression issue before it was appealed, stated that "[t]here is nothing about a magazine clip found in a pick up truck Defendant did not own and Defendant's prior felony conviction that would, necessarily, implicate his residence." Answer Brief of Appellee Roberto Gonzales at 10, United States v. Gonzales, 399 F.3d 1225 (10th Cir. 2005)(No. 04-2126), 2004 WL 3830626, at *10 (internal quotation marks omitted)(quoting Judge Brack's opinion).[56] Judge Brack noted how the evidence of suspected criminal activity -- a magazine clip -- was found in a vehicle that did not

<hr />

[56]The Court cites to the Answer Brief of Appellee Roberto Gonzales for the substance of Judge Brack's opinion, because his opinion is not publicly available on Westlaw, Lexis, or Bloomberg. Judge Brack's opinion is, however, available in full on CM/ECF. See United States v. Gonzales, 04-cr-0520, Memorandum Opinion and Order, filed May 27, 2004 (Doc. 48).

belong to the defendant, and that the magazine clip "is not inherently criminal."  Answer Brief of Appellee Roberto Gonzales at 12, 2004 WL 3830626 at *12 (internal quotation marks omitted)(quoting Judge Brack's opinion).  He concluded that the affidavit "did not conclusively establish that a crime had been committed."  Answer Brief of Appellee Roberto Gonzales at 12, 2004 WL 3830626 at *12 (internal quotation marks omitted)(quoting Judge Brack's opinion).

Judge Brack contrasted the affidavit's facts with the affidavit in United States v. Tisdale, 248 F.3d 964 (10th Cir. 2001), which "tied the residence to the suspected criminal activity," and found that, "[u]nlike the affidavit in *Tisdale* that linked the residence to the suspected criminal activity, the affidavit here did not provide any evidence implicating Defendant's home."  Answer Brief of Appellee Roberto Gonzales at 10-11, 2004 WL 3830626, at *10-11 (internal quotation marks omitted)(quoting Judge Brack's opinion).  The affidavit in United States v. Tisdale supporting the search warrant for the defendant's home and vehicle provided probable cause, because it provided facts supporting "a fair probability . . . that the Nissan Maxima and/or [the defendant's] house was the subject of the robbery/burglary and that either or both may have contained evidence of a crime or criminal activity."  United States v. Tisdale, 248 F.3d at 971. These facts included how officers responded to an attempted robbery/burglary that occurred near 1645 and 1651 Hydraulic, which had resulted in a shooting that left one man dead and another wounded, leaving "numerous shell casings" scattered near the defendant's vehicle and house. United States v. Tisdale, 248 F.3d at 971.

The Second Affidavit's facts linking Streett's suspected criminal activity to his residence are not as strong as those in United States v. Tisdale, but not as weak as those in United States v. Gonzales.  It is true that there are no facts in the Second Affidavit that link Streett specifically to

the 4620 Plume residence, which is why the Second Warrant lacks probable cause.  See generally

Second Affidavit at 1-13.  The Second Affidavit contains, however, facts that necessarily implicate

Streett's residence as containing evidence of his suspected criminal activity.  See Second Affidavit

at 3-5.  The Second Affidavit describes a conversation that law enforcement had with M.Y., in

which she describes how she, only fourteen years old at the time, met Streett on Twitter and that

"he has asked her to take and send him a nude photograph of her two or three times."  Second

Affidavit at 4-5.  The Second Affidavit also describes the NCMEC Tip, containing the same

indications of criminal activity as M.Y.'s statement to law enforcement, and T-Mobile's response

to the Subpoena shows that 505-974-9704 is "registered to Bentley Streett, who lives in Bernalillo

County," but does not say how this telephone number was obtained.  Second Affidavit at 4.  See

also supra Part II (analyzing the reliability of the NCMEC Tip).  These facts necessarily mean,

however, that the Second Affidavit is not "devoid of factual support."  United States v. Cardall,

773 F.2d at 1133.  Although the Second Affidavit is lacking, it provides facts that necessarily

implicate Streett's residence in the suspected criminal activity, because Streett's cellular telephone

was one target of the search and the telephone, through T-Mobile's return under the Subpoena, is

linked to his home.  See Second Affidavit at 1, 4.  The "natural reading" of the Second Affidavit

as a whole reveals that T-Mobile provided Streett's address in Bernalillo County, although the

Second Affidavit did not provide this address when discussing T-Mobile's Email, and that the

targeted home -- the 4620 Plume residence -- must be that address.  United States v. Beck, 139 F.

