# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

      Plaintiff,

vs.                                       No. CR 14-3609 JB

BENTLEY A. STREETT,

      Defendant.

## <u>MEMORANDUM OPINION</u>[1]

**THIS MATTER** comes before the Court on: (i) the Defendant's Motion to Dismiss Counts 3 Through 7 of Second Superseding Indictment, filed December 1, 2017 (Doc. 77)("Motion"); (ii) the Defendant Bentley Streett's Motion to Dismiss Proposed Findings of Fact and Conclusions of Law, filed November 1, 2018 (Doc. 167)("Streett's Proposed Findings"); and (iii) the United States' Proposed Findings of Fact and Conclusions of Law (September 10, 2018 Evidentiary Hearing), filed November 1, 2018 (Doc. 166)("United States' Proposed Findings"). The Court held a motion hearing on June 25, 2018, and an evidentiary hearing on September 10, 2018. The primary issues are: (i) whether Defendant Bentley A. Streett has standing to make a facial challenge to 18 U.S.C. § 2251(a), even though Streett does not allege that the statute is unconstitutional as applied to him; (ii) whether § 2251(a) applies to juveniles; (iii) whether teenage sexting that falls under § 2251(a)'s ambit is constitutionally protected speech under the First

---

[1]The Court previously issued an Order that denied the Defendant's Motion to Dismiss Counts 3 Through 7 of Second Superseding Indictment, filed December 1, 2017 (Doc. 77)("Motion"). <u>See</u> Order, filed December 4, 2018 (Doc. 182)("Order"). In the Order, the Court stated that it would "issue a Memorandum Opinion at a later date more fully detailing its rationale for this decision." Order at 1 n.1. This Memorandum Opinion is the promised opinion that details the Court's rationale for the previous Order denying the Motion.

Amendment to the Constitution of the United States of America; and (iv) whether § 2251(a) is overbroad, and creates a realistic risk of chilling or infringing on protected speech. At the evidentiary hearing, the Court indicated its inclination to deny the Motion. The Court concludes that: (i) Streett has standing to make a facial challenge to § 2251(a) as unconstitutionally overbroad, because First Amendment jurisprudence grants defendants standing for overbreadth challenges even when the defendant does not allege that the statute is unconstitutional as applied to him or her; (ii) from the statute's plain language, § 2251(a) applies to juveniles; (iii) teenage sexting that falls within § 2251(a) is not protected speech, because it still constitutes criminal child abuse bringing it within the First Amendment's categorical exception for child pornography; and (iv) § 2251(a) is not unconstitutionally overbroad, because it does not create a realistic risk of chilling or infringing on protected speech. Accordingly, the Court denies the Motion.

## FACTUAL BACKGROUND

Rule 12(d) of the Federal Rules of Criminal Procedure requires the Court to state its essential findings on the record when deciding a motion that involves factual issues. See Fed. R. Crim. P. 12(d) ("When factual issues are involved in deciding a motion, the court must state its essential findings on the record."). The findings of fact in this Memorandum Opinion shall serve as the Court's essential findings for rule 12(d) purposes. In deciding such preliminary questions, the other rules of evidence, except those with respect to privileges, do not bind the Court. See Fed. R. Evid. 104(a) ("The court must decide any preliminary question about whether a witness is qualified, a privilege exists, or evidence is admissible. In so doing, the court is not bound by evidence rules, except those on privilege."). Having heard and read the evidence presented, both

at the hearing and in articles presented to the Court in the briefing and at the hearing, the Court makes the following findings of fact.[2]

1.    **The Experts' Backgrounds.**

1.    The United States' expert witness, Sueann G. Kenney-Noziska, is a licensed clinical social worker and registered play therapist[3] supervisor.  See Transcript of Motion Proceedings at 65:13-17 (Kenney-Noziska)(taken September 10, 2018), filed September 28, 2018 (Doc. 158)("Sept. Tr.").

2.    Kenney-Noziska works exclusively with "abused and traumatized children and adolescents."  Sept. Tr. at 66:21-22 (Kenney-Noziska).  See id. at 66:22-23 (Kenney-Noziska).

3.    In 2016, at the National Center for Missing and Exploited Children's ("NCMEC")[4] invitation, Kenney-Noziska attended two and one-half days of training "regarding exploited and missing children, so that [she] can provide services when NCMEC needs them in [New Mexico]." Sept. Tr. at 71:4-6 (Kenney-Noziska).  See id. at 70:24-71:6 (Kenney-Noziska).

---

[2]The parties agreed that the Court could use any of the articles filed or introduced as evidence freely in making its findings of fact.  See Transcript of Motion Proceedings at 56:15-23 (Court, Zimmerman)(taken September 10, 2018), filed September 28, 2018 (Doc. 158).

[3]Kenney-Noziska defines "play therapy" as "an expressive modality for addressing clinical symptoms," which includes "thematic play therapy, which is with younger children, and . . . directive intervention that is focus[ed] on core treatment components by our best practices in terms of treatment for children and adolescents that have a history of trauma."  Sept. Tr. at 69:18-25 (Kenney-Noziska).

[4]Congress established the private, non-profit organization NCMEC in 1984 with the Missing Children's Assistance Act, 34 U.S.C. § 11291.  See National Center for Missing and Exploited Children, Wikipedia, https://en.wikipedia.org/wiki/National_Center_for_Missing_and_Exploited_Children (last visited January 14, 2020).  The Department of Justice primarily funds NCMEC to provide information to the public, and to "assist in locating missing children and to raise public awareness about ways to prevent child abduction, child sexual abuse and child pornography."  National Center for Missing and Exploited Children, supra.

4.     Such services for NCMEC "would include working with children who have been, not only physically or sexually abused in person, but also abused through exploitation." Sept. Tr. at 71:16-18 (Mease). See id. at 71:7-19 (Mease, Kenney-Noziska).

5.     Kenney-Noziska's areas of specialization are: "Clinical treatment for children and teens"; "outpatient"; "child abuse and neglect or child maltreatment," which includes[5] "sexual abuse, sexual trauma, and sexual exploitation." Sept. Tr. at 72:8-16 (Kenney-Noziska, Mease).

6.     Kenney-Noziska's training also "encompass[es] childhood development and adolescent development." Sept. Tr. at 73:5-6 (Kenney-Noziska).

7.     Kenney-Noziska has presented trainings in which "child and adolescent development is interwoven." Sept. Tr. at 73:15-16 (Kenney-Noziska).

8.     The children who come to see Kenney-Noziska "all fall on the trauma continuum," Tr. 104:3 (Kenney-Noziska), and are "almost exclusively" "sexually traumatized," Sept. Tr. at 104:4-5 (Zimmerman).

9.     Streett's expert witness, Dr. Victor C. Strasburger, worked at the University of New Mexico School of Medicine for twenty-eight years as a professor of pediatrics. See Sept. Tr. at 140:15-18 (Strasburger, Zimmerman); id. at 141:13-15 (Strasburger).

10.    Dr. Strasburger also "worked for 18 years at [Sequoyah] Adolescent Treatment Center helping to treat some of the most severe kids in New Mexico for a variety of offenses." Sept. Tr. at 141:17-20 (Strasburger).

_____

[5]At the hearing, Sarah Mease, Assistant United States Attorney, asked Kenney-Noziska: "And within the umbrella of child abuse and neglect and maltreatment, would you exclude sexual abuse, sexual trauma, sexual exploitation?"  Sept. Tr. at 72:14-16 (Mease).  Considering the context, the whole of Kenney-Noziska's testimony, and the Court's presence at the hearing, the Court is sure that the word "exclude" is a typographical error in the Tr., and thus reads it as it should have been, i.e., "include."

11.     In 1982, Dr. Strasburger joined the Task Force on Children and Television at the request of the American Academy of Pediatrics, and began "studying children and the media." Sept. Tr. at 142:3-4 (Strasburger).  See id. at 140:24-142:4 (Strasburger).

12.     Dr. Strasburger "ha[s] authored or co-authored most of the American Academy of Pediatrics policy statements on Children, Adolescents, and the Media."  Sept. Tr. at 142:7-9 (Strasburger).

13.     The American Academy of Pediatrics has awarded Dr. Strasburger the highest awards available in adolescent medicine and in children and media advocacy.  See Sept. Tr. at 142:14-17 (Strasburger).

14.     Dr. Strasburger has authored thirteen books, including four textbooks, on Children, Adolescents, and the Media -- one of these textbooks is widely used in college communications courses around the United States.  See Sept. Tr. at 142:7-12 (Strasburger); id. at 142:21-143:2 (Zimmerman, Strasburger).

15.     Dr. Strasburger has lectured "about 500 times in [his] career on various continents, including Europe, Asia, and Australia," and in forty-seven of the fifty states.  Sept. Tr. at 143:5-7 (Strasburger).  See id. at 143:10 (Strasburger).

16.     Since 2010, "[v]irtually every lecture [Dr. Strasburger has] given . . . has included sexting." Sept. Tr. at 143:17-18 (Strasburger).

**2.     The Definition of "Sexting."**

17.     The media has coined the term "sexting," a portmanteau of "sex" and "texting," which has a number of definitions and commonly includes the sharing of sexually explicit images, videos, or messages with peers.  See Sept. Tr. at 75:10-12 (Kenney-Noziska); id. at 82:20-22 (Kenney-Noziska)(describing the images and videos considered sexts as "naked portrayals"); id.

at 106:11-13 (Zimmerman)(describing sext messages as including "sexually explicit verbiage"); id. at 202:23-203:2 (Strasburger)(stating that the consensus is that sexting includes any sexual images, videos, or text messages); Nat'l Ctr. for Missing & Exploited Children, Policy Statement on Sexting at 1 (Sept. 1, 2009), filed December 1, 2017 (Doc. 77-2)("NCMEC Statement"); Sheri Madigan et al., Prevalence of Multiple Forms of Sexting Behavior Among Youth: A Systemic Review and Meta-Analysis, 172 JAMA Pediatrics 327, 328 (2018)(submitted to the Court at the September 10, 2018, evidentiary hearing as Plaintiff's Hearing Exhibit 5)("Meta-Analysis").

18.     "Sexting" is "a popular term among the public" used broadly to encompass a wide variety of content.  Kaitlin Lounsbury et al., The True Prevalence of "Sexting" at 6 (Crimes Against Children Research Ctr., 2011), filed July 9, 2018 (Doc. 137-2)("True Prevalence").

19.     The term "sexting," "is most commonly used to describe the creation and transmission of sexual images by minors."[6]  True Prevalence at 3.

20.     In the study "Sexting: A Typology," the authors reviewed 550 cases of "youth-produced sexual images," which are "images of minors created by minors that could qualify as child pornography under applicable criminal statutes."  Janis Wolak & David Finkelhor, Sexting: A Typology at 2 (Crimes Against Children Research Ctr., 2011), filed July 9, 2018 (Doc. 137-1)("Typology").

21.     Professors Janis Wolak and David Finkelhor divide sexting into two broad categories: "experimental" and "aggravated."  Typology at 2.  See Sept. Tr. at 83:21-23 (Kenney-Noziska).

---

[6]Although adults also engage in sexting, Streett's Motion -- and therefore this Opinion -- focuses only on sexting in which underage teenagers engage.

22.     "Experimental" sexting is defined as youth-produced images sent "to established boy- or girlfriends, to create romantic interest in other youth, or for other reasons such as attention-seeking." Typology at 2. See Sept. Tr. at 85:12-17 (Kenney-Noziska)(describing experimental sexting as teen-produced, shared with a teen peer, in a romantic relationship or to seek sexual attention); id. at 130:4-16 (Zimmerman, Kenney-Noziska)(underlining the consensual nature of such sexts); id. at 171:11-172:18 (Strasburger, Zimmerman)(describing consensual sexting as the new way of flirting). See also Streett's Proposed Findings ¶ 2, at 7 ("Experimental sexting is consensual.").

23.     Experimental sexting does not involve "malice or misuse or other criminal use of the image." Sept. Tr. at 85:20-21 (Kenney-Noziska).

24.     Experimental sexting is produced by teenagers, for teenagers. See Sept. Tr. at 108:19-23 (Kenney-Noziska).

25.     Experimental sexting could include images of genitalia or breasts. See Sept. Tr. at 130:9-12 (Zimmerman, Kenney-Noziska).

26.     "Aggravated" sexting, on the other hand, "involve[s] criminal or abusive elements beyond the creation, sending or possession of youth-produced sexual images." Typology at 2. See Tr. at 84:1-7 (Kenney-Noziska).

27.     There must be some "additional act beyond what was anticipated or consented to by the person producing th[e] photograph" for it to become an aggravated sext. Sept. Tr. at 109:8-10 (Zimmerman). See id. at 109:8-14 (Zimmerman, Kenney-Noziska); id. at 172:11-18 (Zimmerman, Strasburger)(describing such situation as cyber bullying).

28.     Where the original, consensual sext is disseminated beyond its intended recipient, it becomes nonconsensual, and can be a form of cyber bullying or revenge pornography.  <u>See</u> Sept. Tr. at 109:15-25 (Zimmerman, Kenney-Noziska); <u>id.</u> at 172:14-18 (Strasburger).

29.     Such aggravated or nonconsensual sexting includes sexts exchanged between a teen and an adult.  <u>See</u> <u>Typology</u> at 2; Sept. Tr. at 84:1-7 (Kenney-Noziska); <u>id.</u> at 170:14-16 (Strasburger).

30.     Other instances of aggravated or nonconsensual sexting, besides adult involvement or criminal or abusive behavior, include creating or sharing an image without consent, sharing a sext with the intent to cause harm, and obtaining sexts via coercion or other non-consensual means. <u>See</u> <u>Typology</u> at 2; Tr. at 84:1-86:2 (Kenney-Noziska, Mease).

31.     "[S]exting episodes are very diverse and complex and cannot be categorized or generalized very easily," <u>Typology</u> at 10, so "it is important not to oversimplify the behavior," United States' Proposed Findings ¶ 2, at 2.

32.     Sexts can change categories over time and, thus, should not be confined to one category at production -- for example, if an experimental sext is later shared without consent, it may be classified as an aggravated sext.  <u>See</u> Sept. Tr. at 94:2-10 (Mease, Kenney-Noziska); <u>id.</u> at 133:17-21 (Mease, Kenney-Noziska); <u>id.</u> at 138:10-18 (Zimmerman, Kenney-Noziska); <u>id.</u> at 172:11-18 (Zimmerman, Strasburger).

**3.      <u>The Prevalence of Teenage Sexting</u>.**

33.     A sext could be considered child pornography and regulated by 18 U.S.C. § 2251(a) if it contains "sexually explicit conduct," which is defined as "actual or simulated -- (i) sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic

abuse; or (v) lascivious exhibition of the genitals or pubic area of any person."  18 U.S.C. § 2256(2)(A).

34.     Determining the percentage of teenage sexting which falls under the federal definition of child pornography from the available studies "is difficult, due to differences in defining sexting, failure to limit studies to minors or other issues with study representation, limiting studies to internet users, and how broadly the questions are phrased."  Streett's Proposed Findings ¶ 1, at 4-5 (citations omitted).  See Sept. Tr. at 86:3-87:2 (Mease, Kenney-Noziska); id. at 203:3-22 (Mease, Strasburger); id. at 205:22-210:2 (Mease, Strasburger); Motion app. A. at 34-45; Anne S. Frankel et al., Sexting, Risk Behavior, and Mental Health in Adolescents: An Examination of 2015 Pennsylvania Youth Risk Behavior Survey Data, 88 J. Sch. Health 190, 191, 196 (2018)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Hearing Exhibit L)("2015 Pennsylvania Survey"); Manual Gámez-Guadiz & Patricia de Santisteban, "Sex Pics?": Longitudinal Predictors of Sexting Among Adolescents, 63 J. Adolescent Health 608, 613 (2018)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Exhibit M)("Sex Pics"); Meta-Analysis at 333; Kimberly J. Mitchell et al., Prevalence and Characteristics of Youth Sexting: A National Study, Pediatrics, Jan. 2012, at 1, 2, 7, filed December 1, 2017 (Doc. 77-4)("Prevalence and Characteristics"); True Prevalence at 3-6; Typology at 3.

35.     Dr. Strasburger could not comment as to how the prevalence of teenage sexting applies to the federal statute at issue, or the percentage of teenage sexting to which the statute applies.  See Sept. Tr. at 212:3-24 (Mease, Strasburger).

36.     "[T]he term sexting 'has come to encompass too many activities to make it an appropriate term for formal research.'"  United States' Proposed Findings ¶ 5, at 3 (quoting True Prevalence at 6).

37.     There is no consensus as to the prevalence of teenage sexting, with current literature estimating that the rate ranges between 1.3% to 60%.  See Meta-Analysis at 328.  See also True Prevalence at 6 ("However, analysis of the relevant research to date reveals that there is little consistency in the estimated prevalence of sexting among adolescents.").

38.     With current consensus figures showing twenty-two million teenagers aged thirteen to seventeen, Dr. Strasburger estimated that three million (15%) teenagers have sent a sext, and six million (30%) teenagers have received a sext.  See Sept. Tr. at 174:12-18 (Strasburger).

39.     "In discussing the prevalence of sexting, Dr. Strasburger relied heavily upon three fairly recent studies" -- (i) the Meta-Analysis; (ii) the 2015 Pennsylvania Survey; and (iii) Sex Pics -- which range in their published prevalence rates from 10.7% to 29%, and included data which fall outside the federal definition of child pornography.  United States' Proposed Findings ¶ 6, at 3-4.

40.     The Meta-Analysis, performed in 2018, looked at thirty-nine prior studies and concluded that "[t]he prevalence of sexting has increased in recent years and increases as youth age," Meta-Analysis at 327, "with the prevalence increasing each year until youth reach the age of 18 years," Meta-Analysis at 328.

41.     Dr. Strasburger stated that the Meta-Analysis and the studies following it "are consistent and consistently show increasing levels of sexting, and increasing sexting as teenagers get older."  Sept. Tr. at 201:13-15 (Strasburger).

42.    The Meta-Analysis, in analyzing thirty-nine studies with at total of 110,380 participants age 11.9 to 17.0, determined "that a sizable minority of youth engage in sexting (1 in 7 sends sexts, while 1 in 4 receives sexts), with rates varying as a function of age, year of data collection, and method of sexting." Meta-Analysis at 332. See id. at 327; Sept. Tr. at 172:24-173:13 (Strasburger)(discussing the Meta-Analysis' figures for consensual sexting as the "best estimate currently").

43.    Specifically, the Meta-Analysis concluded that the mean prevalence of sending a sext in this age group is 14.8%, the mean prevalence for receiving sexts is 27.4%, the mean prevalence for forwarding a sext without consent is 12.0%, and the mean prevalence of having a sext forwarded without consent is 8.4%. Meta-Analysis at 327, 332-33.

44.    Several studies that find higher rates of sexting, however, present methodological problems.  Some studies that Streett cites rely on polling samples that included eighteen- and nineteen-year-olds -- who are statistically more likely to engage in sexting than younger teenagers -- and  the studies use ambiguous definitions of sexting that may not amount to content that § 2251(a) proscribes.  See True Prevalence at 2-6 (noting that several frequently cited studies use definitions that "could include many types of images that are not illegal under federal law" ); Prevalence and Characteristics at 1 (concluding that one percent of "youth had appeared in or created nude or nearly nude pictures or videos," a definition far broader than that which § 2256(2)(A) provides).

45.    The Meta-Analysis also has limitations, for it did not discuss the content of the images or videos that the underlying studies asked about and relied on studies which included "sexually explicit messages" as a form of sexting, so it is impossible to know which proportion of the prevalence rates it provides would fall within the federal definition of "sexually explicit."

Meta-Analysis at 330. See United States' Proposed Findings ¶ 7(a)-(b), at 4-5 (stating that "over one-third of the studies included in the aggregate prevalence rates rely on data that could not be considered sexually explicit under the federal statutory definition); Sept. Tr. at 203:11-22 (Mease, Strasburger)(discussing how different definitions of sexting are used in the various studies and that there is no standardization in the research).

46.     The Meta-Analysis also did not consider the recipient of the youth-produced sext, i.e., whether it was sent to an adult or a peer, and it relied on studies that included data relating to nonconsensual sexting (specifically, the sharing of sexts without consent), so its aggregate prevalence data does not relate solely to consensual sexting between teenagers. See Meta-Analysis at 330; United States' Proposed Findings ¶¶ 7(c)-(d), at 5; Sept. Tr. at 88:1-12 (Mease, Kenney-Noziska); id. at 209:1-9 (Mease, Strasburger).

47.     The 2015 Pennsylvania Survey noted that "adolescents in general do not think sexting is a problem and it has become commonplace in youth behavior, limiting [the] possible bias" of teenagers being dishonest in reporting their sexting activities. 2015 Pennsylvania Survey at 196.

48.     The 2015 Pennsylvania Survey determined that, of 6,021 participating high school students, 29% "reported engaging in consensual sexting (sending or receiving a sext) and 3% in nonconsensual sexting," 2015 Pennsylvania Survey at 193, in the last thirty days, see 2015 Pennsylvania Survey at 192.

49.     The 2015 Pennsylvania Survey surveyed high school students in the 12th grade, so it includes eighteen-year-old students, and used a broad definition of sext -- "a revealing or sexual photo of yourself" -- so it does not help to determine which portion of minors' consensual sexting

would fall under 18 U.S.C. § 2251(a)'s auspices.  2015 Pennsylvania Survey at 192.  See United States' Proposed Findings ¶ 8(a), at 6.

50.     The Sex Pics study sampled 1,208 students between twelve and sixteen years old in Spain over a one-year period, finding that 10.7% reported sending a sext at the baseline period and 19.2% reported sending at the one-year follow up.  See Sex Pics at 3-4.

51.     Sex Pics' definition of sexting exceeds the federal definition of "sexually explicit conduct," as Sex Pics defines sexting as sending: (i) "written information or text messages with sexual content about you"; (ii) "pictures with sexual content (e.g., naked) about you"; or (iii) "images (e.g., via web-cam) or videos with sexual content about you."  Sex Pics at 3.

52.     The Prevalence and Characteristics study attempted to determine whether the images that adolescents sent were sexually explicit by asking 1,560 adolescents age ten to seventeen whether they had received, forwarded, appeared in, or created "nude or nearly nude images or videos," Prevalence and Characteristics at 3 tbl. 1 (title case omitted), and by asking those who responded affirmatively whether those images or videos "showed breasts, genitals, or someone's bottom," Prevalence and Characteristics at 4.  See Prevalence and Characteristics at 2-4.

53.     The Prevalence and Characteristics study found that 1.2% of the respondents appeared in or created an image that met the study's definition of sexually explicit, and 5.9% of the respondents received an image that met the study's definition of sexually explicit; the study's definition of the term "sexually explicit" is still more inclusive than 18 U.S.C. § 2256(2)(A)'s

definition.[7]  See Prevalence and Characteristics at 4; United States' Proposed Findings ¶ 10(a), at 7.

54.    Four categories of images that the Prevalence and Characteristics study asked about could meet § 2256(2)(A)'s definition of "sexually explicit conduct" and thus fall under § 2251(a): (i) "genitals"; (ii) "someone completely nude"; (iii) "sexual intercourse"; and (iv) "masturbation," Prevalence and Characteristics at 6 -- although (i) and (ii) would not automatically meet § 2256(2)(A)'s definition, as it requires "lascivious exhibition of the genitals or pubic area," 18 U.S.C. § 2256(2)(A).  See United States' Proposed Findings ¶ 10(b), at 7-8.

55.    Prevalence and Characteristics shows that 0.13%[8] of adolescents creating or appearing in such images and 1.06%[9] of adolescents receiving such images would plainly meet § 2256(2)(A)'s definition of "sexually explicit conduct" and thus fall under § 2251(a).  See Prevalence and Characteristics at 6 tbl. 3.

_____

[7]The United States contends that the study did not clarify whether those received images depicted minors.  See United States Proposed Findings at 7 n.1.  The study provides the screener questions, and the only question asking about receiving a sext is: "Has anyone ever sent you nude or nearly nude pictures or videos of kids who were under the age of 18 that someone else took?" Prevalence and Characteristics at 3.  Accordingly, the Court determines that the data on the images received reflects images of minors.

[8]Ten percent of the 1.3% of adolescents creating or appearing in sexually explicit images stated that they depicted masturbation, and none stated that they depicted sexual intercourse.  See Prevalence and Characteristics at 6 tbl. 3.  This means that only 10% of the 1.3% can clearly be determined to meet the federal definition of sexually explicit content.

[9]Thirteen percent of the 5.9% of adolescents who received sexually explicit images of minors stated that they depicted masturbation and 5% stated that the images depicted sexual intercourse.  See Prevalence and Characteristics at 6 tbl. 3.  This means that only 18% of the 5.9% can clearly be determined to meet the federal definition of sexually explicit content.

56.     That more recent studies found a higher prevalence of teenage sexting "was not surprising," because "smartphone ownership [has] becom[e] near ubiquitous in recent years," and smartphone applications "have been developed that may (seemingly) facilitate privacy in the sharing and storing of videos/images." Meta-Analysis at 332.

57.     In 2015, 88% of American teenagers aged thirteen to seventeen reported that they have access to some type of cellular telephone, and 90% of those teenagers with cellular telephones reported exchanging texts -- teenagers sent and received a median of thirty texts per day. See Amanda Lenhart et al., Pew Research Ctr., Teens, Social Media & Technology Overview 2015: Smartphones Facilitate Shifts in Communication Landscape for Teens at 5, 9 (2015), filed December 1, 2017 (Doc. 77-3)("Social Media").[10]

58.     "Smartphones are just 10 years old now. But the most recent research shows 95 percent of teenagers have access [to] or own a smartphone." Sept. Tr. at 170:10-12 (Strasburger).

59.     The growing availability of smartphones means the prevalence of teenage sexting will also grow. See Sept. Tr. at 175:14-19 (Strasburger, Zimmerman)(discussing how "the vast majority of sexting appears to be via smartphone" and how numbers are growing); id. at 120:22-121:19 (Zimmerman, Kenney-Noziska)(discussing how the prevalence of sexting is growing and with smartphones it is "likely to increase").

_____

[10]Streett relies on this study for the proposition that "[o]one can still identify patterns without looking to specific percentages." Streett's Proposed Facts ¶ 3, at 5 (citing Social Media at 7). The study itself does not speak broadly to being able to identify patterns without looking at percentages; rather, the study states that "[the authors] believe that the broad contours and patterns evident in this web-based survey are comparable to those seen in previous telephone surveys." Social Media at 7. Accordingly, the Court does not adopt this proposed fact, but rather takes the percentages as they are and uses them as the Court can to develop its analysis.

60.     A survey of 1,560 internet users age ten to seventeen conducted between August, 2010, and January, 2011, determined "national prevalence estimates" for various definitions of sexting, which revealed an estimate of a rate of involvement of 1% where sexting is defined as "youth creating images of themselves that include their naked breasts, genitals, or bottom." Prevalence and Characteristics at 5.

61.     The Prevalence and Characteristics survey also concluded that "[t]he percentage of youth who have, in the past year, appeared in or created sexually explicit sexual images that potentially violate child pornography laws is low (1%)," but that this is "still a considerable number of youth[, which] raises the question of how the law should treat such cases."  Prevalence and Characteristics at 6-7.

62.     A "factsheet" presenting critiques of sexting studies concluded: "While sexting does seem to occur among a notable minority of adolescents, there is little reliable evidence that the problem is as far-reaching as many media reports have suggested."  True Prevalence at 1, 6.