App'x at 957.  See Second Affidavit at 4.  While the Second Affidavit is not ideal, there is a

minimal nexus between the 4620 Plume residence and Streett's alleged criminal activity, and,

therefore, the Second Affidavit is not "so lacking in indicia of probable cause as to render official

belief in its existence entirely unreasonable." United States v. Gonzales, 399 F.3d at 1231 (internal quotations omitted)(quoting United States v. Leon, 468 U.S. at 923). See United States v. Danhauer, 229 F.3d at 1007 ("Although the affidavit in support of the warrant did not establish probable cause, it was not so lacking in indicia of probable cause that the executing officer should have known the search was illegal despite the state magistrate's authorization.").

Further, applying the exclusionary rule to the evidence seized from the 4620 Plume residence will not further the rule's "purpose of deterring improper police action." United States v. Gonzales, 399 F.3d at 1229. The exclusionary rule is "a judicially created remedy designed to safeguard Fourth Amendment rights generally through its deterrent effect, rather than a personal constitutional right of the party aggrieved." United States v. Calandra, 414 U.S. at 348. The Supreme Court has written that, "[f]or exclusion to be appropriate, the deterrence benefits of suppression must outweigh its heavy costs." Davis v. United States, 564 U.S. at 237. The exclusionary rule's "sole purpose . . . is to deter future Fourth Amendment violations." Davis v. United States, 564 U.S. at 236-37. Therefore, "[w]here suppression fails to yield 'appreciable deterrence,' exclusion is 'clearly . . . unwarranted.'" Davis v. United States, 564 U.S. at 237 (quoting United States v. Janis, 428 U.S. 433, 454 (1976)).

Hartsock testified that he believed that M.Y.'s statement to law enforcement in Minnesota and Streett's telephone records showing a high amount of communication with M.Y. -- including a MMS message from Streett -- corroborated the NCMEC Tip, so he drafted a search warrant to search the 4620 Plume residence, because this address was the one provided in the NCMEC Tip, in the Subpoena return, and in T-Mobile's return under the First Warrant. See Tr. at 100:13-101:2 (Hartsock, Mease). Hartsock also spoke about how he surveilled the house to provide "a

description for my warrant and try to see if I could learn anything more about the house," but did not recall seeing any humans. Tr. at 101:6-12, 18-19 (Hartsock). He then obtained the Second Warrant from "a detached and neutral magistrate," and executed it within its scope, so there is nothing to deter here. United States v. Tuter, 240 F.3d at 1298-99. The Fourth Amendment allows officers "the support of the usual inferences which reasonable men draw from evidence," when "those inferences [are] drawn by a neutral and detached magistrate," and, because Hartsock obtained a warrant, that is what happened here. Johnson v. United States, 333 U.S. 10, 14 (1948). The Court therefore concludes that Hartsock and his fellow officers were acting in objective good faith and tried to comply with the Fourth Amendment. The Fourth Amendment violation here is not "'deliberate, reckless, []grossly [negligent], or [evidence of] recurring or systemic negligence' such that exclusion of evidence procured while executing the search warrant would have meaningful deterrent effect." United States v. Romero, 743 F. Supp. 2d at 1320 (quoting Herring v. United States, 555 U.S. at 145). There would be no "appreciable" deterrent effect here, so suppression of the evidence seized from the 4620 Plume residence is unwarranted. Davis v. United States, 564 U.S. at 237. As the Supreme Court has recognized, while one could argue that suppression of evidence obtained "where the police failed to demonstrate probable cause in the warrant application deters future inadequate presentations," this argument is "speculative[,] and . . . suppression of evidence obtained pursuant to a warrant should be ordered only on a case-by-case basis and only in those unusual cases in which exclusion will further the purposes of the exclusionary rule." United States v. Leon, 468 U.S. at 918.