**4.     The Inherent Harm in Teenage Sexting.**

63.     There is not a consensus whether experimental or consensual sexting is normative developmental behavior.  See Sex Pics at 1 ("It has been pointed out that sexting can be a normal form of intimate expression and communication in sexual and romantic relationships. . . .  Sexting may be particularly problematic during adolescence . . . .").  Compare Sept. Tr. at 91:11-13 (Kenney-Noziska)("I would consider the experimental sexting as something that could potentially be developmentally appropriate . . . ."), and Typology at 4 ("We use the term 'Experimental' because, while there is no evidence that this behavior is normative, these incidents appear to grow out of typical adolescent impulses . . . ."), with Sept. Tr. at 175:20-176:1 (Zimmerman,

Strasburger)(stating that experimental sexting is "[a]bsolutely" "a normative part of adolescent growth").

64.     Aggravated or nonconsensual sexting, on the other hand, is clearly not normative developmental behavior.   See Sept. Tr. at 93:20-23 (Mease, Kenney-Noziska)(stating that aggravated sexting is placed in the "atypical development" category, as opposed to normative); id. at 147:8-12 (Strasburger)(stating that "there is a major distinction between consensual sexting, where no one is hurt" and nonconsensual, "coercive sexting," which are "clearly examples of child abuse").

65.     Current literature suggests that the human brain is not fully developed until around age twenty-five to twenty-seven.  See Sept. Tr. at 78:23-25 (Kenney-Noziska).

66.     Adolescents therefore do not have "complete development of the prefrontal cortex," Sept. Tr. at 79:19-20 (Kenney-Noziska), and, because of that, often engage in risk-taking behavior, see Sept. Tr. at 79:17-19 (Kenney-Noziska), and lack the "ability to delay gratification" so they are "more impulsive than somebody with a mature brain," Sept. Tr. at 81:3-5 (Kenney-Noziska). See also Sept. Tr. at 170:20-171:3 (Strasburger)(stating that "teenagers are programmed to do dumb things . . . until about age 25" and that they do not "have impulse control" or "judgment from the prefrontal cortex").

67.     Even consensual sexts carry risks, because one the image is sent it is completely out of the adolescent's control and could be shared at any time without the adolescent's consent and quickly evolve into an aggravated sext.  See Tr. at 133:2-21 (Mease, Kenney-Noziska).

68.     Similarly,

69.     Adolescents often will consensually take and send images to or do things for a person who they believe loves them, but is actually exploiting or trafficking them, and the

adolescents do not realize that they are being exploited or victimized. <u>See</u> Sept. Tr. at 113:12-15 (Kenney-Noziska).

70.     Once an image has been shared online there is really no way of retrieving the image, and so there is potentially no end to the exploitation and victimization, making it much harder for the adolescents pictured to recover and heal from the trauma of knowing those images are publicly available. <u>See</u> Sept. Tr. at 97:13-98:2 (Kenney-Noziska); Mary Graw Leary, <u>Self-Produced Child Pornography: The Appropriate Societal Response to Juvenile Self-Sexual Exploitation</u>, 15 Va. J. Soc. Pol'y & L. 1, 10 (2007), filed July 9, 2018 (Doc. 137-3)("<u>Societal Response</u>")(stating that child pornography "is a crime of perpetuity where every time an image is distributed the victim is revictimized").

71.     While "sexting can be a normal form of intimate expression and communication in sexual and romantic relationships," it "may be particularly problematic during adolescence because teens are not fully developed in their decision-making and recognition of long-term consequences of sharing sexual content." <u>Sex Pics</u> at 1. <u>See</u> <u>Typology</u> at 8 ("Learning about romantic and sexual relationships is a key task of adolescence in our culture, which provides very mixed messages about appropriate sexual behavior."); Sept. Tr. at 79:19-20 (Kenney-Noziska)(discussing the risk-taking behavior that adolescents engage in because of their lack of having a fully matured brain).

72.     Adolescence is an anxiety-filled period, so teenagers experiencing transitional and social anxiety on a daily basis is not unusual. <u>See</u> Sept. Tr. at 138:6-9 (Zimmerman, Kenney-Noziska); <u>id.</u> at 188:1-9 (Zimmerman, Strasburger); <u>2015 Pennsylvania Survey</u> at 191 ("[N]early 32% of youth ages 13-18 have been diagnosed with an anxiety disorder . . . .").

73.     "The sharing of sexual images, while risqué in one cultural dimension, may also be a form of sexual sharing that has some comparative safety to it in contrast to face-to-face sexual intimacy, since it can be engaged in outside the presence of the other person.  Thus the feelings of immediate embarrassment may be more manageable, a youth can control how she or he appears to another, and the pressure for additional sexual intimacy is not so intense and immediate, as it might be in a face-to-face sexual encounter."  Typology at 9 (footnote omitted).

74.     The Meta-Analysis reveals that sexting increased with age, which "is expected and generally corresponds to the age of sexual identity and exploration, which lends credence to the notion that youth sexting may be an emerging, and potentially normal, component of sexual behavior and development."  Meta-Analysis at 332.  See id. at 332 ("It is possible that [sexting] may be a normal part of sexual behavior and identity formation in the digital age.").

75.     Kenney-Noziska has had teenage patients who, while already in treatment, shared their worry, or short-term preoccupation about having sent an experimental sext but has not had a teenager request therapy because of sending an experimental sext -- it is not "a separate clinical issue."  Sept. Tr. at 96:21-22 (Kenney-Noziska).  See id. at 96:12-22 (Kenney-Noziska); id. at 126:3-7 (Kenney-Noziska, Zimmerman)(confirming that engaging in experimental sexting is "not a reason that [a teenager] would present or have presented for me in treatment," because it generally does not cause trauma).

76.     When teenagers present with regret or anxiety over sending an experimental sext, Kenney-Noziska typically sees "transient anxiety" over sending a sext, which is "mostly contained to that moment and the impact of sending that sext, and then a preoccupation with" the ramifications, but that she has not seen this "lead to a separate clinical issue in and of itself."  Sept. Tr. at 132:9-11, 14-15 (Kenney-Noziska).  See id. at 132:8-17 (Kenney-Noziska).

77.     A teenager who sends a sext consensually could also later regret this sext as he or she grows older, see Sept. Tr. at 194:18-22 (Strasburger), but teenagers often do things that they later regret and they "have to make mistakes in order to gain a sense of mature judgment," Sept. Tr. at 195:12-13 (Strasburger).  See also Sept. Tr. at 237:11-24 (Zimmerman, Strasburger).

78.     The danger in teenager sexting lies in "the cyber bullying aspect," i.e., the dissemination of the photography beyond the intended recipient, "and the adult to teenager child pornography aspect." Sept. Tr. at 182:22-23 (Strasburger).  See id. at 182:2-10 (Strasburger).

79.     Consequences of aggravated sexting include: "clinical levels of anxiety," Sept. Tr. at 94:24 (Kenney-Noziska), which is different from typical anxiety because it "impact[s] the way somebody functions," Tr. at 95:4 (Kenney-Noziska); "clinical levels of depression," Sept. Tr. at 95:6 (Kenney-Noziska); impact on self-perception and self-identity, see Sept. Tr. at 95:7-9 (Kenney-Noziska); low self-esteem, shame, or guilt, see Sept. Tr. at 95:10-11 (Kenney-Noziska); cutting, see Sept. Tr. at 95:13 (Kenney-Noziska); eating disorders, see Sept. Tr. at 95:13 (Kenney-Noziska); substance abuse or addiction, see Sept. Tr. at 95:714-15 (Kenney-Noziska); isolation, see Sept. Tr. at 95:18 (Kenney-Noziska); entering "risky or unsafe or dangerous relationships," see Sept. Tr. at 95:20-21 (Kenney-Noziska); cyber bullying or even suicide, see Sept. Tr. at 95:25-96:1 (Mease, Kenney-Noziska), or attempted suicide, see Sept. Tr. at 187:19 (Strasburger).

80.     An online survey of 655 teenagers between the ages of thirteen and eighteen found that nine in ten teenagers who "sent sexually suggestive text messages or emails with nude or nearly-nude photos of themselves" reported no negative consequences, Cox Commc'ns et al., Teen Online & Wireless Safety Survey: Cyberbullying, Sexting, and Parental Controls, Cox 5 (May 2009), https://www.cox.com/wcm/en/aboutus/datasheet/takecharge/2009-teen-survey.pdf ("2009 Cox Survey"); see id. at 4, 38, but found that three in ten friends of teenagers who sent texts

reported that the photograph was "forwarded to someone other than the intended recipient," Dena T. Sacco et al., <u>Sexting: Youth Practices and Legal Implications</u> 6 (Berkman Ctr. for Internet & Soc'y at Harvard Univ., Publ'n No. 2010-8, 2010), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=1661343, filed December 1, 2017 (Doc. 77-1)("<u>Youth Practices</u>")(citing <u>2009 Cox Survey</u> at 38).

81.     The 2015 Pennsylvania Survey noted that "[t]he relationship between consensual sexting and sexual activity has been well examined," evincing "that youth who sext are more likely to be sexually active than their nonsexting peers," although "[t]he relationship sexting and risky sexual behavior is less clear[.]" <u>2015 Pennsylvania Survey</u> at 191.

82.     The 2015 Pennsylvania Survey's results underscored the correlation between sexting and other sexual activity, but also found that "consensual sexting is highly related to alcohol and tobacco use, being a male student, being cyberbullied, and reporting both depressive symptoms and previous suicide attempts," although it could not determine causality. <u>2015 Pennsylvania Survey</u> at 195.

83.     At this time, it is premature to conclude that experimental, consensual sexting is causing those teenagers who consensually sext to engage in other risky behaviors -- such as alcohol and drug use, teenage pregnancy, and attempting suicide. <u>See</u> Sept. Tr. at 116:3-117:15 (Zimmerman, Kenney-Noziska); <u>id.</u> at 183:12-23 (Strasburger<u>); 2015 Pennsylvania Survey</u> at 195 (showing that, while consensual sexting is related to risk behaviors, causality is unknown).

84.     Those adolescents who had experienced aggravated, nonconsensual sexting reported depression, attempted suicide, and self-harm behaviors in larger percentages than those who had engaged in experimental sexting. <u>See</u> <u>2015 Pennsylvania Survey</u> at 195 tbl. 2. <u>Cf.</u> Sex

Pics at 5 (finding that more depressive symptoms at the baseline time period meant an increased likelihood of sending a sext within the next year).

85.     Studies show that the rates of teenage pregnancy and alcohol and drug use among teenagers are decreasing.  See Sept. Tr. at 116:21-25 (Zimmerman, Kenney-Noziska).

86.     While there are certainly differences in degree in the harm that consensual, experimental sexting and aggravated, nonconsensual sexting cause, there is no bright line between self-produced, experimental sexting and that which results from coercion or abuse.   Some teenagers who engage in normative, experimental sexting come to regret that behavior later, and may suffer anxiety or other harm as a result.  See Sept. Tr. at 132:1-5 (Mease, Kenney-Noziska). Kenney-Noziska attributes this to the fact that, once the sext is sent, it is no longer in the teenager's control, leaving the sender vulnerable to coercion.  Sept. Tr at 133:2-21 (Mease, Kenney-Noziska). Between eight and twelve percent of sexts are forwarded without the sender's consent, regardless whether the initial sext was sent voluntarily in love and good fun, or as the result of abuse or coercion.  See Sept. Tr. at 174:2-7 (Strasburger).  Once leaked or posted to the internet, sexts are difficult to retrieve or erase regardless of the sexter's initial motivation, making the "sexual exploitation or . . . abuse . . . even harder to recover from."  Sept. Tr. at 97:13-21 (Kenney-Noziska).

87.     Nor are the teenage sexters themselves often aware of where the line is.  Given teenagers' latent prefrontal cortex development, they are susceptible to being coerced or induced into producing sexts despite believing they are "engaging in perfectly normal behavior."  Sept. Tr. at 98:8-19 (Mease, Kenney-Noziska).  Teenagers are prone to believe that they are engaging in consensual behavior, despite a romantic partner or internet acquaintance coercing them.  See Sept. Tr. at 114:8-15 (Kenney-Noziska).  Because of latent brain development, "[y]ounger teenagers

don't appreciate the risks of sexting," even those who are "in a good relationship." Sept. Tr. at 180:24-181:1 (Strasburger).

88.     Nonetheless, "[f]urther study is necessary to determine whether sexting 'can be considered a risk behavior along with traditional adolescent risk behaviors like sexual behavior and substance abuse.'"  Streett's Proposed Findings ¶ 13, at 8 (quoting 2015 Pennsylvania Survey at 197).  See Sex Pics at 1 ("Due to the importance and possible consequences of sexting, more information about sexting predictors is crucial to effectively advance educational efforts.").

89.     More research is needed to understand nonconsensual sexting, and to identify the variables and signs associated with it.  See Meta-Analysis at 333.

**5.     Prosecutions of Teenagers for Sexting and Their Consequences.**

90.     The Court could find no cases prosecuting a minor for violating § 2251(a), and the parties have provided none.  That the Court could not find a case where a minor was charged with violating § 2251(a) is not surprising, and thus not probative of § 2251(a)'s applicability to minors, given how federal courts generally treat juveniles.  Under the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031-5042 ("FJDA"), juvenile defendants are typically surrendered to state authorities.  See 18 U.S.C. § 5032.

91.     Streett's avenue of attack is providing the Court material concerning state legislation and state prosecution[11] of teenage sexting, which is not relevant to the chilling effect of

---

[11]Streett proffers as fact: "Consequences of sexting prosecution range from diversion to felony convictions and sex offender registration."  Streett's Proposed Findings ¶ 1, at 10 (citing State Map at 1 (undated)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Hearing Exhibit A); Pie Chart at 1 (undated)( submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Hearing Exhibit B); How the States Approach Teen Sexting at 1-4 (undated)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Hearing Exhibit C)).  The sources to which Streett cites do not discuss felony convictions or sex offender registration.  See State Map at 1; Pie Chart at 1; How the States

the federal statute, but demonstrates that, even in the face of state criminal prosecutions, the rate of teenage sexting is increasing. See United States' Proposed Findings ¶ 14, at 11.

92.     Streett also has not provided information regarding the frequency of adult prosecutions under § 2251, undermining the proposition that the prosecution of minors "would represent substantial overbreadth in relation to the legitimate sweep of the statute." United States Proposed Findings ¶ 1, at 11-12.

93.     Dr. Strasburger adamantly opposes criminal prosecution of teenagers who engage in consensual sexting, because it involves "ruining a teenager's life before he or she has a chance to develop and live," Sept. Tr. at 176:25-177:2 (Strasburger), and there are other, less restrictive ways of dealing with consensual sexting such as counseling or other educational measures, see Sept. Tr. at 177:3-4 (Strasburger). See also Sept. Tr. at 124:20-125:17 (Zimmerman, Kenney-Noziska)(discussing how teenagers who take sexual photographs of themselves should not be labeled offenders, and that it is preferable for those who engage in consensual sexting to be educated rather than prosecuted).

94.     Dr. Strasburger notes that potentially millions of teenagers are sexting and with the embarrassment and cost involved in criminal prosecutions, it should not be left to law enforcement to decide whom to charge, because "the real danger is the cyber bullying aspect, and the adult to teenager child pornography aspect." Sept. Tr. at 182:22-23 (Strasburger). See id. at 182:11-23 (Zimmerman, Strasburger).

_____

Approach Teen Sexting at 1-4. Further, the Court is unable to ascertain where these sources are from or when they were compiled, and thus cannot determine their reliability short of examining every state statute to which they cite, a time-consuming undertaking that would not be helpful for determining whether the federal statute is overbroad. Accordingly, the Court does not adopt this proffered fact.

95.     Dr. Strasburger says that "[t]here is nothing more embarrassing, if you're a teenager, than seeing your name in the paper in a way that you didn't want it there," Sept. Tr. at 185:11-13 (Strasburger), so he disagrees with legislation that only reduces penalties, as opposed to removing them, for teenage sexting -- which he labels as "innocent, flirtatious behavior," Sept. Tr. at 185:7-8 (Strasburger).  See Sept. Tr. at 184:22-185:13 (Zimmerman, Strasburger).

96.     Kenney-Noziska believes that a prosecutor -- as opposed to a parent or a school -- should examine each instance of sexting on a case-by-case basis to make the decision to prosecute, that there should be no blanket exceptions for certain types of sexts or relationships and that prosecution should not be automatic.    See Sept. Tr. at 110:19-111:4 (Kenney-Noziska, Zimmerman); 128:4-13 (Zimmerman, Kenney-Noziska).

97.     Dr. Strasburger agreed that, when determining whether a sext constitutes child pornography, "it's a case by case content, and consent can vary, and both matter."  Sept. Tr. at 235:1-2 (Strasburger).

98.     It may be particularly confusing for a teenager who sends a sext of himself or herself and is later prosecuted for child pornography, because the teenager is both the offender and the victim in that situation.  See Sept. Tr. at 183:3-9 (Strasburger).

99.     In searching Google, Dr. Strasburger has found more than a dozen state prosecutions of teenagers for sexting from 2017-2018, including those where a teenager who shared a self-produced image was both offender and victim.  See Sept. Tr. at 145:17-23 (Strasburger).

100.    Criminal prosecutions of teenagers for sexting may result in their being put "in jail for up to 20 years" and being labeled as "juvenile sexual offenders for life," Sept. Tr. at 177:5-6 (Strasburger), with this label dictating where they may live and causing society to shun them, see

Sept. Tr. at 177:8-10 (Strasburger), all because they "were engaging in what is a -- not a good, but an innocent activity," Sept. Tr. at 177:11-12 (Strasburger).

101.    Some states allow teenagers to "be taken into custody as a juvenile offender as soon as [they are] discovered to be sexting," Sept. Tr. at 187:1-3 (Strasburger), which makes reporting sexting "to the police . . . a tremendous issue for teenagers," Sept. Tr. at 187:6-7 (Strasburger), especially because such policies do not differentiate "between consensual sexting and sexting that has been disseminated," Sept. Tr. at 187:10-11 (Strasburger).

102.    Teenagers who are prosecuted for sexting are "no longer going to school" and "are shunned by their peers," meaning that they are "locked out of normal adolescence." Sept. Tr. at 177:17-19 (Strasburger).

103.    The stigma that attaches to a teenager who goes to jail, receives other criminal penalties, or who is labeled as a sex offender because of sexting is serious, and still attaches even if the charges are eventually dismissed or result in only educational or diversionary programs.  See Tr. at 124:24-125:11 (Zimmerman, Kenney-Noziska); id. at 219:14-21 (Mease, Strasburger).

104.    Other adverse consequences of criminal prosecutions of teenagers for sexting include depression, anxiety, and social isolation.  See Tr. at 219:6-13 (Mease, Strasburger).

105.    Some states require schools to report any sexting activities to their local law enforcement office.  See Streett's Proposed Findings ¶ 2, at 10 (citing N.J. Dep't of Educ., A Uniform State Memorandum of Agreement Between Education and Law Enforcement Officials at 52 (2015)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Exhibit E); Memorandum of Understanding, Between Reading Public Schools and Reading Police Department at 4 (undated)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Exhibit E); Memorandum of Understanding, Between Acton Boxborough Regional

School District and Acton Police Department at 4 (undated)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Exhibit E)).

106.    Schools may suspend the teens pending the outcome of such investigations, and the fact of the investigation may get out and cause embarrassment for the teen.  See Sept. Tr. at 186:9-18 (Strasburger).

107.    Only two states -- New Mexico and Maine -- completely decriminalize teenage sexting.  See Sept. Tr. at 178:7-10 (Strasburger); How the States Approach Teen Sexting at 1-4 (undated)(submitted to the Court at the September 10, 2018, evidentiary hearing as Defendant's Hearing Exhibit C).

108.    NCMEC operates "the congressionally-mandated reporting mechanism for crimes against children on the Internet," and is legally required to accept and forward all reports of child pornography "to the appropriate law-enforcement agency for investigation," but "does not determine whether photos are actual child pornography or a violation of any laws."  NCMEC Statement at 4.

109.    "NCMEC does not believe that a blanket policy of charging all youth with juvenile or criminal violations will remedy the problem of sexting."  NCMEC Statement at 2.

110.    In 2010, the media reported "that prosecutors in various parts of the country are using criminal investigations and prosecutions under state pornography laws in an attempt to control the growing practice of sexting," including some cases in which "girls . . . took or posted pictures of themselves."  Youth Practices at 7.

111.    Prosecutions of sexting teenagers included experimental sexting, between romantic partners.  See Typology at 10.

112.    Many sexting episodes brought to law enforcement's attention "appeared to be rather minor in nature, and were more rightly viewed as adolescent sexual experimentation than as criminal violations," such as a teenager self-producing an image that is not shared, teens engaging in legal sexual activity, images that do not meet the federal definition of child pornography, and images shared within a relationship.  <u>Typology</u> at 8.

113.    It appears that law enforcement's concerns with sexting "went beyond simple distinctions of whether or not the images constituted child pornography" and that, even if teenagers are aware of the potential legal implications of sexting, "the interpersonal utility of image sharing may seem worth the risk to them," meaning "the problem may be best handled as part of education and mentoring."  <u>Typology</u> at 9.

**6.    <u>Teenage Sexting and its Relation to Child Pornography.</u>**

114.    Approximately twenty-six percent of all internet pornography involves children, and approximately 5.4% of all child pornography on the internet is self-produced.  <u>See</u> <u>Societal Response</u> at 7, 19 (citing David Finkelhor & Richard Ormrod, <u>Child Pornography: Patterns from NIBRS</u> at 2, U.S. Dep't of Justice, Dec. 2004).

115.    Most victims of child pornography are teenagers.  <u>See</u> Societal Response at 7.

116.    One study found that in twenty-two percent of juvenile sexual abuse cases, the abuser used pornography prior to the attack to groom, legitimize, and demonstrate for the victim what to do."  <u>Societal Response</u> at 13-14 (citing Mimi Halper Silbert, "The Effects on Juveniles of Being Used for Pornography and Prostitution" at 215, 226, in <u>Pornography: Research Advances and Policy Considerations</u> (Dolf Zillman & Jennings Bryant eds., 1989)).  "When offenders use these images, whether self-produced or otherwise, the damage is the same."  <u>Societal Response</u> at 15.

117.     The market for child pornography does not distinguish between self-produced images and those that adults produce, as "'many offenders prefer [images of] children who are smiling and who appear to be enjoying'" their role in the images, which may be common to many teenager-produced sexts.  Societal Response at 16 (quoting Ethel Quayle, "The Impact of Viewing an Offending Behavior," in Child Sexual Abuse and the Internet: Tackling the New Frontier (Martin Calder eds., 2004)).

118.     Some teenagers use the internet to self-produce and sell child pornography to strangers via webcams and online payment services.  See Societal Response at 24.

## PROCEDURAL BACKGROUND

In December, 2015, a grand jury returned a Second Superseding Indictment,[12] charging Streett with two counts of traveling in interstate commerce from New Mexico to Illinois "for the purpose of engaging in any illicit sexual conduct" with a person under eighteen years of age -- Jane Doe 1 -- that "would be in violation of Chapter 109A of Title 18, United States Code, had the

---

[12]The Second Superseding Indictment is the controlling Indictment in this case.  The first Indictment, which the grand jury issued on October 2014, charges Streett with two counts of coercing or enticing a minor to engage in sexually explicit conduct, in violation of 18 U.S.C. § 2422(b).  See Indictment at 1-2, filed October 21, 2014 (Doc. 12).  The Indictment also charges Streett with two counts of transferring obscene matter to someone younger than sixteen years old, in violation of 18 U.S.C. § 1470.  See Indictment at 2 3.

In February 2015, a grand jury returned a Superseding Indictment, charging Streett with two counts of traveling in interstate commerce from New Mexico to Illinois "for the purpose of engaging in any illicit sexual conduct" with a person under eighteen years of age that "would be in violation of Chapter 109A of Title 18, United States Code, had the sexual act occurred," in violation of 18 U.S.C. § 2423(b).  Superseding Indictment at 1-2, filed February 25, 2015 (Doc. 22).  The Superseding Indictment charges Streett with three counts of attempted production of a visual depiction of a minor engaging in sexually explicit conduct, in violation of 18 U.S.C. §§ 2251(a), (e), and 2256.  See Superseding Indictment at 2-4.  The Superseding Indictment also charges Streett with two counts of transferring obscene materials to minors, in violation of 18 U.S.C. § 1470.  See Superseding Indictment at 4-5.

sexual act occurred," in violation of 18 U.S.C. § 2423(b). Second Superseding Indictment at 1-2, filed December 17, 2015 (Doc. 33). The Second Superseding Indictment charges Streett with five counts of coercion and attempted coercion of a minor "to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct," in violation of 18 U.S.C. §§ 2251(a), (e), and 2256. Second Superseding Indictment at 2-4.[13] The Second Superseding Indictment also charges Streett with one count of distributing visual depictions of minors engaged in sexually explicit conduct, in violation of 18 U.S.C. §§ 2252(a)(2), (b)(1), and 2256, see Second Superseding Indictment at 5, two counts of transferring obscene materials to minors, in violation of 18 U.S.C. § 1470, see Second Superseding Indictment at 5-6, and two counts of possessing child pornography, in violation of 18 U.S.C. §§ 2252A(a)(5)(B), (b)(2), and 2256, see Second Superseding Indictment at 6. Streett seeks to dismiss the Second Superseding Indictment's Counts 3 through 7, on the theory that § 2251 is unconstitutionally overbroad because teenage sexting is protected speech.

1. **The Motion.**

Streett moves to dismiss Counts 3 through 7 of the Second Superseding Indictment. See Motion at 1. Streett frames his motion around the general argument that "18 U.S.C. § 2251(a) is unconstitutionally overbroad in that it captures protected speech entirely unrelated to child pornography as that crime has been historically defined by the United States Supreme Court." Motion at 1. Streett then provides his definition of sexting: "self-produced nude images that a teenager typically produces with their cellular telephone and then transmits to a teenage peer,

---

[13]These counts -- Counts 3 through 7 -- each identify a different minor: John Doe, Jane Doe 4, Jane Doe 1, Jane Doe 2, and Jane Doe 3, respectively. See Second Superseding Indictment at 2-4.

typically a partner with whom the producer of the image is involved in a romantic relationship." Motion at 1.  See supra n.2.

Streett asserts that § 2251(a) is unconstitutionally overbroad, "because it criminalizes the protected speech of minors who photograph or film themselves in the nude free of adult coercion or adult influence."  Motion at 3.  Streett warns that, as drafted, § 2251(a) exposes to criminal liability any teenager who takes a nude photograph of themselves and sends that photograph to another teenager.  See Motion at 3.  "Oddly" Streett avers, § 2251(a) renders such a teenager both victim and perpetrator.  Motion at 3.  Streett develops this point by averring that a minor who takes a nude photograph of him- or herself has employed or used a minor, as § 2251(a) proscribes.  See Motion at 3.  Streett also argues that § 2551(a) lacks an affirmative defense "for minors who wish to record nude images of themselves and send them to a peer via a cellular telephone," which Streett characterizes as "[a]nother fatal defect."  Motion at 3.

Streett then summarizes the overbreadth doctrine.  See Motion at 3.  Streett posits that the overbreadth doctrine's crux is whether the law "imposes a 'direct restriction on protected First Amendment activity.'"  Motion at 3 (quoting Sec'y of State of Md. v. Munson Co., Inc., 467 U.S. 947, 968 (1984)).  Streett asserts also that, if a statute imposes such a direct restriction and also "risks chilling free speech," then the statute is void for overbreadth.  Motion at 3-4.  Streett also avers that the United States carries the burden to defend against an overbreadth challenge; that is, Streett argues that the United States must prove that § 2551(a) is not overbroad.  See Motion at 4.  Streett contends that § 2551(a) must satisfy strict scrutiny, but, alternatively, must survive intermediate scrutiny "at a minimum."  Motion at 4 (citing Heideman v. South Salt Lake City, 348 F.3d 1182, 1197 (10th Cir. 2003)).