**B.** **LAW ENFORCEMENT OFFICERS WOULD HAVE OBTAINED A VALID WARRANT AND THE 4620 PLUME RESIDENCE WOULD HAVE BEEN SEARCHED LEGALLY EVEN IF HARTSOCK AND HIS FELLOW OFFICERS HAD NOT RELIED ON THE SECOND WARRANT IN GOOD FAITH.**

"The inevitable discovery doctrine provides an exception to the exclusionary rule, and permits evidence to be admitted 'if an independent, lawful police investigation inevitably would have discovered it.'" United States v. Cunningham, 413 F.3d at 1203 (citations omitted)(citing Nix v. Williams, 467 U.S. at 444, 448; United States v. Romero, 692 F.2d at 704)(quoting United States v. Owens, 782 F.2d at 152). The United States bears the burden here to prove, "by a preponderance of the evidence[,] that the evidence at issue would have been discovered without the Fourth Amendment violation." United States v. Cunningham, 413 F.3d at 1203 (citation omitted). The Court must "examine each of the contingencies involved that would have had to have been resolved favorably to the government in order for the evidence to have been discovered legally and to assess the probability of the contingencies having occurred." United States v. Cunningham, 413 F.3d at 1203. Where "there is no exception to the warrant requirement that could serve as a basis for the inevitable discovery exception," the Tenth Circuit has adopted a four-part test to aid courts in the inevitable discovery determination:

> 1) "the extent to which the warrant process has been completed at the time those seeking the warrant learn of the search"; 2) the strength of the showing of probable cause at the time the search occurred; 3) whether a warrant ultimately was obtained, albeit after the illegal entry; and 4) "evidence that law enforcement agents 'jumped the gun' because they lacked confidence in their showing of probable cause and wanted to force the issue by creating a fait accompli."

United States v. Souza, 223 F.3d at 1203-04 (citations omitted)(quoting United States v. Cabassa, 62 F.3d at 473 & n.2).

No exception to the warrant requirement applies here, for "searches and seizures inside a home without a warrant are presumptively unreasonable," Payton v. New York, 445 U.S. 573, 586 (1980), so the Court turns to the Tenth Circuit's test. As to the first factor of the test, Hartsock prepared the Second Affidavit to obtain a search warrant for the 4620 Plume residence and ultimately received a warrant, albeit an invalid one under the Fourth Amendment. Hartsock could not have done anything else to complete the warrant process here, because he obtained a search warrant. As to the second factor, Hartsock possessed a strong showing of probable cause when he searched the 4620 Plume residence. He confirmed that Streett's telephone number texted a minor asking for a nude photograph. See T-Mobile's Email at 1; Vig Report at 1. Further, the TLO report in the NCMEC Tip, the T-Mobile Email, the cellular telephone records obtained via the First Warrant, and Streett's driver's license all state that 4620 Plume is Streett's residence. See Tr. at 100:24-101:2 (Hartsock); Hartsock Report at 4. Hartsock also had a firsthand account from M.Y. that she told Streett that she was fourteen, that her age was apparent from her Twitter profile -- where they met -- and that he had asked her to send him nude photographs "two or three times." Vig Report at 1. The telephone records which Hartsock obtained under the First Warrant show a high amount of communication between Streett and M.Y. See Tr. at 97:12-18 (Hartsock); id. at 100:13-18 (Hartsock); Hartsock Report at 3. The telephone records also show that Streett sent an MMS message, see Tr. at 100:15-16 (Harstock), but M.Y. said this was a "face photo, no nudity," Vig Report at 1. The telephone records as a whole -- with 135 different area codes, a number of MMS messages likely evincing photographs, and with texts making up "the large majority of the 56,000 records" -- also corroborate that Streett was meeting people on the internet and could be soliciting nude photographs. Tr. at 259:6-7 (Hartsock). See id. at 110:7-111:23 (Mease,

Hartsock); id. at 121:3-5 (Mease, Hartsock).  Despite the lack of knowledge of any sexually

explicit photographs being sent to Streett, the evidence Hartsock had collected was sufficient to

support probable cause to believe that N.M. Stat. Ann. § 30-37-3.2 had been violated, because

§ 30-37-3.2 makes knowing solicitation of such photographs from minors unlawful.  See N.M.