Streett next addresses his standing to mount an overbreadth challenge.  See Motion at 4.

Streett cites Broadrick v. Oklahoma, 413 U.S. 601 (1973), for the proposition that "[f]acial challenges to statutes under the doctrine of overbreadth have long allowed for third-party standing." Motion at 4. Streett argues that overbreadth's allowance for third-party standing is meant to expedite challenges to and adjudications of statutes that chill protected speech. See Motion at 4. Streett avers that overbroad statutes deter others from engaging in constitutionally protected speech, reducing the likelihood of as-applied challenges and judicial review. See Motion at 4 (citing Sec'y of State of Md. v. Munson Co., Inc., 467 U.S. at 956-57). Last, Streett contends that a defendant whose actions "indisputably fall within" the statute's reach have standing to challenge the law, provided he or she can prove that the statute "'substantially abridges the First Amendment rights of parties not before the court.'" Motion at 5 (quoting Schamburg v. Citizens for a Better Environment, 444 U.S. 620, 634 (1980)).

Streett next develops his argument that "[t]eenagers have a First Amendment right to engage in sexting with their peers." Motion at 5. Streett avers that federal caselaw supports this contention. See Motion at 5. Streett cites Miller v. Mitchell, 598 F.3d 139 (3d Cir. 2010), which Streett characterizes as a "leading" authority. Motion at 5. Streett concedes that Miller v. Mitchell did not hold that the First Amendment protects teenage sexting, but asserts that the United States Court of Appeals for the Third Circuit there held that "compelling a minor to write an essay about why it was 'wrong' to appear in a semi-nude photograph found on a cell phone violated her First Amendment right." Motion at 5 (quoting Miller v. Mitchell, 598 F.3d at 152. Streett does not describe the import of Miller v. Mitchell's reasoning to his case.

Streett then cites several law review articles for the proposition that "[a]cademics have also indicated that teenage sexting should be considered constitutionally-protected speech." Motion at 6. A former Assistant United States Attorney wrote one of those articles, and she distinguished

sexting from child pornography, which, as the Supreme Court of the United States of America

noted, is unprotected "only because there is harm to a child at the moment of production." Youth

Practices at 3 (citing Ashcrof v. Free Speech Coalition, 535 U.S. 234, 244 (2002)("Free Speech

Coalition"). Streett argues that this concern does not apply to voluntarily self-produced nude

photographs. See Motion at 6. Streett also cites Brown v. Entertainment Merchants Ass., 564

U.S. 786, 793 (2011)(Scalia, J.), see Motion at 6, which involved a California ban on the sale of

violent video games to minors, and in which the Supreme Court held that video games qualify for

First Amendment protection, that new categories of unprotected speech may not be created, and

that the ban was void as both over- and under-inclusive relative to California's proffered legislative

purpose, see Brown v. Entertainment Merchants Ass'n., 564 U.S. at 805. Streett argues that,

because the Supreme Court "has limited the scope of child pornography laws to 'narrow and well-

defined' images of children being abused by adults, sexting between teenage peers is entitled to

First Amendment protection."[14] Motion at 6. Streett also avers that, because § 2251(a) lacks an

---

[14]Streett does not provide citation for his "narrow and well-defined quotation." Motion at 6. The Court observes, however, that this quote is inapposite as Streett uses it. The phrase originated in Erzoznik v. City of Jacksonville, 422 U.S. 205 (1975)(Powell, J.), which involved a municipal ordinance that prohibited "showing films containing nudity by a drive-in movie theater when its screen is visible from a public or space." 422 U.S. at 206. The City of Jacksonville's stated legislative rationale was to protect children "from this type of visual influence." 422 U.S. at 212. Writing for the majority, Justice Powell acknowledged that governments "can adopt more stringent controls on communicative materials available to youths than on those available to adults." 422 U.S. at 212. "Nevertheless," Justice Powell wrote, "minors are entitled to a significant measure of First Amendment protection, . . . and only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to them." 422 U.S. at 212-13. The Supreme Court invalidated the ordinance on its face as overbroad and not susceptible to a limiting construction. See 422 U.S. at 216. The Supreme Court later quoted this phrase in Brown v. Entertainment Merchants Ass'n, to reject a ban on the sale of violent video games to minors and note that states "lack free-floating power to restrict the ideas to which children may be exposed." 564 U.S. at 794 (Scalia, J.). Streett's quoted phrase, accordingly, does not stand for the proposition that the Supreme Court "has limited the scope of child pornography laws to 'narrow and well-defined' images of children being abused by adults[.]" Motion at 6. The phrase

"affirmative defense for teenage sexters, the law cannot survive an overbreadth attack under the First Amendment." Motion at 7.

Streett describes that the NCMEC "has been following the sexting issue closely," and that, "[t]ellingly, the National Center [for Missing and Exploited Children] does not attempt to describe the voluntary production and publication of sexual images by teenagers as illegal." Motion at 7 (citing NCMEC Statement at 2). Streett also says that the NCMEC does not view a blanket prohibition on sexting as an effective legislative remedy. See Motion at 7.

Streett argues that Free Speech Coalition should guide the Court's analysis. See Motion at 7. Streett notes that the Supreme Court in Free Speech Coalition held that virtual child pornography and pornography depicting young-looking adults "'records no crime and creates no victims by its production.'" Motion at 7 (quoting Free Speech Coalition, 535 U.S. at 250). Streett argues that the Supreme Court in Free Speech Coalition excluded child pornography from First Amendment protection on the basis of "'how it was made, not on what it communicated.'" Motion at 7 (quoting Free Speech Coalition, 535 U.S. at 251). Streett also avers that the Supreme Court in Free Speech Coalition rejected the United States' argument that banning virtual child pornography is necessary because, although its production does not involve child abuse, it could lead to child abuse. See Motion at 7-8 (citing Free Speech Coalition, 535 U.S. at 251). Streett contends that, like virtual child pornography, "teenage sexting is not related in any way to the abuse" inherent to child pornography. Motion at 8. Accordingly, Streett argues that § 2251(a) is overbroad. See Motion at 8.

_____

supports, however, the proposition that "only in narrow and well-defined circumstances may government bar public dissemination of protected materials" to minors. Brown v. Entertainment Merchants Ass'n., 564 U.S. at 793.

Streett next develops his argument that § 2251(a)'s overbreadth is substantial. See Motion at 8. Streett acknowledges that, to prevail on an overbreadth challenge, he must "show a substantial overlap of the law with protected speech." Motion at 8 (citing United States v. Williams, 553 U.S. 285, 292 (2008)("Williams")). Streett also acknowledges that declaring a statute overbroad is "'strong medicine' which should not be 'casually employed.'" Motion at 8 (quoting Los Angeles Police Dep't. v. United Reporting Publ'g Corp., 528 U.S. 32, 39 (1999)). Streett contends, however, that overbreadth in the child pornography context applies where a statute touches on speech that is not itself the record of child abuse. See Motion at 8 (citing Free Speech Coalition, 535 U.S. at 250-51). Streett further argues that the First Amendment protects speech which is neither obscene nor the product of child abuse. See Motion at 8 (citing Free Speech Coalition, 535 U.S. at 251).

Streett says that § 2251(a) is substantially overbroad. Streett says that "the Court should be aware that cell phone use by teenagers has skyrocketed in recent years." Motion at 9. Because many cellular telephones are equipped with cameras, Streett contends, "nearly every teenage[r] has at their fingertips the technology to produce and transmit nude photographs of themselves." Motion at 9. Citing an American Academy of Pediatrics study, Streett asserts that, as teenagers get older, their likelihood of engaging in sexting increases, such that fifteen percent of sixteen-year-olds "had appeared in, created, or received such images, as had 18% of seventeen-year olds." Motion at 9 (citing Kimberly J. Mitchell et al., Prevalence and Characteristics of Youth Sexting: A National Study, 129 Pediatrics 1, 7 (2011)). Streett further contends that teenage sexting occurs primarily between romantic partners, such that "the motivation for sexting does not remotely fall under the child abuse rationale that [New York v. Ferber, 458 U.S. 747 (1982)("Ferber")] used to justify criminalizing such images." Motion at 9 (citing NCMEC Statement at 5). Accordingly,

Streett argues that § 2251(a) is "unconstitutionally overbroad and Counts 3 through 7 of the underlying Indictment must be dismissed." Motion at 9-10.

### 2. **The Response.**

The United States responds. See United States' Response in Opposition to Defendant's Motion to Dismiss Counts 3 Through 7 of the Second Superseding Indictment at 1, filed April 2, 2018 (Doc. 114)("Response"). The United States argues that the Court should deny the Motion, "because the First Amendment does not protect an adult's solicitation of minors to produce sexually explicit conduct." Response at 1. "As an initial matter," the United States notes,

> to prevail on a facial attack, a defendant "must demonstrate that the challenged law either could never be applied in a valid manner or that even though it may be validly applied to plaintiff and others, it nevertheless is so broad that it may inhibit the constitutionally protected speech of third parties."

Response at 2 (quoting New York State Club Ass'n, Inc. v. City of New York, 487 U.S. 1, 11 (1988)). The United States further asserts that a successful overbreadth challenge requires proof that the statute "'significantly compromise recognized First Amendment protections of parties not before the Court.'" Response at 3 (quoting Members of City Council of Los Angeles v. Taxpayers for Vincent, 466 U.S. 789, 801 (1984)). The United States also argues that overbreadth challenges are disfavored as "'strong medicine'" used "'only as a last resort.'" Response at 3 (quoting Broadrick v. Oklahoma, 413 U.S. 601, 613 (1973)). The United States notes that the Supreme Court favors limiting constructions, where feasible, to save statutes from overbreadth challenges. See Response at 3 (citing Ferber, 458 U.S. at 769 n.24.

Turning to Streett's argument, the United States avers that the First Amendment does not protect child pornography and that § 2251(a) "does not prohibit a substantial amount of free speech." Response at 4. The United States also contends, as a policy argument, that Streett's

argument "would embolden online predators everywhere and defeat the clear intent of Congress to protect children from sexual exploitation." Response at 4. The United States describes Streett's argument as legally unsupported and argues that the United States Court of Appeals for the Tenth Circuit has rejected First Amendment challenges to § 2251.[15] See Response at 4. The United States cites to United States v. Reedy, which the United States argues rejects an overbreadth

---

[15]In a footnote, the United States asserts that the "Tenth Circuit has also examined the constitutionality of 18 U.S.C. § 2251(a) in an 'as applied' facial challenge." Response at 4 n.1 (quoting United States v. Wolf, 890 F.2d 241, 242 (10th Cir. 1989)). The Court does not read United States v. Wolf as involving a facial challenge. In that case, the defendant contended § 2251 was unconstitutional "as applied" to his prosecution, arguing that the photograph that he took of a partially-nude, sleeping five-year-old child was "not within the contemplation of the statute because the sleeping child is not exuding sexual suggestiveness." United States v. Wolf, 890 F.2d at 242-43. Without such "lascivious exhibition," the defendant argued, the First Amendment protected the photograph. United States v. Wolf, 890 F.2d at 243. The defendant argued that First Amendment requires that the trial court interpret § 2251 to require the photographed minor to appear to be sexually suggestive or "willing[] to engage in sexual activity." United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986)(Thompson, J.). See United States v. Wolf, 890 F.2d at 242-43. Interpreting § 2251 to not require the photographer to "portray the victimized child as a temptress," the Tenth Circuit held that § 2241(a) "is constitutional as applied to count number one in the indictment against" the defendant. United States v. Wolf, 890 F.2d at 244, 247.

As the Court has previously elaborated, a facial challenge is an assertion that a statute violates the Constitution "'in all, or virtually all, of its applications.'" Martinez v. City of Rio Rancho, 197 F. Supp. 3d 1294, 1309 (D.N.M. 2016)(Browning, J.)(quoting United States v. Supreme Court of New Mexico, 839 F.3d 888, 907 (10th Cir. 2016). In contrast, an as-applied challenge may concede that the statute is generally constitutional in most of its applications, but asserts that the statute is unconstitutional under the particular case's circumstances. See Martinez v. Rio Rancho, 197 F. Supp. 3d at 1309. Although "the distinction between facial and as-applied challenges is not so well defined that it has some automatic effect," Citizens United v. Fed. Election Comm'n, 558 U.S. 310, 331 (2010), the defendant in United States v. Wolf did "not seek to strike [§ 2251] in all its applications, but only to the extent it covers" photographs of nude minors in non-sexually-suggestive poses, John Doe No. 1 v. Reed, 561 U.S. 186, 194 (2010). See United States v. Wolf, 890 F.2d at 747 (holding that "the term 'lascivious exhibition of the genitals or pubic area of any person,' as contained in 18 U.S.C. § 2256(2)(E), constitutionally contemplates the depiction of the victim in the instant photograph"). United States v. Wolf thus involved an as-applied challenge to § 2251, and stands for the proposition that § 2256(2)(E)'s definition of "lasciviousness" refers not to "a characteristic of the child photographed but of the exhibition that the photographer sets up for an audience that consists of himself or likeminded individuals." 890 F.2d at 247.

challenge to § 2251 "premised on the argument that the statute captured artistic or scientific works." Response at 4 (citing United States v. Reedy, 845 F.2d 239, 24041 (10th Cir. 1988)). The United States also argues that the iteration of § 2251 that the Tenth Circuit reviewed in United States v. Reedy is "identical to the language of the version of the statute currently at issue." Response at 5 n.2 (comparing § 2251(a) as cited in United States v. Reedy, 856 F.2d at 420, with 18 U.S.C. § 2251(a)'s current iteration).

Turning to caselaw from other Courts of Appeals, the United States argues that the clear trend is towards denying "overbreadth challenges to § 2251[] in the context of the statute's lack of a mistake-of-age defense[.]" Response at 5 (citing United States v. Fletcher, 634 F.3d 395, 403 (7th Cir. 2011); United States v. Humphrey, 608 F.3d 955, 962 (6th Cir. 2010); United States v. Malloy, 568 F.3d 166, 174 (4th Cir. 2009); United States v. Deverso, 518 F.3d 1250 (11th Cir. 2008)). The United States avers that these cases' "reasoning applies with equal force here." Response at 5. These cases, the United States argues, support its proposition that the Congress may protect minors from "'self-destructive decisions reflecting the youthful poor judgment that makes them, in the eyes of the law, beneath the age of consent.'" Response at 5-6 (quoting United States v. Malloy, 568 F.3d at 175)(emphasis omitted). The United States avers that "no court has held that self-produced photos of child pornography are protected by the First Amendment," Response at 7, and that Congress has a legitimate interest in protecting children from that to which they are legally incapable of consenting, see Response at 5-6. The United States then suggests that the Court balance Congress' interest "in protecting children from sexual exploitation by adults" against "the production of any protected conduct." Response at 6-7. Accordingly, the United States argues, § 2251(a) is not substantially overbroad. See Response at 7.

The United States then posits that "it is not clear that § 2251 would encompass a child self-

producing [nude] images." Response at 7. The United States asserts that § 2251's language "implies two actors, a person acting upon another person (*i.e.*, the minor) . . . and the statute should be so construed to avoid constitutional problems." Response at 7. The United States does not, however, specifically offer such a limiting construction. See Reply at 7.

Although Streett does not argue about adults' rights, the United States asserts that adults do not have a First Amendment right to solicit minors to produce nude photographs of themselves. See Response at 7 (citing United States v. Dhingra, 371 F.3d 557, 563 (9th Cir. 2004)). The United States cites Williams, 554 U.S. 285 (2008). See Response at 7. The United States describes that, in Williams, the "Supreme Court rejected an overbreadth challenge to another child pornography statute, § 2252A(a)(3)(B), which[] 'prohibits offers to provide and requests to obtain child pornography.'" Response at 7 (quoting Williams, 553 U.S. at 293). The United States contends that §§ 2251(a) and 2252A(a)(3)(B) "largely contain[] the[] same features" such that Williams applies to Streett's argument. Response at 7. The Supreme Court in Williams, the United States avers, held that "'offers to provide or requests to obtain child pornography are categorically excluded from the First Amendment.'" Response at 8 (quoting Williams, 553 U.S. at 299). "If offers to exchange child pornography are excluded from the First Amendment," the United States asserts, "certainly inducement or coercion to create child pornography should be as well." Response at 8 (emphasis omitted).

The United States also analogizes to 18 U.S.C. § 2422, which the United States describes as prohibiting the use of the internet to persuade or to coerce a minor to engage in sexual activity. See Response at 9. The United States avers that courts "have repeatedly held that § 2422 does not violate the First Amendment, even though violations of § 2422 can occur without the involvement of a real child." Response at 9 (citing United States v. Thomas, 410 F.3d 1235, 1243-44 (10th Cir.

2005); United States v. Gagliardi, 506 F.3d 140, 148 (2d Cir. 2007)). "Such reasoning applies with equal force here," the United States argues, given the statutes' similarity. Response at 9. The United States notes that, in United States v. Gagliardi, the United States Court of Appeals for the Second Circuit described that § 2422 "is not overbroad because 'it punishes the *act* of enticing or attempting to entice a minor when it is knowingly done; it does not implicate speech.'" Response at 9 (quoting United States v. Gagliardi, 506 F.3d at 148)(emphasis in United States v. Gagliardi and Response). The United States further asserts that, to the extent that § 2422 prohibits speech, such speech is not constitutionally protected. See Response at 9 (citing United States v. Hite, 896 F. Supp. 2d 17, 22 (D.D.C. 2012)(Kollar-Kotelly, J.)). Because § 2251 uses language similar to § 2422, the United States argues, the First Amendment does not protect Streett's speech in this case. See Response at 9-10.

> **3.    The Reply.**

Streett replies. See Reply to Government's Response to Defendant's Motion to Dismiss Counts 3 Through 7 of Second Superseding Indictment at 1, filed September 10, 2018 (Doc. 156)("Reply"). Streett contends that the United States misconstrues his argument and focuses on his "alleged acts, and not on the teen sexting behavior at issue." Reply at 1. Streett contends that the United States "broadly labels teen sexting child pornography," and that the United States "is blind to the constitutionally-protected sexting behavior occurring more and more among the population the statute purports to protect." Reply at 2.

Streett acknowledges the Supreme Court's language in Sabri v. United States, 541 U.S. 600 (2004), that overbreadth challenges are disfavored. See Reply at 2. Streett argues, however, that the Supreme Court in Sabri v. United States also said that overbreadth "successes are more likely when grounded 'on the strength of specific reasons weighty enough to overcome our well-founded

reticence.'"  Reply at 2 (quoting <u>Sabri v. United States</u>, 541 U.S. at 609-10).  "Restrictions on speech[] like that attempted here," Streett argues, "are among those successful settings."  Reply at 2 (citing <u>Broadrick v. Oklahoma</u>, 413 U.S. 601 (1973)).

Streett then argues that sexting is not child pornography, "because it does not cause the harm the Supreme Court has used to anchor any burden on speech otherwise protected by the First Amendment."  Reply at 2.  "Simply stated," Streett contends, "teen sexting" is not child pornography, "because it does not involve the sexual abuse of a child."  Reply at 4.  Streett contends that the Supreme Court has categorically excluded child pornography from First Amendment protection, because of how child pornography is created and not because of "'what it communicated.'"  Reply at 4 (quoting <u>Free Speech Coalition</u>, 535 U.S. at 250-51).  Streett argues that the United States concedes this point when it writes, in the Response, that "sexting 'often involves images that do not meet the definition of child pornography.'"  Reply at 4 (quoting Response at 6).  "The Government's statement [is] correct," Streett contends, "but for the wrong reason."  Reply at 4.  Streett contends that the United States' error derives from its conflation of "sexually explicit" and "child pornography," which Streett argues are not synonymous in light of <u>Ferber</u>.  Reply at 4.

Turning to his overbreadth argument, Streett first cites two state appellate decisions "finding statutes which restricted First Amendment rights with respect to visual depictions of minors to be unconstitutionally overbroad."  Reply at 3 n.3 (citing <u>State v. Bonner</u>, 138 Idaho 254, 61 P.3d 611 (Ct. App. 2002); <u>State v. Zidel</u>, 156 N.H. 684, 940 A.2d 255 (2008)).  Streett contends that teenage sexting "is the kind of universe of speech <u>Ashcroft</u> describes."  Reply at 3.  Streett asserts that the United States "ignores" <u>Free Speech Coalition</u>, which Streett asserts supports his contention that teenage sexting is constitutionally protected.  Reply at 3.  Streett also argues that §

2251 discriminates on the basis of content, but does not describe how § 2251 does this or what content is being discriminated.  See Reply at 3.  Streett argues that such a statute must be "narrowly tailored to promote a compelling government interest."  Reply at 3 (citing United States v. Playboy Entertainment Grp., 529 U.S. 803, 816-17 (2000)).

Next, Streett distinguishes the United States' cited cases.  See Reply at 4.  Streett first argues against United States v. Reedy's applicability, arguing that technological changes and the recent ubiquity of cellular telephones with built-in cameras render that case obsolete.  See Reply at 4 (citing United States v. Reedy, 846 F.2d at 240).  "It is reasonable to believe that the Tenth Circuit, with the added wisdom of three decades of technology, might now feel otherwise."  Reply at 5.  Streett also criticizes the United States' reliance on cases that "clearly" and "unquestionably" involve child pornography.  Reply at 5.  Streett contends that United States v. Fletcher, 634 F.3d 395, 403 (7th Cir. 2011); United States v. Humphrey, 608 F.3d 955, 962 (6th Cir. 2010); United States v. Malloy, 568 F.3d 166, 174 (4th Cir. 2009); and United States v. Deverso, 518 F.3d 1250 (11th Cir. 2008), all involved "child pornography showing adults engaged in sexual activity with minors and not just the kind of sexually explicit, self-produced images common to sexting."  Reply at 5.  Streett asserts that "those cases spoke specifically of sexual acts and not the kind of sexting conduct that Mr. Streett maintains makes the statute here overbroad."  Reply at 6.  Streett returns to his policy argument that, in an "enlightened society, there must be a distinction between protecting a minor from unlawful sexual acts and the socially accepted act of sexting among peers."  Reply at 6.  Streett contends that Ferber allows Congress to regulate speech to protect minors "from unlawful sexual acts," but does not allow Congress to regulate speech to prohibit "the socially accepted act of sexting among peers."  Reply at 6.  Streett thus posits that teenage sexting involves no harm to minors and asserts that the Supreme Court categorically excluded child pornography

because its very production amounts to sexual child abuse.  See Reply at 5-6.  Because teenage sexting does not involve that which makes child pornography constitutionally unprotected, Streett avers, teenage sexting must be afforded First Amendment protection.  See Reply at 5-6.

Streett then argues that, if teenage sexting is constitutionally protected speech, then § 2251 chills such protected speech, leaving "millions of teenagers subject to its reach[.]"  Reply at 6. Streett cites a law review article that gathers data from various polls, and concludes that between twenty and twenty-five percent of teenagers have engaged in sexting.  See Reply at 6-7 (quoting Melissa Hamilton, The Child Pornography Crusade and its Net-Widening Effect, 33 Cardozo L. Rev. 1679, 1720-21 (2012)).  These data, Street asserts, demonstrate "the enormity [sic] [of] the speech involved."  Reply at 7.  Streett mistrusts the United States' suggestion of a limiting construction, averring that "recent [United States Department of Justice] about faces in other areas, from cannabis enforcement to the filing of 21 U.S.C. § 851 enhanced penalties demonstrate that any policy the Government employs for the enforcement of criminal laws is never set in stone." Reply at 8.  Streett also avers that § 2251(a) is not susceptible to a limiting construction that would save it from his overbreadth challenge.  See Reply at 8.  According to Streett, § 2251(a) "'requires rewriting, not just reinterpretation.'"  Reply at 8 (quoting United States v. Stevens, 559 U.S. at 481).

Streett then cites two state cases to support his contention that "[s]exting draws the attention of state prosecutors because it often falls within a state's definition of child pornography." Reply at 8 (citing A.H. v. State, 949 So. 2d 234 (Fla. Dis. Ct. App. 2007); State v. Canal, 773 N.W.2d 528 (Iowa 2009)).  Streett asserts that, in response to sexting's increased prevalence and potential prosecution under child pornography laws, "there has been an outpouring of scholarly articles that distinguish between teenage sexting [and child pornography] because of lack of

concrete, direct harm." Reply at 9 (citing John Humbach, 'Sexting' and the First Amendment, 37 Hasting Const. L. Q. 433 (2010)). Streett contends that sexting prosecution may be underreported because "sexting teens experienced threats of prosecution that resulted in alternative disposition that may not have warranted or allowed an appeal." Reply at 9. Streett cites two law review articles discussing instances of teenage sexters facing prosecution. See Reply at 9 (citing Christina Stripp, Romeo and Juliet: Tragedy in the Information Age, 44 Rutgers L. Rev. 73, 82-83 (2016); Joann Sweeney, Do Sexting Prosecutions Violate Teenagers' Constitutional Rights?, 48 San Diego L. Rev. 951, 957 (2011)). Streett contends that few states have enacted statutes differentiating sexting from child pornography, resulting in "[p]otential teen prosecution for sexting[.]" Reply at 10 (citing Rayeed Ibtesam, On Teenage Sexting and the Law, 37 Hamline J. Pub. L. & Pol'y 246, 255 (2017)).

Streett avers that federal courts have not "been immune from teen sexting cases." Reply at 10. Streett points to three federal district court cases. See Reply at 10-11. First, Streett cites S.N.B. v. Pearland Indep. Sch. Dist., 120 F. Supp. 2d 620 (S.D. Tex. 2014)(Costa, J.). See Reply at 10. In S.N.B. v. Pearland Indep. Sch. Dist., the Honorable Gregg Costa, then-United States District Judge for the Southern District of Texas, and now United States Circuit Judge for the United States Court of Appeals for the Fifth Circuit, dismissed a § 1983 lawsuit that alleged that a school's prohibition of obscene text messages violated students' rights under the First, Fifth, and Fourteen Amendments to the Constitutional of the United States of America. See 120 F. Supp. 3d at 621-25. Judge Costa opined that, although the First Amendment protects photographs that communicate ideas, no such protection is afforded to sexting, and held that school officials did not violate a student's clearly established First Amendment rights by punishing her for a nude photography. See S.N.B. v. Pearland Indep. Sch. Dist. 120 F. Supp. 3d at 635-637. Street, cites

S.N.B. v. Pearland Indep. Sch. Dist., however, for its collection of instances in which "'[y]oung

adults'" have been prosecuted for sexting.  Reply at 10 (quoting S.N.B. v. Pearland Indep. Sch.

Dist., 120 F. Supp. 3d at 635)  Streett then cites T.V. ex rel. B.V. v. Smith-Green City Sch. Corp.,

807 F. Supp. 2d 767 (N.D. Ind. 2011)(Simon, J.).  See Reply at 11.  In that case, the Honorable

Philip Simon, United States District Judge for the United States District Court for the Northern

District of Indiana, narrowly concluded that sexually suggestive image of minors were

constitutionally protected.  See T.V. ex rel. B.V. v. Smith-Green City Sch. Corp., 807 F. Supp. at

786.  The images did not amount to child pornography under the state law, and "were intended to

be humorous to the participants and to those who would later view the images," such that the

photographs communicated a message and amounted to protected speech.  T.V. ex rel. B.V. v.