Stat. Ann. § 30-37-3.2(A) ("Child solicitation by electronic communication device consists of a

person knowingly and intelligently soliciting a child under sixteen years of age, by means of an

electronic communication device, to engage in sexual intercourse, sexual contact or in a sexual or

obscene performance, or to engage in any other sexual conduct when the perpetrator is at least four

years older than the child."  (emphasis added)).[57]  As to factors three and four, a warrant, albeit an

invalid warrant, was obtained before the illegal search and there is no evidence that Hartsock

"jumped the gun" because of a lack of confidence in probable cause.  United States v. Cunningham,

413 F.3d at 1205.  The Court therefore concludes that, had the improper Second Warrant not issued

and had Hartsock not searched the 4620 Plume residence under its auspices, Hartsock would have

obtained a proper warrant, and the evidence in question would have been found.[58]  Accordingly,

_____

[57]It is thus not true that the issuing judge "merely relied on Hartsock's conclusion that the images or the request violated state law regarding child pornography," because "[m]ere nudity does not fit the federal statutory definition of child pornography."  Streett's Proposed Findings ¶ 11, at 43 (citing United States v. Horn, 187 F.3d at 789).  While mere nudity may be constitutionally protected and insufficient to prosecute under § 30-37-3.2, it supplies the probability of criminal activity needed for probable cause.  United States v. Edwards, 813 F.3d at 962.

[58]Streett's Proposed Findings appear to concede that Hartsock would have inevitably obtained a proper warrant here, by saying "Hartsock could have used the information gleaned from the telephone warrant as a basis for the house warrant, even without the information Minnesota police provided after their interview of MY."  Streett's Proposed Findings ¶ 61, at 13 (citing Tr. at 109-10).  Cf. Streett's Proposed Findings ¶ 9, at 31 (citing Tr. at 109-10)("Hartsock testified he could have used the information gleaned from the telephone warrant as a basis for the house warrant, even without the information Minnesota police provided after their interview of MY.").

the Court will not suppress any of the evidence obtained from the search of the 4620 Plume residence.

C.   **EVEN IF THE GOOD-FAITH AND INDEPENDENT-DISCOVERY EXCEPTIONS DO NOT APPLY, LAW ENFORCEMENT OFFICERS WOULD HAVE DISCOVERED THE OTHER VICTIMS' IDENTITIES FROM THE RECORDS OBTAINED FROM THE FIRST WARRANT.**

The United States' last argument against suppression is that the telephone records obtained via the First Warrant "contain[] the phone numbers for each of the other charged victims" -- Hartsock sought a search warrant for the telephone records of one of these victims -- and, thus, "Hartsock would have inevitably identified, located, and interviewed each of these victims."[59] Response at 23.  Hartsock obtained the victims' identities through searching Streett's cellular telephone after executing the Second Warrant, so the independent-source doctrine, for which the United States argues, is inapplicable.  See Murray v. United States, 487 U.S. at 538 (stating that the independent-source doctrine relates to either information obtained from means separate from the "illegal evidence-gathering activity").  As in Nix v. Williams, 467 U.S. at 444-45, because the victims were not found through the independent source of the First Warrant, the independent-

---

The Court does not conclude, however, that Streett has conceded his argument against the application of this doctrine.

[59]Streett's Proposed Findings appear to concede that Hartsock would have inevitably obtained the victims' identities through the telephone records, because it states: "If Hartsock had not sought the house warrant, he could have used the telephone search warrant records to identify people in other telephone numbers through public information, subpoena, search warrant, or cold-calling.  Streett's Proposed Findings ¶ 30, at 13 (citing Tr. at 109-09, 126); id. ¶ 10, at 31 (citing Tr. at 109-09, 126).  The Court does not conclude, however, that Streett has conceded his argument against the application of this doctrine.

source doctrine is not applicable, but the inevitable-discovery exception will justify admission of this evidence.[60]

Unlike the analysis in the previous section, there is no need to go through the Tenth Circuit test for when a warrant exception does not apply. No new warrant is needed to obtain the victims' identities, because Hartsock already received Streett's extensive telephone records which contained the telephone numbers of all the charged victims via the valid First Warrant. See Response at 23. He sorted the numbers contacted in an Excel table to determine the most frequently contacted numbers, finding only two with New Mexico area codes and a total of 135 different area codes. See Tr. at 107:4-13 (Hartsock); Map at 1. Without the Second Warrant to search the 4620 Plume residence, Hartsock would have more thoroughly investigated these telephone records. See Tr. at 107:18-21 (Mease, Hartsock). As a law enforcement officer with about ten years of experience at the time, Hartsock knew that people who want nude photographs from minors "obsessively try to gain nude images from one particular minor or multiple minors," and he believed Streett's texting pattern fit this "mold[,] potentially dead-on." Tr. at 107:18-108:15 (Mease, Hartsock). He testified that he thus would have tried to identify the owners of the