Smith-Green City Sch. Corp., 807 F. Supp. 2d at 786-87.  Streett cites T.V. ex rel. B.V. v. Smith-

Green City Sch. Corp., and summarizes that a "second federal court was forced to protect two high

school students' First Amendment rights after their school punished them for taking provocative

photos with sexual themes and posting them on the internet while away from school."  Reply at

11 (citing T.V. ex rel. B.V. v. Smith-Green City Sch. Corp., 807 F. Supp. 2d at 786).  Streett also

cites Miller v. Skumanick, 605 F. Supp. 2d 634 (M.D. Pa. 2009)(Munley, J.).  See Reply at 11. In

that case, the Honorable James Munley, United States District Judge for the United States District

Court for the Middle District of Pennsylvania, issued a temporary restraining order in a § 1983

case enjoining a state prosecutor from pursuing charges against minors for sexting, because the

prosecutor sought to punish the minors by having them write an essay why sexting is wrong.  See

Miller v. Skumanick, 605 F. Supp. 2d at 637-39.

　　　　Streett next argues that Congress intended that § 2251 apply to minors.  See Reply at 11.

Streett contends that § 2251's legislative history affords no basis on which to conclude that

Congress sought to limit § 2251's reach to adults.  See Reply at 11 (citing Clark v. Roccanova, 772 F. Supp. 2d 844, 847 (E.D. Ky. 2011)(Coffman, J.)).  Streett further asserts that § 2251's use of the term "person," rather than "adult," supports this point.  Reply at 11 (citing 18 U.S.C. §§ 2251, 2252).  The Court construes this point as supporting Streett's argument that § 2251 is not susceptible to a limiting construction.  See Reply at 10-11.  Streett nonetheless avers that Congress did not "anticipate[]" that § 2251 "allows for victimization of a minor[.]"  Reply at 14.

Returning to his overbreadth argument, Streett contends that the United States "must focus on the image's requester, because it cannot dispute the widespread sexting phenomena that makes the statute overbroad." Reply at 12.  Streett asserts that the United States "ignores the quandary of the dual victim/offender minor who self-produces images."  Reply at 12.  Similarly, Streett seeks to distinguish Williams and Ferber, asserting that, in those cases "[n]o realistic danger of prosecution existed for those otherwise engaged in lawful activity."  Reply at 14 (citing Williams, 553 U.S. 285 (2008); Ferber, 458 U.S. 747 (1982)).

Finally, Streett advises against the Court getting "distract[ed]" by "emotional argument," and instead urges the Court to focus on his "assertion of the third party fundamental constitutional rights at stake for the millions of third-party teen sexters who are not before the Court and for whom Mr. Streett bears the burden of proceedings."  Reply at 15.  "The title of section 2251 itself," Streett notes, "is 'Sexual Exploitation of Children.'"  Reply at 15 (citing 18 U.S.C. § 2251).  Streett contends that sexting does not involve exploitation, that teenage sexting is constitutionally protected speech, and, thus, that the Court should not hesitate to hold §2251 substantially overbroad.  See Reply at 15-16.

### 4.       The First Hearing.

The Court held its first hearing on the Motion on June 25, 2018.  See Transcript of Hearing

at 1:1-3 (taken June 25, 2018)(Court), filed July 3, 2018 (Doc. 136)("Tr.").  The Court first addressed the parties' wish to have the Court decide the Motion on the briefing, without oral argument.  See Tr. at 3:10-13 (Court).  Having reviewed the caselaw on overbreadth and facial challenges, the Court observed that Courts of Appeals typically appreciate receiving a "robust record," so the Court was concerned that the parties were "contemplating this going up without any sort of record that this is unconstitutional, [with] no evidence at all."  Tr. at 3:15-23 (Court). Streett responded that he "provided the Court with articles and statistics" that support his overbreadth argument, and that this evidence is "enough . . . for the Court to find that the statute is overbroad because it does lead to an overreaching for overprotected conduct."  Tr. at 4:15-19 (Zimmerman). The Court indicated that it was troubled by the prospect of basing its factual findings entirely on law review articles and publications.  See Tr. at 5:2-7 (Court). The Court observed that, in analogous situations, parties had offered expert testimony aiding the Court's factfinding.  See Tr. at 5:9-13 (Court).  Streett responded that, were he to proffer an expert, he or she would provide the Court with "as much material as possible."  Tr. at 5:19.  See id. at 5:25-6:1 (Zimmerman).  Street offered to "seek an expert for the Court," but noted that, because he prioritized timeliness and efficiency, he "did not have enough time to get particular individuals and expertise."  Tr. at 6:10-15 (Zimmerman).

The United States indicated that it had viewed the Motion "as a purely legal issue that the Court could decide on the briefing," but had changed its opinion after hearing the Court's concerns. Tr. at 7:10-15 (Mease).  The United States accordingly indicated that, if Streett wished to proffer an expert, the United States would "not be opposed to a continuance to allow for a more thorough hearing." Tr. at 8:1-4 (Mease).  The United States contended, however, that the statistics and data which Streett provides in the Motion "are in some ways irrelevant," because it "doesn't really

matter how many teens possess a cell phone, how many teens are engaged in sexting behavior, because that doesn't necessarily speak to the statutory scheme at issue." Tr. at 8:19-23 (Mease). More important, the United States argued, is the extent to which such behavior is "coercive in nature." Tr. at 8:23-25 (Mease). The United States further asserted that, because "no court has ever held that this is . . . protected First Amendment speech," Streett's statistics are irrelevant. Tr. at 9:2-4 (Mease). The United States nonetheless averred that Streett's cited statistics show that "a fairly small number of teens . . . admit to engaging in this behavior" relative to the "large number of teens that have access to cell phones." Tr. at 13:4-8 (Mease). The United States accordingly argued that "the very, very small amount of arguably protected activity that would be chilled by . . . finding that the statute is overbroad just pales in comparison to the legitimate . . . sweep of the statute as a whole." Tr. at 9:9-13 (Mease).·

The Court then asked the United States whether it would be comfortable with the Court basing its findings of fact on Streett's cited sources. See Tr. at 10:6-9 (Court). The United States indicated that it would stipulate to the Court's use of Street's appended articles, provided that the United States could file a surreply "to address more specifically some of the articles." Tr. at 10:10-13 (Mease). Streett responded, however, that he would like to "bring in an expert who might be able to synthesize these materials for the Court[.]" Tr. at 11:12-15 (Zimmerman).

Street averred that the United States must present more than a parens patriae interest to withstand strict scrutiny, the constitutional standard that Streett avers applies to § 2251(a). See Tr. at 19:4-17 (Zimmerman). Applying § 2251(a) to teenage sexting, Streett argued, is contrary to Congressional intent, as "Congress would have had no idea at this point that such behavior would be ongoing, given the advanced levels of technology since the statute first came into existence." Tr. at 18:14-18 (Zimmerman). Streett then turned to state caselaw and argued that state statutes

analogous to § 2251(a) are "unconstitutionally vague, if not overbroad," and that "children who are sexting would have no idea, based on the state statute, what the statute covered[.]" Tr. at 19:23-20:2 (Zimmerman). Streett contended that, even if such behavior is not prosecuted frequently, "the administrative sanctions can be so harmful to a young person based on that sexting behavior, there have been instances of suicide [and] such embarrassment that children would not be able to go to school." Tr. at 20:5-11 (Zimmerman).

As to teenage sexting's constitutional dimensions, the United States conceded that, possibly, images shared between two romantically involved seventeen-year-olds "may be protected," but the United States contended that, "the day that that child turns [eighteen], it is no longer protected." Tr. at 13:18-14:1 (Mease). Instead, in such a scenario, the image "becomes . . . child pornography" when the eighteen-year-old views the image. Tr. at 14:1-4 (Mease). The United States asserted that this "example reveals . . . that the image is child pornography; no matter how it's produced, it's child pornography, as long as it meets the federal definition that it's sexually explicit conduct." Tr. at 14:2-8 (Mease). Were the Court to conclude that teenagers have some constitutional right to sext, the United States argued, a "slippery slope" would result, such that an "image is protected one day and not the next." Tr. at 14:9-13 (Mease). Finally, the United States hypothesized that a small percentage of the photographs that Streett contends are constitutionally protected "are just . . . explicit but would not meet the federal definition" of child pornography, Tr. at 15:18-20 (Mease), such that there is "not a broad category of third parties that [is] having [its] conduct chilled by the statute," Tr. at 16:1-3 (Mease).

The Court pointed to Ferber, and asked the United States whether teenage sexting involves the kind of harm inherent to child pornography, for which the Supreme Court excluded child pornography from First Amendment protection. See Tr. at 16:7-10 (Court). The

Court observed that, at times, the United States appears to argue that § 2251 applies to sexting between teenagers and, at other times, that § 2251 is inapplicable to such behavior.  See Tr. at 17:1-5 (Court). The United States deferred its response to the Court's question to its surreply.  See Tr. at 17:14-19 (Mease).  The Court pressed the United States on this point, however, and the United States opined that § 2251 "does apply" to sexting between teenagers.  Tr. at 17:24-25 (Mease).  See id. at 17:20-22 (Court).

The Court informed the parties that it had been studying the caselaw and noted that this issue "does not fit squarely with the [New York v.] Ferber exception," leaving the Court with two options. Tr. at 21:12-19 (Court).  First, the Court could hold that teenage sexting is constitutionally protected speech.  See Tr. at 21:21-23 (Court).  Second, the Court could acknowledge that "teenage sexting doesn't squarely fit within Ferber, but then lay out why the Ferber exception or some version of it should be expanded or created to cover this conduct."  Tr. at 21:24-22:3 (Court).  The Court then advised the parties to inform the Court should they decide to present further evidence in a later hearing.  See Tr. at 22:11-16 (Court).

### 5. The Sur-Reply.

The United States filed its Surreply to Defendant's Reply Regarding Motion to Dismiss Counts 3 Through 7 of the Second Superseding Indictment on July 9, 2018 (Doc. 13 7)("Surreply").  The United States says it filed the Surreply "to clarify the United States' position and more thoroughly explore the significant flaws in Defendant's legal arguments."  Surreply at 1. The United States summarizes its argument that "child pornography does not receive First Amendment protection" and that, even if the Court concludes that "teenage sexting is constitutionally protected speech, the Court should find that § 2251 is not overbroad and any potential overbreadth pales in comparison to the legitimate reach of the statute."  Surreply at 1.

The United States first argues that the First Amendment does not protect teenage sexting, which the United States asserts is child pornography. <u>See</u> Surreply at 2. The United States acknowledges that <u>Ferber</u>'s "facts . . . related to the distribution of child pornography," but asserts that <u>Ferber</u>'s "language and rationales . . . went well beyond the examination of whether regulating distribution was constitutionally permissible." Surreply at 2 (citing <u>Ferber</u>, 458 U.S. at 749). In holding that legislatures "'are entitled to greater leeway in the regulation of pornographic depictions of children,'" the United States argues that "the Supreme Court rested on five grounds." Surreply at 2 (quoting <u>Ferber</u>, 458 U.S. at 749.

The United States says that the Supreme Court's first conclusion was that states have a compelling interest in "'safeguarding the physical and psychological well-being of a minor.'" Surreply at 2 (quoting <u>Ferber</u>, 458 U.S. at 756). The United states accordingly asserts that the Supreme Court typically sustains statutes that protect children, even those regulating constitutionally protected areas. <u>See</u> Surreply at 2 (citing <u>Ferber</u>, 458 U.S. at 757). "For instance," the United States argues, "a state can permissibly protect children from exposure to non-obscene literature in which adults would have a First Amendment interest." Surreply at 2-3 (citing <u>Ferber</u>, 458 U.S. at 757; <u>FCC v. Pacifica Foundation</u>, 438 U.S. 726 (1978); <u>Prince v. Massachusetts</u>, 321 U.S. 158, 168 (1944)). Second, the United States avers that <u>Ferber</u> concluded that states have a compelling interest in eliminating child pornography's supply and availability. <u>See</u> Surreply at 3 (citing <u>Ferber</u>, 458 U.S. at 759). The United States argues that, accordingly, the Supreme Court sanctioned the prohibition of child pornography's possession and not just its distribution. <u>See</u> Surreply at 3 (citing <u>Ferber</u>, 458 U.S. at 774-75)(O'Connor, J., concurring). Third, the United States contends that the Supreme Court has concluded that governments may prohibit child pornography's distribution as a means to eliminate its production. <u>See</u> Surreply at 3 (citing <u>Ferber</u>,

458 U.S. at 761). Fourth, the United States asserts that the Supreme Court has "recognized that any literary, scientific, or educational value in permitting the production of pornographic images of a child is 'exceedingly modest, if not de minimis.'" Surreply at 3 (quoting Ferber, 458 U.S. at 762). "Fifth and finally," the United States argues that the Supreme Court describes its holding as consistent with its prior decisions involving "'a content-based classification of speech'" in which "'the evil to be restricted so overwhelmingly outweighs the express interests, if any, at stake, that no process of case-by-case adjudication is required.'" Surreply at 3-4 (quoting Ferber, 458 U.S. at 763-64).

The United States contends that caselaw after Ferber does not diminish Ferber's application to teenage sexting. See Surreply at 4. Turning to Free Speech Coalition, the United States acknowledges that the Supreme Court held unconstitutional the prohibition of virtual child pornography, but asserts that the Supreme Court "left undisturbed the provisions of the statute related to abuse of actual minors." Surreply at 4. The United States also distinguishes Free Speech Coalition, noting that, in contrast to the virtual child pornography in that case, "teenage sexting . . . involves real children." Surreply at 6 (emphasis omitted). The United States notes that the Supreme Court in Williams upheld a statute that prohibits all child pornography's distribution, "'even material that does not qualify as obscenity.'" Surreply at 4 (quoting Williams, 553 U.S. at 288). The United States asserts that those cases demonstrate that the Supreme Court has applied consistently Ferber to situations involving technological advances that Congress did not foresee. See Surreply at 4.

The United States characterizes Street's Motion as arguing that, "even though adults do not have a protected right to use minors [to] produce child pornography, minors have the right to use other minors to produce such materials." Surreply at 4-5. The United States contends,

however, that none of its cited Supreme Court precedent distinguishes between the materials minors produce and the materials adults produce, and none turns on whether the child is a consensual, willing participant in the pornography. See Surreply at 5. Accordingly, the United States argues that it is irrelevant whether teenager sexting involves child abuse or otherwise harms its teenage participants. See Surreply at 5. Instead, the United States avers that teenage sexting, "to the extent it depicts sexually explicit conduct, is, by definition, child pornography -- and thus unprotected." Surreply at 5 (citing United States v. Laursen, 847 F.3d 1026, 1034 (9th Cir. 2017)).

The United states next asserts that Congress' interest in protecting children "demands the conclusion" that the First Amendment does not protect teenage sexting. Surreply at 6. The United States asserts that Streett "ignores the legislative judgment that the United States has a strong interest in protecting children from being depicted in sexually exploitive conduct." Surreply at 6. The United States also cites state caselaw that affirms a legislative interest in criminalizing teenage sexting. See Surreply at 7 (citing A.H. v. State, 949 So. 2d 234, 235 (Fla. Dist. Ct. App. 2007); In re: S.K., 237 Md. App. 458, 186 A.3d 181, aff'd in part, rev'd in part, 466 Md. 31, 215 A.3d 300 (2019); State v. E.G., 194 Wash. App. 457, 377 P.3d 272 (Wash Ct. App. 2016)). The United States describes that these cases conclude that self-produced, nude images of children become "'a permanent record' involving a child 'who the legislature may reasonably have determined might lack the judgment to understand the consequences of allowing the creation and distribution of that record.'" Surreply at 7 (quoting In re: S.K., 186 A.3d at 194). The United States thus avers that teenagers who engage consensually in sexting may be constitutionally prosecuted under child pornography laws. See Surreply at 7.

The United States next argues that Congress' "compelling" interest in "closing the distribution network for harmful images of children is relevant in the sexting context." Surreply

at 8.  The United States cites at length a Court of Appeals of Washington opinion which, the United States avers, "succinctly exposed the flaws" in Streett's argument:

> "[O]ne of the primary purposes of child pornography statutes is to restrict the distribution network for child pornography in order to eliminate the market for producing the materials.  Exempting self-produced images simply affords putative child pornographers the opportunity to purchase child pornography directly from voluntary, consenting minors, or else encourages minors to produce and market their own child pornography.  Such exemptions would significantly frustrate efforts to combat child pornography.
>
> An exemption for minors would also constitute a significant expansion of their First Amendment privileges in this area.  States are permitted to prohibit the sale to minors of non-obscene sexually-oriented materials that can be sold to adults.  If the First Amendment does not require a minor to have access to non-obscene materials that are available to adults, it does not afford them a privilege to produce or distribute sexually explicit materials."

Surreply at 8 (quoting State v. E.G., 377 P.3d at 276)(citations omitted in Surreply).  The United States avers that teenage sexting necessarily "implies a distribution component," such that, once a minor sends a sext, "the minor loses control over the material."  Surreply at 8.  That shared image, the United States argues, "is now available to feed the market for sexually explicit images of children."  Surreply at 8.  According tot eh United States, teenage sexting thus "frustrates the government's interest in closing the distribution network for this harmful material."  Surreply at 9.

The United States turns to its argument that, even if teenage sexting is constitutionally protected, § 2251(a) is not substantially overbroad.  See Surreply at 8.  The United States contends that, because overbreadth is an exceptional finding, the Supreme Court identifies overbreadth "only where the benefit of such an approach outweighs its considerable costs."  Surreply at 9.  The United States cites Broadrick v. Oklahoma for the assertion that overbreadth is particularly unlikely where the complained-of infringement involves expressive conduct.  See Surreply at 9

(citing <u>Broadrick v. Oklahoma</u>, 413 U.S. at 613).  The United States further contends that courts weigh the statute's chilling effect against the breadth of its legitimate applications.  <u>See</u> Surreply at 10-11.  The United States thus argues that a court holding a statute to be overbroad is exceedingly rare, especially where a statute proscribes conduct that it typically has a right to regulate.  <u>See</u> Surreply at 10-11.

The United States says that <u>Ferber</u> is instructive here.  <u>See</u> Surreply at 11.  In that case, the United States asserts, the Supreme Court concludes "that the statute was not substantially overbroad, because the statute's 'legitimate reach dwarfs its arguably impermissible applications.'"  Surreply at 11 (quoting <u>Ferber</u>, 438 U.S. at 773).  Nor did the Supreme Court resort to a limiting construction, the United States argues, instead calling for a "'case-by-case analysis of the fact situations to which its sanction, assertedly, may not be applied.'"  Surreply at 11 (quoting <u>Ferber</u>, 438 U.S. at 773-74).

The United States contends that § 2251(a) is not substantially overbroad, because it primarily applies to constitutionally unprotected conduct.  <u>See</u> Surreply at 11.  The United States says that Streett "makes no attempt to show that § 2251 does not proscribe conduct that is committed primarily, or even over even overwhelmingly, by adults."  Surreply at 11.  The United States contends that Streett directs his argument only at "one side of the ledger, focusing solely on the potentially chilled speech and not on the statute's legitimate sweep."  Surreply at 11.  The United States also avers that, to the extent that the First Amendment might protect a minor's right to self-produce child pornography, § 2251 does not apply in such a situation, because the statute's language "clearly implies two actors."  Surreply at 5-6 n.1  The United States notes § 2251(a)'s application to instances where an "individual 'employs, uses, persuades, entices, or coerces' a minor . . . .  [A]n individual cannot employ, induce, entice, or coerce him or herself."  Surreply at

6 n.1 (quoting 18 U.S.C. § 2251(a)).

The United States then disputes Streett's use of statistics and scholarly studies to support his overbreadth argument. See Surreply at 11. The United States first disputes Streett's citation to one study for the proposition that fifteen percent of sixteen-year-olds have participated in sexting. See Surreply (citing Motion at 9). The United States says that it "understands" Streett's cited portion to demonstrate that "only 2.5% of youth appeared in or created nude (or nearly nude) images or videos." Surreply at 12 (citing Prevalence and Characteristics at 1). The United States contends that Prevalence and Characteristics "further found that the already low 2.5%" probably overstated the prevalence of sexually explicit images, which the United States says is an important point, because § 2251(a) applies only to depictions of sexually explicit conduct. Surreply at 12. The United States notes that the authors in Prevalence and Characteristics define "sexually explicit images" as "'naked breasts, genitals, or bottoms,'" a definition which the United States avers is "less restrictive than" § 2251(a)'s definition. Surreply at 12 (quoting Prevalence and Characteristics at 1). Summarizing its understanding of the Prevalence and Characteristics findings, the United States contends that "fewer than 1.3% of teenagers appeared in or created [] sexually explicit images." Surreply at 13. The United States argues that this figure does not amount to § 2251(a)'s overbreadth. See Surreply at 13. The United States also attaches a study disputing "the oft-cited statistic that 20% of teenagers have been involved in sexting." Surreply at 13 (citing True Prevalence). The United States argues that this figure does not amount to § 2251(a)'s overbreadth. See Surreply at 13-14. "Turning to the other side of the equation," the United States argues that Streett "cites no probative evidence concerning the frequency with which federal prosecutions of adults occur under § 2251 or establish any relation between that number and that which would concern his claimed protected class." Surreply at 14. The United Stats

contends that Streett therefore must rely on state prosecutions, which the United States argues are irrelevant to § 2251(a)'s constitutionality.  See Surreply at 14.  State prosecutions, the United States avers, pertain more to "the equity" of prosecuting teenage sexting, rather than to § 2251(a)'s constitutionality.  Surreply at 14.

The United States also asserts that "teenage sexting can, and does often, stem from coercive or exploitive circumstances."  Surreply at 15.  The United States contends that teenagers' involvement in sexting does not preclude victimization, such as, for example, a seventeen-year-old soliciting explicit material from an eight-year-old.  See Surreply at 15.  This example, the United States argues, "is an excellent illustration of why case-by-case, as-applied adjudication is better suited to delineating the constitutional bounds of the statue than a facial overbreadth challenge."  Surreply at 15.  Accordingly, the United States requests that the Court deny the Motion.  See Surreply at 16.

**6.**      **The Second Hearing.**

The Court held an evidentiary hearing on September 10, 2018, at which the parties presented further evidence in support of their arguments.  See Sept. Tr. at 2:2-5.  The parties indicated that they wish the Court to treat its subsequent briefing on the Motion as supplemental briefing, rather than as new motions.  See Sept. Tr. at 44:17-25 (Court, Mease, Zimmerman).  Next, Streett requested that the Court close the hearing to the public.  See Sept. Tr. 50:7-13 (Zimmerman). The Court noted that few people were in the courtroom, and the United States indicated its opposition to closing the courtroom.  See Sept. Tr. at 50:14-18 (Court, Mease).  The Court cited the First Amendment and the United States' opposition to Streett's request, and said that it would deny Streett's oral motion without prejudice.  See Sept. Tr. at 7-12 (Court).  Streett then said that, because he asserts it is the United States' burden to demonstrate that § 2251 is not

substantially overbroad, the United States should present its evidence first.  See Sept. Tr. at 51:23-52:5 (Court, Zimmerman).  The Court said it would not make a ruling on whether the United States carried any burden of persuasion on Streett's Motion, but invited the United States to present first.  See Sept. Tr. at 52:24-53:3 (Court).  Finally, the parties stipulated that the Court may take judicial notice of the exhibits that the United States attaches to its Surreply.  See Sept. Tr. at 54:20-24 (Mease); id. at 56:9-13 (Zimmerman).

In its opening statement, the United States asserted that Congress has a compelling interest in protecting youth "well-being," and that teenage sexting involves "harmful short-term and long-term consequences."  Sept. Tr. at 59:5-13 (Mease).  The United States asserted that, even if the First Amendment protects some teenage sexting, § 2251 is not overbroad relative to its "legitimate reach."  Sept. Tr. at 59:15-20 (Mease).

The United States then called its first witness, Sueann Kenney-Noziska, a New Mexico-licensed clinical social worker.  See Sept. Tr. at 65:1-15 (Mease, Kenney-Noziska).  Kenney-Noziska explained that she has a bachelor's degree in psychology and a master's degree in social work.  See Sept. Tr. at 65:8-10 (Kenney-Noziska).  Kenney-Noziska also said that she practices as a therapist, and that she specializes in "working with . . . abused and traumatized children and adolescents."  See Sept. Tr. at 66:16-23 (Kenney-Noziska).  Kenney-Noziska began her career in South Dakota, where she worked for the state's Child Protective Services Department, and she also worked for ten years in California for its Department of Mental Health, where she worked as a social worker in a children's health clinic.  See Sept. Tr. at 67:9-25 (Kenney-Noziska); id. at 68:8-14 (Kenney-Noziska).  Since moving to New Mexico in 2008, Kenney-Noziska has done "outpatient clinical social work, working with children, teens, and their families."  Sept. Tr. at 68:25-69:1 (Kenney-Noziska).  Kenney-Noziska attended a "two-and-a-half day training" through

the NCMEC in 2016, pertaining to "crisis intervention for families who have a missing or exploited child." See Sept. Tr. at 70:22-71:11 (Mease, Kenney-Noziska). Kenney-Noziska also lectures at social-work conferences on "childhood trauma" and its "impact . . . on neurobiological development[.]" See Sept. Tr. at 74:4-16 (Mease, Kenney-Noziska). Kenney-Noziska said she has treated children or teenagers "affected by sexting." See Sept. Tr. at 75:16-20 (Mease, Kenney-Noziska). Without objection from Streett, the Court recognized Kenney-Noziska as an expert in childhood trauma.[16] See Sept. Tr. at 76:10-23 (Mease, Court, Zimmerman).

Kenney-Noziska said that the "current literature suggests that our brains are fully developed and mature around the age of 25 to 27, all the way up until our 30's." Sept. Tr. at 78:23-25 (Kenney-Noziska). Kenney-Noziska also asserted that teenagers have underdeveloped prefrontal cortices. See Sept. at 79:10-12 (Kenney-Noziska). Kenney-Noziska said that the prefrontal cortex "helps us control our impulses [and] regulate our emotion," as well as aid in decision-making, reasoning, and planning, such that "we often see risk-taking behavior in adolescents because they don't have that complete development of the prefrontal cortex." Sept. Tr. at 79:10-20 (Kenney-Noziska). Kenney-Noziska asserted that an underdeveloped prefrontal cortex correlates with impulsivity. See Sept. Tr. at 81:1-7 (Mease, Kenney-Noziska). "Sometimes," Kenney-Noziska opined, "teens will act out of . . . initial emotion, as opposed to being able to think through and regulate more complex emotions." Sept. Tr. at 81:20-24 (Kenney-

---

[16]The United States sought to admit Kenney-Noziska as an expert in childhood development, to which Streett objected. See Sept. Tr. at 76:12-21 (Mease, Court, Zimmerman). The United States argued that Kenney-Noziska's expertise in childhood trauma necessarily includes expertise in childhood development, because Kenney-Noziska needs "to know what is normative in order to assess, diagnose, and treat" childhood trauma. See Sept. Tr. at 77:7-16 (Mease). The Court proposed, and Streett agreed, that Streett could object on a question-by-question basis to any matter outside Kenney-Noziska's expertise. See Sept. Tr. at 77:19-23 (Court, Zimmerman).

Noziska).

Turning to the topic of sexting, Kenney-Noziska asserted that there is no definitive figure representing sexting's prevalence among teenagers and criticized the disparate methodology that various studies use, making it difficult to compare studies. <u>See</u> Sept. Tr. at 86:17-22 (Kenney-Noziska). Another "stumbling block," Kenney-Noziska said, is that many studies do not ask respondents to whom they sent their photographs, such that it is difficult to compare the prevalence of aggravated and experimental sexting. Sept. Tr. at 86:17 (Kenney-Noziska). <u>See</u> <u>id.</u> at 86:20-87:2 (Kenney-Noziska). Kenney-Noziska opined that there is not a general consensus among researchers as to sexting's prevalence among teenagers. <u>See</u> Sept. Tr. at 89:9-12 (Mease, Kenney-Noziska).