---

[60]Streett argues that the facts here "present a 'classic case in which the independent source exception applies involves two separate searches." Streett's Proposed Findings ¶ 14, 32 (quoting United States v. Forbes, 528 F.3d at 1279). He compares the facts here to those in Murray v. United States, where the Supreme Court "held that the existence of a 'genuine independent evidentiary source'" turned on whether the initial search [']contribute[d] to the agents' decision to apply for the later warrant or to the magistrate's decision to issue it." Streett's Proposed Findings ¶ 15, 32 (second alteration in Streett's Proposed Findings)(quoting United States v. Forbes, 528 F.3d 1279 (citing Murray v. United States, 487 U.S. at 542)). The Court does not rely on this case here, however, because it concluded that the First Warrant was not a search and, even if it was, it is supported by probable cause. The Court does not apply the independent-source doctrine here, though, because the victims' identities were not found through the independent source of the telephone records, but rather through the search of Streett's cellular telephone.

telephone numbers which Streett was texting, either with public information or legal service -- such as a subpoena or search warrant -- or even by calling the numbers to see who answered.  See Tr. at 108:8-15 (Hartsock).  He also testified that he obtained a victim's identity by cold-calling M.S., see Tr. at 116:14-3 (Mease, Hartsock), and that all of the MMS messages caught his attention, see Tr. at 122:3-5 (Hartsock).  Finally, all of the alleged victims named in the Second Superseding Indictment are present in the telephone records.  See Tr. at 117:3-118:20 (Mease, Hartsock); id. at 119:20-123:13 (Mease, Hartsock).  Hartsock also obtained a warrant for one such telephone number based in part on the hundreds of text messages exchanged with Streett in July 2013.  See Fourth Warrant at 3.  This evidence establishes by a preponderance that Hartsock would have obtained the victims' identities through his search of Streett's telephone records and, thus, that suppression of this evidence is unwarranted.  See Nix v. Williams, 467 U.S. at 444 ("If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . then the deterrence rationale has so little basis that the evidence should be received.").

Because all the evidence from the search of the 4620 Plume residence will come in under the good-faith and inevitable-discovery doctrines, there are no fruit-of-the-poisonous-tree issues with the subsequent Third and Fourth Warrants.  See United States v. Leon, 468 U.S. at 907, 916-18 (discussing how "the use of fruits of a past unlawful search" is not a new Fourth Amendment violation, and that exclusion of this evidence does not protect Fourth Amendment rights where there is no appreciable deterrent effect -- such as where officers relied in good faith on a warrant issued by an impartial magistrate judge).  Accordingly, the Court will deny Streett's requests in the Motion and the Supp. Motion.  The Subpoena does not constitute a search under the Fourth

Amendment, and was not issued in contravention of state law or of the Due Process Clause, so the Court will not suppress the subscriber information received under the Subpoena. Probable cause supports the First Warrant, and that warrant is thus valid under the Fourth Amendment. Moreover, even if the First Warrant were not valid, the good-faith exception applies, so the Court will not suppress the telephone records received under the First Warrant. Further, the First Warrant does not violate Streett's due process rights. Finally, although the Second Warrant is invalid, both the good-faith and inevitable-discovery exceptions apply, so the Court will not suppress the evidence obtained via the Second Warrant -- Streett's statements to Hartsock, his computer, his smartphone, and his regular telephone.

**IT IS ORDERED** that: (i) the requests in the Defendant's Motion to Suppress Evidence, filed December 1, 2017 (Doc. 78), are denied; and (ii) the requests in the Defendant's Supplemental Motion to Suppress All Evidence Seized and Any Fruits of the Poisonous Tree Obtained as a Result of the Unlawful Search, filed July 24, 2018 (Doc. 141), are denied. The Court therefore will not exclude from trial the telephone subscriber information and records, or any of the evidence seized from Defendant Bentley Streett's residence or obtained as a result of that search.


_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Nicholas Jon Ganjei
Alexander Mamoru Max Uballez
Sarah Jane Mease
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

Alexandra W. Jones
Jones Law Firm, LLC
Albuquerque, New Mexico

--and--

John S.L. Osborn
Robert R. Cooper
Robert Cooper Law Firm
Albuquerque, New Mexico

--and--

Harry I. Zimmerman
Harry Ira Zimmerman Attorney at Law
Albuquerque, New Mexico

--and--

Martin Lopez, III
Martin Lopez, III, P.C.
Albuquerque, New Mexico

     *Attorneys for the Defendant*