Citing <u>Typology</u>, Kenney-Noziska described that sexting can be divided into two categories: aggravated and experimental. <u>See</u> Sept. Tr. at 83:11-23 (Mease, Kenney-Noziska). Aggravated sexting, according to Kenney-Noziska, is "sexting that has criminal or malic[ous] intent or repercussions beyond producing the image." Sept. Tr. at 85:1 -7 (Kenney-Noziska). Kenney-Noziska said that an example of aggravating sexting would be a teenager who sends a sext to a teenaged romantic partner who, upon breaking up with the teenager, "sends it to 25 other people as a way to tarnish her reputation." Sept. Tr. at 84:16-2 4 (Kenney-Noziska). Experimental sexting, Kenney-Noziska said, involves sharing nude images of oneself with romantic partners, without "malice or misuse or other criminal use of the image." Sept. Tr. at 85:18-21 (Kenney-Noziska). Kenney-Noziska acknowledged that this definition means that a sext can change categories over time, depending on how its recipient uses it. <u>See</u> Sept. Tr. at 94:6-10 (Mease, Kenney-Noziska). Of the two categories, Kenney-Noziska primarily encounters aggravated sexting in her practice. <u>See</u> Sept. Tr. at 90:23-91:2 (Mease, Kenney-Noziska). When asked

whether she considered sexting as "normative," Sept. Tr. at 91: 6-7 (Mease), Kenney-Noziska opined that experimental sexting "could potentially be developmentally appropriate," but aggravated sexting is not normative, Sept. Tr. at 10-18 (Kenney-Noziska). Kenney-Noziska said that she would have to look at sexting, however, "on a case-by-case basis" to determine whether any given instance was healthy or appropriate. Sept. Tr. at 92:3-5 (Mease, Kenney-Noziska). Kenney-Noziska did not elaborate on what would make a particular sexting incident normative or harmful. Kenney-Noziska acknowledged that experimental sexting "probably falls closer to typical development" than behavior like drug or alcohol use. Sept. Tr. at 93:8-14 (Mease, Kenney-Noziska). Kenney-Noziska noted that, given the various studies' methodological shortcomings, she is unaware of any data concerning the relative prevalence of aggravated and experimental sexting. See Sept. Tr. at 118:23-119:3 (Zimmerman, Kenney-Noziska).

Kenney-Noziska contended that aggravating sexting can lead to "clinical levels of anxiety," altering the way teenagers "perceive themselves and their self-identity." Sept. Tr. at 95:5-9 (Kenney-Noziska). Kenney-Noziska also speculated that sexting can lead to "cutting, . . . eating disorders, . . . [and] substance abuse." Sept. Tr. at 95:12-15 (Kenney-Noziska). Kenney-Noziska did not describe or hypothesize the causal mechanism by which sexting leads to these pathologies. Kenney-Noziska said that she had "never had a teenager that presents themselves for therapy because they sent an experimental text." Sept. Tr. at 96:12-14 (Kenney-Noziska). Kenney-Noziska asserted, however, that some of her teenage patients express worry that the images they had sent will be shared beyond the photos' initial recipients. See Sept. Tr. at 96:15-22 (Kenney-Noziska). Kenney-Noziska noted the similarities between shared, experimental images and images resulting from coerced child pornography, as both are difficult to retrieve from the internet, making the "sexual exploitation or . . . abuse . . . even harder to recover" from. Sept.

Tr. at 97:13-21 (Kenney-Noziska). Kenney-Noziska also opined that, given teenagers' latent prefrontal cortex development, they may be susceptible into being coerced or induced into producing sexts despite believing they are "engaging in perfectly normal behavior." Sept. Tr. at 98:8-19 (Mease, Kenney-Noziska). Kenney-Noziska also averred that teenagers are prone to believing that they are engaging in consensual behavior, despite being coerced by a romantic partner or internet acquaintance. See Sept. Tr. at 114:8-15 (Kenney-Noziska).

On cross-examination, Kenney-Noziska acknowledged that, because many of her patients suffer underlying trauma, she cannot specifically attribute any of their clinical pathologies to sexting. See Sept. Tr. at 104:10-16 (Zimmerman, Kenney-Noziska). Kenney-Noziska acknowledged that most of the studies that the United States cited in its Surreply, and on which Kenney-Noziska relied in forming her opinions are ten years old and that cellphone prevalence has increased dramatically since these studies. See Sept. Tr. 127:12-25 (Zimmerman, Kenney-Noziska). Kenney-Noziska also acknowledged that she generally does not treat patients who are engaging in normative behavior; most of her patients exhibit some sort of pathological behavior beyond sexting. See Sept. Tr. at 115:18-22 (Zimmerman, Kenney-Noziska). Similarly, Kenney-Noziska asserted that most pathologies she associates with sexting involve patients who have suffered further sexual abuse beyond aggravated sexting. See Sept. Tr. at 115:25-116:9 (Zimmerman, Kenney-Noziska). Kenney-Noziska also described that the various studies have not, to her knowledge, correlated sexting alone with other pathological behavior, like teenage pregnancy or "increased teen sexual relations." Sept. Tr. at 116:9-20 (Zimmerman, Kenney-Noziska). Kenney-Noziska also observed that certain behavior which she characterizes as pathological, such as teenage pregnancy or teenage substance abuse, has generally been decreasing among the current generation of teenagers, while sexting has been increasing. See Sept Tr. at

116:22-25 (Zimmerman, Kenney-Noziska).  Kenney-Noziska also observed that, from her understanding of the various state laws pertaining to sexting, law enforcement could prosecute some of what she considers normative sexting.  See Sept. Tr. at 23:16-17 (Kenney-Noziska).

On redirect examination, Kenney-Noziska reiterated that sexting does "come up as part of the counseling and therapy" which she provides to teenagers.  Sept. Tr. at 131:18-25 (Mease, Kenney-Noziska).  Kenney-Noziska also noted that some teenagers who engage in normative, experimental sexting come to regret that behavior later, and may suffer anxiety or other harm as a result.  See Sept. Tr. at 132:1-5 (Mease, Kenney-Noziska).  Kenney-Noziska accordingly opined that, in her opinion, no teenage sexting is completely harm-free.  See Sept. Tr. at 132:18-23 (Mease, Zimmerman). Kenney-Noziska believes that this results from the fact that, after the sext is sent, it is no longer in the teenager's control, leaving the sender vulnerable to coercion.  See Sept. Tr at 133:2-21 (Mease, Kenney-Noziska).

After the United States rested, Street proposed admitting five exhibits to aid his expert witness' examination.  See Sept. Tr. at 150:7-18 (Court, Zimmerman).  The United States characterized Streett's proffered exhibits as "cherry-picked internet articles," and objected on authentication, relevance, and hearsay grounds.  See Sept. Tr. at 151:6-7 (Mease).  See id. at 151:21-152:18 (Mease).  In response to the Court's questioning, the United States sought to distinguish Streett's proffered exhibits from those the United States attached to the Surreply, asserting that Streett provided it with these exhibits the previous evening, and that some of the exhibits contain unauthenticated summaries.  See 153:1-13 (Court, Mease); id. at 153:22-154:5 (Mease).  The United States also averred that it negated any hearsay issues with its cited articles because its expert, Kenney-Noziska, relied on those articles in forming her opinions.  See Sept. Tr. at 155:1-3 (Mease).  The Court observed that mere reliance is not how the rule against hearsay

works, but reminded the parties that they appeared willing to admit hearsay evidence in the form of scholarly articles for the Court's findings of fact. See Sept. Tr. at 155:4-18 (Court). The parties then agreed to waive their hearsay objections to the cited articles. See Sept. Tr. at 156:2-22 (Court, Mease, Zimmerman). The Court admitted Streett's five exhibits into evidence. See Sept. Tr. at 160:1-7 (Court, Zimmerman). The Court proposed, however, that the United States "preserve all arguments as to the weight of the evidence," as the United States had not yet reviewed extensively Streett's exhibits, and the parties agreed. Sept. Tr. at 161:2-8 (Court, Mease, Zimmerman).

Streett called Victor Strasburger, M.D., to testify. See Sept. Tr. at 139:8-9 (Zimmerman). Dr. Strasburger has been a professor of pediatrics at the University of New Mexico for twenty-eight years. See Sept. Tr. at 140:13-18 (Zimmerman, Strasburger). Dr. Strasburger also worked for eighteen years at the Sequoia Adolescent Treatment Center "helping to treat some of the most severe kids in New Mexico for a variety of offenses." Sept. Tr. at 141:17-20 (Strasburger). Dr. Strasburger served as a member of the American Academy of Pediatrics' Task Force on Children and Television, and "authored or co-authored most of the American Academy of Pediatrics policy statements on children, adolescents, and the media." Sept. Tr. at 142:7-12 (Strasburger). The Court recognized Dr. Strasburger as an expert in adolescents and the media. See Sept. Tr. at 145:8-10 (Court). Dr. Strasburger said that he reviewed each of Streett's exhibits in preparation for his testimony. See Sept. Tr. at 162:8-163:11 (Zimmerman, Strasburger).

Citing a 2008 study, Dr. Strasburger described that teenagers receive their information about sex primarily from television. See Sept. Tr. at 164:20-165:5 (Zimmerman, Strasburger). Dr. Strasburger also opined that the "amount of sexual material available to teenagers is startling," with the internet providing easy access to pornography. Sept. Tr. at 167:1-5 (Zimmerman). Dr. Strasburger contended that sexting material is "very similar" to images presented on television

and the internet.  Sept. Tr. at 168:21-169:4 (Zimmerman, Strasburger).  Dr. Strasburger opined

that sexting's prevalence is a function of increased teenage exposure to sex in the media.  See Sept.

Tr. at 169:16-170-2 (Zimmerman, Strasburger).  Dr. Strasburger said that there "are good data []

that sexting teenagers are more likely either to begin having sex soon or they're already having

sex," suggesting that sexting is correlated with sexual activity.  Sept. Tr. at 172:4-7 (Strasburger).

Dr. Strasburger opined that sexting can be divided into three categories: consensual

sexting, nonconsensual sexting, and sexting between adult and minors.  See Sept. Tr. at 170:14-16

(Strasburger).  Consensual sexting, Dr. Strasburg opined, is a normative part of adolescent

development and that "most of the people in [his] field in adolescent medicine would agree with

that."  Sept. Tr at 175:21-176:1 (Zimmerman, Strasburger).  Dr. Strasburger defines consensual

sexting as "[i]nnocent transmission of a visual image or video from one person to another without

any dissemination, without significant coercion."   Sept. Tr. at 193:23-25 (Strasburger).   Dr.

Strasburger elaborated, however, that sexting is not "a great idea," and that it is "obviously a

slightly dysfunctional way of" courting a potential romantic partner.  Sept. Tr. at 176:6-14

(Strasburger, Zimmerman). Dr. Strasburger opined that teenage sexting should not be prosecuted,

but based his opinion on the facts that teenagers' brains are still developing and that criminal

prosecution can harm or derail teenage defendants' lives.  See Sept. Tr. 177:1-13 (Strasburger).

Dr. Strasburger also acknowledged that, because of latent brain development, "[y]ounger teenagers

don't appreciate the risks of sexting," even those who are "in a good relationship."  Sept. Tr. at

180:24-181:1 (Strasburger).  Dr. Strasburger nonetheless disagreed with equating teenage sexting

with child pornography and asserted that twenty-three states equate the two.  See Sept. Tr. at

188:21-23 (Zimmerman, Strasburger); id. at 192:9-22 (Zimmerman, Strasburger).

Dr. Strasburger said that roughly fifteen percent of all thirteen-to-seventeen-year-olds have

sent a sext, and thirty percent have received a sext.  Sept. Tr. at 174:12-18 (Strasburger).  Dr. Strasburger contended that sexting's prevalence will increase generally, see Sept. Tr. at 17 5:16-19 (Zimmerman, Strasburger), and that teenagers tend to be more likely to sext as they age, see Sept. Tr. at 181:4-6 (Strasburger).  Dr. Strasburger asserted that between eight and twelve percent of sexts were forwarded without the sender's consent, which he characterized as "a problem." Sept. Tr. at 174:2-7 (Strasburger).  Dr. Strasburger opined, however, that "[d]issemination is a separate problem and issue" from sexting itself.  Sept. Tr. at 182:7-10 (Strasburger).

Asked whether sexting leads to "destructive behavior," Sept. Tr. at 183:10-11 (Zimmerman), Dr. Strasburger cited a study by "Dr. Jeff Temple at the University of Texas . . . that said the data just are not there on the relationship between sexting and further harm," Sept. Tr. at 183:13-17 (Strasburger).  Dr. Strasburger acknowledged that the lack of academic studies makes it difficult to draw reliable conclusions about sexting's harm.  See Sept. Tr. at 187:24-25 (Strasburger).  Dr. Strasburger contended, however, that, with consensual sexting, "no one is hurt the way someone is devastatingly hurt in child pornography."  Sept. Tr. at 195:2-3 (Strasburger).

Turning to state treatment of teenage sexting, Dr. Strasburger asserted that "there is a great deal of variation in how sexting is treated among the states."  Sept. Tr. at 184:7-9 (Strasburger). Dr. Strasburger described that "in certain states" law enforcement arrest teenage sexters for violating child pornography laws.  Sept. Tr. at 187:1-3 (Strasburger).  Dr. Strasburger opined that only "a handful of states have positive" laws regarding consensual sexting.  Sept. Tr. at 184:9-10 (Strasburger).  Dr. Strasburger attributes this to sexting's recency, such that "technology is advancing so quickly that it's difficult to get a legislative handle on how to deal with it."  Sept. Tr. at 184:15-18 (Strasburger).  Dr. Strasburger also averred that even reduced penalties or administrative resolutions targeted toward sexting are not ideal, because any criminal treatment of

sexters stigmatizes and shames common contemporary behavior.  See Sept. Tr. at 185:6-8 (Strasburger).  Any criminalization of sexting is not ideal, Dr. Strasburger says, because such laws typically do not distinguish between consensual and aggravated sexting.  See Sept. Tr. at 187:8-14 (Zimmerman, Strasburger).  Most harmful effects that result from even aggravated sexting, Dr. Strasburger opined, pale in comparison with prosecution's deleterious effects.  See Sept. Tr. at 195:11-20.  Dr. Strasburger also said that he conducted further research via Google and opined that some state courts dismiss child pornography prosecutions against "innocent" sexters.  Sept. Tr. at 191:4-15 (Zimmerman, Strasburger).

After passing the witness, Streett requested that the Court take judicial notice of each of his exhibits.  See Sept. Tr. at 196:21-24 (Zimmerman).  Streett defended his exhibits' informality -- Streett's Exhibit C is a collection of state statutes -- by noting that, "because we're dealing with juvenile matters, there is not a lot of case law," rendering state statutes and anecdotal evidence relevant.  Sept. Tr. at 198:5-12.  The United States continued to indicate it took issue the relevance of Streett's hearing exhibits, see Sept. Tr. at 199:3-8 (Mease), but agreed to stipulate to the admissibility of Streett's hearing exhibits while reserving arguments as to those exhibits' relative weight and utility, see Sept. Tr. at 200:1-5 (Mease, Court, Zimmerman).

On cross-examination, Dr. Strasburger acknowledged that "there is no standardization of sexting research" to date, and that studies vary broadly in the sexting definitions that they employ.  Sept. Tr. at 203:11-22 (Mease, Strasburger).  Dr. Strasburger also noted that, although § 2251(a) does not necessarily prohibit photographs of teenagers' breasts, many of the studies that the parties cite include such pictures in their definitions of sexting.  See Sept. Tr. at 205:7-21 (Mease, Strasburger); id. at 206:6-10 (Mease, Strasburger).  Similarly, Dr. Strasburger noted that some state statutes prohibit such photographs.  See Sept. Tr. at 206:10-12 (Mease, Strasburger).

Dr. Strasburger also acknowledged that, of the thirty-nine studies that the Meta-Analysis evaluates, only eight "dealt with nonconsensual behavior." Sept. Tr. at 207:17-20 (Mease, Strasburger). Another limitation, Dr. Strasburger noted, is that most studies do not evaluate how sexts are procured or disseminated, but rather typically only measure the images' existence. See Sept. Tr. at 209:6-17 (Mease, Strasburger). Dr. Strasburger accordingly opined that the studies' researchers did not "look[] at the federal statute before they started their research studies." Sept. Tr. at 212:16-18 (Strasburger).

Turning to sexting's effects on the teenagers that engage in it, Dr. Strasburger noted that there may be short-term, negative consequences, but nothing "devastating," provided that sexting is consensual. Sept. Tr. at 215:2-9 (Strasburger, Mease). In cases of aggravated or nonconsensual sexting, Dr. Strasburger related "anecdotal reports of -- particularly teenage girls, but occasionally teenage boys -- committing suicide when they are outed, in a sense, technologically." Sept. Tr. at 217:19-22 (Strasburger). Dr. Strasburger contended, however, that consensual sexting amounts to the "technological equivalent of getting to first base. It is flirting, it is innocent." Sept. Tr. at 240:25-241:2 (Strasburger). Dr. Strasburger argued that consensual sexting "does not become harmful in any substantial way to merit . . . severe criminal prosecution," and that, although leaked consensual sexts are harmful to the sext's subject, such behavior should be treated as cyberbullying. Sept. Tr. at 242:22-24 (Strasburger). See id. at 243:1-4 (Strasburger).

## LAW REGARDING MOTIONS TO DISMISS IN CRIMINAL CASES

The Federal Rules of Criminal Procedure contain no analog for summary judgment under rule 56 of the Federal Rules of Civil Procedure. See United States v. China Star, Inc., 375 F. Supp. 2d 1291, 1293 (D.N.M. 2005)(Browning, J.)("Under Tenth Circuit law, the Court is not free to determine, like on a motion for summary judgment under the Federal Rules of Civil Procedure,

whether a genuine issue of material fact exists."). "Generally, the strength or weakness of the government's case, or the sufficiency of the government's evidence to support a charge, may not be challenged by a pretrial motion." United States v. Hall, 20 F.3d at 1087. When testing an indictment's sufficiency before trial, an indictment's allegations are taken as true, and courts should not consider evidence outside of the indictment. See United States v. Hall, 20 F.3d at 1087. See also United States v. Tafoya, 376 F. Supp. 2d 1257, 1260 (D.N.M. 2005)(Browning, J.). Accordingly an indictment is legally sufficient so long as it:

> (1) contains the essential elements of the offense intended to be charged, (2) sufficiently apprises the accused of what he must be prepared to defend against, and (3) enables the accused to plead an acquittal or conviction under the indictment as a bar to any subsequent prosecution for the same offense.

United States v. Hall, 20 F.3d at 1087. The Tenth Circuit has, however, carved out an exception to that general rule for cases "where the underlying facts [are] essentially undisputed and the government fail[s] to object to the district court's resort to evidence beyond the four corners of the indictment." United States v. Hall, 20 F.3d at 1087. "Under this scenario, a pretrial dismissal is essentially a determination that, *as a matter of law,* the government is incapable of proving its case beyond a reasonable doubt." United States v. Hall, 20 F.3d at 1088 (emphasis in original).

The Federal Rules of Criminal Procedure permit defendants, however, to assert defects other than evidentiary insufficiency before trial, because rule 12(b) allows parties to "raise by pretrial motion any defense, objection, or request that the court can determine without a trial on the merits." Fed. R. Crim. P. 12(b)(1). See Fed. R. Crim. P. 12(b)(1) advisory committee note to 2014 amendments ("The more modern phrase 'trial on the merits' is substituted for the more archaic phrase 'trial of the general issue.' No change of meaning is intended."). That "Rule 47 applies to a pretrial motion," Fed R. Crim. P. 12(b)(1), means that the Court may consider evidence

outside of the indictment, see Fed. R. Crim. P. 47(d) ("The moving party must serve any supporting affidavit with the motion. A responding party must serve any opposing affidavit at least one day before the hearing, unless the court permits later service."). On the other hand, rule 47(d) does not permit courts to conduct a "trial on the merits," Fed. R. Crim. P. 12(b)(1), via motion practice, because

> [t]he last sentence providing that a motion may be supported by affidavit is not intended to permit 'speaking motions' (e.g. motion to dismiss an indictment for insufficiency supported by affidavits), but to authorize the use of affidavits when affidavits are appropriate to establish a fact (e.g. authority to take a deposition or former jeopardy).

Fed R. Crim. P. 47 advisory committee's note to 1944 adoption.

A court can determine a pretrial motion without a trial on the merits when a motion goes to "what evidence might be admitted at trial . . . or the conduct of and preparation for trial." United States v. Pope, 613 F.3d 1255, 1260 (10th Cir. 2010)(Gorsuch, J.). Pretrial motions that "seek and result in dismissal of the case altogether but that can be decided, at least in the circumstances of the case at hand, without deciding any disputed questions of fact about the circumstances of the alleged crime" -- i.e., motions that "involve only the taking of evidence that is 'entirely segregable from the evidence to be presented at trial'" -- also qualify under rule 12(b)(1). United States v. Pope, 613 F.3d at 1260 (quoting United States v. Barletta, 644 F.2d 50, 58 (1st Cir. 1981)). See United States v. Olivas-Perea, No. CR 16-4518, 2017 WL 5001985 (D.N.M. Oct. 31, 2017)(Browning, J.)("To decide the MTD, the Court needs to determine only when, not whether, Olivas-Perea was found in the United States, so the Court faces a factual dispute that is peculiar to the MTD, and does not go to Olivas-Perea's guilt or innocence."). Similarly, courts "may entertain motions that require it to answer only pure questions of law." United States v. Pope, 613 F.3d at 1260.

The "most prominent" reason for that rule is "respect for the role of the jury." United States v. Pope, 613 F.3d at 1259.[17] The jury is charged with determining a defendant's guilt or innocence, so fact-finding "based on evidence that goes to this question can risk trespassing on territory reserved to the jury." United States v. Pope, 613 F.3d at 1259. Criminal defendants are entitled to "'a jury determination that [they are] guilty of every element of the crime with which [they are] charged, beyond a reasonable doubt.'" Apprendi v. New Jersey, 530 U.S. 466, 477 (2000)(quoting United States v. Gaudin, 515 U.S. 506, 510 (1995)). That entitlement extends to so-called "sentencing factors," i.e., facts, "[o]ther than the fact of a prior conviction," that increase "the penalty for a crime beyond the prescribed statutory maximum." Apprendi v. New Jersey, 530 U.S. at 490.

## LAW REGARDING FIRST AMENDMENT OVERBREADTH CHALLENGES

An overbreadth challenge is a facial challenge to a speech-restricting statute on First Amendment grounds, and, if successful, it results in the invalidation of the entire statute. To succeed, the challenged statute must regulate substantially more expression than the First Amendment allows governments to regulate. See Schad v. Borough of Mt. Ephraim, 452 U.S. 61 (1981). The party challenging the statute need not have been engaged in constitutionally protected expression to have standing to challenge the law; even if the law is constitutional as applied to the challenging party, if the law is found to be overbroad, it is invalid in its entirety. See Village of Schaumburg v. Citizens for a Better Env't, 444 U.S. 620, 634 (1980)("Given a case or controversy,

_____

[17]Other reasons for the rule include: (i) that evidence adduced at trial can provide a more certain framework for a court's analysis; (ii) that holding a separate mini-trial on a defense "only to repeat the exercise with largely the same evidence a short time later at the trial itself" disserves judicial economy; and (iii) that permitting pre-trial motions on matters to be presented at trial could "facilitate an end-run around the limited discovery rules governing criminal proceedings." United States v. Pope, 613 F.3d at 1259.

a litigant whose own activities are unprotected may nevertheless challenge a statute by showing that it substantially abridges the First Amendment rights of other parties not before the court." (citations omitted)).   There are, thus, two aspects of an overbreadth challenge that set it apart from other facial challenges: the substantive aspect and the standing aspect.

1.      **The Substantive Aspect: Inverting the Usual Rule for Facial Challenges.**

Outside of the First-Amendment context, for a party to succeed in facially challenging a statute, "the challenger must establish that no set of circumstances exists under which the Act would be valid."[18]  United States v. Salerno, 481 U.S. 739, 745 (1987).  Overbreadth is not quite

_____

[18]The Tenth Circuit and leading commentators contend that the formulation in United States v. Salerno, 481 U.S. 739, 745 (1987), is neither normatively desirable nor -- more importantly for the Court's purposes -- descriptively accurate.

> [I]n City of Chicago v. Morales, [527 U.S. 41, 55 n.22 (1999),] a plurality of the Court asserted that "[t]o the extent that we have consistently articulated a clear standard for facial challenges, it is not the Salerno formulation, which has never been the decisive factor in any decision of this Court, including Salerno itself."
>
> . . .
>
> Salerno's language thus is accurately understood not as setting forth a test for facial challenges, but rather as describing the result of a facial challenge in which a statute fails to satisfy the appropriate constitutional standard.  In other words, where a statute fails the relevant constitutional test (such as strict scrutiny, the Ward test, or reasonableness review), it can no longer be constitutionally applied to anyone -- and thus there is "no set of circumstances" in which the statute would be valid.  The relevant constitutional test, however, remains the proper inquiry.

Doe v. City of Albuquerque, 667 F.3d 1111, 1125-26, 1127 (10th Cir. 2012)(emphasis in original)(referring to Ward v. Rock Against Racism, 491 U.S. 781 (1989), which held that, even in a public forum, the government may impose reasonable restrictions on the time, place, or manner of protected speech, as long as the restrictions are narrowly tailored to serve a significant governmental interest, the restrictions leave open ample alternative channels for communicating the information, and the restrictions are justified without reference to the content of the regulated speech).  See Richard H. Fallon, Jr., Fact and Fiction About Facial Challenges, 99 Cal. L. Rev. 915, 936-49 (2011)(examining empirical evidence and concluding that the Supreme Court regularly facially invalidates laws, and ignores the purported standard when it does); Richard H.

the 180-degree reverse of this standard -- which would be that a law is unconstitutional if it proscribes any constitutionally protected speech -- but instead invalidates only those laws whose "overbreadth is substantial." Bd. of Airport Comm'rs of L.A. v. Jews for Jesus, Inc., 482 U.S. at 574. The usual burden of proof in attacking the constitutionality of a statute is switched in the First Amendment context, so that the government "bears the burden of establishing its constitutionality," ACORN v. Municipality of Golden, 744 F.2d 739, 746 (10th Cir. 1984), and the usual presumption that a statute is constitutional is negated, see Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012)("[A]s a general matter, we give all statutes a presumption of constitutionality and we must apply the same presumption to . . . ordinances. However, this presumption does not apply when the challenged statute infringes upon First Amendment rights." (omission in original)(citations and internal quotation marks omitted)).

An example of a successful overbreadth challenge occurred in Schad v. Borough of Mt. Ephraim. In that case, a club that featured nude dancing challenged a city ordinance that purported

---

Fallon, Jr., As-Applied and Facial Challenges and Third-Party Standing, 113 Harv. L. Rev. 1321, 1322-23, 1342-43 (2000); Michael C. Dorf, Facial Challenges to State and Federal Statutes, 46 Stan. L. Rev 235, 239-42 (1994)("[T]he Salerno opinion cites no direct authority to support its truly draconian standard."). If the standard in United States v. Salerno were taken seriously, virtually no statute would ever be invalidated. A statute criminalizing male-male sexual relations would be constitutional, because it could validly be applied to nonconsensual male-male sexual relations. See Lawrence v. Texas, 539 U.S. 558 (2003)(striking down a male-male sodomy law without ever using the term "facial challenge" or reciting any recognizable standard of the same). It is not clear how this standard even could be applied to Equal Protection challenges, invidious purpose challenges, procedural rights challenges, or challenges that a law falls outside of the federal government's enumerated powers; how it can be squared with void-for-vagueness doctrine; or whether and how it affects severability analysis. See Citizens United v. Fed. Election Comm'n, 558 U.S. at 331("[T]he distinction between facial and as-applied challenges is not so well defined that it has some automatic effect or that it must always control the pleadings and disposition in every case involving a constitutional challenge.").

to ban all live entertainment in commercial zones.[19]  See 452 U.S. at 63-64.  Although the Supreme

Court has since determined that the First Amendment does not protect nude dancing, see Barnes

v. Glen Theatre, Inc., 501 U.S. 560 (1991), the ordinance banned a substantial swath of

activities -- such as "plays, concerts, musicals, dance," and athletic events -- that the First

Amendment protected, Schad v. Borough of Mt. Ephraim, 452 U.S. at 66.  The Supreme Court did

not do as they might have done in non-First Amendment settings and narrowly interpret the

ordinance to ban only constitutionally unprotected speech, but rather struck the ordinance down

entirely as overbroad.  See 452 U.S. at 66.

"[T]he overbreadth of a statute must not only be real, but substantial as well, judged in

relation to the statute's plainly legitimate sweep."  Broadrick v. Oklahoma, 413 U.S. at 615-16.  In

Broadrick v. Oklahoma, the Supreme Court upheld a state law, patterned on the federal Hatch Act

of 1939, 5 U.S.C. §§ 7321-7326, that barred government employees from engaging in partisan

political activities.  See 413 U.S. at 615-16.  On its face, the statute could be construed to ban

forms of expression, like wearing partisan buttons and displaying partisan bumper stickers on

vehicles, that both parties agreed the First Amendment protected.[20]  See 413 U.S. at 615-16.  The

_____

[19]The Borough of Mt. Ephraim argued that the zoning ordinance constituted a "reasonable
time, place, and manner restriction."  452 U.S. at 74.  The Supreme Court replied that, "[t]o be
reasonable, time, place, and manner restrictions not only must serve significant state interests but
also must leave open adequate alternative channels of communication.  Here, the Borough totally
excludes all live entertainment . . . ."  452 U.S. at 75-76 (citations omitted)(citing Grayned v. City
of Rockford, 408 U.S. 104, 116 (1972)).

[20]Government employees do not receive the same level of First Amendment protection
from adverse employment actions, e.g., firings, that citizens do from adverse government action,
e.g., penal or civil sanctions, discrimination on the basis of speech (content-based speech
regulation), compelled speech, or the conditioning of a benefit.  See Erwin Chemerinsky,
Constitutional Law: Principles and Policies § 11.2.4.1, at 969; id. § 11.3.8.1, at 1112.  Government
employees are protected from adverse employment actions only on the basis of speech if: (i) the
speech is "on a matter of public concern," Connick v. Myers, 461 U.S. 138, 146 (1983); and (ii) the

State Personnel Board, the body charged with enforcing the statute and disciplining noncompliant employees, had, however, internally interpreted the statute to ban only unprotected speech, and the disciplined plaintiff-employees had not been engaged in protected speech, but merely sought to invalidate the law on the basis of the theoretical unconstitutional applications.  See 413 U.S. at 615-16.  The Supreme Court held that the statute was "not substantially overbroad and that whatever overbreadth may exist should be cured through case-by-case analysis of the fact situations to which its sanctions, assertedly, may not be applied."  413 U.S. at 615-16.

As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition. It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.  On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.

> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine.  While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."  Ferber, 458 U.S. 747, 772 (1982).  In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. at 800-01 (footnote omitted)(citations omitted).

---

government's needs, "as an employer, in promoting the efficiency of the public services it performs through its employees," Pickering v. Bd. of Educ., 391 U.S. 563, 568 (1968), do not -- when balanced against the speech rights of the employee -- justify the speech restriction.

When assessing whether an overbroad statute is likely to chill third parties from engaging in protected expression, courts should assess not only whether the number of unconstitutional potential applications of the statute is significant relative to the overall number of applications, but also the level of interpretive discretion given to those in charge of its enforcement, and the likelihood of capricious enforcement. In <u>City of Houston v. Hill</u>, 482 U.S. 451 (1987), the Supreme Court struck down as overbroad a city ordinance making it a crime "for any person to assault, strike or in any manner oppose, molest, abuse or interrupt any policeman in the execution of his duty." 482 U.S. at 455 (quoting Code of Ordinances, City of Houston, Tex. § 34-11(a) (1984)). The Supreme Court held that the ordinance was "not narrowly tailored to prohibit only disorderly conduct or fighting words," 482 U.S. at 465, and "criminalizes a substantial amount of constitutionally protected speech, and accords the police unconstitutional discretion in enforcement," 482 U.S. at 466. The Supreme Court explained:

> As the Court observed over a century ago, "[i]t would certainly be dangerous if the legislature could set a net large enough to catch all possible offenders, and leave it to the courts to step inside and say who could be rightfully detained, and who should be set at large." <u>United States v. Reese</u>, 92 U.S. (2 Otto) 214, 221 (1876).
>
> . . . .
>
> The ordinance's plain language is admittedly violated scores of times daily, yet only some individuals -- those chosen by the police in their unguided discretion -- are arrested. Far from providing the "breathing space" that "First Amendment freedoms need . . . to survive," <u>NAACP v. Button</u>, 371 U.S. 415, 433 (1963), the ordinance is susceptible of regular application to protected expression.

<u>City of Houston v. Hill</u>, 482 U.S. at 465-67 (citations to the record omitted). The Court presumes that, assuming the same level of overbreadth, the threat of criminal sanctions produces a stronger chilling effect than that of civil monetary sanctions, directions to cease and desist, or exposure to civil liability.

Some commentators have suggested that, when considering whether a statute's overbreadth is substantial, courts should take into account the importance of the protected speech being restricted or chilled.  See Richard Fallon, Jr., Making Sense of Overbreadth, 100 Yale L. J. 853, 894 (1991).  Under this view, a statute that chills a swath of political speech should be more readily facially invalidated than one that chills sexual, frivolous, or even artistic speech -- the latter statute being more amenable to as-applied challenges.  Although the Supreme Court has not endorsed this view explicitly, it has held that "the overbreadth doctrine does not apply to commercial speech."  Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 497 (1982).

In Griffin v. Bryant, No. CIV 13-0799 JB/GBW, 2014 WL 3377705 (D.N.M. June 18, 2014)(Browning, J.), the Court found that a plaintiff had standing to challenge a municipality's rule prohibiting statements criticizing the municipality's employees or governing body.  Even though the plaintiff had not been penalized for violating the municipality's rule, because the rule likely affected his speech, he had suffered a sufficient injury in fact to establish standing.  See Griffin v. Bryant, 2014 WL 3377705, at *28.

### 2.     **The Standing Aspect: The Near Abolition of Prudential Standing Factors.**

A non-First Amendment, non-overbreadth facial challenge is always more difficult to mount than an as-applied challenge to the same statute.  See United States v. Salerno, 481 U.S. at 745.  An as-applied challenge requires only that the law is unconstitutional as applied to the challenger's case; a facial challenge requires this showing as well[21] and also requires that there

---

[21]A logical consequence of there being "no set of circumstances" wherein the law would be constitutional is that the manner in which the government applied the law in the challenger's case must also be unconstitutional.

exists "no [other, theoretical] set of circumstances" in which the law could be constitutionally applied. United States v. Salerno, 481 U.S. at 745. A successful as-applied challenge is, thus, a necessary, but not sufficient, ingredient to a successful facial challenge. The Supreme Court has attributed the relative difficulty of facial and as-applied challenges to the Case or Controversy Clause, U.S. Const. art. III, § 2, cl. 1, specifically its standing requirement[22]:

> Embedded in the traditional rules governing constitutional adjudication is the principle that a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court. A closely related principle is that constitutional rights are personal and may not be asserted vicariously. These principles rest on more than the fussiness of judges. They reflect the conviction that under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws. Constitutional judgments, as Mr. Chief Justice Marshall recognized, are justified only out of the necessity of adjudicating rights in particular cases between the litigants brought before the Court.

Broadrick v. Oklahoma, 413 U.S. at 610 (citations omitted).

The relative difficulty of mounting facial and as-applied challenges is almost, but not entirely, reversed in the context of a First Amendment overbreadth challenge. Although a successful as-applied challenge does not guarantee a victorious facial challenge -- the court could find the statute's overbreadth insubstantial -- it is not necessary to have a viable as-applied challenge to succeed on a facial challenge. "[W]here the claim is that a statute is overly broad in violation of the First Amendment, . . . [there is] no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity." Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957. Even if the

---

[22]Standing is not the only reason that facial challenges are disfavored. Other cases say that "[f]acial adjudication carries too much promise of 'premature interpretation of statutes' on the basis of barebones records." Sabri v. United States, 541 U.S. 600, 609 (2004)(alterations omitted)(quoting United States v. Raines, 362 U.S. 17, 22 (1960)).

challenger engaged in constitutionally unprotected, validly penalized speech, if he can establish that the statute penalizes a substantial swath of protected speech, then he will prevail in getting the statute invalidated not only as it relates to the constitutionally protected speech of others, but to his own unprotected speech as well. For example, if a statute criminalized "demeaning, threatening, or inflammatory words," a challenger arrested for using "fighting words" in a bar -- unprotected speech which may be validly criminalized under Chaplinsky v. New Hampshire, 315 U.S. 568 (1942) -- could challenge the law on behalf of third parties who might risk arrest for constitutionally protected demeaning or inflammatory words, see Goading v. Wilson, 405 U.S. 518 (1972)(invalidating a Georgia law making it a crime for "[a]ny person [to], without provocation, use . . . opprobrious words or abusive language, tending to cause a breach of the peace").

The relaxation of the usual standing rules in the overbreadth context goes further than simply allowing an individual to whom the law is constitutionally applied to sue on the basis of unconstitutional applications. The challenged law need not have been applied against the challenger at all; as long as the barebones requirements of Article III standing are met,[23] the elements of prudential standing are presumed satisfied in an overbreadth challenge.[24] In Secretary

---

[23]Establishing Article III standing requires three components: (i) an injury in fact, which is "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical"; (ii) causation between the injury in fact and the conduct complained of, such that the injury is fairly traceable to the challenged action; and (iii) "it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)(Scalia, J.)(internal quotation marks and citations omitted).

[24]A leading commentator offers a possible justification for the virtual abandonment of standing doctrine in the context of overbreadth challenges that also explains the concept of "taxpayer standing" for suits brought under the Establishment Clause: the grammar of the Constitution's text. Nicholas Q. Rosenkranz, The Subjects of the Constitution, 62 Stan. L. Rev.

of State of Maryland v. Joseph H. Munson Co., the Supreme Court allowed a professional

fundraising company to bring suit challenging a state statute that prohibited charities from

soliciting funds unless at least seventy-five percent of their revenue was used for charitable

purposes. See 467 U.S. at 949. The Supreme Court held that the plaintiff had standing, even

though the law had not been and -- as the company was not a charity -- could not be applied against

it:

> [T]he Secretary's most serious argument against allowing Munson to challenge the statute is that there is no showing that a charity cannot bring its own lawsuit. Although such an argument might defeat a party's standing outside the First Amendment context, this Court has not found the argument dispositive in determining whether standing exists to challenge a statute that allegedly chills free speech. To the contrary, where the claim is that a statute is overly broad in violation of the First Amendment, the Court has allowed a party to assert the rights of another without regard to the ability of the other to assert his own claims and "'with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.'" Broadrick v. Oklahoma, 413 U.S. at 612 (quoting Dombrowski v. Pfister, 380 U.S. 479, 486 (1965)).

> The fact that, because Munson is not a charity, there might not be a possibility that the challenged statute could restrict Munson's own First Amendment rights does not alter the analysis. Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society -- to prevent the statute from chilling the First Amendment rights of other parties not before the court. Munson's ability to serve that function has nothing to do with whether or not its own First Amendment rights are at stake. The crucial issues are whether Munson satisfies the requirement of "injury-in-fact," and whether it can be expected satisfactorily to frame the issues in the case. If so, there is no reason that Munson need also be a charity. If not, Munson could not bring this challenge even if it were a charity.

---

1209, 1250-57, 1257-63 (2010). The thrust of the argument is that, while all the other provisions of the Bill of Rights are written in passive voice, the First Amendment provides that "Congress shall make no law . . . ." U.S. Const. amend. I. See Rosenkranz, supra, at 1250. Professor Rosenkranz suggests that, while the Constitution contemplates that, for example, Fourth Amendment harm occurs at the point when an unreasonable search occurs, First Amendment injury occurs when Congress passes the infringing law. See Rosenkranz, supra, at 1255.

The Secretary concedes that the Art. III case-or-controversy requirement has been met and the Secretary has come forward with no reason why Munson is an inadequate advocate to assert the charities' rights. The activity sought to be protected is at the heart of the business relationship between Munson and its clients, and Munson's interests in challenging the statute are completely consistent with the First Amendment interests of the charities it represents. We see no prudential reason not to allow it to challenge the statute

Sec'y of State of Md. v. Joseph H. Munson Co., 467 U.S. at 957-58 (citations omitted).

## ANALYSIS

The Court concludes that Streett has standing, under established First Amendment caselaw, to mount an overbreadth challenge against § 2251(a). The Court also concludes that § 2251(a) applies to minors and some teenage sexts. Finally, the Court concludes that the First Amendment does not protect teenage sexting, and that, even if some teenage sexting is protected, § 2251(a) is not substantially overbroad.

## I. STREETT HAS STANDING TO PURSUE AN OVERBREADTH CHALLENGE TO 18 U.S.C. § 2251(a).

The Second Superseding Indictment's Counts 3 through 7 each allege that Streett violated 18 U.S.C. § 2251(a) by persuading and/or attempting to persuade a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct. See Second Superseding Indictment at 2-5. There is no contention that Streett's alleged actions are protected speech. See Motion at 5 (arguing that Streett has third-party standing to challenge § 2251(a) for "violat[ing] the First Amendment rights of others not before the Court"); United States v. Dhingra, 371 F.3d at 563 ("Simply put, the inducement of minors to engage in illegal sexual activity enjoys no First Amendment protection."), as amended on denial of reh'g (July 23, 2004).

Although Streett's First Amendment rights are not directly at stake, First Amendment jurisprudence nonetheless grants Streett standing to facially challenge § 2251(a) on the grounds

that it criminalizes protected speech not at issue here.  See Broadrick v. Oklahoma, 413 U.S. at

611-12.  The Supreme Court has explained:

> It has long been recognized that the First Amendment needs breathing space
> and that statutes attempting to restrict or burden the exercise of First Amendment
> rights must be narrowly drawn and represent a considered legislative judgment that
> a particular mode of expression has to give way to other compelling needs of
> society.  As a corollary, the Court has altered its traditional rules of standing to
> permit -- in the First Amendment area -- "attacks on overly broad statutes with no
> requirement that the person making the attack demonstrate that his own conduct
> could not be regulated by a statute drawn with the requisite narrow specificity."
> Dombrowski v. Pfister, 380 U.S. [479, 486 (1965)] . . . .  Litigants, therefore, are
> permitted to challenge a statute not because their own rights of free expression are
> violated, but because of a judicial prediction or assumption that the statute's very
> existence may cause others not before the court to refrain from constitutionally
> protected speech or expression.

Broadrick v. Oklahoma, 413 U.S. at 611-12 (citations omitted).  See Sec'y of State of Md. v.

Joseph H. Munson Co., 467 U.S. at 956-57 ("Even where a First Amendment challenge could be

brought by one actually engaged in protected activity, there is a possibility that, rather than risk

punishment for his conduct . . . he will refrain from engaging further in the protected activity.

Society as a whole then would be the loser.").  Thus, the Supreme Court has concluded that "the

possible harm to society in permitting some unprotected speech to go unpunished is outweighed

by the possibility that protected speech of others may be muted and perceived grievances left to

fester because of" overbroad statutes' "inhibitory effects."  Broadrick v. Oklahoma, 413 U.S. at

612.  Although Streett concedes that § 2251(a) validly prohibits the conduct in which he engaged,

he has standing to proceed with his claim that § 2251(a) impermissibly and substantially infringes

upon the First Amendment rights of those not before the Court.  See United States v. Brune, 767

F.3d 1009, 1018 n.5 (10th Cir. 2014).

## II.     18 U.S.C. § 2251(a) APPLIES TO TEENAGE SEXTING.

Section 2251(a) applies to teenage sexting, although it is unclear just how much teenage sexting falls under § 2251(a)'s sweep. Section 2251(a) distinguishes solely on the basis of a sext's content and subject. See 18 U.S.C. § 2251(a). Accordingly, § 2251(a) does not require the involvement of an adult, and so applies to purely intra-teenager sexting, provided that the sext depicts a minor engaging in sexually explicit conduct.

### A.     18 U.S.C. § 2251(a) APPLIES TO TEENAGERS.

In determining whether § 2251(a) criminalizes teenage sexting, the Court naturally begins with the statutory language. The statute states:

> Any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or who has a minor assist any other person to engage in, or who transports any minor in or affecting interstate or foreign commerce, or in any Territory or Possession of the United States, with the intent that such minor engage in, any sexually explicit conduct for the purpose of producing any visual depiction of such conduct or for the purpose of transmitting a live visual depiction of such conduct, shall be punished . . . if such person knows or has reason to know that such visual depiction will be transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed, if that visual depiction was produced or transmitted using materials that have been mailed, shipped, or transported in or affecting interstate or foreign commerce by any means, including by computer, or if such visual depiction has actually been transported or transmitted using any means or facility of interstate or foreign commerce or in or affecting interstate or foreign commerce or mailed.

18 U.S.C. § 2251(a). Streett argues that § 2251(a) covers teenage sexting because the statute punishes "any person" for coercing a minor into engaging in sexual conduct for the purposes of producing a visual depiction, and that "any person" includes other minors. Motion at 3.

The Court could find no cases prosecuting a minor with violating § 2251(a), nor could it uncover any hints in the statute or caselaw indicting whether "any person" includes minors. The Court, nonetheless, concludes that the best interpretation of "any person" is that it includes minors.

- 83 -

Statutory construction "begins . . . with the language of the statute itself," <u>United States v. Ron Pair Enters., Inc.</u>, 489 U.S. 235, 241 (1989). "[C]ourts must presume that a legislature says in a statute what it means and means in a statute what it says there." <u>Conn. Nat. Bank v. Germain</u>, 503 U.S. 249, 253-54 (1992). "Any person" is not ambiguous. Had Congress intended § 2251(a) to apply only to adults, it could have easily said so. Indeed, Congress knows how to put age restrictions on its criminal statutes' potential offenders. <u>See</u>, <u>e.g.</u>, 18 U.S.C. § 2241(c) (stating that a person commits aggravated sexual abuse when he or she crosses state lines to engage in a sexual act with someone older than twelve but younger than sixteen "and is at least 4 years younger than the person so engaging"); 18 U.S.C. § 2243 (stating that a person commits sexual abuse of a minor when he or she engages in a sexual act with someone who is older than twelve but younger than sixteen "and is at least four years younger than the person so engaging").[25]

---

[25]The Honorable Jennifer B. Coffman, Chief United States District Judge of the Eastern District of Kentucky, reached the same conclusion. <u>See</u> <u>Clark v. Roccanova</u>, 772 F. Supp. 2d 844, 847 (E.D. Ky. 2011)(Coffman, J.). She writes:

> Nothing in the plain language of the statutes or their legislative history indicates that Congress intended 18 U.S.C. § 2251 and § 2252 to apply only to the conduct of adults. Both statutes prohibit creation, possession and transmission of child pornography by any "person." While "person" is not defined in 18 U.S.C. § 2256, the statute's definition of "identifiable minor" begins by stating that a minor is a "person." 18 U.S.C. § 2256(9)(A). This indicates that "person" is meant to refer to an individual of any age, not just an adult. Neither statute at issue contains language which would narrow the definition of "person" to mean only adults.
>
> Additionally, there is nothing in the legislative history which would indicate Congress intended "person" to mean an adult. 18 U.S.C. § 2251 and § 2252 were first enacted as part of the Protection of Children Against Sexual Exploitation Act of 1997, Pub. L. No. 95–225, 92 Stat. 7 (1978). In all legislative records regarding the statutes at issue, Congress refers only to "persons" and does not narrow the term to adults.
>
> Rather, the legislative history of the Act states that the "Committee on Human Resources has a deep and abiding concern for the health and welfare of the *children* and the *youth of America*," and therefore "condemns such base and sordid activities which may permanently traumatize and warp the minds of the *children*

That the Court could not find a case where a minor was charged with violating § 2251(a) is not surprising, and thus not probative of § 2251(a)'s applicability to minors, given how federal courts generally treat juveniles. Under the Federal Juvenile Delinquency Act, 18 U.S.C. § 5031-5042 ("FJDA"), juvenile defendants are typically surrendered to state authorities. See 18 U.S.C. § 5032.[26] In any case, the Court concludes that § 2251(a) applies to minors, even if the FJDA

---

involved." S.Rep. No. 95–438, at 3–4 (1977), U.S. Code Cong. & Admin. News 1978, pp. 40, 40–42 (emphasis added). Encounters which produce child pornography "cannot help but have a deep psychological, humiliating impact on these youngsters and jeopardize the possibility of healthy, affectionate relationships in the future." *Id.* at 6. Nothing in the record indicates that a child would be less traumatized if that pornography is created or transmitted by a child rather than an adult. Lynch argues that the phrase "use of a minor" in the definition of "child pornography" demonstrates that Congress intended to target adults. R. 11 at 6 (quoting 18 U.S.C. § 2256). However, nothing in the phrase, the rest of the definition or the congressional record indicates that only an adult can "use" a minor.

Clark v. Roccanova, 772 F. Supp. 2d at 847.

[26]A juvenile not surrendered to the state or other relevant local authority is processed pursuant to the FJDA unless he or she is "transferred" into adult status and tried in federal district court as an adult. See 18 U.S.C. § 5032. A juvenile defendant can be transferred to adult status if the defendant requests the transfer and the court grants it, see 18 U.S.C. § 5032 ("A juvenile who is alleged to have committed an act of juvenile delinquency and who is not surrendered to State authorities shall be proceeded against under this chapter unless he has requested in writing upon advice of counsel to be proceeded against as an adult."), or if the juvenile defendant committed certain violent, drug, or weapons-related crimes, and a judge decides, after considering certain factors, that the defendant be transferred to adult status, see 18 U.S.C. § 5032.

A FJDA proceeding is not a criminal proceeding. See United States v. Mechem, 509 F.2d 1193, 1195 (10th Cir. 1975)("Congress has barred criminal prosecution of juveniles in certain circumstances and provided for a completely separate system of treatment for them under State or Federal procedures."); Treatment, under the Federal Juvenile Delinquency Act (18 U.S.C.A. §§ 5031-5042), of juvenile alleged to have violated law of United States, 137 A.L.R. Fed. 481 ("The Federal Juvenile Delinquency Act provides a non-criminal procedure for the treatment of juveniles who are subject to federal jurisdiction for having committed an act which violates a federal law, and would have been a crime if committed by an adult."). Process under the FJDA may resemble a criminal proceeding in the sense that a court determines whether the juvenile defendant committed acts that ostensibly violate a criminal statute, see, e.g., United States v. Samuel M., 2013 WL 2284970, at *21 (stating that the United States needed to prove that the juvenile defendant committed acts that a certain criminal statute proscribes), but the more accurate way to

means that the circumstances under which a minor could be criminally prosecuted for violating § 2251(a) are rare.[27]  That criminal prosecutions of minors under § 2251(a) are exceedingly rare counts against the statute's potential breadth, but does not discount it.  Criminal prosecution is not necessary for a statute to limit speech; even when a juvenile defendant is not criminally prosecuted for violating § 2251(a), the juvenile's violating that statute directly leads to other consequences -- e.g., processing under the FDJA or surrender to state jurisdiction.

## B.    SECTION 2251(A) APPLIES TO SOME TEENAGE SEXTING.

Sexting is a broad concept, with no clearly accepted definition.  Sexting commonly includes the sharing of sexually explicit images, videos, or messages with peers.  See Sept. Tr. at 75:10-12 (Kenney-Noziska); id. at 82:20-22 (Kenney-Noziska)(describing the images and videos considered sexts as "naked portrayals"); id. at 106:11-13 (Zimmerman)(describing sext messages

---

put it is that the court determines whether the juvenile defendant is a delinquent, by determining whether he or she committed acts that would have violated a federal criminal statute had the juvenile defendant been an adult when he or she committed them.  See United States v. Allen, 574 F.2d 435, 437 (8th Cir. 1978)(determining that the federal courts, not a tribal court, had jurisdiction over a Native American juvenile defendant's case, even though the Federal Juvenile Delinquency Act is not a crime that the Major Crimes Act enumerates, because the Federal Juvenile Delinquency Act "does not create a substantive offense with its own jurisdictional basis, but rather establishes a procedural mechanism for the treatment of juveniles who are already subject to federal jurisdiction because of the commission of acts cognizable under other federal criminal statute"); United States v. Hill, 538 F.2d 1072, 1075 (4th Cir. 1976)(characterizing "the essential nature" of the Federal Juvenile Delinquency Act proceeding" as "the ascertainment of his status as a juvenile delinquent rather than his conviction as a criminal").

[27]Such a situation would occur if, for example, the defendant violated § 2251(a) while a teenager, but the United States does not indict the defendant until he or she is older than twenty-one, or if the defendant remains in federal court and a judge requests his or her request to be tried as an adult.  See supra n.25.  The Court found one such instance involving § 2251(a).  See Running v. United States, No. CIV 13-3007 RAL, 2016 WL 3083372, at *2 n.4 (D.S.D. May 31, 2016)(Lange, J.).  In that case, the defendant filmed his younger siblings engaging in sexually suggestive conduct when the defendant was fourteen years old, but was not prosecuted until he was twenty-three years old.  See United States v. Running, 431 F. App'x 520, 521 (8th Cir. 2011)(unpublished).

as including "sexually explicit verbiage"); id. at 202:23-203:2 (Strasburger)(stating that the consensus is that sexting includes any sexual images, videos, or text messages); NCMEC Statement at 1; Meta-Analysis at 328. "Sexting" is "a popular term among the public" used broadly to encompass a wide variety of content. True Prevalence at 6. Further complicating matters is that, even within definitions of sexting, scholars divide sexting into several categories, ranging from the relatively benign to the coercive, abuse, and malicious. See Typology at 2 (providing two categories: experimental and aggravated). Experimental sexting is produced by teenagers, for teenagers, and does not involve "malice, misuse, or other criminal use of the image." Sept. Tr. at 85:20-21 (Kenney-Noziska). See id. at 108:19-23 (Kenney-Noziska). "Aggravated" sexting, on the other hand, "involve[s] criminal or abusive elements beyond the creation, sending or possession of youth-produced sexual images." Typology at 2. See Tr. at 84:1-7 (Kenney-Noziska). Aggravated sexting may involve adults, or may involve teenage recipients of the sext who share the sext beyond the sender's consent. See Sept. Tr. at 109:8-10 (Zimmerman); id. at 109:8-14 (Zimmerman, Kenney-Noziska); id. at 172:11-18 (Zimmerman, Strasburger)(describing such situation as cyber bullying).

Section 2251(a) criminalizes "any person who employs, uses, persuades, induces, entices, or coerces any minor to engage in, or has a minor assist any other person to engage in . . . any sexually explicit conduct for the purpose of producing any visual depiction of such conduct." 18 U.S.C. § 2251(a). Congress defines "sexually explicit conduct" as

actual or simulated --

> (i)      sexual intercourse, including genital-genital, oral-genital, anal-genital, or oral-anal, whether between persons of the same or opposite sex;

> (ii)     bestiality;

        (iii)     masturbation;

        (iv)     sadistic or masochistic abuse; or

        (v)     lascivious exhibition of the anus, genitals, or pubic area of any person."

18 U.S.C. § 2256(2)(A).  Section 2256(2)(A) does not define "lascivious," although the Honorable Gordon Thompson, Jr., United States District Judge for the United States District Court for the Southern District of California, in an oft-cited opinion, proposed the following factors:

    1)    whether the focal point of the visual depiction is on the child's genitalia or pubic area;

    2)    whether the setting of the visual depiction is sexually suggestive, i.e., in a place or pose generally associated with sexual activity;

    3)    whether the child is depicted in an unnatural pose, or in inappropriate attire, considering the age of the child;

    4)    whether the child is fully or partially clothed, or nude;

    5)    whether the visual depiction suggests sexual coyness or a willingness to engage in sexual activity;

    6)    whether the visual depiction is intended or designed to elicit a sexual response in the viewer.

United States v. Dost, 636 F. Supp. 828, 832 (S.D. Cal. 1986)(Thompson, J.), aff'd sub nom. United States v. Wiegand, 812 F.2d 1239 (9th Cir. 1987), and aff'd, 813 F.2d 1231 (9th Cir. 1987). The Tenth Circuit has since adopted the United States v. Dost factors but concluded "that all six factors need not be present in order to bring the depiction under the proscription of the statute." United States v. Wolf, 890 F.2d 241, 245 (10th Cir. 1989).  "Whether an image depicts a lascivious exhibition of the genitals or pubic area instead turns on the 'overall content of the visual

depiction.'" United States v. Wells, 843 F.3d 1251, 1254 (10th Cir. 2016)(quoting United States v. Dost, 636 F. Supp. at 832).

Section 2251(a) thus contains several elements. First, "any person," including minors, must --"use[], employ[], persuade[], induce[], entice[], or coerce[]" -- a minor to engage in sexually explicit conduct. 18 U.S.C. § 2251(a). Second, the defendant must do so "for the purpose of producing any visual depiction of such conduct." 18 U.S.C. § 2251(a). Finally, the person must "know[] or ha[ve] reason to know that such visual depiction will be transported using any means or facility of interstate commerce." 18 U.S.C. § 2251(a). Section 2251(a) thus does not require that the defendant personally distribute child pornography; production alone may suffice. Section 2251(a) requires only that the defendant know or have reason to know that the depictions will be distributed or that the depictions have been produced or transmitted through interstate commerce. See 18 U.S.C. § 2251(a). A defendant can thus satisfy this element by "produc[ing]" the child pornography "using materials that have been mailed, shipped, or transported in or affecting interstate of foreign commerce." 18 U.S.C. § 2251(a). Use of a recording or photographing device manufactured outside the state in which the sexually explicit conduct occurs is sufficient. See, e.g., United States v. Smith, 945 F.3d 860 (5th Cir. 2019).

Although experts and scholars have divided sexts into categories based on the degree of harm the sext causes the subject, § 2251 does not distinguish between the different classes of sexting. See 18 U.S.C. § 2251. Instead, § 2251 defines child pornography by the subject's age and the image's content. See 18 U.S.C. § 2256(1)-(2)(A). Accordingly, § 2251(a) would not prohibit, for example, a teenager sharing a self-produced photograph of her breasts with her teenage boyfriend. Nonetheless, §2251(a)'s plain language makes no distinction that could insulate teenagers' self-produced sexts, even those that may fall under the experimental category,

provided that the sexts depict minors engaging in sexually explicit conduct. See 18 U.S.C. § 2251(a). Nor does § 2251(a) require the sext's viewer be an adult. Instead, "any person who employs, uses persuades, induces, entices, or coerces any minor to engage in . . . sexually explicit conduct" for the purposes of creating a visual depiction of that conduct, is guilty of violating § 2251(a). Accordingly, § 2251(a) applies to minors who self-produce any visual depiction of sexually explicit conduct.

## III. THE FIRST AMENDMENT DOES NOT PROTECT TEENAGE SEXTING, AND 2251(a) IS NOT OVERBROAD.

Streett defines "teenage sexting" as "self-produced nude images that a teenager typically produces with their cellular telephone and then transmits to a teenage peer, typically a partner with whom the producer of the image is involved in a romantic relationship." Motion at 1 n.1. As one can readily see, this definition is incredibly broad. This definition would include a girl, not doing anything sexually explicit, sending an unsolicited photograph of her breasts to her boyfriend. The Supreme Court has not ruled on whether that conduct is protected speech and Congress is not trying to regulate it, so we need not dwell on that speech. See 18 U.S.C. § 2251(a) (criminalizing employing, using, persuading, inducing, enticing, or coercing a minor to engage in "sexually explicit conduct for the purpose of producing any visual depiction of such conduct"); 18 U.S.C. § 2256(2)(A) (defining "sexually explicit conduct" as "actual or simulated -- (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person"). The issue that the Court must decide is whether there is a smaller subset of Streett's definition of "teenage sexting" that Congress has criminalized in § 2251(a) and which the First Amendment protects.

## A. THE FIRST AMENDMENT DOES NOT PROTECT ANY TEENAGE SEXTING THAT § 2251(a) PROHIBITS.

The First Amendment protects "generally prevents government from proscribing speech," but, "our society, like other free but civilized societies, has permitted restrictions upon the content of speech in a few limited areas." R.A.V. v. City of St. Paul, Minn., 505 U.S. 377, 382-83 (1992). Relevant here, the First Amendment does not protect child pornography, see Ferber, 458 U.S. 747, 765 (1982)("Ferber"), nor does it protect obscenity, see Roth v. United States, 354 U.S. 476, 485 (1957). The Court will first discuss children's First Amendment rights as both speaker and audience. The Court will then discuss child-pornography caselaw and its applicability to teenage sexting. The Court concludes that, whatever protection the First Amendment might afford teenage sexting, the First Amendment does not protect any teenage sexting that § 2251(a) prohibits.

Streett contends that all -- or nearly all -- teenage sexting is constitutionally protected speech. See Motion at 2-3. Streett contends that Ferber categorically excludes child pornography from First Amendment protections because child pornography is intrinsically linked to child abuse. See Motion at 6 (citing Ferber, 458 U.S. at 759). Because teenage sexting, Streett contends, is neither intrinsically linked to child abuse nor harmful to the teenage sexter, teenage sexting is not child pornography. See Motion at 6. Streett also asserts that teenage sexting is not necessarily obscene. See Motion at 8. Streett also observes that the Supreme Court in United States v. Stevens foreclosed the creation of further categories of unprotected speech. See Motion at 6 (citing United States v. Stevens, 559 U.S. 460, 470-71 (2010)). Streett accordingly argues that, because teenage sexting is neither child pornography nor necessarily obscene speech, and because the Supreme Court has foreclosed the creation of further categories of unprotected speech, teenage sexting is constitutionally protected from a categorical ban like § 2251(a). See Motion at 6-8. The United

States responds and asserts that teenage sexting is not protected speech.  See Response at 4. Nonetheless, the United States argues that, even if the Constitution protects some teenage sexting, Congress' interest in regulating child pornography justifies § 2251(a).  See Response at 6.

The Court first notes that, in the First Amendment context, the Supreme Court treats minors somewhat differently than it treats adults.  Concerning the First Amendment and its relation to minors, the Supreme Court's cases appear to be split broadly into two categories.  The first concerns the government's ability to curtail otherwise protected speech that may reach minors. The Supreme Court's "First Amendment jurisprudence has acknowledged limitations on the otherwise absolute interest of the speaker in reaching an unlimited audience where the speech is sexually explicit and the audience may include children."  Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. 675, 684 (1986).  Accordingly, the Supreme Court has upheld statutes prohibiting the sale of sexually explicit material to minors, "even though the material in question was entitled to First Amendment protection with respect to adults."  Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. at 684 (citing FCC v. Pacifica Found., 438 U.S. 726; Ginsberg v. N.Y., 390 U.S. 629 (1968)). Relevant for sexting's purposes, the Supreme Court also has affirmed legislative authority to restrict minors' access to non-obscene pornography.  See Ginsberg v. N.Y., 390 U.S. at 636-37. The second category, pertaining to minors' free speech rights, primarily involves the rights of schools to curtail speech.  The Court has given special authority to schools, in loco parentis, to curtail youth expression that would otherwise be protected off school grounds.  Cf. Morse v. Frederick, 551 U.S. at 405 (discussing Bethel Sch. Dist. No. 403 v. Fraser, 478 U.S. at 682, and noting that, "[h]ad Fraser delivered the same speech in a public forum outside the school context, it would have been protected.").  Similarly, given the "'special characteristics of the school environment,'" the Supreme Court has allowed a school to punish a student's school-related

speech that could be construed as advocating drug use.  Morse v. Frederick, 551 U.S. at 408-10

(quoting Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 506 (1969)).  Nonetheless,

even in the school context, the government does not have the authority to compel children to speak

or express a message, see W. Va. Bd. of Educ. v. Barnette, 319 U.S. 624, 644 (1943), or punish

political speech, see Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. at 514.

     Other First Amendment principles also take on different shape when applied to minors.

The Supreme Court in Reed v. Gilbert declared that "regulation of speech is content based if a law

applies to particular speech because of the topic discussed or the idea or message expressed."  135

S. Ct. 2218, 2227 (2015).  "A law that is content based on its face is subject to strict scrutiny

regardless of the government's benign motive, content-neutral justification, or lack of 'animus

toward the ideas contained' in the regulated speech."  Reed v. Gilbert, 135 S. Ct. at 2228.  The

Court observes, however, that the Supreme Court has not always applied this tenet to minors'

speech, especially in the school context.  See Morse v. Frederick, 441 U.S. at 409 (holding that a

school has the power to punish speech advocating drug use); Douglas Laycock, High Value Speech

and the Basic Educational Mission of a Public School: Some Preliminary Thoughts, 12 Lewis &

Clark. L. Rev. 111 (2008)(contending that the school's restricting a "Bong Hits 4 Jesus" banner

was "squarely and explicitly based on viewpoint.").  Similarly, even the dissenting justices in

Morse v. Frederick acknowledged that schools may punish advocacy of illegal conduct, despite

adults having a right to engage in such speech.  Compare Morse v. Frederick, 551 U.S. at 435

(Stevens, J., dissenting)(arguing that "the First Amendment protects student speech if the message

itself neither violates a permissible rule nor expressly advocates conduct that is illegal and harmful

to students."), with Brandenburg v. Ohio, 395 U.S. 444, 447-448 (1969)(per curiam)("the

constitutional guarantees of free speech and free press do not permit a State to forbid or proscribe

advocacy of the use of force or of law violation except where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."); NAACP v. Claiborne Hardware Co., 458 U.S. 886, 928-929 (1982).

Accordingly, although the First Amendment protects broadly minors' speech, minors receiver a lesser degree of protection than adults, and the Supreme Court has blessed narrow legislative efforts to protect children from otherwise-protected but harmful material. The crucial question, then, is whether Ferber applies to teenage sexting. The Court reads the caselaw in this area as holding that governments have a compelling interest in protecting children from child pornography and are afforded considerable leeway in regulating those aspects of the child pornography market that are intrinsically related to the harm that child pornography inflicts on children. Ferber involved a New York statute prohibiting the "distribution of material depicting children engaged in sexual conduct without requiring that the material be legally obscene." Ferber, 458 U.S. at 749. The defendant sold two films depicting young boys masturbating, and was convicted for violating the statute. See Ferber, 458 U.S. at 752. The issue before the Supreme Court was thus whether the legislature has the power to prohibit the distribution of non-obscene material that depicts children engaged in sexual conduct. See Ferber, 458 U.S. at 753. The Supreme Court charted a trajectory, beginning with Chaplinsky v. New Hampshire, in which the Court identified the existence of categories of speech that are "'of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.'" Ferber, 458 U.S. at 754 (quoting Chaplinsky v. New Hampshire, 315 U.S. at 572). The Supreme Court noted that this language led naturally to its recognition of obscenity as an unprotected category of speech, but the Court asserted that it had carefully balanced "the State's interests in protecting the 'sensibilities of unwilling recipients' from exposure to

pornographic material and the dangers of censorship inherent in unabashedly content-based laws."
See Ferber, 458 U.S. at 755-56 (quoting Miller v. Cal., 413 U.S. 15, 18 (1973)). The Supreme
Court concluded, however, that "the States are entitled to greater leeway in the regulation of
pornographic depictions of children" than they are in regulating obscene images and depictions of
adults. Ferber, 458 U.S. at 756. The Supreme Court accordingly held that states are afforded
flexibility in targeting that which is intrinsically related to the harm that child pornography causes.

The Supreme Court based its conclusion, first and primarily, on states' compelling interest
in "'safeguarding the physical and psychological well-being of a minor[.]'" Ferber, 458 U.S. at
756 (quoting Globe Newspaper v. Superior Court, 457 U.S. 596, 607 (1982)). The Supreme Court
noted several instances in which it had permitted, as compelling interests, states to restrict
children's access to otherwise-protected material, but characterized states' interest in preventing
"sexual exploitation and abuse of children" as an "objective of surpassing importance." Ferber,
458 U.S. at 757. The Supreme Court blessed the states' "legislative judgment . . . that the use of
children as subjects of pornographic materials is harmful to the physiological, emotion, and mental
health of the child," and cited medical authorities documenting child pornography's harm to its
subjects. Ferber, 458 U.S. at 758.

The Supreme Court dedicates much of the rest of its opinion to delineating the facets of the
child pornography market that intrinsically relate to the harm that child pornography's production
causes. Accordingly, the Supreme Court next concluded that child pornography's distribution "is
intrinsically related" to child abuse because child pornography is "a permanent record" of the
child-subject's harm, and because preventing child pornography's distribution is a necessary
means to end its production. Ferber, 458 U.S. at 759. Unlike sexually explicit depictions of adults,
accordingly, states need not demonstrate that the child pornography they prohibit appeals to the

prurient interest, or that it be patently offensive.  See Ferber, 458 U.S. at 760-61.  The Supreme Court expressly rejected requiring that states ban only obscene child pornography, in part because doing so would render it more difficult to prosecute child pornographers and end the abuse they inflict.  See Ferber, 458 U.S. 747, 761 (1982).  Third, the Supreme Court similarly concluded that child pornography's sale incentivizes -- and thus is intrinsically related to -- its production, so states can prohibit child pornography's advertisement.  See Ferber, 458 U.S. at 761-62.  Because child pornography's production is "illegal throughout the Nation," states can also ban its sale and advertisement.  Ferber, 458 U.S. at 761.  In an oft-quoted passage, the Supreme Court asserted that "'[i]t has rarely been suggested that the constitutional freedom for speech and press extends its immunity to speech or writing used as an integral part of conduct in violation of a valid criminal statute.'"  Ferber, 458 U.S. at 761-62 (quoting Giboney v. Empire Storage & Ice Co., 336 U.S. 490, 498 (1949)).  Fourth, the Supreme Court concluded statutes like New York's present little danger of overbreadth, because actual children engaged in sexual conduct could almost never "constitute an important and necessary part of a literary performance or scientific or educational work," such that child pornography's value is "exceedingly modest, if not de minimis."  Ferber, 458 U.S. at 762-63.  Finally, the Court asserted that its content-based holding is compatible with prior caselaw because, for some classes of speech, it is the content itself whose "evil to be restricted so overwhelmingly outweighs the expressive interest, if any, at stake."  Ferber, 458 U.S. at 763.  Accordingly, a "trier of fact need not find that the material appeals to the prurient interest of the average person; it is not required that sexual conduct portrayed be done so in a patently offensive manner; and the material at issue need not be considered as a whole."  Ferber, 458 U.S. at 764.  The Court reads Ferber, therefore, to provide states considerable "leeway" in their efforts to end child pornography and the harm it inflicts to children.

The Supreme Court in <u>Osborne v. Ohio</u>, 495 U.S. 103 (1990), further developed the tools at states' disposal in ending child pornography.  In that case, the Supreme Court held that states may prohibit child pornography's possession to defeat its production, affirming that the interest in protecting children from sexual abuse is compelling enough to regulate each component of the child pornography market.  <u>See</u> <u>Osborne v. Ohio</u>, 495 U.S. at 109-11.  One of the Supreme Court's main justifications was preventing child pornography's subjects from being "haunt[ed]" by the their images' continued existence and circulation.  <u>Osborne v. Ohio</u>, 495 U.S. at 111.  The State of Ohio argued that, since <u>Ferber</u>, "much of the child pornography market has been driven underground; as a result, it is now difficult, if not impossible, to solve the child pornography problem by only attacking production and distribution."  <u>Osborne v. Ohio</u>, 495 U.S. at 110.  The Supreme Court also noted that pedophiles use child pornography "to seduce other children into sexual activity," such that child pornography's possession perpetuates its production.  <u>Osborne v. Ohio</u>, 495 U.S. at 111.

Governments' ability to regulate the child pornography market in order to end the abuse the child pornography inflicts, however, is not limitless.  The Supreme Court refined its child pornography doctrine in <u>Free Speech Coalition</u>, 535 U.S. 234.  In <u>Free Speech Coalition</u>, the Supreme Court addressed the constitutionality of the Child Pornography Prevention Act of 1996 ("CPPA"), 18 U.S.C. § 2251 et seq, that prohibited, in relevant part, virtual child pornography and pornography made with adults who look like children.  <u>See</u> <u>Free Speech Coalition</u>, 535 U.S. at 239.  Because the CPPA did not exempt speech with "redeeming social value," it potentially prohibited "Renaissance painting[s]" and "Hollywood movies, filmed without any child actors, if a jury believes an actor 'appears to be' a minor engaging in "actual or simulated . . . sexual intercourse.'"  <u>Free Speech Coalition</u>, 535 U.S. at 241 (quoting 18 U.S.C. § 2256(2) (1996)).

Congress' stated rationale for the CPPA was that virtual child pornography could lead to increased production of actual child pornography, as pedophiles might "use the materials to encourage children to participate in sexual activity," or to "whet their own sexual appetites, . . . thereby increasing" the demand for actual child pornography. Free Speech Coalition, 535 U.S. at 241. Further, virtual child pornography's existence renders it "more difficult to prove that a particular picture was produced using actual children," such that actual child pornography's producers might evade prosecution. Free Speech Coalition, 535 U.S. at 242. "Under these rationales, harm flows from the content of the images, not from the means of their production." Free Speech Coalition, 535 U.S. at 242. A California trade association for the adult entertainment industry challenged the CPPA for overbreadth and vagueness. See Free Speech Coalition, 535 U.S. at 243.

Writing for the Supreme Court, Justice Kennedy asserted that the CPPA's ban on virtual child pornography went "beyond [Ferber], which distinguished child pornography from other sexually explicit speech because of the State's interest in protecting the children exploited by the production process." Free Speech Coalition, 535 U.S. at 239. Justice Kennedy asserted that the Supreme Court would have to regard virtual child pornography "as an additional category of unprotected speech" to uphold the CPPA. Free Speech Coalition, 535 U.S. at 246. The CPPA, Justice Kennedy contended, "proscribes the visual depiction of an idea -- that of teenagers engaging in sexual activity -- that is a fact of modern society and has been a theme in art and literature throughout the ages." Free Speech Coalition, 535 U.S. at 246. Further, the CPPA prohibited images featuring persons who appear to be younger than eighteen, an age "higher than the legal age for marriage in many States, as well as the age at which persons may consent to sexual relations." Free Speech Coalition, 535 U.S. at 247. The Supreme Court rejected the United States' argument that the speech which the CPPA prohibits is "virtually indistinguishable from

child pornography."  Free Speech Coalition, 535 U.S. at 249.  Ferber, the Supreme Court contended, allows for wholesale prohibition of images that "are themselves the product of sexual abuse" regardless of such images' possible social value.  Free Speech Coalition, 535 U.S. at 249.  This is because such images are themselves a permanent record of child abuse.  See Free Speech Coalition, 535 U.S. at 249.  "Like a defamatory statement, each new publication of the speech would cause new injury to the child's reputation and emotional well-being."  Free Speech Coalition, 535 U.S. at 249.  In contrast, the Supreme Court argued, virtual child pornography "records no crime and creates no victims by its production."  Free Speech Coalition, 535 U.S. at 250.  Similarly, the United States' compelling interest in preventing child abuse did not extend to banning otherwise protected content that might inspire child abuse.  See Free Speech Coalition, 535 U.S. at 253.  "The mere tendency of speech to encourage unlawful acts is not a sufficient reason for banning it."  Free Speech Coalition, 535 U.S. at 253.  Justice Kennedy further opined that virtual child pornography is not indistinguishable from actual child pornography: were that so, Justice Kennedy argued, "the illegal images would be driven from the market by the indistinguishable substitutes."[28]  Free Speech Coalition, 535 U.S. at 253.  Free Speech Coalition

---

[28]If not inaccurate when written, several scholars have argued that these words vastly understate the difficulty of distinguishing between virtual and actual child pornography given contemporary technology.  See, e.g., Brian G. Slocum, Virtual Child Pornography: Does It Mean the End of the Child Pornography Exception to the First Amendment, 14 Alb. L.J. Sci. & Tech. 637 (2004). Daniel S. Armagh, Virtual Child Pornography: Criminal Conduct or Protected Speech, 23 Cardozo L. Rev. 1993 (2002).  Congress recognized that "[a]n image seized from a collector of child pornography is rarely a first-generation product, and the retransmission of images can alter the image so as to make it difficult for even an expert conclusively to opine that a particular image depicts a real child."  H.R. Rep. No. 107-526, at 18.  Justice Kennedy's assertion is also likely anachronistic, particularly with the recent advent of "Deepfake" technology, which cheaply uses artificial intelligence to create hyper-realistic videos of real people engaged in falsified actions.  See Cade Metz, "Internet Companies Prepare to Fight the 'Deepfake; Future," The New York Times (Nov. 24, 2019), available at https://www.nytimes.com/2019/11/24/technology/tech-companies-deepfakes.html (last visited December 27, 2019).  Even relatively dated -- and widely

accordingly stands for the proposition that, despite the compelling interest in protecting children from sexual abuse and exploitation, legislatures may not ban speech that is merely linked to child pornography without demonstrating that speech's inherent harm to children.

The Supreme Court in United States v. Stevens foreclosed the possibility of further categories of unprotected speech and argued that the First Amendment's "guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits." 559 U.S. at 470. The Supreme Court further declared that established free speech exceptions are all based upon "a previously recognized, long-established category of unprotected speech." United States v. Stevens, 559 U.S. at 470. The Supreme Court accordingly held that, before a state may regulate a class of speech, the state must show a "long-settled tradition of subjecting that speech to regulation." 559 U.S. at 469. In United States v. Stevens, Chief Justice

---

available -- software, like PhotoShop, allows anyone with a computer to create virtual child pornography indistinguishable from the real thing:

> [O]nce an image is stored on a computer, it is impossible to tell absolutely, using just the image itself, whether it has been transferred to the computer from a photograph of an actual minor or has been created from scratch or modified from a real photograph using only a computer program and the author's imagination.

Timothy J. Perla, Attempting to End the Cycle of Virtual Pornography Prohibitions, 83 B.U. L. Rev. 1209, 1219 (2003).

Justice Thomas, concurring, noted that "technology may evolve to the point where it becomes impossible to enforce actual child pornography laws because the Government cannot prove that certain pornographic images are of real children." Free Speech Coalition, 535 U.S. at 259 (Thomas, J., concurring in the judgment). Were such technology to eclipse the ability to tell real from fabricated, Justice Thomas asserted that legislatures should be permitted to enact "regulation of virtual child pornography that contains an appropriate affirmative defense or some other narrowly drawn restriction." Free Speech Coalition, 535 U.S. at 259. Similarly, Justice O'Connor, with whom Chief Justice Rehnquist and Justice Scalia joined, argued that the CPPA's ban on virtual child pornography could be saved by interpreting "appears to be . . . of a minor" as "virtually indistinguishable" from actual child pornography. Free Speech Coalition, 535 U.S. at 264-65 (O'Connor, J., concurring in part and dissenting in part).

John Roberts stated that <u>Ferber</u> "grounded its analysis in a previously recognized, long-established category of unprotected speech, and our subsequent decisions have shared this understanding." <u>United States v. Stevens</u>, 559 U.S. at 471. The Chief Justice summarized that "long-established category" as the absence of a First Amendment right to use speech "'as an integral part of conduct in violation of a valid criminal statute.'" <u>United States v. Stevens</u>, 559 U.S. at 471 (quoting <u>Ferber</u>, 458 U.S. at 761-62). The Chief Justice thus characterized <u>Ferber</u> not as the result of "a simple cost-benefit analysis" but as the natural outgrowth of a longstanding, historical exception to the First Amendment.[29]

Against this backdrop, if teenage sexting is unprotected, it must be because it falls within <u>Ferber</u>'s umbrella. <u>See</u> <u>United States v. Stevens</u>, 559 U.S. at 469 (foreclosing new categories of

---

[29]Scholars and commentators have criticized this characterization, insisting instead that history has rarely, if ever, been the basis of determining whether First Amendment protections apply. <u>See</u>, <u>e.g.</u>, Genevieve Lakier, <u>The Invention of Low-Value Speech</u>, 128 Harv. L. Rev. 2166, 2178-79 (2015)(noting an absence of nineteenth century First Amendment caselaw, and asserting that "early American courts did not in fact recognize the existence of a delimited set of well-defined and narrowly limited categories to which the constitutional guarantees of press and speech freedom did not apply."). Professor Lakier also asserts that "for all intents and purposes, obscenity was constitutionally protected against prior restraint, if not post-publication sanctions." 128 Harv. L. Rev. at 2187 (collecting cases). As Justice Joseph Story wrote in 1833:

> [T]he language of [the first] amendment imports no more, than that every man shall have a right to speak, write, and print his opinions upon any subject whatsoever, without any prior restraint, so always, that he does not injure any other person in his rights, person, property, or reputation; and so always, that he does not thereby disturb the public peace, or attempt to subvert the government. . . .
> . . .
> . . . Every freeman has an undoubted right to lay what sentiments he pleases before the public; to forbid this is to destroy the freedom of the press. But, if he publishes what is improper, mischievous, or illegal, he must take the consequences of his own temerity.

Joseph Story, <u>Commentaries on the Constitution of the United States</u> § 1874, at 732, §1878, at 736 (1833)(footnotes omitted).

unprotected speech). Streett argues that <u>Ferber</u> is inapplicable because it is not inherently harmful to the children who produce it. <u>See</u> Motion at 6. Nor could § 2251(a) be justified as a ban on obscenity, as not all teenage sexting is categorically obscene, and §§ 2251(a) and 2256 lack any requirement that the conduct and images they prohibit lack artistic, literary, or scientific value. <u>See</u> <u>Williams</u>, 553 U.S. at 309.

Contrary to both Streett's and the United States' assertions, it is difficult to generalize teenage sexting's harm, as it occurs in a variety of contexts. Consensual sexting may be a healthy, normal behavior among adolescents.

> The sharing of sexual images, while risqué in one cultural dimension, may also be a form of sexual sharing that has some comparative safety to it in contrast to face-to-face sexual intimacy, since it can be engaged in outside the presence of the other person. Thus the feelings of immediate embarrassment may be more manageable, a youth can control how she or he appears to another, and the pressure for additional sexual intimacy is not so intense and immediate, as it might be in a face-to-face sexual encounter.

<u>Typology</u> at 9 (footnote omitted). The <u>Meta-Analysis</u> reveals that sexting's prevalence increases with age, which "is expected and generally corresponds to the age of sexual identity and exploration, which leads credence to the notion that youth sexting may be an emerging, and potentially normal, component of sexual behavior and development." <u>Meta-Analysis</u> at 332. <u>See</u> <u>id.</u> at 332 ("It is possible that [sexting] may be a normal part of sexual behavior and identity formation in the digital age."). Aggravated sexting, on the other hand, often leads to disastrous consequences. Consequences of aggravated sexting include: "clinical levels of anxiety," Sept. Tr. at 94:24 (Kenney-Noziska), which is different from typical anxiety because it "impact[s] the way somebody functions," Sept. Tr. at 95:4 (Kenney-Noziska); "clinical levels of depression," Sept. Tr. at 95:6 (Kenney-Noziska); impact on self-perception and self-identity, <u>see</u> Sept. Tr. at 95:7-9 (Kenney-Noziska); low self-esteem, shame, or guilt, <u>see</u> Sept. Tr. at 95:10-11 (Kenney-Noziska);

cutting or other self-harm, see Sept. Tr. at 95:13 (Kenney-Noziska); eating disorders, see Sept. Tr. at 95:13 (Kenney-Noziska); substance abuse or addiction, see Sept. Tr. at 95:714-15 (Kenney-Noziska); isolation, see Sept. Tr. at 95:18 (Kenney-Noziska); entering "risky or unsafe or dangerous relationships," see Sept. Tr. at 95:20-21 (Kenney-Noziska); cyber bullying or even suicide, see Sept. Tr. at 95:25-96:1 (Mease, Kenney-Noziska), or attempted suicide, see Sept. Tr. at 187:19 (Strasburger).

Despite these varied effects on teenagers who engage in sexting, there is no way to distinguish, based on an image's content, whether the sext was the product of consensual sexting or aggravated sexting. Some studies, however, associate certain harmful effects with sexting generally, and do not distinguish between classes of sexting. For example, the 2015 Pennsylvania Survey's results underscored the correlation between sexting and other sexual activity, but also found that "consensual sexting is highly related to alcohol and tobacco use, . . . being cyberbullied, and reporting both depressive symptoms and previous suicide attempts," although it could not determine causality. 2015 Pennsylvania Survey at 195. Accordingly, at this time, it is premature to conclude, and there is no indication that, experimental, consensual sexting is causing those teenagers who consensually sext to engage in other risky behaviors -- such as alcohol and drug use, teenage pregnancy, and attempting suicide. See Sept. Tr. at 116:3-117:15 (Zimmerman, Kenney-Noziska); id. at 183:12-23 (Strasburger); 2015 Pennsylvania Survey at 195 (showing that, while consensual sexting is related to risk behaviors, causality is unknown).

In addition to the inability to distinguish between consensual and aggravated sexts, the Court observes the difficulties that would arise if speech, like sexts, were protected for some viewers but not for others. It is clear that Congress enacted § 2251(a) and the other, adjacent statutes in order to protect children from sexual abuse, particularly by adult producers of child

pornography.[30]  In several cases, the Supreme Court has held that speech "within the rights of adults to hear may not be silenced completely in an attempt to shield children from it." <u>Free Speech Coalition</u>, 535 U.S. at 252.  <u>See</u> <u>United States v. Playboy Entm't Group, Inc.</u>, 529 U.S. 803 (2000); <u>Sable Commc'ns of Cal., Inc. v. FCC</u>, 492 U.S. 115 (1989); <u>Butler v. Michigan</u>, 352 U.S. 380 (1957).  Here, Streett would have the Court conclude that Government may not silence speech that children may have a right to hear in an attempt to shield adults from it.  <u>See</u> Motion at 1-4.  The United States pursued this argument at the evidentiary hearing and observed the classification difficulties that would arise if a seventeen-year-old recipient of his teenage girlfriend's sexts retained those photographs after his eighteenth birthday.  <u>See</u> Sept. Tr. at 232:12-16 (Mease, Strasburger).  Streett would have the Court hold that teenagers have a First Amendment right to create sexually explicit images of themselves and share those images with other teenagers.  If teenagers have such a right because this behavior is not inherently harmful, and thus <u>Ferber</u> does not apply, then the Supreme Court's holding in <u>Osborne v. Ohio</u> is also likely inapplicable such that legislatures could not prohibit adults from possessing self-produced, sexually explicit

---

[30]Congress' stated rationales for § 2251 are:

(1)    child pornography has developed into a highly organized, multi-million dollar industry which operates on a nationwide scale;

(2)    thousands of children including large numbers of runaway and homeless youth are exploited in the production and distribution of pornographic materials; and

(3)    the use of children as subjects of pornographic materials is harmful to the physiological, emotional, and mental health of the individual child and to society.

Child Protection Act of 1984, Pub. L. No. 98-292, 98 Stat. 204 (codified as amended at 18 U.S.C. § 2251 (2006)).

photographs of fifteen-year-olds.  See Osborne v. Ohio, 495 U.S. at 110-12.  The Court is uncomfortable with such a broad consequence of holding that teenage sexting is constitutionally protected.

Instead, the Court concludes that teenagers do not have a constitutional right to sext with other teenagers.  Ferber, Free Speech Coalition, and United States v. Stevens do not render teenage sexting constitutionally protected.  Free Speech Coalition pertained to virtual images or those featuring young-looking adults; it did not pertain to sexually explicit images of real children.  See Free Speech Coalition, 535 U.S. at 241.  Ferber's categorical exclusion of sexually explicit images of children thus remains valid.  Accordingly, Free Speech Coalition does not necessarily mean that the First Amendment's application to images of nude children depends on the extent to which the process traumatizes that child.  Cf. Williams, 553 U.S. at 297 ("Critically, unlike in *Free Speech Coalition*, § 2252A(a)(3)(B)(ii)'s requirement of a 'visual depiction of an actual minor' makes clear that, although the sexual intercourse may be simulated, it must involve actual children").

Further, protecting self-produced child pornography would thwart the government interests that the Supreme Court recognized as compelling in Ferber.  First, protecting self-produced child pornography would inhibit efforts to eradicate coercive, adult-made child pornography.  The Supreme Court characterized this interest as one of "surpassing importance," Ferber, 458 U.S. at 757, and accordingly affirmed banning child pornography's possession as a valid and direct means of curtailing its production, see Osborne v. Ohio, 495 U.S. at 113.  Prohibiting child pornography's possession reduces its demand, and thereby curtails its existence and the child abuse that it causes. See Osborne v. Ohio, 495 U.S. at 109.  Protecting self-produced child pornography would render it difficult to enforce bans on exploitive, adult-produced child pornography, as authorities may not be able to distinguish between to the two based on images' content alone.  The market for child

pornography does not distinguish between self-produced images and those that adults produce.[31] Approximately 5.4% of all child pornography on the internet is self-produced, such that protecting teenage sexting would likewise render it difficult for authorities to distinguish between the images that Streett seeks to protect and those that adult pedophiles produce. See Societal Response at 19. Similarly, pedophiles use child pornography -- including self-produced child pornography -- to entice other children to participate in similar conduct, thereby perpetuating the abuse that renders child pornography unprotected.[32] See Osborne v. Ohio, 495 U.S. at 111. "When offenders use these images, whether self-produced or otherwise, the damage is the same." Societal Response at 15. Self-produced child pornography, accordingly, perpetuates the same secondary harms as adult-produced child pornography, and thus falls under Ferber's umbrella.

Further, as discussed, self-produced child pornography is not harmless in and of itself, and its production allows for a "permanent record of the children's participation." Ferber, 458 U.S. at 759. The evidence before the Court demonstrates that there is no bright line between self-produced, experimental sexting and that which results from coercion or abuse. Some teenagers who engage in normative, experimental sexting come to regret that behavior later, and may suffer anxiety or other harm as a result. See Sept. Tr. at 132:1-5 (Mease, Kenney-Noziska). Kenney-Noziska attributes this to the fact that, once the sext is sent, it is no longer in the teenager's control,

---

[31]Indeed, studies show that "'many offenders prefer [images of] children who are smiling and who appear to be enjoying'" their role in the images. Societal Response at 16 (quoting Ethel Quayle, "The Impact of Viewing an Offending Behavior," in Child Sexual Abuse and the Internet: Tackling the New Frontier (Martin Calder eds., 2004)).

[32]"One study found that in twenty-two percent of juvenile sexual abuse cases, the abuser used pornography prior to the attack to groom, legitimize, and demonstrate for the victim what to do." Societal Response at 13-14 (citing Mimi Halper Silbert, "The Effects on Juveniles of Being Used for Pornography and Prostitution" at 215, 226, in Pornography: Research Advances and Policy Considerations (Dolf Zillman & Jennings Bryant eds., 1989)).

leaving the sender vulnerable to coercion. Sept. Tr at 133:2-21 (Mease, Kenney-Noziska). Between eight and twelve percent of sexts are forwarded without the sender's consent, regardless whether the initial sext was sent voluntarily in love and good fun, or as the result of abuse or coercion. See Sept. Tr. at 174:2-7 (Strasburger). Once leaked or posted to the internet, sexts are difficult to retrieve or erase regardless of the sexter's initial motivation, making the "sexual exploitation or . . . abuse . . . even harder to recover from." Sept. Tr. at 97:13-21 (Kenney-Noziska). Nor are the teenage sexters themselves often aware of where the line is. Given teenagers' latent prefrontal cortex development, they are susceptible to being coerced or induced into producing sexts despite believing they are "engaging in perfectly normal behavior." Sept. Tr. at 98:8-19 (Mease, Kenney-Noziska). Teenagers are prone to believe that they are engaging in consensual behavior, despite a romantic partner or internet acquaintance coercing them. See Sept. Tr. at 114:8-15 (Kenney-Noziska). Because of latent brain development, "[y]ounger teenagers don't appreciate the risks of sexting," even those who are "in a good relationship." Sept. Tr. at 180:24-181:1 (Strasburger). Teenage sexting -- self-produced child pornography -- is thus intrinsically related to the adult-produced child pornography that Streett seeks to distinguish. Given these harms, the Supreme Court concluded that legislatures can ban child pornography's production and possession without regard to whether the material amounts to obscenity. See Ferber, 458 U.S. at 751-53. "The value of permitting live performances and photographic reproductions of children engaged in lewd sexual conduct is exceedingly modest, if not *de minimis.*" Ferber, 458 U.S. at 762.

For these reasons, § 2251(a) is not subject to heightened scrutiny as a content-based restriction. Streett asserts, in a footnote, that § 2251(a) is "a content-based restriction subject to strict scrutiny." Motion at 4 n.2. Streett does not elaborate this argument or describe how

§ 2251(a) discriminates on the basis of sexually explicit images' content. Streett is correct that statutes that discriminate between speech's content are subject to strict scrutiny. See, e.g., Reed v. Town of Gilbert, Ariz., 135 S. Ct. at 2227. The caselaw establishes, however, that child pornography statutes are typically not subject to such analysis. See Ferber, 458 U.S. at 763-64 (noting that the First Amendment's categorical exclusions are all content-based, such that "it is not rare that a content-based classification of speech has been accepted because it may be appropriately generalized that within the confines of the given classification, the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required"). As Justice Scalia described, rejecting a similar argument that sought to distinguish commercial child pornography exchanges from noncommercial ones: "It would be an odd constitutional principle that permitted the government to prohibit offers to sell illegal drugs, but not offers to give them away for free." Williams, 553 U.S. at 298.

In any case, even if the First Amendment were to protect some teenage sexting, Ferber makes clear that the First Amendment does not protect the conduct that § 2251(a) prohibits. Section 2251(a) addresses not just the content of images like sexts, but also the manner in which such images are procured. There are thus two issues as play: whether the First Amendment protects the content of teenage sexts, and whether the First Amendment protects the right to procure such content. Section 2251(a), accordingly, "penalizes speech that accompanies or seeks to induce a transfer of child pornography -- via reproduction or physical delivery -- from one person to another." Williams, 553 U.S. at 294. Notably, the statute criminalizes the person who "employs, uses, persuades, induces, entices, or coerces any minor" to engage sexually explicit conduct to produce a visual depiction of such conduct. 18 U.S.C. § 2251(a). The statute's unambiguous and plain language therefore necessarily requires two people: (i) the person, who

could be a minor, who is doing the employing/using/persuading/inducing/enticing/coercing; and (ii) the minor who is being employed/ used/persuaded/induced/enticed/coerced.  This does not then cover, as Streett argues, a minor taking a photograph on his or her own accord, because that minor is not being employed/used/persuaded/induced/enticed/coerced by another.  Thus, any instance of teenage sexting that falls under the statute would require one teenager employing/using/ persuading/inducing/enticing/coercing another to produce the sexually explicit image.  As the Court understands the expert testimony at the evidentiary hearing, such conduct would be considered "aggravated sexting," which produces adverse psychological consequences.  Sept. Tr. at 85:12-24 (Kenney-Noziska, Mease); id. at 94:22-95:22 (Kenney-Noziska).  This conduct falls into Ferber's exception to First Amendment protection: sexually explicit depictions of minors, the production of which involves committing a crime that inflicts psychological harm to its victims.  Even if the First Amendment offers teenagers some right to self-produce sexually explicit images of themselves, it does not follow that teenagers have a right to employ, use, persuade, induce, entice, or coerce minors to self-produce such images.

   The Court recognizes that lucid arguments support that government should not prosecute teenagers for consensual sexting.  See, e.g., Sarah Wastler, The Harm in "Sexting"?: Analyzing the Constitutionality of Child Pornography Statutes That Prohibit the Voluntary Production, Possession, and Dissemination of Sexually Explicit Images by Teenagers, 33 Harv. J. L. & Gender 687, 698 (2010).  Indeed, several commentators have sounded the alarm against a potential wave of state prosecutions for teenage sexting.  See, e.g., Catherine Arcabascio, Sexting and Teenagers: OMG R U Going 2 Jail???, XVI Rich. J.L. & Tech. 3 (2019); Carmen Naso, Sext Appeals: Re-Assessing the Exclusion of Self-Created Images from First Amendment Protection, 7 Crim. L. Brief 4 (2011); Lawrence G. Walters, How to Fix the Sexting Problem: An Analysis of the Legal

and Policy Considerations for Sexting Legislation, 9 First Amend. L. Rev. 98 (2010). Prosecutorial indiscretion and differences of legislative judgment, however, do not demand constitutionalizing, and removing from legislatures' reach, a broad and growing ambit of behavior with proven, harmful consequences. Whatever conduct § 2251(a) proscribes, the First Amendment does not protect it.

### B. EVEN IF THE FIRST AMENDMENT PROTECTS SOME TEENAGE SEXTING, § 2251(a) IS NOT OVERBROAD.

Although the Court concludes that the First Amendment does not protect teenage sexting, § 2251(a) would not be overbroad even if some teenage sexting is protected. Although § 2251(a) is relatively precise in what it proscribes, see supra Section I, it is a challenge to determine § 2251(a)'s applicability to teenage sexting, as studies use vague definitions or do not generally consider sexts' contents or recipients. See Meta-Analysis at 330. Some studies use broad language, such as "a revealing or sexual photo of yourself." 2015 Pennsylvania Survey at 192. Another study asks whether teenagers had seen or sent sexts that "showed breasts, genitals, or someone's bottom." Prevalence and Characteristics at 4. Four categories of images that the Prevalence and Characteristics study asked about could meet § 2256(2)(A)'s definition of "sexually explicit conduct" and thus fall under § 2251(a): (i) "genitals"; (ii) "someone completely nude"; (iii) "sexual intercourse"; and (iv) "masturbation," Prevalence and Characteristics at 6 -- although (i) and (ii) would not automatically meet § 2256(2)(A)'s definition, which requires "lascivious exhibition of the genitals or pubic area," 18 U.S.C. § 2256(2)(A).

Streett defines "teenage sexting" as "self-produced nude images that a teenager typically produces with their cellular telephone and then transmits to a teenage peer, typically a partner with whom the producer of the image is involved in a romantic relationship." Motion at 1 n.1. As

discussed above, this is an incredibly broad definition which includes conduct that § 2251(a) does not prohibit. See 18 U.S.C. § 2251(a) (criminalizing employing, using, persuading, inducing, enticing, or coercing a minor to engage in "sexually explicit conduct for the purpose of producing any visual depiction of such conduct"); 18 U.S.C. § 2256(2)(A) (defining "sexually explicit conduct" as "actual or simulated -- (i) sexual intercourse . . .; (ii) bestiality; (iii) masturbation; (iv) sadistic or masochistic abuse; or (v) lascivious exhibition of the genitals or pubic area of any person"). The issue that the Court must decide is whether there is a smaller subset of Streett's definition of "teenage sexting" that Congress has criminalized in § 2251(a) and which the First Amendment protects.

Streett argues that § 2251(a) is overbroad "in terms of the amount of speech it prohibits and the number of people it affects." Motion at 8. Streett provides statistics that, he contends, demonstrate that § 2251(a) prohibits a substantial amount of speech: 15% of sixteen-year-olds and 18% of seventeen-year-olds have engaged in sexting, see Motion at 8-9. According to Streett, those numbers suggest that "between 3 and 4 million teenagers have participated in sexting," and that the most did so as part of an existing romantic relationship. Motion at 9 (citing NCMEC Statement at 5).

The United States responds, first, that "fewer than 1.3% of teenagers appeared in or created" sexts that § 2251(a) prohibits. Surreply at 13 (citing Prevalence and Characteristics at 1). The United States also contends that, regardless how many teenagers engage in sexting that § 2251(a) prohibits, the Court should weigh § 2251(a)'s potential chilling effects against its utility, and argues that there is "no evidence before the court [that] substantial amounts of protected conduct are being chilled by § 2251, relative to its plainly legitimate purpose of targeting the sexual exploitation of children." Response at 6. The United States adds that the "government's

paramount interest in protecting children from sexual exploitation by adults -- which courts have recognized is legitimate even when it involves consent of the minor and other self-destructive behavior -- is not outweighed by the production of any protected conduct."  Response at 7.

First Amendment overbreadth doctrine is an exception to the bedrock principle that "a person to whom a statute may constitutionally be applied will not be heard to challenge that statute on the ground that it may conceivably be applied unconstitutionally to others, in other situations not before the Court."  Broadrick v. Oklahoma, 413 U.S. at 610.  This principle reflects the heart of American jurisprudence: "under our constitutional system courts are not roving commissions assigned to pass judgment on the validity of the Nation's laws."  Broadrick v. Oklahoma, 413 U.S. at 610-11.  Accordingly, the doctrine of First Amendment overbreadth is closely circumscribed such that a statute is only constitutionally overbroad if its overlap with protected speech is "substantial."  Broadrick v. Oklahoma, 413 U.S. at 615-16.  As to where the line is between insubstantial overbreadth and substantial overbreadth, the Supreme Court has stated:

> The concept of substantial overbreadth is not readily reduced to an exact definition.  It is clear, however, that the mere fact that one can conceive of some impermissible applications of a statute is not sufficient to render it susceptible to an overbreadth challenge.  On the contrary, the requirement of substantial overbreadth stems from the underlying justification for the overbreadth exception itself -- the interest in preventing an invalid statute from inhibiting the speech of third parties who are not before the Court.
>
> "The requirement of substantial overbreadth is directly derived from the purpose and nature of the doctrine.  While a sweeping statute, or one incapable of limitation, has the potential to repeatedly chill the exercise of expressive activity by many individuals, the extent of deterrence of protected speech can be expected to decrease with the declining reach of the regulation."  Ferber, 458 U.S. 747, 772 (1982).  In short, there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the Court for it to be facially challenged on overbreadth grounds.

Members of the City Council of L.A. v. Taxpayers for Vincent, 466 U.S. 789 at 800-01 (footnote omitted)(citations omitted).  The Supreme Court has cautioned:

> Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is "strong medicine" and have employed it with hesitation, and then "only as a last resort."

Ferber, 458 U.S. at 769 (quoting Broadrick v. Oklahoma, 413 U.S. at 613).  See Los Angeles Police Dep't v. United Reporting Publ'g. Corp., 528 U.S. 32, 39 (1999)("[T]he overbreadth doctrine is not casually employed").

Turning to § 2251(a), the Supreme Court upheld language similar to § 2251(a)'s operative phrase -- directed at "[a]ny person who employs, uses, persuades, induces, entices, or coerces any minor" to participate in child pornography, 18 U.S.C. § 2251(a) -- in Williams.  In that case, the Supreme Court addressed whether 18 U.S.C. § 2252A(a)(3)(B)'s prohibition against "advertis[ing], promot[ing], present[ing], distribut[ing], or solicit[ing]" purported child pornography was overbroad.  553 U.S. at 293-94.  The Supreme Court first limited "promotes" and "presents" in light of their neighboring verbs, and concluded that the statute applied to transactional behavior involving child pornography.  Williams, 553 U.S. at 294.  Noting that "[o]ffers to engage in illegal transactions are categorically excluded from First Amendment protection," the Supreme Court accordingly concluded that the statute's criminalization of offering or requesting child pornography, when done with the intent that the transaction's subject depict real children, is not overbroad.  Williams, 553 U.S. at 285.  See id. at 303.  Applying a similar construction, § 2251(a) regulates the act of enticing or coercing a minor to engage in child pornography; it does not regulate speech.  Similarly, § 2251(a)'s language makes it unsusceptible to the kind of overbreadth that the Supreme Court identified in Free Speech Coalition, where it

- 113 -

struck a statutory provision that "criminalized the possession and distribution of material that had been pandered as child pornography, regardless of whether it actually was that." Williams, 553 U.S. at 289 (citing Free Speech Coalition, 535 U.S. at 257). Under § 2251(a), a person could not "face prosecution for possessing unobjectionable material that someone else had pandered," Williams, 553 U.S. at 289, as § 2251(a) prohibits coercing or inducing a child to engage in child pornography's creation, see 18 U.S.C. §§ 2251(a), 2256(1)-(2)(A).

"[O]verbreadth claims, if entertained at all, have been curtailed when invoked against ordinary criminal laws that are sought to be applied to protected conduct." Broadrick v. Oklahoma, 413 U.S. at 613. Section 2251(a) is an ordinary criminal law, and it does not apply to protected conduct, much less to protected speech. Government has an "indisputably compelling interest in protecting children from the documented ills of child pornography." United States v. Fletcher, 634 F.3d 395, 402 (7th Cir. 2011), as amended (Feb. 23, 2011). Section 2251(a) targets those ills' source by prohibiting coercion or cajolery aimed at getting children to participate in child pornography. As the Supreme Court has described, such a prohibition does not regulate speech, but rather "[o]ffers to engage in illegal transactions," which are "categorically excluded from First Amendment protection." Williams, 553 U.S. at 297. Section 2251(a) makes no distinction between the age of the coercer or cajoler and the caselaw does not support that the First Amendment requires such a distinction. Accordingly, § 2251(a) is not overbroad.

114.     Even if § 2251(a) applies to minors voluntarily self-producing sexually explicit images of themselves and even if such behavior is constitutionally protected, its unconstitutional applications are insignificant relative to the overall number of applications. First, § 2251(a) does not proscribe vast swaths of teenage behavior. A Typology cites one study which found that "4% of [youth aged twelve to seventeen] has created and sent 'sexually suggestive nude

or nearly nude' images." A Typology at 2 (quoting Amanda Lenhart, "Teens and sexting: How and why minor teens are sending sexually suggestive nude or nearly nude images via text messaging," in PEW Research Center, Millennials: A Portrait of Generation Next (2009)).[33] Prevalence and Characteristics shows that 0.13% of adolescents creating or appearing in such images and 1.06%[34] of adolescents receiving such images would plainly meet § 2256(2)(A)'s definition of "sexually explicit conduct" and thus fall under § 2251(a). See Prevalence and Characteristics at 6 tbl. 3. In True Prevalence, the authors discuss several studies and surveys of teenage sexting, and conclude: "While sexting does seem to occur among a notable minority of adolescents, there is little reliable evidence that the problem is as far-reaching as many media reports have suggested." True Prevalence at 4. Further, several studies that find higher rates of sexting present methodological problems. For example, some studies that Streett cites rely on polling samples that included eighteen- and nineteen-year-olds -- who are statistically more likely to engage in sexting than younger teenagers -- and the studies use ambiguous definitions of sexting that may not amount to content that § 2251(a) proscribes. See True Prevalence at 2-6 (noting that several frequently cited studies use definitions that "could include many types of images that are not illegal under federal law" ); Prevalence and Characteristics at 1 (concluding that one percent of "youth had appeared in or created nude or nearly nude pictures or videos," a definition far broader than that which § 2256(2)(A) provides). The Court is wary of reading too much into the

_____

[33]This study addresses only sexts sent by text message and does not include messages sent by more contemporary digital means. See True Prevalence at 3-4.

[34]Thirteen percent of the 5.9% of adolescents who received sexually explicit images of minors stated that they depicted masturbation and 5% stated that the images depicted sexual intercourse. See Prevalence and Characteristics at 6 tbl. 3. This means that only 18% of the 5.9% can clearly be determined to meet the federal definition of sexually explicit content.

absence of federal prosecutions of teenagers for sexting, given the FJDA. Nonetheless, that the Court could find no instances of any federal prosecution for the what the Court understands as consensual or experimental sexting does not suggest substantial overbreadth.

Streett describes at length state prosecutions for sexting. See Court's Findings of Fact, supra, ¶¶ 89-101. In searching Google, Dr. Strasburger describes that he found more than a dozen state prosecutions of teenagers for sexting from 2017-2018, including those where a teenager who shared a self-produced image was both offender and victim. See Sept. Tr. at 145:17-23 (Strasburger). That state and local law enforcement might be prosecuting teenage sexting might amount to a policy reason for changing local legislation, but this information does little to demonstrate that § 2251(a) is substantially overbroad.

The Court then compares § 2251(a)'s arguably unconstitutional application to consensual teenage sexting against its undoubtedly constitutional application to abusive child pornography. Section 2251(a) validly applies where, for example, a man intoxicates a thirteen-year-old girl to the point of unconsciousness and films himself assaulting her. See United States v. Jeronimo-Bautista, 425 F.3d 1266, 1268 (10th Cir. 2005). It applies where an adoptive father forces his eight-year-old daughter to pose in sexually explicit photographs. See United States v. Croxforx, 170 F. App'x 31, 33 (10th Cir. 2006)(unpublished). It applies where a defendant films himself sexually assaulting his thirteen-year-old stepdaughter, see United States v. Culver, 598 F.3d 740, 744-45 (11th Cir. 2010), or a five-year-old and a two-year-old left in his care, see United States v. Grzybowicz, 747 F.3d 1296, 1301 (11th Cir. 2014). The United States has satisfied its burden to demonstrate § 2251(a)'s lack of overbreadth, substantial or otherwise. See Doe v. City of Albuquerque, 667 F.3d 1111, 1120 (10th Cir. 2012).

**IT IS ORDERED** that the Defendant's Motion to Dismiss Counts 3 Through 7 of Second

Superseding Indictment, filed December 1, 2017 (Doc. 77), is denied.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

John C. Anderson
   United States Attorney
Sarah Jane Mease
Nicholas Jon Ganjei
Alexander Mamoru Max Uballez
   Assistant United States Attorneys
United States Attorney's Office
Albuquerque, New Mexico

       *Attorneys for the Plaintiff*

Alexandra W. Jones
Jones Law Firm, LLC
Albuquerque, New Mexico

--and--

Robert R. Cooper
Johnn S.L. Osborn
Robert Cooper Law Firm
Albuquerque, New Mexico

--and--

Harry I. Zimmerman
Harry Ira Zimmerman Attorney at Law
Albuquerque, New Mexico

--and--

Martin Lopez, III
Martin Lopez, III, P.C.
Albuquerque, New Mexico

       *Attorneys for the Defendant*